# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MADELINE M. COX                                  :
2613 Apple Way                                   :
Dunkirk, MD 20754                                :
                                                 :
    Plaintiff,                :
                                                 :
v.                                               :   Case No.
                                                 :   Judge:
GRAPHIC COMMUNICATIONS                           :   Deck Type:   Labor/ERISA
CONFERENCE/INTERNATIONAL                         :
BROTHERHOOD OF TEAMSTERS,                         :
1900 L Street, NW                                :
Washington, DC 20036                             :
                                                 :
GRAPHIC COMMUNICATIONS                           :
NATIONAL HEALTH AND                              :
WELFARE FUND,                                    :
Five Gateway Center, Suite 620                   :
60 Boulevard of the Allies                       :
Pittsburgh, PA 15222                             :
                                                 :
BOARD OF TRUSTEES OF THE                         :
GRAPHIC COMMUNICATIONS                           :
NATIONAL HEALTH AND                              :
WELFARE FUND,                                    :
1900 L Street, N.W.                              :
Washington, DC 20036                             :
                                                 :
GEORGE TEDESCHI, Individually                    :
And as President                                 :
GRAPHIC COMMUNICATIONS                           :
CONFERENCE/INTERNATIONAL                         :
BROTHERHOOD OF TEAMSTERS,                        :
1900 L Street, NW                                :
Washington, DC 20036                             :
                                                 :
    Defendants.               :

## COMPLAINT

## Introduction

Defendants wrongfully denied retirement health insurance benefits to Plaintiff Madeline Cox ("Cox"), a long term administrative employee of the Defendant Graphic Communications Conference of the International Brotherhood of Teamsters ("GCC/IBT" or "Employer"), when she retired at age fifty-five (55). Plaintiff was the Executive Secretary to the President of the Graphic Communications International Union ("GCIU"), the predecessor of the GCC/IBT, and thereafter the Executive Secretary to the Executive Assistant to the President of the GCC/IBT. Plaintiff is entitled to these retiree health benefits pursuant to the collective bargaining agreement between her union, the Office and Professional Employees International Union Local 2 ("OPEIU") and her Employer, and the governing ERISA Plan documents. Defendant Graphic Communications National Health and Welfare Fund ("Health & Welfare Fund") is responsible for providing the benefits to Plaintiff. Due to the pressure and influence of defendant George Tedeschi ("Tedeschi"), defendant Board of Trustees of the Graphic Communications National Health and Welfare Fund ("Board of Trustees") wrongfully denied the award of benefits to Plaintiff.

## JURISDICTION, VENUE AND PARTIES

1.      This Court has jurisdiction over the parties pursuant to 29 U.S.C. § 1132, as plaintiff seeks to recover retirement health care benefits due to her under the terms of her benefits plans, controlled and administered by defendants. Venue lies within this judicial district pursuant to 28 U.S.C. § 1391 as the violations alleged herein took place in this district.

2.      Plaintiff Cox, an adult individual residing at 2613 Apple Way Dunkirk,

MD 20754, was an employee of the GCC/IBT Supplemental Retirement and Disability Fund ("SRDF") between 1973 and 1996. From 1997 until her March 31, 2006 retirement, she worked for the GCIU, and its successor the GCC/IBT at its office in the District of Columbia. Cox is a "participant" of said plan under 29 U.S.C. § 1002(7) and (8).

3.      Defendant GCC/IBT is an international labor union with local unions across the United States and in Canada, with its headquarters and principal place of business located at 1900 L Street, NW, Washington, DC 20036.

4.      Defendant Health & Welfare Fund is a national health and welfare plan established for the welfare of GCC/IBT members, with its principal place of business at Five Gateway Center, Suite 620, 60 Boulevard of the Allies, Pittsburgh, PA 15222. The Health & Welfare Fund is an employee welfare benefits plan within the meaning of ERISA, 29 U.S.C. §1002(1).

5.      Defendant Board of Trustees controls defendant Health & Welfare Fund, and its principal place of business is 1900 L Street, N.W., Washington, DC 20036. The Board of Trustees are plan fiduciaries and plan administrators within the meaning of ERISA, 29 U.S.C. § 1002.

6.      Defendant Tedeschi is the President of the GCC/IBT, and has a business address at 1900 L Street, N.W., Washington, DC 20036. Defendant Tedeschi also materially affects, pressures and influences the decisions of the Board of Trustees of defendant Health & Welfare Fund.

### FACTS

7.      Plaintiff was employed for over 32 years, from 1973 until her retirement

on March 31, 2006, as an Executive Secretary for the Defendant GCC/IBT or its predecessor, GCIU and related entities.  Between 1973 and December 1996, Cox was employed by the GCC/IBT Supplemental Retirement and Disability Fund as an Executive Secretary.  From 1997 until her retirement, she was employed as an Executive Secretary to the President of the GCIU, initially for James Norton and later she was assigned to serve as the Executive Secretary to Richard Whitworth, the Executive Assistant to President Tedsechi. At the time of her retirement, she was age fifty-five (55).

8.    Throughout her employment, Cox was a member of the union representing administrative employees, the Office and Professional Employees International Union Local 2 ("OPEIU").

9.    On March 1, 1997, the GCC/IBT and employers in the graphic communications industry entered into a Trust Agreement in order to create a national health and welfare fund to provide health and life insurance benefits for employees in the graphic communications industry.

10.    Pursuant to the Trust Agreement, defendant Health & Welfare Fund was created "to provide for the deposit of income, payment of health and life insurance benefits, and to hold present and future assets accumulated for the purpose of providing health and life insurance benefits for Plan participants."    (A copy of the Agreement and Declaration of Trust of the Graphic Communications National Health and Welfare Fund is attached hereto as Exhibit A).

11.    Under the Trust Agreement, a "Participating Employer" is defined as "An Employer in the graphic communications industry which, pursuant to a collective bargaining agreement with a local union of the GCC/IBT, is required to contribute to the

4

National Fund on behalf of employees directly, not *vis-à-vis* Participating Local Union Fund."

12.    Effective October 1, 1997, the Graphic Communications International Union ("GCIU"), which was predecessor to the GCC/IBT, and OPEIU entered into a collective bargaining agreement (hereinafter referred to as the "GCIU-OPEIU contract"). On October 1, 2001, the GCIU-OPEIU contract was renewed effective pursuant to similar terms. On September 13, 2005, pursuant to a letter agreement between the parties, the GCIU-OPEIU contract was extended effective to September 30, 2007. A copy of the most recent labor contract is attached hereto as Exhibit B .

13.    Pursuant to Section 2.02 of the GCIU-OPEIU contract, Plaintiff Cox, who was a "current secretar[y] to the President . . . [was] guaranteed a job with the Employer without any loss of seniority and without any loss in pay, and . . . in the future, [to] receive any increases negotiated by the Union."

14.    Effective May 1, 1998, on July 1, 2001, a Special Participation Agreement between the GCIU and the Board of Trustees was made and entered into, in which the GCIU agreed to make contributions to the defendant Health & Welfare Fund. Additionally, pursuant to the Special Participation Agreement, the GCIU agreed to be bound by all of the terms and provisions of the Trust Agreement. The Special Participation Agreement stated further that:

> The eligibility standards for employees and former employees of the Employer for participation in the Fund shall be determined solely by reference to the Bargaining Agreement [defined as "said collective bargaining agreements as in effect from time to time hereinafter] that shall be interpreted in accordance with its terms and procedures, or other agreement between the Employer and the Local Union.

(A copy of the Special Participation Agreement is attached hereto as Exhibit C).

15.    Additionally, in the late 1990's, the Officers, Representatives and

Organizers Pension Plan ("ORO"), which covered officers, representatives and

organizers of the GCC/IBT, was expanded to provide coverage to department heads and

executive secretaries.  As a result of this expansion, plaintiff also became covered by the

ORO, which provided participants health and welfare benefits until Medicare retirement

age.  Under the ORO, health and welfare benefits were provided by the GCIU National

Health and Welfare Plan.  Plaintiff was vested in the ORO pension plan at the time of her

retirement.

16.    The Trust Agreement (Exhibit A hereto), the collective bargaining

agreement (Exhibit B hereto), the Special Participation Agreement (Exhibit C hereto),

and the ORO (Exhibit D hereto) are governing plan documents within the meaning of

ERISA, 29 U.S.C. §1002.

17.    The GCIU-OPEIU contract (Exhibit B hereto) was in effect at the time

Plaintiff retired on March 31, 2006. The GCIU-OPEIU contract provided three separate

pension benefits, along with lifetime retirement health insurance benefits, for covered

employees including Plaintiff Cox.  In Article XIV, entitled "Pension, Health,

Hospitalization and Life Insurance Programs," the labor contract states that:

> The Employer [GCIU] agrees that all employees covered by this
> agreement will continue to be participants in the Employer Retirement
> Pension Program. . . and the Graphic Communications International Union
> Supplemental Retirement and Disability Pension Program.  Additionally,
> the contract stated that "The Employer shall withhold 6% from each
> employee's gross weekly wages and shall forward such amounts . . .  to
> the Inter-Local Pension Fund . . . .

Plaintiff was vested in these three GCIU/IBT pension plans at the time of her retirement.

18.    Regarding retirement health benefits, the GCIU-OPEIU contract (Exhibit

B hereto) in effect at the time of plaintiff's retirement stated that:

> The Employer agrees to cover the employees of the Graphic
> Communications International Union under the same Health and Welfare
> Plan presently in effect, and this premium is to be fully paid by the
> Employer.

> Effective May 1, 1998, the Employer shall change health and welfare
> coverage from the current plan to the GCIU National Health and Welfare
> Plan. Premiums **shall continue to be fully paid by the Employer. There
> will be no reduction in benefits,** with improvements to be added where
> they already exist in the plan (see Exhibit B). Effective January 1, 2002,
> eye care shall be increased to a maximum of $400 every two years and
> dental shall be increased to $2,250 per year. Effective January 1, 2003,
> dental shall be increased to $2,500 per year. The Lifetime Maximum
> Benefit for Orthodontia shall remain at $1,200.

19.     The Health and Welfare Fund published and disseminated a summary plan

description booklet, titled "Graphic Communications National Health and Welfare Fund,

Summary Plan Description Booklet" ("SPD Booklet") which described the plan's

benefits in terms geared to be readily understood by the plan participants. The pertinent

provisions of the SPD Booklet are attached hereto as Exhibit E. The SPD Booklet is a

governing plan document within the meaning of ERISA, 29 U.S.C. §1002.

20.     The GCIU-OPEIU contract provisions concerning health and welfare

benefits, along with the Health and Welfare Fund plan documents, have been interpreted

by the parties as providing a vested, continuing, fully paid benefit from the time of an

employee's retirement under one of the contractual pension plans, until the time the

retiree becomes eligible for Medicare or until the employee dies, at which time the

benefit levels are reduced as described in the plan. After attaining Medicare eligibility,

Medicare becomes the primary insurer and supplemental coverage is provided by the

GCIU through AARP. The parties have, through past practice, construed the contract

provisions to provide this continuing retirement health and welfare benefits for life for

other retirees, regardless of the age at which the employee elected to retire.

21.     Under the collective bargaining agreement in effect at the time of Cox's retirement, and under the applicable terms of the Health and Welfare Fund governing plan documents, Cox was eligible for vested, continuing fully paid health and welfare benefits until she reached the age of Medicare eligibility or until her death, and she and/or her dependents were entitled to reduced benefits for life after she reached Medicare eligibility or for a 12 month period after her death.

22.     Under the Health & Welfare Fund SPD Booklet, a "Retiree" is defined as "[a] retired Employee who is receiving monthly pension benefits from a qualified retirement plan established for Employees in the graphic communications industry."

23.     Pursuant to the applicable eligibility rules published in the SPD Booklet for the Health & Welfare Fund, eligibility for retirees is defined as follows:

> In the event the employee retires directly from employment with the GCIU and is eligible for retirement benefits from a GCIU-sponsored pension plan in which the GCIU participates, coverage under the National Plan will continue, at GCIU's expense, until the employee attains age 65. Upon attainment of age 65, Medicare becomes the primary insurer and supplemental coverage is provided by the GCIU though [sic] AARP.

24.     According to the SPD Booklet for the Health & Welfare Fund, health coverage for eligible retirees and dependents lasts until they reach age 65 and are eligible for Medicare coverage.  Upon reaching Medicare age, coverage for retirees and Dependents continues to be provided through a Medicare Supplement policy.  After the death of a covered Retiree, coverage continues for a covered Dependent for an additional 12 months.

25.     Since March 31, 2006, Cox has been a retired Employee who is receiving monthly pension benefits from a qualified retirement plan established for Employees in

8

the graphic communications industry and has therefore been a retiree eligible for fully-paid health and welfare benefits pursuant to the eligibility rules stated for the defendant Health & Welfare Fund and pursuant to the collective bargaining agreement in effect at the time she retired.

26.    From 1997 until 2000, Cox worked as an executive Secretary for the then-president of the Graphic Communication International Union, James Norton. When Norton retired, Cox worked as an Executive Secretary in the President's office of Norton's successor, George Tedeschi ("Tedeschi"), who exhibited personal animus towards Cox before her retirement.

27.    Cox retired on March 31, 2006, by application memo dated March 9, 2006. At that time, Tedeschi informed Cox that she would not be provided retirement heath care benefits because Cox was under 60 years of age at the time of her retirement, and because it would be a financial burden on GCC/IBT.

28.    Despite having applied for retirement health benefits, defendants repeatedly denied Cox's requests, and she currently receives no retirement health and welfare benefits, even though she is entitled to such benefits under the governing terms of the Health and Welfare Fund plan documents.

29.    There are no terms in the applicable collective bargaining agreement or in the Health & Welfare Fund denying health and welfare coverage to retirees under age 60. Defendant Health & Welfare Fund has followed a consistent past practice of providing health and welfare benefits to retirees, regardless of the age of their retirements. Additionally, there are other similarly-situated retirees to Cox, who received and/or are receiving fully paid health and welfare benefits despite retiring before age 60.

30.     A few days after Cox's retirement, on or about April 7, 2006, defendant Health & Welfare Fund, by letter, issued a Termination of Health Insurance Coverage (Termination) to Cox, her spouse and eligible dependent, which stated that they were no longer eligible to be covered as of April 1, 2006, which was the alleged date of Cox's "qualifying event," i.e., her retirement.

31.     Cox appealed the denial of her benefits to the GCC/IBT General Board. However, Tedeschi refused to place the appeal before the General Board, stating that Cox, though an employee, was not a member of the GCC/IBT, and thereby blocked consideration of her appeal.  Some members of the GCC/IBT General Board knew of and objected to the handling of Cox's situation, but did not effectively protest her treatment by Tedeschi.  The OPEIU declined to pursue the matter on Cox's behalf.

32.     Subsequently, on April 2, 2007, Cox, by counsel, filed a Notice of Claim of Plan Benefits with defendant Health & Welfare Fund, and requested, *inter alia,* reconsideration of the Termination of benefits.

33.     On April 17, 2007, defendant Health & Welfare Fund, by counsel, wrote to Cox's undersigned counsel, and stated Cox was dropped from the eligibility report provided to the Health & Welfare Fund by her employer, GCC/IBT.  In this communication, the Health & Welfare Fund stated further that the GCC/IBT had notified it that, under the plan of benefits negotiated between the employer and the collective bargaining representative, Cox was not entitled to health care benefits following termination of employment.

34.     The Health & Welfare Fund also stated that the letter of Cox's counsel, dated April 2, 2007, had been forwarded to the GCC/IBT with a request for an

10

explanation of the determination that Cox was no longer eligible for coverage. The

Health and Welfare Fund stated that once it had received a response, it would respond

further to the referenced April 2, 2007 letter.

35.    On June 8, 2007, and nearly two (2) more months having elapsed, Cox, by

counsel, wrote to the Health & Welfare Fund's counsel, and again requested an

explanation as to the denial of health coverage benefits. However, to date, there has been

no response.

36.    Cox has consequently exhausted her internal plan remedies.

37.    Having been retired since March 31, 2006, Cox has suffered ongoing and

irreparable harm by virtue of being denied the health insurance coverage to which she

would have been otherwise entitled as a GCC/IBT retiree. She has incurred significant

monetary expense in obtaining alternative private health care for herself and her spouse

and will incur such expenses for the remainder of her lifetime. From her retirement

through April 30, 2008, Cox has had to pay $28,179.75 in health care costs that would

have otherwise been covered. More importantly, she has had to defer major testing for a

health condition that has claimed the lives of several family members due to the cost of

the tests, which has caused her severe mental anguish.

## COUNT I
## VIOLATION OF ERISA PLAN

38.    Plaintiff repeats and incorporates the allegations of paragraphs one (1)

through thirty-seven (37) as if fully stated herein.

39.    Plaintiff brings this action under 29 U.S.C. §1132 (a)(1)(B) to recover

benefits due her under the terms of her plan, to enforce her right to benefits under the

terms of the plan, and to clarify her right to future benefits under the terms of the plan.

11

40.    Plaintiff is entitled to retirement health care coverage under the terms of the governing plan documents, which include the collective bargaining agreement between the GCC/IBT and OPEIU; the plan documents governing the defendant Health & Welfare Fund, and the applicable Summary Plan Description booklet for the Health & Welfare Fund.

41.    Defendants breached their obligations to plaintiff under the terms of the applicable plan documents by arbitrarily, capriciously and wrongfully denying her retirement health coverage at the time of her retirement on March 31, 2006 and thereafter.

42.    Defendants' refusal and failure to provide Cox's retirement health care benefits violates the terms of said plans.

## COUNT II
## INTERFERENCE WITH RIGHT TO BENEFITS

43.    Plaintiff repeats and incorporates the allegations of paragraphs one (1) through forty-two (42) as if fully stated herein.

44.    Defendant Tedeschi, individually, and as President of the GCC/IBT, discriminatorily denied Plaintiff health benefits on the purported ground that she retired prior to age 60, knowing that other retirees covered by the Plan were receiving such benefits.  Due to defendant Tedeschi's pressure and influence, the defendant Board of Trustees confirmed this discriminatory denial of plaintiff's benefits.

45.    By discriminatorily denying Plaintiff the retiree health benefits she was entitled to under the Plan, Defendant Tedeschi interfered with Plaintiff's attainment of the right to health care benefits which she had become entitled to in violation of ERISA Section 510,  29 U.S.C. § 1140.

## COUNT III
## BREACH OF CONTRACT

46.     Plaintiff repeats and incorporates the allegations of paragraphs one (1) through forty-five (45) as if fully stated herein.

47.     Defendant GCC/IBT breached the applicable contracts that obligated the defendant Health & Welfare Fund to provide her with vested, continuing, fully paid retiree health care benefits.  Defendant GCC/IBT committed the breach by wrongly denying plaintiff coverage in the Health & Welfare Fund upon her retirement or by wrongly instructing the Health & Welfare Fund that plaintiff was not eligible for coverage.

48.     Plaintiff has no remedy available to her through the OPEIU-GCC/IBT grievance procedure because she is retired and, even though an honorary lifetime union member, has no right to collective bargaining representation from the OPEIU.

49.     Plaintiff exhausted her internal plan remedies.

50.     As a result of Defendant GCC/IBT's breach, Plaintiff has suffered irreparable harm for which she has no adequate remedy at law.

51.     As a further result of Defendant's breach, Plaintiff has suffered other monetary loss, for which she is entitled to an award of compensatory damages.

WHEREFORE, plaintiff Madeline M. Cox respectfully requests that this Court:

A.     Determine that defendants are obligated under ERISA to provide retiree health care benefits to plaintiff and her covered dependent spouse as set forth in the applicable bargaining agreements and plan documents.

B.     Determine that Defendants have discriminated against Plaintiff concerning her plan rights and benefits;

13

C.    Enter permanent injunctive relief requiring defendants to provide the retiree health care benefits provided for in the applicable plan documents during the lifetime of plaintiff.

D.    Order defendants to reimburse plaintiff for any costs incurred as a result of denying her health insurance coverage since March 31, 2006 and to make her whole for any losses she has incurred.

E.    Award plaintiff attorneys' fees and costs incurred in this action.

F.    Grant such further relief as may be determined necessary and proper.

### JURY DEMAND

Plaintiff requests a jury trial of all issues so triable.

MADELINE M. COX


_____
Geoffrey M. Bohn (DC Bar #463248)
Robert A. Battey (DC Bar #463978)
BOHN & KOURETAS, PLC
P.O. Box 17811
Arlington, VA 22216
Tel:    (703) 599-7076
Fax:    (703) 842-8089


_____ BY PERMISSION GMB
Charles R. Both (D.C. Bar #42424)
1666 Connecticut Ave. N.W., Suite 500
Washington, D.C. 20009
Tel:    (202) 833-9060
Fax:    (202) 463-6686

Attorneys for Plaintiff

14

**March 27, 2006**

### AGREEMENT AND DECLARATION OF TRUST
### OF THE
### GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND
### RESTATED EFFECTIVE JANUARY 1, 2005

THIS TRUST AGREEMENT was made and entered into as of the 31st day of January 1997, effective March 1, 1997 by the Board of Trustees of the Graphic Communications National Health and Welfare Fund ("the Fund"), with its principal place of business at 1900 L Street, N.W., Washington, D.C. 20036, is hereby stated.

### RECITALS

**WHEREAS,** the Graphic Communications Conference of the International Brotherhood of Teamster ("the GCC/IBT"), formerly the Graphic Communications International Union ("GCIU"), and employers in the graphic communications industry ("the Parties") are desirous of offering local health and welfare funds created pursuant to collective bargaining agreements between GCC/IBT local unions and employers in the graphic communications industry the opportunity to participate in a national health and welfare fund, and

**WHEREAS,** the Parties aim to provide a national program which is both cost-effective and comprehensive while assisting in stabilizing the financial structure of individual health and welfare funds and effectuating a more economical distribution of welfare benefit resources, and

**WHEREAS,** the Parties established a trust fund to secure the assets accumulated for the purpose of providing such benefits, and



PLAINTIFF'S
EXHIBIT
A

Blumberg No. 5113

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 2

**WHEREAS**, to meet the foregoing goals, the Parties established a Voluntary Employees' Beneficiary Association within the meaning of Section 501(c)(9) of the Internal Revenue Code of 1986, as amended, for the purpose of creating a fund to provide for the deposit of income, payment of health and life insurance benefits and to hold present and future assets accumulated for the purpose of providing health and life insurance benefits for Plan participants, as defined in the Plan,

**WHEREAS**, the former Graphic Communications International Union merged with the International Brotherhood of Teamsters effective January 1, 2005 changing the name of the Graphic Communications International Union to the Graphic Communications Conference of the International Brotherhood of Teamsters; and

**NOW, THEREFORE**, in consideration of the premises, effective January 1, 2005 it is mutually understood and agreed as follows:

## ARTICLE I

### Definitions

**Section 1.01. Definitions.** Where the following words and phrases appear in this Trust Agreement, unless the context clearly indicates to the contrary, they shall have the respective meanings set for below:

**(a) Graphic Communications National Health and Welfare Fund (National Fund or Plan):** The written programs of surgical, hospital, or other medical

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 3

benefits, life insurance or death benefits, accidental death and dismemberment, disability, prescription drug, mental health, optical or dental benefits, or other such benefits as may be deemed appropriate by the Board of Trustees, as provided to Plan Participants.

(b) **Board of Trustees or Trustees:** The persons designated in this Trust Agreement to administer the Graphic Communications National Health and Welfare Fund and their successors.

(c) **Code:** The Internal Revenue Code of 1986, as amended.

(d) **ERISA:** The Employee Retirement Income Security Act of 1974 (Public Law 93-406), as amended.

(e) **Investment Manager:** An entity, which may include an individual, corporation or other entity named by the Board of Trustees to manage (including the power to acquire and dispose of) all or a portion of the Trust Fund, who

(i) is registered as an investment advisor under the Investment Advisors Act of 1940;

(ii) is a bank (as defined in the Investment Advisors Act of 1940); or

(iii) is an insurance company which is qualified to manage, acquire and dispose of assets of a trust exempt from federal income taxation under § 501 of the Code under the laws of more than one state;

and which has acknowledged in writing that it is a fiduciary with respect to the Fund.

(f) **Participant:** An Employee, former Employee or beneficiary who has become a Participant in the Graphic Communications National Health and Welfare Fund in accordance with the eligibility standards established by Participating Local Union

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 4

Funds or the National Fund pursuant to Article V herein and the provisions of the Plan Documents.

(g) **Trust Fund:** The assets delivered to and held by or for which the Board of Trustees are responsible hereunder and any income derived there from.

(h) **Fiscal Year:** The 12-month period beginning June 1 and ending May 31.

(i) **Participating Local Union Fund:** A Taft-Hartley, GCC/IBT Local Union health and welfare benefit fund which has been accepted for participation in the National Fund and whose board of trustees has agreed in writing to be bound by the terms of this Trust Agreement. A Participating Local Union Fund can also include a GCC/IBT Local Union, GCC/IBT entity or a joint GCC/IBT-Employer entity which has agreed to be bound to the terms of this Trust Agreement with respect to the health and welfare plan established for the benefit of its employees.

(j) **Participating Employer:** An employer in the graphic communications industry which, pursuant to a collective bargaining agreement with a local union of the GCC/IBT, is required to contribute to the National Fund on behalf of employees directly, not *vis-a-vis* a Participating Local Union Fund.

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 5

## ARTICLE II

## Establishment of Association and Trust

**Section 2.01.    Establishment.**    The Parties hereby establish a Voluntary Employees' Beneficiary Association (the "Trust") with the Trust consisting of such sums of money or other property acceptable to the Board of Trustee as shall from time to time be paid or delivered to the Board of Trustee, together with the income there from, all of which shall constitute the Trust Fund.

**Section 2.02.  Acceptance of Trust.**  The Board of Trustees accepts the Trust hereby created and agrees to hold the Trust Fund in trust upon the terms and conditions of this Trust Agreement and the National Fund.

**Section 2.03.  General Purpose.**  The Trust is intended to qualify as a Voluntary Employees' Beneficiary Association within the meaning of § 501(c)(9) of the Code. The Trust Agreement shall not be amended to cause the Trust to lose its qualification as a Voluntary Employees' Beneficiary Association Trust.  The Trust is intended to:

(a)    directly through self-funding or indirectly through an insurance carrier(s), pay or provide surgical, hospital, or other medical benefits, life insurance or death benefits, accidental death and dismemberment, disability, prescription, mental health, optical or dental benefits, or other such benefits as may be deemed appropriate by the Board of Trustees, for Plan Participants.

(b)    establish and accumulate such reserve funds as may be necessary and appropriate for the proper execution of the Trust herein created.

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 6

(c)      pay or provide for all the reasonable expenses involved in the administration of the affairs of the Trust Fund, including the employment of such administrative, consulting, actuarial, legal, accounting, expert and clerical assistance, the leasing or purchasing of such materials, supplies, equipment and property, real and personal, as may be necessary in the discretion of the Trustees. For the purpose of minimizing the expense of administration, the Trustees shall make arrangements for the administration of all record keeping of the National Fund in the office of the GCC/IBT, unless the Trustees shall otherwise determine, provided however that all assets of the Trust shall at all times be held by and in the name of the Trustees or the Trust except by direction of the Trustees.

Section 2.04. Exclusive Benefit Rule. At no time prior to the satisfaction of all liabilities to Participants under the terms of the National Fund shall any part of the corpus or income of the Trust Fund revert to any Employer or Union or be used for, or diverted to, any purpose other than for the exclusive benefit of the Participants (including reasonable expenses for administering the National Fund and the Trust as provided herein). No person shall have any financial interest in, or right to, the Trust Fund or any part thereof except as expressly provided for in the Plans and this Trust Agreement and as permitted by ERISA and the Code.

Section 2.05. Non-Alienation. No monies, property or equity of any nature whatsoever in the Trust Fund, nor benefits which shall be payable under the National Fund from the Trust Fund, shall be subject in any manner to anticipation, alienation,

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 7

sale, transfer, assignment, pledge, garnishment, encumbrance, or charge, and any attempt to do so shall be null and void; nor shall any such benefits be in any manner subject to the debts, contracts, liabilities or engagements of the person entitled to such benefits except for debts owed by Participants to the Trust Fund.

**Section 2.06. Investment of the Trust Fund.**  The Trust Fund, in its entirety, shall be invested and reinvested, without distinction between principal and income, as the Board of Trustees or its duly authorized representative may direct pursuant to Article III herein.

**Section 2.07. Fidelity Bond.**  Any person or persons receiving, holding or handling any money or other property of the Trust Fund shall be covered by fidelity bond of a type, in such amount, and issued by such bonding company as the Trustees may determine, and shall, in any event, be bonded in such form and manner as may be required by law.

## ARTICLE III

## IDENTITY AND TERM OF BOARD OF TRUSTEES

**Section 3.01. Designation of Trustees**

(a) **In General.**  At all times, the number of Trustees who may be appointed by the management and union representatives shall be equal.  Such Trustees shall be considered as "named fiduciaries", "fiduciaries", the "plan administrator" and the "plan sponsor" as those terms are defined in ERISA. The total number of Trustees, or the

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 8

number to be appointed at any time, shall not be changed, except as the parties may provide by this document or amendments thereto.

(b) **Participating Local Union Funds.** Each Participating Local Union Fund shall designate one management and one union Trustee to serve as Trustees of the Trust Fund.

(c) **Participating Employers with 250 Employees or More:** Each Participating Employer which contributes to the Trust Fund on behalf of at least 250 employees shall designate one management Trustee to serve as Trustee of the Trust Fund. In addition, the local union with which the Participating Employer has entered into a collective bargaining agreement requiring contributions to the Trust Fund shall designate one union Trustee to serve as Trustee of the Trust Fund. In the event that one local union is party to collective bargaining agreements with multiple Participating Employers which contribute to the Plan on behalf of at least 250 employees, the local union may designate only one union Trustee. And, the corresponding Participating Employers may designate only one management Trustee from among themselves which Trustee may be rotated among the Participating Employers.

(d) **Participating Employers with Fewer than 250 Employees:** Except as set forth in this paragraph, a Participating Employer which contributes to the Trust Fund on behalf of fewer than 250 employees shall not be permitted to designate a management Trustee. However, if a local union is signatory to multiple collective bargaining agreements requiring contributions to the Trust Fund on behalf of a total of at least 250

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 9

employees, then such local union shall designate one union Trustee to serve as Trustee of the Trust Fund and the Participating Employers with whom such local union is signatory to collective bargaining agreements shall, among themselves, designate one management Trustee to serve as Trustee of the Trust Fund.

Section 3.02. **Removal of Trustees**. Any designated Trustee to the Trust Fund may resign or be removed from office by the designating party, provided that a successor Trustee is immediately designated so that no intervening vacancy is permitted to exist. The designating party shall notify the Trust Fund in writing of any changes in designation of Trustees. Designation of successor Trustees to the Trust Fund shall be effective upon receipt of written notification thereof to the Trust Fund, provided, however, that receipt of such notification must be received no later than 14 days prior to an annual or other official meeting of the Trust Fund's Board of Trustees in order for the successor Trustee to be recognized as a voting member at the meeting.

Any successor Trustee appointed hereunder may qualify as such by executing, acknowledging and delivering to the Board of Trustees an instrument accepting such appointment hereunder, in such form as may be satisfactory to the Trustees, and thereupon such successor without further act, deed or conveyance, shall become vested with all the estate, rights, powers, discretion, duties and obligations of his predecessor Trustee with like effect as if originally named as Trustee herein. The word "Trustee," as used in this Trust Agreement, shall mean the Trustee who may, at any time, be acting as Trustee hereunder.

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 10

**Section 3.03. Persons Disqualified from Serving as Trustees.** No individual who has been convicted of any of the crimes listed in Section 411(a) of ERISA or who is prohibited from holding office pursuant to Section 504 of the Labor-Management Reporting and Disclosure Act (29 U.S.C. §504, as amended) shall be permitted to serve as a Trustee during the period of disqualification specified in the statute. Further, the appointment of a Trustee shall be automatically terminated if such Trustee is convicted of any of the crimes listed in Section 411(a) of ERISA.

**Section 3.04. Designation Co-Chairmen.** Two Co-Chairmen shall be elected by the Board of Trustees from among the Board of Trustees. The terms of such Officers shall commence on the date of their election and continue for three calendar years. In the event of resignation or removal of an Officer as a Trustee, the Executive Committee shall be empowered to name a replacement officer to serve out the remaining term. At all times, one office shall be held by a management Trustee and the other by a union Trustee. The Officers shall be responsible for calling, establishing the agenda, and setting the time and place of Trustee meetings and for such other responsibilities as may be delegated to them by the Trustees.

**Section 3.05. Executive Committee**

(a) There shall be an Executive Committee consisting of ten Trustees, equally divided between management Trustees and Union Trustees elected by the full Board of Trustees. The two Co-Chairmen, elected by the Trustees pursuant to Section 3.04 herein will serve in the same capacity on the Executive Committee.

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 11

(b) Between meetings of the Board of Trustees, the Executive Committee shall be empowered to administer the Trust Fund and to perform any functions delegated to the Trustees under Article IV or otherwise under this Trust Agreement subject to subsequent ratification by the full Board of Trustees. Minutes of all approved Executive Committee meetings will be promptly forwarded to all Trustees.

(c)    The Executive Committee shall meet at least twice a year, one such meeting to immediately precede the annual meeting of the full Board of Trustees.

(d) Members of the Executive Committee shall receive reimbursement by the Trust Fund for all reasonable expenses incurred in connection with their duties on the Executive Committee unless those expenses would otherwise be incurred in the performance of their duties as a member of the full Board of Trustees, such as expenses incurred in conjunction with attendance at the annual meeting of the Board of Trustees.

(e) The current Executive Committee shall serve from March 1, 1997 until February 28, 1998. Effective with the term beginning March 1, 1998, of the Trustees from the five Participating Local Funds elected to new terms by the full Board, the Trustees from two Funds shall serve for full three year terms, the Trustees from two other Funds shall serve for two years and the Trustees from the remaining Fund shall serve for one year. Thereafter, newly elected Trustees shall serve for three year terms.

**Section 3.06. Other Committees of the Board of Trustees.** The Trustees may, by resolution or other provision of the Trust Agreement, create such standing or ad

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 12

hoc committee as they deem appropriate, and allocate their fiduciary and administrative responsibilities and duties to such committees.

**Section 3.07. Term of Trustees.** Each Trustee shall serve for a maximum term of three years or, if earlier, until termination or resignation of appointment.

**Section 3.08. Compensation of Trustees.** The Trustees shall receive no compensation for their services hereunder. All expenses incurred by Trustees in connection with their participation as Trustees to the Trust Fund shall be the sole responsibility of and directly paid by the designating party unless otherwise reimbursed by the Trust Fund in accord with the provisions of this Trust Agreement.

**Section 3.09. Return of Books and Records.** In the event of the termination of appointment, resignation, or death of a Trustee, the Trustee (or his legal guardian, heirs, or personal representative) shall, upon the request of the Trustees, forthwith turn over to the Trust Fund any and all records, books, documents, monies, and other property in the possession of the Trustee, or under his or her control, that belong to the Trust Fund or that were received by him or her in his or her capacity as a Trustee.

## ARTICLE IV

## Powers and Duties of the Trustee

The Trustee shall have all the powers necessary to carry out the provisions of this Trust Agreement. In amplification, but not in limitation, of such powers, the Trustee shall have the following powers and immunities and perform the following duties:

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 13

**Section 4.01. General Duties and Powers.** It shall be the duty of the Board of

Trustees:

(a) To establish and administer any lawful employee benefit plan;

(b) To hire an administrator and/or any such other employees or professional or

technical assistance as they may require in the performance of their duties as Trustees

including the administration of such benefit plans.

(c) To determine the details of the benefit plans, including the establishment of

procedures, rules and regulations pertaining to the operation of the plan;

(d) To make amendments to such benefit plans, including amendments that

expand, restrict, or terminate all or part of the rules relating to the nature of such

benefits.

(e) To provide benefits, in whole or in part, directly from the Trust Fund or to

contract with an insurance carrier or other entity, to underwrite or provide such benefits.

(f) To enter into any and all contracts and agreements for carrying out the terms

of this Trust Agreement and for the administration of the Trust Fund and to do all acts

as they, in their discretion, may deem necessary and advisable.

(g) To establish and accumulate, as part of the Trust Fund, a reserve or

reserves adequate, in the opinion of the Trustees, to carry out the purpose of such

Trust.

(h) To pay out of the Trust Fund all real and personal property taxes, income

taxes and other taxes of any and all kinds levied or assessed under existing or future

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 14

laws upon or in respect to the Trust Fund or any money or property or securities forming part thereof.

(i) To receive Premium payments, contributions or payments from any source whatsoever to the extent permitted by law.

(j) To invest or reinvest all income or other monies not required for the payment of current benefits or expenses. The Trustees may invest or reinvest in bank accounts, savings and loan accounts, securities, mortgages, deeds of trust, notes, commercial paper, real estate, insurance contracts, and in other such property, real, personal or mixed, as they deem prudent, provided that in the making of investments, the Trustees shall diversify such investments as required by Section 404(a)(1)(C) of ERISA so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. Further, no investment shall be made which would constitute a "prohibited transaction" within the meaning of Section 406 of ERISA, provided that the Trustees shall have the authority to apply to the Secretary of Labor for a conditional or unconditional exemption from any of the "prohibited transaction" rules, as they may deem necessary in the administration of the Trust Fund and benefit plans. In the event the Trustees designate one or more banks to similar financial institutions supervised by the United States or a state to serve as custodian or the Trust Fund assets, or as a corporate trustee, or in another fiduciary capacity, the monies belonging to the Trust Fund may be invested in accounts of such bank or institution, provided that such accounts bear a reasonable interest rate. The Trust Fund shall be invested and

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 15

reinvested as a single Trust Fund, and the Trustees shall not be required to invest separately any part of the Trust Fund representing accrual of interest of any individual Participating Local Union Fund, Participating Employer or Participant.

(k) To vote any shares of stock which the Trustee may own from time to time either directly or through any duly authorized proxy.

(l) To hold in uninvested cash, such sums as they deem necessary or advisable for the cash requirements of the Trust Fund.

(m) To settle or compromise any claims, debts or damages due or owing to or from the Trust.

(n) To manage, administer, operate, lease for any period of years, develop, improve, repair, alter, demolish, mortgage, pledge, grant options with respect to, or otherwise deal with any real property or interest therein at any time held by it.

(o) To appoint a bank(s) or trust company to be designated as "custodial trustee" and to enter into and execute a trust agreement with such bank or banks or trust company or companies, to provide for the investment and reinvestment or assets of the Trust Fund, with such other provisions incorporated therein as may be deemed desirable, in the Trustees' sole discretion, for the proper management of the Trust Fund; and upon such execution to convey and transfer to such Custodial Trustee any assets of the Trust Fund and with limit with respect to the power which the Trustees may grant to such Custodial Trustee in such agreement to the extent permitted by law.

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 16

(p) To enter into agreements with trustees of other Trust Funds or benefit plans, providing for merger, joinder, or the exchange of benefit credit.

(q) To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary in the administration of the Trust Fund or to accomplish the general objective of the enabling Plan Participants to obtain health and welfare benefits in the most efficient and economical manner.

### Section 4.02. Other Trustee Powers.

(a) In addition to the foregoing powers, the Trustee shall have and possess all of the powers, rights and privileges, although not specifically set forth herein, that the Trustee may deem necessary and appropriate to administer and carry out the purposes of this Trust Agreement, except as any such rights, powers and privileges are modified or otherwise prohibited by ERISA and the Code.

(b) The Trustees shall be the sole judges of the:

      (i)     all factual determinations;

      (ii)    the standard of proof required in any case;

      (iii)   application and interpretation of the Plan; and

      (iv)   entitlement to or amount of benefits payable.

The Trustees shall exercise their authority under this Section in their discretion and each interpretation and decision made by the Trustees in the fulfillment of their responsibilities under the terms of the Plan shall be final and binding on all parties concerned unless a court with proper jurisdiction over the matter issues a final decision

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 17

that the determination of the Trustees was arbitrary, capricious, or made in bad faith and had no rational basis.

**Section 4.03. Appointment of Investment Managers.** The Board of Trustees may appoint one or more Investment Manager to manage the investment of any portion of the Trust Fund and, with respect to such portion, to confer fiduciary responsibility under ERISA. In each case where such an appointment of an Investment Manager is made, the Trustees shall ensure that: (a) such appointment is made in accordance with the terms of the Trust; (b) the Investment Manager has acknowledged in writing that it is a fiduciary with respect to the Trust and, (c) that the Investment Manager meets the criteria set forth in Article I herein.

**Section 4.04. Trustee's Liability.** The Trustees shall not be liable for the making, retention or sale of any investment or reinvestment made or received by it at the direction of the Investment Manager or for any loss to or diminution of the Trust Fund resulting from any action taken or from any act omitted by the Trustees at the direction of an Investment Manager except if due to any failure of the Trustees to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**Section 4.05. Trustee's Records of Accounts.** The Trustees shall keep a full and complete record of the administration of the Trust Fund which shall include a detailed account of all receipts and disbursements, and other transactions hereunder,

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 18

and all accounts, books and records relating thereto. Such records shall be audited at least annually by an independent certified public accountant selected by the Trustees.

## ARTICLE V

### Operation of the Trust Fund

**Section 5.01. Meetings of the Board of Trustees.** The Trustees shall meet annually to review the Trust Fund's financial status and annual audit results. The Trustees, in their sole discretion, may hold such other meetings as are deemed necessary to carry out their duties to the Trust Fund. Meetings of the Trustees, including meetings of the Executive Committee, shall be held at such time and place as agreed upon by the Co-Chairmen upon thirty (30) days' written notice to the other Trustees unless the Trustees unanimously consent, in writing, to waiver of such notice.

**Section 5.02. Secretary of the Trust Fund.** The Trust Fund shall have a Secretary who shall be appointed by the President of the GCC/IBT. The Secretary shall keep minutes and records of all meetings, proceedings and acts of the Board of Trustees and the Executive Committee and shall be responsible for sending copies of all such minutes and records to the Participating Local Union Funds and Participating Employers. Unless otherwise entitled to vote, the Secretary shall not be entitled to cast a vote solely by reason of the appointment to that position.

**Section 5.03. Quorum of Trustees .** At meetings of the Trustees, including meetings of the Executive Committee, a quorum shall consist of three (3) Trustees from

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 19

among those designated by the union and three (3) Trustees from among those designated by management.

**Section 5.04. Action By the Trustees.** Actions or decisions of the Board of Trustees or the Executive Committee may be taken only by:

(a)    written declaration, signed or approved in writing, by all persons then serving as Trustees; or

(b)    majority vote of the Trustees present and voting at a duly called meeting, provided that, in such voting, the management- or union-appointed Trustees present shall be entitled to cast the votes of all other management- or union-appointed Trustees and, if those present shall be in disagreement, then the votes of absent management- or union-appointed Trustees not present shall be similarly treated, it being the intent of this provision that the number of votes available to be cast at any meeting by management-appointed and union-appointed Trustees shall be equal.

**Section 5.05. Trustee Deadlock.** In the event that the votes cast at any meeting on any matter coming before the Trustees shall be equally divided, then any two Trustees may serve upon all Trustees written notice of request that an impartial umpire be appointed.  If, within ten (10) days, a majority of the union-appointed Trustees and a majority of the management-appointed Trustees shall not have agreed in writing upon a person to serve as such umpire, any two (2) Trustees may make written request to the Federal Mediation and Conciliation Service for the appointment of such umpire, and the said agency shall be thereby empowered to designate a person to

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 20

act as such umpire, which person shall be deemed to have been agreed upon by the

Trustees and shall have the rights and powers herein set forth. If, for any reason, the

foregoing procedure shall not result in designation of an impartial umpire, the

management-appointed and union-appointed Trustees shall have such rights as are

provided by law to petition a court or other agency for appointment of an umpire. An

impartial umpire designated pursuant to the provisions of this Section shall be

empowered to sit with the Trustees, shall hear all points of view, conduct such hearings

and investigations as such umpire may deem appropriate and attempt to resolve such

matter by agreement. If the matter in dispute shall not otherwise have been resolved at

the conclusion of such proceedings, the umpire shall have the authority to convene a

meeting of the Trustees at which the action of the Trustees with respect to the matter in

dispute shall be determined by vote on such motion or motions as any Trustees or the

umpire shall make them in writing with respect to such matter, in which vote the union-

appointed Trustees and the management-appointed Trustees shall vote in the manner

set forth above, and the impartial umpire shall cast the deciding vote, if necessary. The

reasonable fee of the impartial umpire and the expenses of the proceedings shall be

paid out of the Trust Fund. The union-appointed Trustees and the management-

appointed Trustees shall have the right to be represented by counsel and to produce

witnesses and evidence and present argument at all hearings or meetings with the

impartial umpire present, and each group of Trustees or the parties appointing them

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 21

shall bear any expense, including legal fees, of such representation and presentation, such expense not being chargeable to the Trust Fund.

**Section 5.06. Other Rules.** The Board of Trustees shall make such rules for the governing of its activities as it may deem desirable, not inconsistent with any provision of this Trust Agreement.

## ARTICLE VI

### Duties and Liabilities of

### Participating Local Union Funds and Participating Employers

**Section 6.01. Acceptance of Local Union Funds and Employers for Participation.** The Trustees shall establish procedures under which any GCC/IBT Local Union health and welfare benefit fund or employer in the graphic communications industry or GCC/IBT entity may apply for participation in the National Fund. Upon acceptance for participation, the board of trustees of the local union fund or the employer must agree, in writing, to be bound by the terms of this Trust Agreement.

**Section 6.02. Setting Eligibility Standards.**

(a) Participating Local Union Funds: It shall be the sole responsibility of each Participating Local Union Fund to determine eligibility standards for Plan Participants for whom each contributes to the Trust Fund and to determine whether benefits shall be extended to beneficiaries of Participants and, if so, to determine which class or classes

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 22

of beneficiaries shall be eligible for benefits, the eligibility rules which will apply to such class or classes of beneficiaries, and the nature and amount of such benefits.

(b) Participating Employers: Eligibility standards for Plan Participants and beneficiaries participating in the National Fund pursuant to employment with a Participating Employer will be established by the Board of Trustees, subject to the terms of any applicable collective bargaining agreement between the Participating Employer and a Local Union.

Section 6.03. Eligibility Data.    Each Participating Local Union Fund and Participating Employer shall provide the Board of Trustees, or its authorized agent, with any and all required information and data regarding Plan Participants that the Board of Trustees may reasonably request, in the form and manner requested.  The repeated failure to provide such information on a timely basis may result, at the Trustees' discretion, with the termination of participation by the Participating Local Union Fund or Participating Employer.

Section 6.04. Termination of Participation.  In the event that a Participating Local Union Fund or Participating Employer elects to terminate its participation in the National Fund or any line of coverage with the National Fund, written notice must be provided to the Board of Trustees, or its authorized Agent, no less than six (6) months prior to the first of January, with termination effective December 31.  In the event of termination of participation, any pending and unrevealed benefit claims of Plan Participants from the terminating Local Union Fund or Participating Employer will be

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 23

assets. No refund of Premiums or Reserves will be due or owing to the terminating Local Union Fund from the Trust Fund.

## ARTICLE VII

### Premium Payments to the Trust Fund

**Section 7.01. Rate of Premium.** Periodically, but not more often than annually, the Trustees, in consultation with their advisors, shall establish the Applicable Monthly Premium due on behalf of Plan Participants of each Participating Local Union Fund and Participating Employer. Each Participating Local Fund and Participating Employer shall determine the amount required to be paid to the Trust Fund by multiplying the Applicable Monthly Premium by the number of Plan Participants eligible for coverage from the respective Participating Local Union Fund or Participating Employer. The Applicable Monthly Premium is the amount established by the Trustees, in consultation with their advisors, payable monthly on behalf of Plan Participants by each Participating Local Union Fund and or Participating Employer. Such amount shall be determined based on the overall experience of the National Fund but will be adjusted for each Participating Local Union Fund and or Participating Employer.

**Section 7.02. Payment of Premium.** The total Applicable Monthly Premium due from each Participating Local Union Fund and Participating Employer shall be due by the 25th day of the month immediately preceding the month for which Plan Participants of such Participating Local Union Fund or Participating Employer are

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 24

eligible for coverage. Payment to the Trust Fund must be made in the form and manner established by the Board of Trustees.

Section 7.03. Default in Premium Payment. Participating Local Union Funds and Participating Employers in default on the first day of the calendar month for which health and welfare coverage is provided will be assessed an interest penalty at a reasonable market rate to be established by the Board of Trustees together with all expenses associated with collection. In the event that the Premium is not received by the Trust Fund by the last day of the calendar month for which coverage is provided, the Trust Fund may hold payment of all claims incurred by Plan Participants of that Participating Local Union Fund or Participating Employer until the Premium Payment is paid. In the event that the Premium is not received by the Trust Fund by the last day of the second calendar month following the month for which coverage is provided, coverage for Plan Participants of the Participating Local Union Fund or Participating Employer shall be terminated retroactive as of the first day of the month for which delinquent Premium payment was due. The Board of Trustees may take any action necessary to enforce payment of the Premium due hereunder, including but not limited to arbitration, or the initiation and prosecution of or the intervention in legal proceedings as the Trustees in their sole discretion determine to be in the best interests of the Fund for the purpose of collection such payments, money and property.

The Trustees may designate impartial arbitrators consisting of one Employer and one Union Trustee to conduct hearings by telephone or otherwise, for the purpose of

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 25

enforcing payment of Premiums, such arbitrations to be held after adequate notice to

the delinquent Participating Local Union Fund or Participating Employer. Cost, hearing

fees, liquidated damages and interest due to the date payment is made may be

assessed against the delinquent Participating Local Union Fund or Participating

Employer. Interest shall be calculated at the rate of prime plus one. Liquidated

damages shall be calculated at the rate of 20 percent of unpaid Premiums unless a

higher percentage is permitted under Federal or state law, in which case, the higher

percentage shall apply.

## ARTICLE VIII

### Trust Amendment

**Section 8.01. Right to Amend.** The provisions of this Trust Agreement may be

amended at any time by an instrument in writing, executed by a majority of the

Trustees. No amendment shall cause any part of the Trust Fund to be used for or

diverted to any purpose other than the purpose of the Trust Fund as hereinabove set

forth, said Trust Fund being held for the exclusive purposes of providing benefits and

defraying the administrative expenses of this Fund. No amendment shall permit the

return of a payment to the Trust Fund or any part thereof to any Participating Local

Union Fund or Participating Employer except for payment made by mistake of fact or

law, to the extent permitted by law; or so amend the Trust Agreement so that there shall

not be an equal number of management and union Trustees to administer the Trust

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 26

Fund. No amendment shall deprive any person without his or her consent of his or her right to any benefit which had accrued to his or her credit up to the time of such change.

**Section 8.02. Maintenance of Tax-exempt Status.** This Trust Agreement may be amended or modified retroactively in order to maintain tax exempt status as a qualified Trust under the Internal Revenue Code.

## ARTICLE IX

## GOVERNING LAW AND SEVERABILITY

**Section 9.01. Trust Created in District of Columbia.** The Trust Fund herein is created and accepted in the District of Columbia; all questions pertaining to said Trust, its validity and the administration thereof, and the construction of this Agreement, shall be determined in accordance with the laws of the District of Columbia except where preempted by Federal law.

**Section 9.02. Severability .**In case any provision of this Trust Agreement shall be held illegal or invalid for any reason, said illegality or invalidity shall not affect the remaining parts of this Agreement, but this Agreement shall be construed and enforced as if said illegal and invalid provisions had never been inserted herein.

## ARTICLE X

## TERMINATION OF TRUST

**Section 10.01. Right to Terminate Trust Fund.** The Board of Trustees expects and intends to continue to administer the Trust Fund indefinitely but reserves the right to terminate the Trust Agreement. The Trust created herein shall continue until such time

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 27

as an absolute two-thirds of the Board of Trustees vote to terminate, as evidenced by a written statement signed by them.

**Section 10.02. Procedure on Termination.** In the event of termination, the Board of Trustees may be convened for a special meeting and shall:

(a)     Make provision out of the Trust Fund for the payment of expenses incurred up to the date of termination of the Trust and the expenses incidental to such termination;

(b)     Arrange for a final audit and report of their transactions and accounts for the purpose of termination of their Trusteeship;

(c)     Apply the Trust Fund to pay any and all obligations of the Trust and distribute and apply any remaining surplus, which in their opinion, will best effectuate the purposes and intent of this Agreement, provided that a portion of this distribution may be held to fulfill the claims run-off obligations of the Trust Fund; and

(d)     Give any notices and prepare and file any reports which may be required by law.

## ARTICLE XI

### Miscellaneous Provisions

**Section 11.01. Headings.** The headings of the Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction or the interpretation of the Trust Agreement.

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 28

**Section 11.02. Binding on All Parties.** The Trust Agreement shall be binding upon heirs, executors, administrators, successors and assigns of all parties hereto, present and future.

**Section 11.03. Participant's Rights.** Neither the establishment of the Trust hereby created, nor any modification thereof, nor the creation of any fund or account, nor the payment of any benefits, shall be construed as giving to any Participant or other person any legal or equitable rights against any Participating Local Union Fund, Participating Employer, or any officer or employee thereof, or the Board of Trustees. Under no circumstances shall the terms of employment of any Participant be modified or in any way affected thereby.

**Section 11.04. Establishment Contingent Upon Tax Exemption.** The establishment of the Voluntary Employees' Beneficiary Association and the Trust is made contingent on and subject to the condition that such Voluntary Employees' Beneficiary Association meet all the statutory requirements for an organization exempt from taxation under § 501(a) of the Code. A copy of the favorable determination letter will be delivered promptly to the Trustee.

## WITNESSETH

WITNESS the signatures of the parties hereto as of the date first above written.

Attest: For the Graphic Communications Conference of the International Brotherhood of Teamsters

Robert Lacey, International Vice President

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 29

Attest:  For Participating Local Union Funds and Participating Employers:

**Philadelphia GCC/IBT Local # 14M**

_____
Andrew Douglas, Union Trustee

_____
Employer Trustee

**Milwaukee GCC/IBT Local # 7**

_____
Randall Herbst, Union Trustee

_____
Tim Burton, Employer Trustee

**Wisconsin GCC/IBT Local # 77P**

_____
Thomas Englebert, Union Trustee

_____
Rita Kantner, Employer Trustee

**Washington DC GCC/IBT Local # 144B**

_____
Union Trustee

_____
Employer Trustee

**Kansas City GCC/IBT Local # 235M**

_____
James Miller, Union Trustee

_____
Employer Trustee

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 30

**GCC/IBT Local # 404M**

_____
Paul Garcia, Union Trustee

_____
Robert Lindgren, Employer Trustee

**Washington DC GCC/IBT Local # 449S**

_____
Kenneth Gaines, Union Trustee

_____
Steve Bearden, Employer Trustee

**Grand Rapids GCC/IBT Local # 550M**

_____
Gordon Beukema, Union Trustee

_____
William Eckerle, Employer Trustee

**Evansville GCC/IBT Local # 571M**

_____
Michael Wohlhueter, Union Trustee

_____
Employer Trustee

**Kent GCC/IBT Local # 767**

_____
Steven Aldrich, Union Trustee

_____
Kara Quarles, Employer Trustee

Agreement and Declaration of Trust
of the
Graphic Communications National Health and Welfare Fund
Page 31

**Changes**

**GCC/IBT Local # 404M**

Doug Brown, Union Trustee                    8-3-06
                                             date

FIRST AMENDMENT
TO THE
GRAPHIC COMMUNICATIONS
NATIONAL HEALTH AND WELFARE FUND
AGREEMENT AND DECLARATION OF TRUST AS RESTATED EFFECTIVE
JANUARY 1, 2005

WHEREAS, the Board of Trustees ("Trustees") adopted the Graphic Communications National Health and Welfare Fund Agreement and Declaration of Trust ("Trust Agreement") to be effective March 1, 1997 and restated the Trust Agreement effective January 1, 2005;

WHEREAS, under Section 8.01 of the Trust Agreement, the Trustees reserve the right to amend the Trust Agreement at any time, subject to certain conditions not here relevant;

WHEREAS, the Trustees deem it advisable to amend the Trust Agreement in the manner hereinafter set forth;

NOW THEREFORE, BE IT RESOLVED, that the Trust Agreement be and hereby is amended effective January 1, 2005 as follows:

**1. A new Section 6.02 shall be inserted to read as follows and the remaining Sections of Article 6 shall be renumbered accordingly:**

a) Except as provided in paragraph (c) and (d) below, it shall be the sole responsibility of the Fund to comply with all notice and administration requirements under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (COBRA) with respect to Participants covered by the Fund and to collect premium payments directly from all Participants in the Fund as a result of COBRA eligibility or who are otherwise entitled to participate after termination of coverage under the Fund. Participating Local Union Funds or Participating Employers shall have no responsibility with respect to such premiums except as may be required by separate agreement between the participants and the Participating Local Union Fund or Participating Employer.

b) It shall be the sole responsibility of the Fund to provide eligible Participants in a timely manner with Certificates of Creditable Coverage as required under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and with the Disclosure Notice as required under the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Medicare Part D).

**FIRST AMENDMENT**
**TO THE**
**GRAPHIC COMMUNICATIONS**
**NATIONAL HEALTH AND WELFARE FUND**
**AGREEMENT AND DECLARATION OF TRUST AS RESTATED EFFECTIVE <u>JANUARY 1, 2005</u>**
**Page 2**

c) Paragraph (a) notwithstanding, Participating Local Union Funds and Participating Employers shall be solely responsible for providing the Fund with accurate and timely information with respect to "Qualifying Events" as defined in Treasury regulation 54.4980B-4 so that the Fund can provide affected Participants with their required COBRA notices and otherwise comply with the COBRA requirements.

d) Paragraphs (a) and (b) notwithstanding, the Fund shall be not be responsible for the administration of COBRA, HIPAA Creditable Coverage certification requirements or the Medicare Part D Disclosure Notice requirements on behalf of Participants of a Participating Local Union Fund or Participating Employer if such Participating Local Union Fund or Participating Employer has in place a separate written agreement with the Trustees to self-administer those programs.

IN WITNESS WHEREOF, we hereunto set our seals this <u>1ST</u> day of <u>November</u>, 2005.

Attest: For the Graphic Communications National Health and Welfare Fund:

_Robert Lacey, Secretary_

**SECOND AMENDMENT
TO THE
GRAPHIC COMMUNICATIONS
NATIONAL HEALTH AND WELFARE FUND
AGREEMENT AND DECLARATION OF TRUST AS RESTATED EFFECTIVE
JANUARY 1, 2005**

WHEREAS, the Board of Trustees ("Trustees") adopted the Graphic Communications National Health and Welfare Fund Agreement and Declaration of Trust ("Trust Agreement") to be effective March 1, 1997 and restated the Trust Agreement effective January 1, 2005;

WHEREAS, under Section 8.01 of the Trust Agreement, the Trustees reserve the right to amend the Trust Agreement at any time, subject to certain conditions not here relevant;

WHEREAS, the Trustees deem it advisable to amend the Trust Agreement in the manner hereinafter set forth;

NOW THEREFORE, BE IT RESOLVED, that the Trust Agreement be and hereby is amended effective May 1, 2007 as follows:

1. **The first recital shall be deleted in its entirety and replaced with the following:**

**WHEREAS,** the Graphic Communications Conference of the International Brotherhood of Teamster ("the GCC/IBT"), formerly the Graphic Communications International Union ("GCIU"), and employers in the graphic communications industry ("the Parties") are desirous of offering local health and welfare funds created pursuant to collective bargaining agreements between GCC/IBT local unions and employers in the graphic communications industry, and local unions of the International Brotherhood of Teamsters (Teamster local unions) and employers in the graphic communications industry, the opportunity to participate in a national health and welfare fund, and

SECOND AMENDMENT
TO THE
GRAPHIC COMMUNICATIONS
NATIONAL HEALTH AND WELFARE FUND
AGREEMENT AND DECLARATION OF TRUST AS RESTATED EFFECTIVE
JANUARY 1, 2005
Page 2

2.    Section 1.1(j). <u>Participating Employers</u>, shall be deleted in its entirety and replaced with the following:

(j) **Participating Employer:** An employer in the graphic communications industry which, pursuant to a collective bargaining agreement with a local union of the GCC/IBT <u>or a Teamster local union</u>, is required to contribute to the National Fund on behalf of employees directly, not *vis-à-vis* a Participating Local Union Fund.

3.    Section 6.01. <u>Acceptance of Local Union Funds and Employers for Participation</u> is shall be deleted in its entirety and replaced with the following:

The Trustees shall establish procedures under which any GCC/IBT Local Union health and welfare benefit fund, employer in the graphic communications industry, GCC/IBT entity, <u>or Teamster local union with a collective bargaining agreement with such employer,</u> may apply for participation in the National Fund. Upon acceptance for participation, the board of trustees of the local union fund or the employer must agree, in writing, to be bound by the terms of this Trust Agreement.

4.    Section 6.02. <u>Setting Eligibility Standards</u>, subparagraph (b), shall be deleted in its entirety and replaced with the following:

(b) Participating Employers: Eligibility standards for Plan Participants and beneficiaries participating in the National Fund pursuant to employment with a Participating Employer will be established by the Board of Trustees, subject to the terms of any

SECOND AMENDMENT
TO THE
GRAPHIC COMMUNICATIONS
NATIONAL HEALTH AND WELFARE FUND
AGREEMENT AND DECLARATION OF TRUST AS RESTATED EFFECTIVE
JANUARY 1, 2005
Page 3

applicable collective bargaining agreement between the Participating Employer and a

GCC/IBT local union or Teamster local union.


IN WITNESS WHEREOF, we hereunto set our seals this _____ day of _____,
2007.


Attest: For the Graphic Communications National Health and Welfare Fund:

Robert Lacey, Secretary

# AGREEMENT BETWEEN



OPEIU 2

UNION LABEL



G C I U

## THE GRAPHIC COMMUNICATIONS INTERNATIONAL UNION

### AND

## THE OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL NO. 2

October 1, 2005
through
September 30, 2007



PLAINTIFF'S
EXHIBIT
B

Blumberg No. 5113

# AGREEMENT BETWEEN

## THE GRAPHIC COMMUNICATIONS INTERNATIONAL UNION

## AND

## THE OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL NO. 2

# INDEX

| **Item:** | | **Page No.:** |
|---|---|---|
| Article I: | Term · Modification | 2 |
| Article II: | Recognition | 2 |
| Article III: | Union Shop | 3 |
| Article IV: | Seniority-Layoff-Recall | 4 |
| Article V: | Job Postings · Applications | 5 |
| Article VI: | Employment, Discipline, and Discharge | 6 |
| Article VII: | Hours of Work · Overtime | 7 |
| Article VIII: | Vacations | 8 |
| Article IX: | Holidays | 9 |
| Article X: | Leave and Time Off | 10 |
| Article XI: | Sick Leave | 12 |
| Article XII: | Grievances | 14 |
| Article XIII: | Wages | 16 |
| Article XIV: | Pension, Health, Hospitalization and Life Insurance Programs | 17 |
| Article XV: | Severance Pay | 19 |
| Article XVI: | No Discrimination Clause | 19 |
| Article XVII: | Bulletin Board | 19 |
| Article XVIII: | Automation | 20 |
| Article XIX: | Workplace Safety | 20 |
| Article XX: | No Reduction in Benefits | 20 |
| Signatures | | 21 |
| Exhibits | | 22 . . . |

1

# AGREEMENT

THIS AGREEMENT IS BETWEEN THE GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, AFL-CIO, CLC, hereinafter referred to as the Employer, and the OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL NO. 2, hereinafter referred to as the Union.

The use of the male gender in this contract is for convenience and does not imply any preference of male to female employees.

## ARTICLE I

### Term - Modification

Section 1.01.  The provisions of this Agreement shall become effective October 1, 2001, and shall remain in effect through September 30, 2005.

Section 1.02.  This Agreement shall remain in effect for four (4) years, and from year to year thereafter subject to modification or cancellation at the expiration date, or at the end of any subsequent year, upon sixty (60) days prior notice by either party by Certified Mail.

Section 1.03.  Supplements or amendments made during the term of this Agreement must be reduced to writing, numbered serially and signed by the parties hereto, and then shall become a part of this Agreement.

## ARTICLE II

### Recognition

Section 2.01.  The Employer recognizes the Union as the exclusive bargaining agent for all office and professional employees (excluding the secretaries of the President, the Secretary Treasurer, and the Executive Assistant to the President) employed by the Employer, including those employees who are normally assigned to work less than five (5) full days each week.  Also excluded are those whose work is of a supervisory nature as defined by the National Labor Relations Board, and those

2

employees not covered by the jurisdiction of the Office and Professional Employees International Union are not recognized.

Section 2.02. It is agreed by the parties that the current secretaries to the President, the Secretary Treasurer and the Executive Assistant to the President will be guaranteed a job with the Employer without any loss of seniority and without any loss in pay, and will, in the future, receive any increases negotiated by the Union, if the officer is replaced and it develops that the new officer would prefer another secretary.

Section 2.03. When the Employer needs additional help and/or new workers, he shall first make applications for those workers to the Union, and the Union shall, at all times, endeavor to supply competent and efficient workers. If the Union is not able to supply the workers, the Employer may recruit workers elsewhere.

Section 2.04. No bargaining unit work may be performed by non-bargaining unit employees. When bargaining unit employees are temporarily transferred to perform non-bargaining unit work, they shall receive a differential of $2.00 per day for all days worked in such non-bargaining unit position.

## ARTICLE III

### Union Shop

Section 3.01. All employees coming under terms of this Agreement shall become members in good standing of the Union after their probationary period (as defined in Article VI, Section 6.02), and shall remain members in good standing for the term of this Agreement.

Section 3.02. The Employer will check off monthly dues and initiation fees as designated by the Secretary Treasurer of the Union, as membership dues in the Union, on the basis of individually-signed voluntary check-off authorization cards. Once each month, the proceeds of these deductions will be paid to the Secretary Treasurer of the Union.

The Employer agrees to deduct from the paycheck of employees covered by this Agreement, voluntary contributions to COPE/VOTE/PEP. The Union shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his/her paycheck. The

3

Employer shall transmit to the Union on a monthly basis the total amount deducted and a list of those on whose behalf a deduction was made.

Section 3.03. The Employer will give to the Chief Shop Steward a list of the employees who have satisfactorily passed their probationary period. The Chief Shop Steward will be responsible for having the employee sign a payroll deduction card which will be turned over to the Accounting Department of the Employer for processing.

### ARTICLE IV

### Seniority-Layoff-Recall

Section 4.01. In cases of increases or decreases of the working force, the rule of seniority shall prevail; that is, the last employee hired shall be the first to be laid off, and vice versa when recalled for service. The parties to this Agreement realize that it will not be feasible in all instances to lay off and recall on the basis of seniority because of the specific training and experience required in some classifications. The Employer may deviate from strict seniority in some instances, but it is the intention of this clause to provide maximum protection for seniority.

Section 4.02. The Employer shall prepare from existing personnel records a seniority roster of all employees presently covered by this Agreement (on the first working day after January 1 and July 1 of each calendar year), based on the beginning date of uninterrupted and continuous employment. The Chief Shop Steward shall be furnished a copy of such seniority roster.

Section 4.03. Seniority shall accumulate as a result of time worked, or otherwise given credit for by agreement between the parties, from the date of continuous employment as a regular full-time employee with the Employer.

Section 4.04. It is agreed that no employee covered by this Agreement will suffer job loss or a reduction of benefits as a result of a merger. It is further understood that all issues arising as a result of a merger shall be subject to the collective bargaining process.

4

**ARTICLE V**

**Job Postings - Applications**

Section 5.01. When vacancies occur in positions covered by this Agreement, or when new positions are created, notices of such vacancies and/or newly-created positions shall be posted on appropriate bulletin boards immediately for a period of three (3) working days, and a copy of such posting shall be supplied to the Chief Shop Steward of the Union. Any employee who has bid for the vacated or newly-created position, and is selected to fill the position, will be put in the position not later than five (5) working days after the completion of the three (3) day posting period. Any deviation from this provision will be discussed with the Union immediately.

Section 5.02. In the case of promotion to a Supervisor or Executive Secretary position to a residing Vice President, employees ranking in seniority will be given consideration; however, the filling of these jobs is within the sole discretion of the Employer.

Section 5.03. When more than one employee applies for the vacancy, seniority shall be given primary consideration in the selection where qualifications are relatively equal.

Section 5.04. If a test is given to determine the technical qualifications of the bidder, then a uniform and standard score must be mutually agreed upon by the Union and the Employer prior to the testing. The bidders who reach or surpass this agreed-upon score will be declared eligible bidders for the job. The eligible bidder having the greater seniority in this group will automatically be declared the successful applicant.

Section 5.05. Applications involving no change in pay grade (lateral transfers) need not be considered by the Employer unless such a change would provide for the applicant a better opportunity for future advancement.

Section 5.06. Applications for positions shall be made out in duplicate, one copy to be presented to the Chief Shop Steward at the time the original is filed with the Personnel Office.

Section 5.07. Employees will be allowed a reasonable probationary period, not to exceed six (6) weeks. If, during that period, said employee, in the opinion of the Employer, fails to perform satisfactorily the duties of the new position, he will be permitted to return to his original position

without loss of seniority. (Any deviation from this provision will be made only following consultation between the Union and the Employer.) It is the intention of this clause to normally return an unsuccessful bidder to his original position.

Section 5.08. In the event a vacancy should occur in the classification of secretary to an officer, the provisions of Section 5.01 herein shall not be compulsory in filling of such vacancy. For the purpose of this section, the term "officers" shall apply to the officers set forth in Section 2.01.

## ARTICLE VI

## Employment, Discipline, and Discharge

Section 6.01. The Employer reserves the right to employ or dismiss in accordance with the seniority provisions of Article IV, Section 4.0l herein, as the conduct of its business requires, and further reserves the right to make final determination of the qualifications of any applicant for employment prior to such employment or during the probationary period for new employees.

Section 6.02. The probationary period for new permanent employees shall be sixty (60) calendar days, at the expiration of which the employee shall be placed on the employment rolls on a permanent basis, provided the work of the new employee is satisfactory to the Employer. Seniority shall then date from the original date of employment.

Section 6.03. Two weeks' notice or two weeks' pay in lieu of notice, except in the case of just cause discharge, shall be given by the Employer in terminating the employment of a permanent employee. A permanent employee leaving the employment shall give two weeks' notice to the Employer.

Section 6.04. The Employer shall not discontinue the services of any employee except for just and sufficient cause. In the event of the discharge of an employee covered by this Agreement, the discharged employee shall be given the reason for his discharge, and the Employer shall notify the employee in the presence of a Shop Steward or in the presence of a Union officer, except that when neither is available, such notification will be given to the Shop Steward as early as possible. In instances where an employee is notified by letter of his dismissal, a copy of the letter will be forwarded to the Shop Steward at the same time. In instances where an Employer finds it necessary to give an

6

employee a final warning, the Employer shall render such final warning in the presence of a Shop Steward or Union officer. If the employee requests that the Steward or Union officer not be present, the Employer shall apprise the Steward or Union officer of the nature of such final warning immediately after the employee has been advised.

Section 6.05. In cases of suspension from the work force, the procedure outlined in Section 6.04 shall be followed.

Section 6.06. An employee who has been disciplined or discharged, and who is subsequently exonerated, shall be reinstated without prejudice or loss of seniority, and shall be compensated for any loss in wages, unless the grievance committee or the arbitrator determines otherwise. Any complaint relative to a discharge must be filed with the Employer within five (5) working days of the time that the Shop Steward is notified of the discharge, or the matter will be considered closed.

## ARTICLE VII

### Hours of Work - Overtime

Section 7.01. The regular work week shall consist of five (5), seven hour days, exclusive of a one (1) hour lunch period. The hours shall be from 9:00 a.m. to 5:00 p.m. However, Department Heads may permit daily scheduling outside of the contractual hours; no starting time shall be earlier than 8:00 a.m., and no quitting time shall extend beyond 5:30 p.m. All departments must be manned between 9:00 a.m. and 5:00 p.m. Shifts scheduled outside of the contractual hours may be mutually agreed upon between the Department Head and employee and must be approved by the Employer. Where more than one employee desires a shift outside of the contractual hours, the most senior employee shall have preference. Work performed in excess of seven (7) hours in any one day or thirty-five (35) hours in any one week shall be paid for at overtime rates, as hereinafter set forth.

Section 7.02. At the employees' discretion, the regular work week shall consist of nine (9) seven hour and fifteen minutes (7.25) days, exclusive of one forty-five (45) minute lunch period and one fifteen (15) minute break. This work week consists of two groups rotating every tenth day (Friday) off. Work performed in excess of seven hours and fifteen minutes (7.25) shall be paid for at overtime

7

rates as hereinafter set forth.  The rest period shall consist of a fifteen (15) minutes break in the morning or in the afternoon, to be used as desired.  The following is a schedule of the hours of work:

8:45 a.m. - 5:00 p.m. with 45 minutes for lunch and one 15-minute break

8:15 a.m. - 4:30 p.m. with 45 minutes for lunch and one 15-minute break

7:45 a.m. - 4:00 p.m. with 45 minutes for lunch and one 15-minute break

Trial period for the new work week shall be from May 1 through August 31, 1998.  Following the trial period, either party may cancel with 30 days' notice.

Section 7.03.  When an employee is requested to work overtime (other than Saturdays, Sundays and holidays), the overtime shall be compensated for at one and one-half (1-1/2) times the employee's regular straight-time hourly rate of pay for the first two (2) hours worked.  Work performed in excess of two (2) hours shall be compensated for at double (two times) the employee's straight-time hourly rate of pay.  All work performed on Saturdays [after four (4) hours], Sundays and holidays shall be compensated for at double (two times) the employee's regular straight-time hourly rate of pay, in addition to his holiday pay.  An employee requested to work on the sixth (6th) day, Sunday or holiday shall be guaranteed a minimum of four (4) hours overtime pay.  Employees required to work shifts which do not begin or end within two (2) hours of the normal work day shall receive a differential of ten (10) percent.

Section 7.04.  If an employee is required to work overtime more than two (2) hours beyond his regularly scheduled quitting time, he shall receive a meal allowance of $5.00.

## ARTICLE VIII

### Vacations

Section 8.01.  Vacations with pay shall be granted employees who have completed periods of continuous service with the Employer as follows:  After six (6) months, one (1) week; after one (1) year, two (2) weeks; after three (3) years, three (3) weeks; after eight (8) years, four (4) weeks; after fifteen (15) years, five (5) weeks.  GCIU agrees to recognize 50% of continuous years of service to employees previously employed by a GCIU entity (i.e., Photoengravers Pension Fund, Project for Equal Progression, Joint Pension Trust, Supplemental Retirement & Disability Fund) towards the calculation

8

of vacation if employed by the GCIU, providing such employment with the GCIU shall commence within 90 calendar days of termination from employment with PPF, SRDF, JPT, or PEP. Past seniority will be used for vacation purposes only and has no bearing on any other provision of the contract. For purposes of calculating length of service with the PPF, SRDF, JPT, or PEP, any part of a year shall be considered a full year.

Section 8.02. All accrued pro rata vacation time shall be paid to employees taking leaves of absence up to the time of the granting of the leave of absence or upon termination of employment.

Section 8.03. The vacation schedule shall be agreed upon by mutual consent. However, at least one employee of any department may select two (2) consecutive weeks' vacation during any period in the year in accordance with seniority, unless otherwise mutually agreed upon between the Employer and the employee.

At least two (2) weeks of vacation may be taken in increments (i.e., one or two days at a time when notice of such intention is given in advance). After an employee's vacation schedule has been approved, it can only be changed with the consent of the Employer. All earned vacation time should be taken during the calendar year, unless otherwise mutually agreed to between the Employer and the Employee. However, allowance has been made for the carry-over of up to one (1) week of vacation, with the specification that same will be used no later than March 1st of the succeeding year.

## ARTICLE IX

### Holidays

Section 9.01. The Employer shall allow time off with pay for all legal holidays: namely, New Year's Day, Martin Luther King, Jr.'s Day, Presidential Inauguration Day, President's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veteran's Day, Thanksgiving Day, the Friday after Thanksgiving Day, Christmas Eve Day, Christmas Day, the last working day before New Year's Day, and any other holiday which may hereafter be declared a general holiday by the President of the United States or by an Act of Congress of the United States, even if such holidays apply only to the District of Columbia. In the event a regular holiday falls on a Saturday, the preceding Friday shall

9

be observed. In the event a regular holiday falls on a Sunday, the following Monday shall be observed. The above-listed holidays shall be celebrated on the same days as the Federal government.

Section 9.02. In addition to the above holidays, all employees shall be entitled to two (2) personal days.

## ARTICLE X

## Leave and Time Off

Section 10.01. Employees with one or more years of service are eligible for leaves of absence. When leaves of absence are granted to employees by the Employer, such leaves may be granted for a period up to one (1) year with extensions beyond that period at the discretion of the Employer, except as provided in Section 10.05 and Section 10.06 of this Article.

Section 10.02. Employees inducted into the Armed Forces shall accumulate seniority, retain all rights and privileges and, upon return, be reinstated in their former positions, or comparable ones, provided applications are made within two months after discharge.

Section 10.03. Employees shall be provided leave with supplemental pay during periods of required jury service and for service resulting from subpoena by any court of competent jurisdiction. Employees shall be required to provide appropriate proof of jury appearance or service to the Office of the Secretary-Treasurer.

During required military service and for those who are members of military units that are reactivated for emergency duty (such as special riot duty), for a period not to exceed two (2) weeks, supplemental pay from the Employer shall be an amount which, when combined with the pay received by the employee for such jury duty, subpoena, military service or emergency military duty, shall equal the total regular salary which would have been received by the employee from the Employer for the same period of time.

Section 10.04. Employees who are registered voters shall receive sufficient time off without reduction in pay to vote on election days, not to exceed two (2) hours.

10

Section 10.05. The Employer agrees to grant a leave of absence without loss of seniority, but without pay, to any employee who is elected or selected for a union office which would involve full-time employment by the Local or International Union, not to exceed three (3) years.

Section 10.06. Physical inability to work due to pregnancy will be considered to be the same as inability to work due to sickness or accident. An employee will automatically be awarded the period of the employee's hospital confinement plus three (3) weeks of sick leave immediately following thereafter, provided the employee has accumulated sick leave to cover this period; otherwise, the employee will be allowed to use the amount of sick leave the employee has accumulated, and it will be presumed that that is the normal length of physical disability. Any employee claiming to be physically unable to work for any period other than the foregoing must, on request of the Employer, supply a certificate from the employee's attending physician that the employee is physically unable to work.

An employee with one or more years of service may, in addition to the sick leave, take additional leave, not to exceed five (5) months, without pay, but without loss of seniority. An employee choosing to take additional leave must so notify the Employer in writing before the end of the three (3) weeks' sick leave following her release from the hospital. Employees who comply with this provision shall be guaranteed the return to the job held at the time of taking leave, at the same rate of pay received at the time of taking leave, plus any increases given to their classification during the time of the leave of absence.

Section 10.07. Employees shall be allowed three (3) days' compassionate leave without loss of pay in the event of death in the immediate family, which shall be limited to step-mother, step-father, foster-parent, mother-in-law, father-in-law, grandmother, grandfather, grandchildren, sister, brother or any blood relative living in the same household as the employee. The Employer shall allow five (5) days' compassionate leave without loss of pay in the event of the death of a spouse, child, mother, father, or step-child. In addition, necessary time off for travel purposes, as measured by the fastest practical mode of transportation, shall be granted upon request of the employer when, in the Employer's judgment, such additional time is warranted.

Section 10.08. Time off with pay will be allowed for union activities to authorized employees servicing this Agreement. The Union will pay for lost time incurred by virtue of its representatives negotiating this Agreement and for duties which do not affect the union representative's own shop.

Section 10.09. Employees will be given one-half day off after they have become permanent employees and Union members to permit the Union to take them through a planned program featuring the meaning of the American labor movement, the necessity for the new members being active, participating members in their shop, and bringing to the new members a knowledge of what organized labor has done for them, as well as the other members of the American labor movement. The outline for this educational program will be worked out between the two subcommittees.

Section 10.10. Authorized leave shall not interrupt the seniority of employees.

## ARTICLE XI

### Sick Leave

Section 11.01. The Employer and Union recognize that the purpose of sick leave is to provide protection and security for covered employees in the event of serious illness. Pursuant to this purpose, the Employer shall grant sick leave with pay at the rate of 20 days per year, and unused sick leave may be accumulated from year to year without any maximum. An employee, who has been warned about sick leave abuse, may be required, if asked by the employer, to bring in a doctor's note stating that they were under the care of the doctor in order to qualify for paid sick leave.

Section 11.02. In the event of termination of employment for Just cause, no pay shall be granted to the terminated employee for accumulated sick leave. Upon layoff of employee, or when the employee gives at least two (2) weeks' prior notice of retirement or voluntary resignation, the employee will receive payment at the rate of pay in effect in accordance with the following formula: For every ten (10) days of banked sick leave, one (1) day of pay shall be given up to a maximum payment of twenty (20) days.

Section 11.03. The use of sick leave shall include employee visits to doctors and dentists, but must be used at a minimum of two (2) hours increments, provided that appointments are scheduled either the first two hours in the morning or the last two hours in the evening.

12

Section 11.04. An employee must call in on the day(s) they will not be reporting to work due to their illness. The call-in must be made within one (1) hour of the normal reporting time to the employee's supervisor or to another supervisor if the employee's supervisor is not available.

Section 11.05. Any employee who qualifies for Workers' Compensation (on-the-job injury) and who receives compensation for such injury shall be entitled to and shall receive the difference between such employee's regular weekly wage and the compensation received from Workers' Compensation for a period of thirteen (13) weeks. Accumulated sick leave shall not be utilized during periods in which any employee is receiving Workers' Compensation benefits.

Section 11.06. Sickness and Accident Benefit:

A.      The GCIU will provide non-occupational sickness and accident benefits to each regular employee who has been employed for the preceding twelve (12) months of more with the GCIU, in the amount of eighty-five percent (85%) of their straight-time wages. This benefit commences on the first regular workday of absence due to a non-occupational sickness or accident, following exhaustion of all accumulated sick leave and vacation time, and extending to a maximum of thirty (30) weeks for any one such sickness or accident.

B.      The above benefits will be paid commencing on the first day if the employee is admitted as an in-patient in a hospital, provided that all accumulated sick leave and vacation time is exhausted pursuant to subparagraph A. The employee shall receive holiday pay for holidays falling within the period of payment of the sickness and accident benefit.

C.      In the event of a sickness or accident which comes under Worker's Compensation Insurance laws, the employee shall receive from the GCIU, commencing on the first week day of absence, the difference between the benefit outlined above and the weekly amount paid by the Worker's Compensation Insurance, provided that all accumulated sick leave and vacation time is exhausted pursuant to subparagraph A.

13

D. A statement from the attending physician stating the cause and nature of the illness or disability, and that the employee is unable to perform his or her regular duties, must accompany each request for such sickness and accident benefits. The employee, at the GCIU's request, shall submit periodic re-verifications by his or her physician that the employee is unable to perform his or her regular duties. The GCIU may also require, at its own expense, that as a condition of receiving the sickness and accident benefit, the employee be examined by a physician selected by the GCIU. If the GCIU declines to pay this benefit on the basis of the opinion of the physician it has selected, the GCIU agrees that the denial of the benefit shall be subject to the Grievance and Arbitration Article of this Agreement. The parties have further agreed that this issue will be handled pursuant to the AAA rules for an expedited arbitration.

E. In the event a person is laid off and they are currently receiving benefits outlined in subparagraph A above, they shall continue to be covered for a normal period of time for that particular injury or illness, but in no case will the total amount of coverage exceed thirty (30) weeks. Benefits/Coverage under this Article will automatically cease if the person goes to work for another employer.

## ARTICLE XII

### Grievances

Section 12.01. A grievance within the meaning of this Agreement shall be any controversy or dispute arising between the parties hereto relating to any matter of wages, hours and working conditions, or any dispute between the parties involving interpretation or application of any provision of this Agreement. A grievance shall be presented within ten (10) calendar days after it occurs; otherwise, it shall not be considered a grievance. The steps of the grievance procedure are as follows:

Step 1. Wherever practicable, the aggrieved employee shall present his grievance to the Shop Steward who, in turn, will present it to the immediate supervisor. If it is the desire of the parties to eliminate the immediate supervisor at the first step, then this, by mutual

14

agreement, can be worked out between the parties. Where the Union does meet with the immediate supervisor and the complaint is not satisfactorily settled within two (2) working days, the employee, the Steward and the immediate supervisor shall complete and sign a written complaint and forward the grievance to the next step in the procedure.

Step 2. Representatives of the Union and the Employer shall meet within three (3) working days after the filing of any grievance. In the event of failure to reach a satisfactory solution to the grievance within five (5) working days, the grievance shall be referred to the next step in the grievance procedure.

Step 3. The Union representative and persons designated by the Employer to represent the Employer shall meet and discuss the grievance within three (3) working days of the completion of the previous step. In the event of failure to reach a satisfactory adjustment to the grievance within five (5) working days, the party responding to the grievance shall give a written step #3 decision. In the event the grievance is denied, it may be taken to arbitration by the aggrieved party upon written notice to the other party within thirty (30) calendar days of the step #3 decision. At the conclusion of this thirty (30) calendar day period, if no request for arbitration is made, the grievance shall be considered dropped. The time periods in Steps 2, 3, and 4 may be extended by mutual agreement between the parties.

Step 4. An impartial arbitrator shall be selected from a panel supplied by the American Arbitration Association upon request of either party. The parties shall, within five (5) working days of receipt of such panel, make a selection of an arbitrator. In the event the parties cannot agree, the American Arbitration Association shall be petitioned to appoint an arbitrator. This arbitrator shall render a decision within thirty (30) days after the case has been heard. The decision of the arbitrator will be final and binding on both parties.

Section 12.02. The arbitrator's fee shall be borne equally by both parties.

15

## ARTICLE XIII

### Wages

Section 13.01. The Employer agrees to adjust the wages of employees in accordance with the cost-of-living formula as prescribed in the GCIU Constitution and Laws for GCIU Officers, Representatives and Organizers.

Effective January 1 in the years 2002, 2003, 2004 and 2005, all employees shall receive a cost-of-living increase based upon the cost-of-living increase during the previous year to a maximum of six percent (6%) in accordance with the Urban Consumer All Cities figures published by the United States Department of Labor.

Further, there shall be signing bonus payments to all employees as follows: Effective October 1, 2001 - $500; Effective October 1, 2002 - $250; Effective October 1, 2003 - $250.

It is agreed by the parties that if in the event there is a wage increase given to the IUG Bargaining Unit during the term of the Agreement in excess of the annual COLA increase, such percentage increase shall also be given to the members of OPEIU Local 2.

Under no circumstances shall wages be decreased below those in effect on October 1, 2001 or in Exhibit "A" attached.

The maximum wage rates provided in Exhibit "A" shall not operate to reduce the wages of present employees receiving higher wages than are provided for in this Agreement. All new employees shall be paid at least the minimum rates as provided in Exhibit "A" attached hereto and included as a part hereof.

All increases gained between anniversary dates of the Agreement shall become a part of the basic wage rate prior to the application of wage increases due thereafter.

Section 13.02. An employee promoted to a higher job classification shall receive an increase sufficient to make his wages equal to the next higher rate in the new wage schedule. He then shall be given credit for the number of months and days accumulated since the last progression increase was

granted. After an employee reaches the maximum rate for his job classification, wage progression credit shall continue to accumulate for a period not to exceed six (6) months. If the application of this progression results in an increase of $1.00 per week, the Employer shall bypass the step which results in an increase of $1.00 and shall place the employee in the next progression step.

Section 13.03. Any employee who is temporarily transferred to a higher-paid classification, and who works in such higher classification for one work day or more, shall be paid for all work performed in such higher classification at the minimum rate step in such classification next above his present rate, whichever is greater.

Section 13.04. A lead-man differential of $5.00 will be granted to those who qualify.

Section 13.05. The Employer agrees to discuss with the Union any proposal to abolish, create, or reclassify jobs which fall within the classification system agreed upon by the Employer and the Union, and which fall within the jurisdiction of the Union as recognized by Article II.

Section 13.06. It is agreed that where the Union feels that a job is presently improperly slotted under the current classification system, the parties will review the job. The parties will also review the request by the Union to insert several other jobs under the classification system.

## ARTICLE XIV

## Pension, Health, Hospitalization
### and Life Insurance Programs

Section 14.01. The Employer agrees to cover the employees of the Graphic Communications International Union under the same Health and Welfare Plan presently in effect, and this premium is to be fully paid by the Employer.

Effective May 1, 1998, the Employer shall change health and welfare coverage from the current plan to the GCIU National Health and Welfare Plan. Premiums shall continue to be fully paid by the Employer.

There will be no reduction in benefits, with improvements to be added where they already exist in the plan (see Exhibit B). Effective January 1, 2002, eye care shall be increased to a maximum of

17

$400 every two years and dental shall be increased to $2,250 per year. Effective January 1, 2003, dental shall be increased to $2,500 per year. The Lifetime Maximum Benefit for Orthodontia shall remain at $1,200.

Section 14.02. Supplemental Retirement and Disability Pension Program. The Employer agrees that all employees covered by this agreement will continue to be participants in the Graphic Communications International Union Supplemental Retirement and Disability Pension Program. The Employer agrees to contribute to the Trustees of the Fund six per cent (6%) of the straight time hourly salary of each covered employee.

Section 14.03. Employer Retirement Pension Program. The Employer agrees that all employees covered by this agreement will continue to be participants in the Employer Retirement Pension Program. The Employer agrees to contribute to the Employer Retirement Program seven dollars ($7.00) per shift on behalf of each covered employee. Effective July 1, 1997, the contribution rate to the Employer Retirement Pension Program shall be increased to eight dollars ($8.00) per shift for each covered employee. Effective July 1, 1998, the contribution rate to the Employer Retirement Pension Program shall be increased to nine dollars ($9.00) per shift for each covered employee. Effective July 1, 2001, the contribution rate to the Employer Retirement Pension Program shall be increased to ten dollars ($10.00) per shift for each covered employee.

Section 14.04. Inter-Local Pension Fund. The Employer shall withhold 6% (but not less than $2.50) from each employee's gross weekly wages and shall forward such amounts so withheld to the Inter-Local Pension Fund under one of the following options:

A.    Monthly to Inter-Local Pension Fund, upon receipt of an assignment from the employee, along with an appropriate report form to permit proper crediting to the employee's account in the Fund;

B.    Weekly to Inter-Local Pension Fund, upon receipt of an assignment from the employee, along with an appropriate report form to permit proper crediting to the employee's account in the Fund;

C.    Monthly by separate check, to the individual employee;

D.    Weekly by separate check, to the individual employee.

18

Section 14.05. Newly hired employees shall not be eligible for participation in the Employer Health & Welfare Program and Pension Plans as provided herein until such time as such new employee completes the required probationary period as contained in Article VI, Section 6.02.

## ARTICLE XV

### Severance Pay

Section 15.01. Employees of six (6) months or more shall receive severance pay at the rate of one (1) week's pay for each year or major fraction thereof worked. Such severance pay shall be based on the highest salary received from the Employer by the employee. Such severance pay shall be paid only in the event of a layoff. Any contemplated layoffs will be discussed with the Union.

## ARTICLE XVI

### No Discrimination Clause

Section 16.01. The parties to this Agreement agree to continue their policy of no discrimination against any employee because of race, creed, color, age, sex, religion, or national origin, in regards to employment advancement, working conditions, rates of pay, or acceptance into Union membership.

Section 16.02. Each and every clause of this Agreement shall be deemed separable from each and every other clause in this Agreement to the end that in the event any clause or clauses shall be determined to be in violation of any local or federal law, then and in such event, such clause or clauses only, to the extent only that any may be so in violation, shall be of no force and effect and unenforceable without impairing the validity and enforceability of the rest of the Agreement including any and all provisions in the remainder of any clause, sentence, or paragraph in which the offending language may appear.

## ARTICLE XVII

### Bulletin Board

Section 17.01. The Employer agrees to provide bulletin boards suitably placed in the office for the use of the Union.

19

## ARTICLE XVIII

### Automation

Section 18.01. It is recognized by the parties that any jobs which may require the use of electronic data processing equipment, computing equipment, or similarly automated office machinery are jobs within the bargaining unit, excepting jobs of a supervisory or managerial nature. In the event that the Employer introduces or uses any electronic data processing equipment, computer equipment, or similarly automated office machinery, prompt notice will be given to the Union and the creation of any jobs not presently within the unit will be posted to permit bidding by the employees within the unit. In the event that training programs are necessary to qualify employees for such jobs, the Employer agrees that employees within the unit will be given first opportunity to qualify for such job training programs before any persons outside the Union are hired to fill such jobs.

Section 18.02. It is further agreed that the Employer, in cooperation with the Union, will exhaust every means possible to keep layoffs due to the introduction of electronic data processing equipment to a bare minimum.

## ARTICLE XIX

### Workplace Safety

Section 19.01. It is understood and agreed to by the parties to this Agreement that a safe workplace is of paramount importance and that the Employer, with the full cooperation of all employees, will take precautions and steps to ensure a safe work environment.

## ARTICLE XX

### No Reduction in Benefits

Section 20.01. The signing of this Agreement shall not act in any manner to reduce or abrogate wages or any other benefits existing in contracts in effect at the time of the signing of this Agreement.

20

SIGNED this 29th day of November, 2001.

OFFICE AND PROFESSIONAL
EMPLOYEES INTERNATIONAL
UNION, LOCAL NO. 2, AFL-CIO

George Kapanoske
Staff Representative

Carol Ann Occhipinti
Shop Steward

Michele Powell
Negotiating Committee Member

GRAPHIC COMMUNICATIONS
INTERNATIONAL UNION,
AFL-CIO

George Tedeschi
President

Gerald Deneau
Secretary-Treasurer

Richard Whitworth
Exec. Asst. to the President

21

COLA: 3.4% Per Week

## EXHIBIT A
## EFFECTIVE JANUARY 1, 2001

| GRADE | CLASSIFICATION | MINIMUM | 6 MOS. | 12 MOS. | 18 MOS. | 24 MOS. |
|-------|----------------|---------|--------|---------|---------|---------|
| 1 | Accounting Clk. I<br>General Office Clk. II<br>Mail Service Clerk | $540.14 | $573.89 | $607.65 | $641.41 | $675.17 |
| 2 | Accounting Clk. II<br>Secretary I<br>Recpt/Telephone<br>General Office Clk. III | $549.32 | $583.65 | $617.99 | $652.32 | $686.65 |
| 3 | Accountant I<br>General Office Clk. IV<br>Computer Operator<br>Research Assistant<br>Secretary II | $559.89 | $594.88 | $629.87 | $664.87 | $699.86 |
| 4 | Accountant II<br>Secretary III<br>General Office Clk. V | $569.06 | $604.62 | $640.19 | $675.75 | $711.32 |
| 5 | Secretary IV | $585.95 | $622.57 | $659.20 | $695.82 | $732.44 |
| 6 | Accountant III<br>Research Analyst<br>Tech Support<br>Programmer I | $607.11 | $645.06 | $683.00 | $720.95 | $758.89 |
| 7 | Software Engineer<br>(DBA I) | $861.60 | $915.45 | $969.30 | $1023.15 | $1077.00 |

|  | MINIMUM | AFTER 90 DAYS |
|--|---------|---------------|
| Journalist | $855.63 | $891.28 |

22

COLA: 2.8% Per Week

## EXHIBIT A
## EFFECTIVE JANUARY 1, 2002

| GRADE | CLASSIFICATION | MINIMUM | 6 MOS. | 12 MOS. | 18 MOS. | 24 MOS. |
|-------|----------------|---------|--------|---------|---------|---------|
| 1 | Accounting Clk. I<br>General Office Clk. II<br>Mail Service Clerk | $555.26 | $589.96 | $624.66 | $659.37 | $694.07 |
| 2 | Accounting Clk. II<br>Secretary I<br>Recpt/Telephone<br>General Office Clk. III | $564.70 | $600.00 | $635.29 | $670.59 | $705.88 |
| 3 | Accountant I<br>General Office Clk. IV<br>Computer Operator<br>Research Assistant<br>Secretary II | $575.57 | $611.54 | $647.51 | $683.49 | $719.46 |
| 4 | Accountant II<br>Secretary III<br>General Office Clk. V | $584.99 | $621.55 | $658.12 | $694.68 | $731.24 |
| 5 | Secretary IV | $602.36 | $640.01 | $677.66 | $715.30 | $752.95 |
| 6 | Accountant III<br>Research Analyst<br>Tech Support<br>Programmer I | $624.11 | $663.12 | $702.13 | $741.13 | $780.14 |
| 7 | Software Engineer<br>(DBA I) | $885.73 | $941.09 | $996.44 | $1051.80 | $1107.16 |

| | MINIMUM | AFTER 90 DAYS |
|--|---------|---------------|
| Journalist | $879.59 | $916.24 |

COLA: 2.4% Per Week

## EXHIBIT A
## EFFECTIVE JANUARY 1, 2003

| GRADE | CLASSIFICATION | MINIMUM | 6 MOS. | 12 MOS. | 18 MOS. | 24 MOS. |
|-------|----------------|---------|--------|---------|---------|---------|
| 1 | Accounting Clk. I<br>General Office Clk. II<br>Mail Service Clerk | $568.58 | $604.12 | $639.66 | $675.19 | $710.73 |
| 2 | Accounting Clk. II<br>Secretary I<br>Recpt/Telephone<br>General Office Clk. III | $578.26 | $614.40 | $650.54 | $686.68 | $722.82 |
| 3 | Accountant I<br>General Office Clk. IV<br>Computer Operator<br>Research Assistant<br>Secretary II | $589.38 | $626.22 | $663.06 | $699.89 | $736.73 |
| 4 | Accountant II<br>Secretary III<br>General Office Clk. V | $599.03 | $636.47 | $673.91 | $711.35 | $748.79 |
| 5 | Secretary IV | $616.82 | $655.37 | $693.92 | $732.47 | $771.02 |
| 6 | Accountant III<br>Research Analyst<br>Tech Support<br>Programmer I | $639.09 | $679.03 | $718.97 | $758.92 | $798.86 |
| 7 | Software Engineer<br>(DBA I) | $906.98 | $963.67 | $1020.36 | $1077.04 | $1133.73 |

| | MINIMUM | AFTER 90 DAYS |
|-------|---------|---------------|
| Journalist | $900.70 | $938.23 |

COLA: 2.8% Per Week

## EXHIBIT A
## EFFECTIVE JANUARY 1, 2004

| GRADE | CLASSIFICATION | MINIMUM | 6 MOS. | 12 MOS. | 18 MOS. | 24 MOS. |
|---|---|---|---|---|---|---|
| 1 | Accounting Clk. I<br>General Office Clk. II<br>Mail Service Clerk | $584.50 | $621.04 | $657.57 | $694.10 | $730.63 |
| 2 | Accounting Clk. II<br>Secretary I<br>Recpt/Telephone<br>General Office Clk. III | $594.45 | $631.60 | $668.75 | $705.91 | $743.06 |
| 3 | Accountant I<br>General Office Clk. IV<br>Computer Operator<br>Research Assistant<br>Secretary II | $605.89 | $643.76 | $681.62 | $719.49 | $757.36 |
| 4 | Accountant II<br>Secretary III<br>General Office Clk. V | $615.81 | $654.30 | $692.78 | $731.27 | $769.76 |
| 5 | Secretary IV | $634.09 | $673.72 | $713.35 | $752.98 | $792.61 |
| 6 | Accountant III<br>Research Analyst<br>Tech Support<br>Programmer I | $656.98 | $698.05 | $739.11 | $780.17 | $821.23 |
| 7 | Software Engineer<br>(DBA I) | $932.38 | $990.65 | $1048.92 | $1107.20 | $1165.47 |

| | MINIMUM | AFTER 90 DAYS |
|---|---|---|
| Journalist | $925.92 | $964.50 |

COLA: 2.8% Per Week

## EXHIBIT A
## EFFECTIVE JANUARY 1, 2005

| GRADE | CLASSIFICATION | MINIMUM | 6 MOS. | 12 MOS. | 18 MOS. | 24 MOS. |
|-------|----------------|---------|--------|---------|---------|---------|
| 1 | Accounting Clk. I<br>General Office Clk. II<br>Mail Service Clerk | $600.87 | $638.43 | $675.98 | $713.54 | $751.09 |
| 2 | Accounting Clk. II<br>Secretary I<br>Recpt/Telephone<br>General Office Clk. III | $611.10 | $649.29 | $687.48 | $725.67 | $763.87 |
| 3 | Accountant I<br>General Office Clk. IV<br>Computer Operator<br>Research Assistant<br>Secretary II | $622.86 | $661.78 | $700.71 | $739.64 | $778.57 |
| 4 | Accountant II<br>Secretary III<br>General Office Clk. V | $633.05 | $672.61 | $712.18 | $751.75 | $791.31 |
| 5 | Secretary IV | $651.84 | $692.58 | $733.32 | $774.06 | $814.80 |
| 6 | Accountant III<br>Research Analyst<br>Tech Support<br>Programmer I | $675.38 | $717.59 | $759.80 | $802.01 | $844.22 |
| 7 | Software Engineer<br>(DBA I) | $958.48 | $1018.39 | $1078.29 | $1138.20 | $1198.10 |

|  | MINIMUM | AFTER 90 DAYS |
|--|---------|---------------|
| Journalist | $951.85 | $991.51 |

4.00% COLA Per Week

## EXHIBIT A
## EFFECTIVE JANUARY 1, 2006

| GRADE | CLASSIFICATION | MINIMUM | 6 MOS. | 12 MOS. | 18 MOS. | 24 MOS. |
|-------|----------------|---------|--------|---------|---------|---------|
| 1 | Accounting Clk. I<br>General Office Clk. II<br>Mail Service Clerk | $624.90 | $663.96 | $703.02 | $742.07 | $781.13 |
| 2 | Accounting Clk. II<br>Secretary I<br>Recpt/Telephone<br>General Office Clk. III | $635.54 | $675.26 | $714.98 | $754.70 | $794.42 |
| 3 | Accountant I<br>General Office Clk. IV<br>Computer Operator<br>Research Assistant<br>Secretary II | $647.77 | $688.25 | $728.74 | $769.22 | $809.71 |
| 4 | Accountant II<br>Secretary III<br>general Office Clk. V | $658.37 | $699.52 | $740.66 | $781.81 | $822.96 |
| 5 | Secretary IV | $677.91 | $720.28 | $762.65 | $805.02 | $847.39 |
| 6 | Accountant III<br>Research Analyst<br>Tech Support<br>Programmer I | $702.39 | $746.29 | $790.19 | $834.09 | $877.99 |
| 7 | Software Engineer<br>(DBA I) | $996.82 | $1,059.12 | $1,121.42 | $1,183.72 | $1,246.02 |

|  |  | MINIMUM | AFTER 90 DAYS |
|--|--|---------|---------------|
|  | Journalist | $989.92 | $1,031.17 |

3.6% COLA Per Week

## EXHIBIT A
## EFFECTIVE JANUARY 1, 2007

| GRADE | CLASSIFICATION | MINIMUM | 6 MOS. | 12 MOS. | 18 MOS. | 24 MOS. |
|-------|----------------|---------|--------|---------|---------|---------|
| 1 | Accounting Clk. I<br>General Office Clk. II<br>Mail Service Clerk | $647.40 | $687.86 | $728.33 | $768.79 | $809.25 |
| 2 | Accounting Clk. II<br>Secretary I<br>Recpt/Telephone<br>General Office Clk. III | $658.42 | $699.57 | $740.72 | $781.87 | $823.02 |
| 3 | Accountant I<br>General Office Clk. IV<br>Computer Operator<br>Research Assistant<br>Secretary II | $663.09 | $704.53 | $745.97 | $787.42 | $828.86 |
| 4 | Accountant II<br>Secretary III<br>general Office Clk. V | $682.07 | $724.70 | $767.33 | $809.96 | $852.59 |
| 5 | Secretary IV | $702.32 | $746.22 | $790.11 | $834.01 | $877.90 |
| 6 | Accountant III<br>Research Analyst<br>Tech Support<br>Programmer I | $727.68 | $773.16 | $818.64 | $864.12 | $909.60 |
| 7 | Software Engineer<br>(DBA I) | $1,032.70 | $1,097.25 | $1,161.79 | $1,226.34 | $1,290.88 |

| | | MINIMUM | AFTER 90 DAYS |
|---|---|---------|---------------|
| | Journalist | $1,025.56 | $1,068.29 |

Page 28

## EXHIBIT B

The parties hereby agree to the implementation of the change from the New York Life Company health benefits plan to the GCIU National Health Care Plan, to the following:

1.      The GCIU agrees that the GCIU National health Care Plan to be implemented for its employees will provide a level of benefits equal to or better than the present coverage provided by the New York Life Company.

2.      The GCIU agrees that it will self-fund or otherwise insure any shortfalls in coverage under the new GCIU National Health Care Plan which are less than or not covered as compared to coverages previously provided by the New York Life plan.

3.      A Committee to oversee the implementation of the new Plan coverages and to assure that like benefits are provided from the current Plan to the GCIU National Health Care Plan will be established. This Committee shall consist of one representative from the IUG bargaining unit, one representative from the OPEIU bargaining unit and one representative designated by the GCIU. The Committee will meet upon request of two (2) members to deal with issues of implementation. All information relating to implementation shall be provided to Committee members as available. This Committee will deal only with assuring that the GCIU benefit plan will provide equal or better coverages as compared to the former Plan and shall not be empowered to deal with appeals of routine coverage decisions not associated with questions of comparable coverage. Such decisions shall be appealed through the appeals process of the Plan Administrator. A unanimous decision of the Committee as so structured will be required for any decision as to comparability of benefits. A unanimous decision of the Committee shall be governing in determining the appropriate, comparable benefit. In the event of a split decision, the Union reserves the right to pursue the matter through the Grievance and Arbitration provisions of this Agreement.

# GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND

Five Gateway Center, Suite 620  •  60 Boulevard of the Allies  •  Pittsburgh, PA 15222-1219

(412) 201-2233  •  (800) 943-4248  •  Fax (412) 201-2250

## SPECIAL PARTICIPATION AGREEMENT
### BETWEEN

_____
(Name of Employer)

### GCIU
(Name of Local Union)

## AND THE BOARD OF TRUSTEES OF THE
## GRAPHIC COMMUNICATIONS NATIONAL
## HEALTH AND WELFARE FUND

This Special Participation Agreement (the "Agreement") is made and entered into this __2nd__ day of _____July_____, 2001, effective as of the 1st day of _____May_____, __1998__ (the "Effective Date"), by and between _____ (the "Employer) _____GCIU_____ ( the "Local Union"), and the Trustees of the Graphic Communications National Health and Welfare Fund (the "National Fund Trustees").

WITNESSETH:

WHEREAS, the Employer is a party to a collective bargaining agreement with the Local Union under the terms of which the Employer has agreed to make certain contributions to the Graphic Communications National Health and Welfare Fund or its successor by consolidation or merger (the "National Fund") commencing as of the Effective Date (said collective bargaining agreements as in effect from time to time hereinafter the "Bargaining Agreement"; and

WHEREAS, the Employer wishes to become an "Employer" under the National Fund pursuant to Section 1.01(j) of the National Fund's Agreement and Declaration of Trust in order to comply with said Bargaining Agreement, and the Trustees are willing to accept the Employer as an Employer under the National Fund, all upon the terms and conditions herein set forth.

NOW, THEREFORE, for and in consideration of the premises and of the mutual covenants herein contained, the Employer, the Local Union, and the Trustees hereby agree as follows:


PLAINTIFF'S EXHIBIT
C

Graphic Communications National Health and Welfare Fund
Special Participation Agreement

1. By execution of this Agreement, the Employer and the Local Union adopt and agree to be bound by all of the terms and provisions of the Agreement and Declaration of Trust of the Graphic Communications National Health and Welfare Fund dated January 31, 1997 and effective March 1, 1997 (the "Trust Agreement"), as amended from time to time, subject to the terms of this Agreement. The Employer and the Local Union agree to be bound by all actions taken by the Trustees pursuant to the powers granted them by the Trust Agreement.

2. By execution of this Agreement by the Employer, the Local Union, and the Trustees, the Trustees accept the Employer for participation in the National Fund as an Employer pursuant to the terms hereof.

3. All premium payments made to the National Fund by the Employer shall be made in the form and manner established by the Trustees. Concurrent with the premium payments, the Employer shall submit such reports as the Trustees deem necessary for the purpose of properly administering the National Fund and payment of benefits.

4. The eligibility standards for employees and former employees of the Employer for participation in the National Fund shall be determined solely by reference to the Bargaining Agreement that shall be interpreted in accordance with its terms and procedures, or other agreement between the Employer and the Local Union.

5. The National Fund shall assume responsibility for all individuals with COBRA rights resulting from health plan coverage in effect prior to the Effective Date under a predecessor to the Bargaining Agreement.

6. Except as provided in Paragraph 8, levels of benefits under the National Fund shall be determined by the Trustees.

7. Except as provided in Paragraph 8, the Trustees shall determine the required premium amounts due and payable to the National Fund on behalf of eligible Participants. Such required premium amounts shall be established and agreed to by the Employer and the Local Union as the Effective Date. Thereafter, the required premium may be increased by the Trustees only as of March 1 (the "Renewal Date") of each calendar year.

8. In the event that the required premium as established by the Trustees exceeds the amounts specified in the Bargaining Agreement between the Employer and the Local Union to be paid to the National Fund for health and welfare coverage, including premium amounts due, if any, from Participants, [the "shortfall"], the shortfall shall be paid by the Employer, or by the Employer and the Local Union agreeing to reduce the benefit package to a level funded by the premium as determined by the National Fund's actuarial consultant (the "Consultant"), or by the Employer and the Local Union agreeing to premium payments by the Participants to

-2-

Graphic Communications National Health and Welfare Fund
Special Participation Agreement

cover the shortfall. In the event that the Employer and the Local Union cannot agree on whether to reduce the benefit package or to increase the premiums necessary to cover the shortfall, the Trustees shall reduce the benefit package so that the maximum amounts specified in the Bargaining Agreement will be sufficient to fund such a reduced benefit package as determined by the Consultant.

9.    If the Employer is delinquent in making premium payments required under this Agreement, it shall be liable for, and agrees to pay, interest on the money due to the day payment is made, at a rate established by the Trustees pursuant to the Trust Agreement, and such legal, court or other costs incurred in collection proceedings and, further, the Trustees may, in their discretion, suspend or terminate the Employer's status as an Employer. In addition to any other remedy which may otherwise be available, the Local Union, the Trustees or both, shall have the right to sue in any court of competent jurisdiction to secure the payment of any monies due hereunder without the necessity of first utilizing any other remedy. Notwithstanding the foregoing, except as otherwise required under this Agreement, the Trustees shall apply the same rules and procedures with respect to collection of premiums as stipulated in the Trust Agreement.

10.    The Employer shall collect premium payments directly from all Participants in the National Fund as a result of COBRA eligibility or who are otherwise entitled to participate after termination of employment with the Employer. The Employer shall have no responsibility with respect to such premiums except as may be required in the Bargaining Agreement. The Employer is responsible for providing the National Fund with accurate and timely information with respect to "Qualifying Events" as defined in Treasury regulation 54.4980B-4 so that the National Fund can provide such participants with their required COBRA notices.

11.    The Employer's participation in the National Fund is contingent upon such participation not impairing the National Fund's qualification under Section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and the Employer's premium payments being deductible for federal income tax purposes.

12.    The Employer, the Local Union, and the Trustees agree that categories of employees, other than those covered by this Agreement, are not eligible for coverage under the National Fund unless and until they are covered by an amendment to this Agreement or a separate Special Participating Agreement.

13.    The Trustees have provided the Employer and the Local Union with a copy of the Trust Agreement which the Employer and the Local Union acknowledge having received.

Graphic Communications National Health and Welfare Fund
Special Participation Agreement

14.  This Agreement may be amended at any time in writing by the Employer, the Union and the Trustees.  The Employer and the Local Union may terminate participation under this Agreement in accordance with Section 6.04 of the Trust Agreement, but only to the extent that termination is not inconsistent with the terms of the Bargaining Agreement.

IN WITNESS WHEREOF, the Employer and Local Union have caused this Agreement to be executed on their behalf by a duly authorized officer, and the Trustees have caused this Agreement to be executed on their behalf by a duly authorized Employer Trustee and Union Trustee as of the date first above written.

_____          Graphic Communications National
(Name of Employer)                   Health and Welfare Fund

By:_____           By:_____
                                          Union Trustee

Title:_____           By:_____
                                          Employer Trustee

_____GCIU_____
(Name of Local Union)

By: _Gerald Dcrean_

Title:_____

-4-

# GCIU OFFICERS, REPRESENTATIVES AND ORGANIZERS
# RETIREMENT PLAN

# SUMMARY PLAN DESCRIPTION



PLAINTIFF'S
EXHIBIT

Blumberg No. 5113

# THE GCIU OFFICERS, REPRESENTATIVES AND ORGANIZERS RETIREMENT PLAN

## SUMMARY PLAN DESCRIPTION

### BOARD OF TRUSTEES

George Tedeschi, Chairman
Gerald H. Deneau, Secretary
David Grabhorn
Duncan Brown
Philip Roberts

### CONSULTANT AND ACTUARY

The Segal Company

### LEGAL COUNSEL

O'Donnell, Schwartz & Anderson, P.C.

### AUDITOR

Calibre CPA Group, PLLC

GCIU OFFICERS, REPRESENTATIVES AND ORGANIZERS
RETIREMENT PLAN

SUMMARY PLAN DESCRIPTION

December, 2003

To All Participants:

On July 1, 1983 the International Printing and Graphic Communications Union ("IPGCU") and the Graphic Arts International Union ("GAIU") merged. The merged organization was named the Graphic Communications International Union ("GCIU"). As a result, the former International Printing and Graphic Communications Union Pension Trust Fund and Plan was restated and renamed the GCIU Officers, Representatives and Organizers Retirement Plan. Service with the former IPGCU is considered service with the GCIU for the purposes of the Plan.

The Plan has been amended from time to time and was restated in its entirety effective July 1, 2001. **This booklet, which summarizes the most important features of the Plan, generally applies to Plan Participants who have an Hour of Service with the GCIU on or after July 1, 2001.** If you terminated employment with the GCIU before that date, then the provisions of the Plan as in effect when you terminated apply to you.

You are urged to read this booklet carefully. It answers many of the most commonly asked questions about the Plan. Please understand, however, that no general explanation can cover every detail. The official Plan Document represents the final authority and governs in case of doubt or conflict with this booklet. You may receive a copy of the complete text of the Plan by contacting the Trustees.

We suggest you share this booklet with your family since they may have an interest in the Plan. We also suggest you keep this booklet for future reference and let your family know where it is kept.

We believe the benefits provided under the Plan represent worthwhile protection for you and your family, and we are proud to be involved in the continued operation of this valuable retirement program.

Sincerely,

BOARD OF TRUSTEES

TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

PARTICIPATION IN AND CONTRIBUTIONS TO THE PLAN . . . . . .    6

ELIGIBILITY REQUIREMENTS          . . . . . . . . . . . . . . . . . . . . .    7

EARNING SERVICE CREDIT AND VESTING SERVICE . . . . . . . . . .    9

PENSION AMOUNT          . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

DISABILITY PENSION PROVISIONS   . . . . . . . . . . . . . . . . . . . . . .    13

FORMS OF PAYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

PRE-RETIREMENT SURVIVING SPOUSE BENEFITS . . . . . . . . . . .    19

APPLYING FOR A PENSION   . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

TAXES AND SOCIAL SECURITY    . . . . . . . . . . . . . . . . . . . . . . . .    23

GENERAL INFORMATION AND RIGHTS OF PARTICIPANTS  . . . . .    24

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 5

# INTRODUCTION

The questions asked on the following pages are those most commonly asked about the Plan.  The answers have been written in laymen's language.  If you still have questions after reading this summary of the Plan, you may obtain further details on any subject by contacting the Plan Administrator.

Some important features of your Plan follow:

- You receive full credit for your prior service with the IPGCU (if any) and Vesting Service for your service with the GAIU (if any).

- A pension from this Plan is in addition to any Social Security benefits you may receive.

- Normal Retirement Age under the Plan is age 60.  However, you may retire as early as age 50 on a reduced pension.

- You must submit an application before benefits can start.

- There are special provisions for disability and death benefits.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 6

## PARTICIPATION IN AND CONTRIBUTIONS TO THE PLAN

1.    Who is covered by the Plan?

The Plan covers full-time **Officers** and certain full-time **Employees** of the Graphic Communications International Union (GCIU or International).  To be considered "full-time", you must complete at least 20 Hours of Service each week for not less than five months in the calendar year or at least 1000 Hours in the calendar year.

Following is a list of the participants:

Officers of the GCIU who are covered by the Plan:

the President,

the Secretary-Treasurer, and

Vice Presidents or other persons specified as Officers in the GCIU's Constitution

Employees of the GCIU who are covered by the Plan are the following:

the Executive Assistant(s) to the President,

International Representatives,

Organizers,

Organizing Coordinator of the International who is appointed by the President, and

Any other person employed by the International who is not included in a unit of employees represented by a labor union whose pension has been the subject of good faith bargaining.

Work for the International as an Officer or Employee as described above is called **Covered Employment**.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 7

2.    How do I become a participant in the Plan?

If you were a full-time Officer or Employee covered by the Plan on July 1, 1983, you are considered a participant in this Plan as of that date. If you became an Officer or Employee after July 1, 1983, you must complete 20 or more Hours of Service in each week for five calendar months or at least 1,000 Hours of Service in a consecutive twelve-month period in order to become a participant in the Plan. Your date of participation is retroactive to your date of hire.

3.    What is an Hour of Service?

An Hour of Service is each hour for which you are paid or entitled to payment for the performance or non-performance of duties during the course of your employment with GCIU (and the former GAIU and IPGCU).

4.    Who pays the cost of the Plan?

This Plan is funded completely by the GCIU. Participant contributions are neither required nor permitted.

## ELIGIBILITY REQUIREMENTS

5.    When am I eligible to receive a pension?

You are entitled to receive a monthly pension if you fulfill the eligibility requirements for one of the following types of pensions:

**Regular Pension**: This pension is designed for Participants who are employed by the International at the time of their retirement. To be eligible, you must be at least age 60 and actively employed as an Officer or Employee covered by the Plan immediately preceding your retirement.

**Deferred Retirement Pension**: This pension is designed for Participants who earned substantial Vesting Service under the Plan but terminated employment with the GCIU before retirement. To be eligible, you must be at least age 60 and,

- have at least five years of Vesting Service including one or more Hour of Service after December 31, 1988

or,

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 8

- if you terminated employment with the GCIU on or before December 31, 1988, you must have at least six years of Vesting Service.

- **Early Retirement Pension**: This pension is designed for any Participant who is "Vested" in the Plan (see Q & A 10 for information on Vesting), who has attained at least age 50 and who elects to retire early on a reduced pension.

- **Disability Pension**: This pension is designed for Participants who become totally and permanently disabled before normal retirement age and while employed by the GCIU. To be eligible you must have least 5 years of Credited Service.

6.    What does "totally and permanently disabled" mean?

To be considered totally and permanently disabled, your disability must prevent you from engaging in any occupation for profit for which you are suited by education or training. The disability must have been continuous for a least a consecutive five-month period, and, in the opinion of a qualified physician approved by the Board of Trustees, must be likely to continue for the remainder of your life.

7.    What must I do to prove my disability?

You must submit an application for approval and investigation by the Trustees. Once you have retired on a Disability Pension, the Trustees may periodically require you to submit evidence relating to your continued disability until you reach age 60.

8.    What happens if I recover from my disability while I am receiving a Disability Pension?

If you recover prior to age 60, you must notify the Trustees in writing within 15 days of the date of your recovery. Your Disability Pension payments then stop and, if you return to work and participate in the Plan you may earn additional Credited Service. Any additional Credited Service you earn is counted when you eventually retire again. The amount of any subsequent pension is not affected by your prior receipt of a Disability Pension.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 9

## EARNING CREDITED SERVICE AND VESTING SERVICE

9.    How do I earn a year of Credited Service?

Once you become a Participant in the Plan, you earn Credited Service for each calendar year in which you complete at least 20 Hours of Service in each week for five or more months or at least 1,000 Hours of Service. Partial years of Credited Service are also earned in monthly increments. A maximum of twenty years of Credited Service is used to determine the amount of your pension benefit.

10.    What is Vesting Service?   Vesting Service is service that counts towards your eligibility for a Deferred Retirement Pension. Once you earn the minimum number of years of Vesting Service to be eligible for a Deferred Retirement Pension, you are "**Vested**" in the Plan. This means that you are permanently entitled to a pension even if you terminate employment with the GCIU. If you terminate employment on or before December 31, 1988, you are partially vested with six years of Vesting Service (see Vesting Schedule in Q & A 19). If you have at least one Hour of Service after December 31, 1988, you are fully Vested with five years of Vesting Service. Also, if you terminate employment with the GCIU on or before December 31, 1988, the amount of the Deferred Retirement Pension, while based on the Regular Pension formula, is reduced if you have fewer than 10 years of Vesting Service.

11.    How is Vesting Service earned?

For each calendar year in which you earn a full year of Credited Service, you also earned a year of Vesting Service. However, partial years of Vesting Service are not recognized by the Plan.

12.    What happens if I terminate employment with the GCIU before I am Vested?

If you leave employment with the GCIU before you are Vested in the Plan and you are absent from such employment for nine consecutive calendar years or longer, all of your previously earned years of Credited Service and Vesting Service are cancelled. This is called a "Break in Continuity." Should you return to employment with the GCIU you will be treated as if you are a newly employed Officer or Employee with no prior participation in the Plan.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 10

13.    Is all time away from work counted in determining whether I have had a Break in Continuity?

No. If you stop working in Covered Employment to enter qualified military service of the United States, your absence will not count toward a Break in Continuity provided you are entitled to re-employment rights and pension benefits under the Uniformed Services Employment and Re-employment Rights Act (USERRA). In addition, you will receive Credited Service and Vesting Service for the period of your absence. To meet the requirements of USERRA, you must generally:

a) Be absent from Covered Employment due to your military service;
b) Give advance notice of your military service to the International unless notice is prevented by military necessity or is otherwise impossible to give due to the circumstances;
c) Be absent due to military service of five or fewer years unless extended service is required as part of your initial period of service or your service is involuntarily extended such as during war;
d) Apply for your job in Covered Employment with the required time period after leaving the military; and
e) Receive an honorable discharge or satisfactorily complete military service. For periods of military service of fewer than 31 days or an absence due to a fitness exam, you must report back to Covered Employment no later than the first regularly scheduled work period on the first day, after an eight hour break and after time for travel back home. For periods of military service from 31 to 180 days, you must report back within 14 days of the date you leave military service. For service over 180 days, you must report back within 90 days of completion of military service. These periods may be extended under the law under certain circumstance.

Also, absence due to Maternity, Paternity, Family or Medical Leave as described below will not be counted towards a Break in Continuity for the Plan Year in which your absence begins or in the following Plan Year if your absence begins in a year which you have already earned Credited Service.

Maternity, Paternity, Family or Medical Leave is absence from Covered Employment due to one or more of the following:

a) your pregnancy;
b) the birth of your child;
c) placement of a child with you through adoption;
d) the care of a child for a period beginning immediately after birth or placement;
e) care for a spouse or other immediate family member with a serious illness; or
f) your own illness pursuant to the Family and Medical Leave Act of 1993 and the regulations thereunder.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 11

You will be required to establish to the satisfaction of the Trustees that your absence is due to one of the reasons described above. Also, you must inform the Trustees within two years of the date you are first absent in order for the period of absence not to count toward a Break in Continuity. Keep in mind that periods of Maternity, Paternity, Family or Medical Leave **do not count** in the calculation of your pension amount.

## PENSION AMOUNT

14.    How is the amount of my pension determined?

The amount of your pension is based on your Final Salary and your years of Credited Service at retirement. It is payable monthly for your life and may become payable to your spouse or beneficiary after your death (See Q & A's 23-35)

Your **Final Salary** is the average of your highest consecutive five years of earnings/salary out of the last ten years of employment immediately prior to retirement or termination of employment.

15.    What is Salary?

Salary includes your compensation, wages, earnings and any other amounts received by you for personal services rendered to the International. Special pay, overtime, per diem expense allowances, reimbursement for other expenses and contributions to a deferred compensation plan (to the extent not included in your gross income) are excluded from the calculation of your Final Salary. In addition, the Internal Revenue Code requires the Plan to disregard the salary of any participant in excess of an amount determined each year by the Internal Revenue Service. For the Plan Year which began January 1, 2003, that amount was $200,000 (adjusted each year for cost of living increases).

16.    How is the Regular Pension calculated?

The amount of the annual Regular Pension is equal to 2% of your Final Salary multiplied by your years of Credited Service to a maximum of twenty years. The maximum benefit payable under the Plan is forty percent of Final Salary per year. (**Note: If you are eligible for a benefit from the GCIU Supplemental Retirement and Disability Plan, your benefit from this Plan may be reduced. See Q & A 17 for details**)

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 12

For example:

Let's say you retire directly from employment with the GCIU. You are age 60 with twenty years of Credited Service and a Final Salary of $60,000. You are eligible for the following monthly Regular Pension for life:

2% x $60,000 x 20 years = $24,000 (Annual Benefit)
$24,000 divided by 12 months = $2,000 a month for life.

Note: This pension amount is subject to reduction depending on the payment form. See Q & A's 23-35.

17.    How does a benefit payable from the GCIU Supplemental Retirement and Disability Plan affect the amount of my pension payable from this Plan?

If you are eligible for a benefit from the GCIU Supplemental Retirement and Disability Plan ("GCIU SRDF") and that benefit, when combined with your pension from this Plan, exceeds 40% of your Final Salary, then the amount of your pension from this Plan will be reduced such that the total amount you receive from both Plans does not exceed 40% of your Final Salary. **Note that only the portion of your GCIU SRDF benefit which is attributable to employment with the GCIU (or GAIU) is taken into account under these Plan provisions.**

If your pension is subject to the foregoing reduction and the amount you are receiving from the GCIU SRDF is ever reduced or terminated under the terms of that Plan such that your combined benefit no longer exceeds 40% of your Final Salary, then the amount payable from this Plan will be increased to a maximum of the amount payable from this Plan before it was reduced. However, the amount you receive from both Plans combined will not exceed 40% of your Final Salary (except as provided below).

The Cost of Living adjustment (COLA) (See Q & A 22) is applied to the amount payable to you from this Plan before any reductions made under these rules. Also, in determining whether your benefit exceeds 40% of your Final Salary, the Cost of Living adjustment is disregarded.

For example:

Using the same example as above, let's say you also participated in the GCIU SRDF while employed by the GCIU (or predecessor union). Under that Plan you are eligible for a Basic Retirement Benefit of $300 and a Supplemental Early Retirement Benefit of $300. Since your pension under this Plan when combined with your GCIU SRDF benefits cannot exceed $2,000 per month, your monthly benefit under this Plan is reduced by $600 to $1,400 per month. However, at the time your $300 Supplemental Early Retirement Benefit

ceases (upon attainment of Social Security retirement age), your benefit under this Plan will be increased by $300 per month to $1,700 per month so that the total amount you receive from both Plans remains at $2,000. And remember, your COLA is always based on the full amount of your benefit under this Plan, in this case, $2,000 per month.

18. How is the amount of the Disability Pension calculated?

If you qualify for a Disability Pension, the calculation of your monthly benefit is based on retirement at age 60 even if you become eligible for this benefit at an earlier age. The amount of the pension is determined in the same manner as a Regular Pension. See Q&A's 5-8 for additional information about the Disability Pension. However, the cost of living adjustment described in Q & A 22 will not be applied to your Disability Pension until you reach age 60.

19. How is the amount of the Deferred Retirement Pension calculated?

If you have at least one Hour of Service under the Plan after December 31, 1988, the Deferred Retirement Pension is calculated in exactly the same way as the Regular Pension, that is, 2% of your Final Salary multiplied by your years of Credited Service.

If you terminated employment with the GCIU on or before December 31, 1988, the amount of your Deferred Retirement Pension is based on the Regular Pension but then reduced if you have fewer than ten years of Vesting Service. (With ten years of Vesting Service, you are entitled to the full Regular Pension amount). The following table shows the percentage of the Regular Pension that is vested and therefore payable with fewer than ten year of Vesting Service.

| Years of Vesting Service | Percentage Vested of Accrued Regular Pension Payable at Age 60 |
|---|---|
| 6 | 20% of Regular Pension |
| 7 | 40% of Regular Pension |
| 8 | 60% of Regular Pension |
| 9 | 80% of Regular Pension |
| 10 or more | 100% of Regular Pension |

20. How is the amount of the Early Retirement Pension calculated?

The Early Retirement Pension is calculated in the same manner as the Regular Pension but is then reduced to account for the longer period of time over which you will be paid. The reduction is an "actuarial reduction" which means that the amount you receive is equivalent to the amount you would have received if you had delayed your retirement to age 60.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 14

For example:

Using the same example, let's say you are entitled to $2,000 per month from the Plan but you are age 55 rather than age 60. Your Regular Pension amount is reduced to $1,407.60 per month since you are expected to collect benefits for a longer period of time.

21.    Are there any restrictions on the amount of pension I may receive?

Yes. The maximum years of Credited Service used in calculating your pension is twenty years and under no circumstances may your benefit exceed forty percent of your Final Salary. (The COLA is disregarded for this purpose). Also, as described in Q & A 17, if you are eligible for a benefit form the GCIU Supplemental Retirement and Disability Plan, your benefit under this Plan may be reduced such that the total amount payable from both Plans combined does not exceed 40% of your Final Salary. Federal law also limits pension amounts. It is unlikely that you will be affected by those limitations but if you are, you will be notified by the Plan Administrator.

22.    Once I retire, will my retirement benefit be increased?

Yes. The amount of your pension is increased each July 1 by an amount equal to the annual cost of living adjustment (COLA) in salary granted to Employees of the GCIU for the prior calendar year. If you retired on a Disability Pension before reaching Normal Retirement Age, however, these increases do not apply to you until you reach age 60.


**FORMS OF PAYMENT**


23.    How is a pension usually paid?

Unless you (and your spouse if you are married) elect otherwise, your pension is paid as follows:

If you are single at retirement, your benefit is paid monthly throughout your life. If you die prior to receiving 120 monthly payments, payments will continue to be made to your designated beneficiary(ies) until 120 monthly payments have been made after which time, all payments will cease.

If married at retirement you can elect to receive payment in the form of a Husband and Wife Pension (see Q & A's 26-29 for details).

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 15

24.    May I elect to receive my pension in one lump-sum?

No. However, any benefits payable under the Plan with a present value of $5,000 or less are automatically paid out in one lump-sum.

25.    What payment options can I select?

If you are single at retirement, you may select the 50%, 75% or 100% Joint and Survivor Option instead of the standard form of payment (see Q & A 23). If you are married and you and your spouse have waived your rights to a Husband and Wife Pension, you may select any form of benefit payment available to a participant who is single.

26.    What is a Husband and Wife Pension?

Under the Husband and Wife Pension, a lifetime benefit is provided for both you and your surviving spouse.  Under this arrangement, the amount of the monthly benefit otherwise payable to you is reduced during your lifetime so that upon your death, 50% of the pension you were receiving is paid to your surviving spouse for life.  The amount of the reduction in your benefit depends on your age and your spouse's age when you retire.  In addition, the amount of the reduction depends on type of pension (Regular, Early, Deferred or Disability) on which you retire.

For example, if you are entitled to a Regular Pension of $2,000 a month and you and your spouse are both age 60 when you retire, the percentage of your unreduced pension payable for life is 92.1%.

$$92.1\% \times \$2,000 = \$1,842$$

Upon your death, your surviving spouse will receive a 50% of your benefit for life, that is, $921.00 per month.

If you are entitled to a Disability Pension, the percentage of your unreduced benefit payable as a Husband and Wife Pension is somewhat less. For example, if you are entitled to a Disability Pension of $2,000 per month and you and your spouse are both age 60 when you retire, the percentage of your unreduced pension payable for life as a Husband and Wife Pension is 79%.

$$79\% \times \$2,000 = \$1,580$$

Upon your death, your surviving spouse will receive 50% of your benefit for life, that is, $790 per month.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 16

27.    Will the amount of my pension change if my spouse dies or we are divorced?

After retirement: If you and your spouse are divorced after your pension becomes payable, the Husband and Wife Pension remains in effect. However, at retirement, you may elect to have the reduced benefit payable under the Husband and Wife Pension restored to the full amount of the single life annuity should your spouse die before you do. If you elect this pop-up option, your benefit amount at retirement will be reduced by an additional amount. The amount of the reduction depends on your age at retirement. Your pension will be restored to the full amount of the single life annuity in the first month following the month of your spouse's death. If your pension is restored to a single life annuity and your should die before a total of 120 months of payments have been made, the remaining payments will be made to your designated beneficiary.

Before retirement: If your spouse dies or you and your spouse are divorced before you retire, your pension is not payable in the form of a Husband and Wife Pension with your former spouse as your beneficiary unless, in the case of divorce, the Plan is directed to do so under the terms of a qualified domestic relations order (QDRO). (See Q & A 53 for details.)

28.    What are the eligibility requirements for a Husband and Wife Pension?

To be eligible for a Husband and Wife Pension, you and your spouse must be married at the time benefits start. In addition, you must have been married to each other for at least one year ending when benefits begin or, if you were not married for the whole year, at least one year on the date of your death. If you and your spouse are married for less than one year when your benefits begin and you should die before having been married for one full year, your spouse will receive a payment equal to the difference between the amount you received in the Husband and Wife Pension form and the amount you would have received if you had waived the Husband and Wife Pension.

Once you are advised about the effect of the Husband and Wife Pension on the amount of your pension, you have ninety days to make a decision about the form of your pension payment. You and your spouse may change your decision at any time during this period. However, once payments begin, you cannot change your mind.

29.    How do I waive the Husband and Wife Pension?

You and your spouse must sign a waiver form and your signatures must be witnessed by a notary public. The waiver form explains the effect of selecting or rejecting a Husband and Wife Pension. The form also explains your spouse's right to know who is named as your beneficiary.

30.    What are the Joint and Survivor Options?

Under the 50%, 75% and 100% Joint and Survivor Options, you elect to receive a reduced retirement pension with the provision that in the event of your death after retirement, 50%, 75% or 100% of your pension (per your election) will continue to be paid for life to your designated beneficiary.  The amount of the pension you would otherwise receive is reduced to take into consideration the longer period of time over which payments will be made.  Since the amount of your benefit depends upon the age difference between you and your beneficiary, the election of someone considerably younger than yourself will result in a significant reduction in your own benefit.

31.    How is the amount of my pension calculated if I elect the Joint and Survivor Option?

If you elect the 50% Joint and Survivor Option, your pension is calculated in exactly the same way as a Husband and Wife Pension is calculated.  The same percentages are used to calculate the adjusted benefit based on the difference in ages between you and your designated beneficiary. Under the 75% and 100% Joint and Survivor Options, after your death either 75% or 100% (per your election) of the amount you were receiving is payable to your beneficiary.  The percentage reductions are higher than those used in the 50% Joint and Survivor Option since the amount which may be payable after your death is higher.

32.    What happens if my beneficiary predeceases me?

At retirement, you may elect to have the reduced benefit payable under the Joint and Survivor Option restored to the full amount of the single life annuity should your beneficiary die before you do.  If you elect this pop-up option, your benefit amount at retirement will be reduced by an additional amount.  Your pension will be restored to the full amount of the single life annuity in the first month following the month of your beneficiaries death.  If your pension is restored to a single life annuity and your should die before a total of 120 months of payments have been made, the remaining payments will be made to your newly designated beneficiary.

33.    Are there any circumstances under which the Joint and Survivor Option is not payable?

Yes.  Your election of the Joint and Survivor Option will become void if you or your designated beneficiary die before pension payments to you begin.  In addition, if your designated Beneficiary predeceases you, no survivor benefits are payable after your death.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 18

34.    How do I designate a beneficiary?

Forms to designate or change your beneficiary are available from the Plan Administrator. The Trustees will pay benefits based on the most recent designation on file prior to your death. If at your death no beneficiary has been designated or your beneficiary predeceases you, any benefit otherwise payable to you will be paid in the following order of priority:

- to your spouse;
- if no surviving spouse, then to your children, divided equally among them;
- if no surviving spouse or children, then to your surviving parents, divided equally between them; or
- if none of these people survive you, then to your estate.

35.    Are there any restrictions regarding the designation of my beneficiary?

Yes. If you name someone other than your spouse as your beneficiary, your spouse must sign a form waiving his or her rights to any surviving spouse benefits and acknowledging your selection of and the identity of the alternate beneficiary. Your spouse's signature must be witnessed by a notary public. In addition, you must have claimed your designated beneficiary as a dependent for personal income tax purposes in the tax year immediately preceding the designation. Also, you may not designate anyone who, because of the difference in your ages, would cause your benefit, when determined, to be less than 50% of the unreduced amount. You are required to furnish proof of your age and the age of your beneficiary when you file your beneficiary designation form.

\*    \*    \*

## **IMPORTANT REMINDER**

If you are married and vested and you do not name your spouse as your beneficiary, your designation is not valid unless both you and your spouse sign the necessary waiver forms and your signatures are witnessed by a notary public. Your spouse must acknowledge in writing that he or she is aware of both the effect of the waiver and the right to know the identity of the named beneficiary.

\*    \*    \*

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 19

## PRE-RETIREMENT SURVIVING SPOUSE BENEFITS

36.    What happens to my benefit if I die before I retire?

The Plan provides two types of death benefits to protect your surviving spouse. One is the Pre-Retirement Surviving Spouse Pension which is payable to your spouse as a monthly life annuity. The other is a monthly benefit equal to 100% of the monthly pension which would have been payable to you had you retired the day before your death. This benefit is payable for only 120 months, and your death must have occurred after you reached age 60. Your eligible surviving spouse may receive only one type of death benefit.

37.    What is a Preretirement Surviving Spouse Pension?

A Pre-Retirement Surviving Spouse Pension is a benefit payable to your surviving spouse if you and your spouse have been married for at least one year at the time of your death and you die after becoming eligible for a pension but prior to retirement. Under this provision, your surviving spouse receives a monthly benefit for life equal to 60% of the pension you would have received if you had retired on a Husband and Wife Pension on the day before your death.

38.    When is the Pre-Retirement Surviving Spouse Pension payable?

If you have not reached age 60 at the time of your death, benefit payments to your surviving spouse are postponed until the first day of the month following the month you would have reached age 60 if you had lived. If you have reached age 60 at the time of your death, monthly payments to your surviving spouse can begin as early as the first day of the month following the date of your death.

39.    What is the 120 Monthly Payments Option?

If you die after attaining age 60, your spouse may elect to receive, in lieu of the Pre-Retirement Surviving Spouse Pension, a monthly death benefit equal to 100% of the amount which would have been payable to you if you had retired on a single life annuity and died the next day. This death benefit is payable to your surviving spouse for a total of 120 months. No benefits are payable after your surviving spouse's death even if he or she should die before receiving 120 monthly payments.

40.    Can my surviving spouse elect to receive payment of a Pre-Retirement death benefit in a lump sum?

No.  However, if your spouse elects to receive the death benefit equal to 120 payments of your monthly pension and the lump sum value of this benefit is less than the lump sum value of the Pre-Retirement Surviving Spouse Pension, the difference in the amounts is paid to your surviving spouse in a lump sum.  In addition, any benefits payable under the Plan with a present value of $5,000 or less are automatically paid out in one lump sum.  See Q & A 52 for information on taxation of lump sum benefits.

41.    When am I eligible for the Pre-Retirement Surviving Spouse Pension?

Coverage for the Pre-Retirement Surviving Spouse Pension begins once you are vested in the Plan.

## APPLYING FOR A PENSION

42.    How do I obtain an application for a pension and apply for a benefit?

Pension application forms are available by contacting the Trustees or you may ask the Plan Administrator to mail the forms to you.  The application contains instructions on how to complete it and how to elect or reject the Husband and Wife Pension and Pop-Up. The application also contains a designation of beneficiary form.  When you have completed the application as accurately as possible and attached the required proof of birth (and marriage) for yourself and your beneficiary, you should sign the form and return it to the Plan Administrator.

The Plan Administrator will acknowledge receipt of your application and supporting documents and will notify you if the Trustees need additional information.  After your application has been reviewed by the Plan Administrator, it is submitted to the Trustees for approval. The Trustees will issue a decision on whether or not you are eligible for a pension within 90 days (within 45 days for Disability Pension applications) after receipt your application by the Plan Administrator, unless special circumstances require an extension of time, in which case a decision on your application will be provided to you not later than 120 days after receipt of your complete application.  Written notice of the required extension of time will be furnished to you prior to the expiration of the initial 90-day period and will indicate the special circumstances requiring an extension of time for processing your application and will indicate the date the Trustees expect to render their decision.  Disability Pension application determinations may be extended twice, each time for up to 30 days provided notice of each extension is given prior to expiration of each prior notice period.

43.    When do pension benefits begin?

Benefits are payable beginning the first day of the month after you have fulfilled all the eligibility requirements including the filing of an application.    Unless additional information or time is required to process your application, benefit payments will begin in the month following the month in which your application is received by the Plan Administrator.

44.    Am I permitted to work past Normal Retirement Age (age 60)?

Yes, but your pension cannot begin until you actually retire under the Plan (unless you attain age 70 ½). (See Q & A 46.) If you continue working past Normal Retirement Age and work for at least 40 hours per month you will be notified by the Plan Administrator that your pension is being suspended and permanently withheld.   You will continue to accrue Credited Service (unless you have the maximum 20 years of Credited Service) and any increases in salary that your earn after Normal Retirement Age will be taken into account when calculating your pension. In addition, if you return to work for the International after you have already retired, your pension will be suspended for any month in which you work 40 or more hours.   You will be notified by the Plan Administrator about the suspension of your pension and you have the right to appeal the suspension if you believe if is erroneous.

45.    Are pensions ever paid retroactively to a date before the application is filed?

Yes, but only if the Trustees find that your failure to make a timely application was due to extenuating circumstances.   Also, if you are over age 60 and have not worked for some time, your pension is paid retroactive to 60 days after the later of the end of the calendar year in which you last worked in Covered Employment or reached age 60.

46.    Can I postpone the commencement date of my pension payments?

Yes.  You may delay the commencement date of your pension payments until the April 1 following the calendar year you reach age 70 1/2. After that date, the Plan must begin to pay you your pension benefits even if you continue to work in employment covered by the Plan.

47.    What happens if my claim for benefits is denied?

If your application for a pension is denied in whole or in part, the Trustees decision will be in writing and will include the specific reasons for the denial and reference to the Plan provisions on which the denial is based.   You will also be advised of any additional information which you need to submit in order to re-file your application, along with an explanation of why such additional information is needed and how the procedure for

appealing the Trustees' decision works. If for any reason you are not notified of the denial of your pension application in accordance with these procedures, then your application is deemed to be denied and you are permitted to proceed with an appeal of the Trustees' denial. (See Q & A 48.)

48.    If my application is denied, do I have the right to appeal?

Yes. If you are dissatisfied with the written decision of the Trustees, you or your authorized representative have the right to appeal the matter to arbitration in accordance with the labor arbitration rules of the American Arbitration Association. If your appeal concerns a non-disability retirement benefits, you must appeal the adverse determination in writing to the Plan Administrator within 60 days after receipt of the notice of denial of benefits. If your appeal concerns a Disability Pension, your appeal must be filed within 180 days after receipt of the notice of denial. All appeals must be in writing and should include any written comments, documents, records, and other information in support of your appeal. Upon request and free of charge, you will be provided with reasonable access to copies of all documents, records and other information upon which the Trustees' initial decision was based. You will be provided with written notice of the decision on your appeal within 60 days of receipt (45 days for Disability Pension applications) unless special circumstances require an extension of time, in which case a decision on your appeal will be provided to you not later than 120 days (90 days for Disability Pension applications) after receipt of your appeal. Written notice of the required extension of time will be furnished to you prior to the expiration of the initial 60-day period (or 45 day period for Disability Pension applications) and will indicate the special circumstances requiring an extension of time for processing your appeal and will indicate the date a decision is expected.

The questions for the arbitrator will be (i) whether the Trustees were in error on an issue of law; (ii) whether they acted arbitrarily or capriciously in the exercise of their discretion, and (iii) whether their findings of fact were supported by substantial evidence. The decision of the arbitrator will be final and binding upon the Trustees, you, and all other interested parties. However, in the event the appeal is denied, you have the right to bring a civil action under §502(a) of the Employee Retirement Income Security Act of 1974, as amended. The expense of arbitration shall be borne by the Trust Fund.

Also, with respect to any appeal of a denial of a Disability Pension, if a determination involves medical judgement, any health care professional who is consulted in connection with the appeal will have appropriate training and will not be the health care professional who was consulted in connection with the adverse benefit determination that is the subject of the appeal.

The same procedures apply if, after your death, your surviving spouse or other beneficiary makes a claim for benefits under the Plan.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 23

## TAXES AND SOCIAL SECURITY

49.    Does the pension I receive from this Plan affect my Social Security benefits in any way?

No.  The amount of your pension is in addition to any Social Security benefits to which you are entitled.

50.    When does Social Security start?

For employees born before 1938, full Social Security benefits are payable at age 65 or reduced benefits at age 62.  For employees born in 1938 or later, Social Security benefits are payable later on a graduated scale. For more information, call your nearest Social Security Administration office and ask for a current booklet explaining benefits.

51.    Is my pension taxable income?

Maybe. Whether your pension is taxable depends on your total income at retirement. You will receive a W-2P form from the Plan each year showing the amount in benefits paid to you under this Plan.

52.    May I have money withheld from my pension for the payment of federal income tax?

Yes.  In fact, you must file a withholding form (W-4P) with the Plan Administrator indicating whether or not you want withholding from your monthly check.  If your monthly check is greater than $1,320, the Fund must withhold federal income tax if you fail to file a Form W-4P with instructions. In such cases, the Fund assumes you are married with three dependents.  In addition, if you receive your pension in one lump sum (see Q & A 24 regarding lump sum payments), the Plan may be required by federal law to withhold 20% of your benefit payment unless you timely notify the Plan to transfer ("rollover") your distribution to an IRA or other qualified retirement plan that accepts rollovers.  If you are effected by this law, you will be notified by the Plan office regarding your rollover options.

53.    Can my pension be assigned to another party or otherwise alienated?

Generally, pension benefits are not subject to garnishment or attachment.  However, there is an exception in the case of payment of alimony, child support or other payments to a former spouse, child or other dependent if required under the terms of a "qualified domestic relations order" or QDRO issued by a state court pursuant to state domestic relations law.  A QDRO must meet certain requirements of the Internal Revenue Code of 1986 and the Employee Retirement Income Security Act of 1974.  A QDRO may require the

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 24

Plan to pay a portion of your pension to a former spouse or child (called an "alternate payee"). In addition, a QDRO may require that a former spouse be treated as the surviving spouse for the purposes of surviving spouse benefits payable by the Plan. A QDRO cannot require the Plan to provide any type or form of benefit or any option not otherwise provided by the Plan or to pay out more than it would have paid absent the QDRO.

When the Plan Administrator receives a judgement, decree or order concerning a property settlement agreement that requires the Plan to pay all or a portion of your benefit to an alternate payee pursuant to state domestic relations law, the Plan Administrator will notify you and any prospective alternate payee of the procedures for determining whether it is a QDRO. If you would like additional information about QDRO's or if you would like a copy of the Plan's QDRO procedures, please contact the Plan Administrator.

## GENERAL INFORMATION AND RIGHTS OF PARTICIPANTS

The following information is provided to inform you of how the Fund is operated on a day-to-day basis and who is responsible for basic decisions.

### Fund Administration

The GCIU Officers, Representatives and Organizers Retirement Fund is administered by a Board of Trustees consisting of six Trustees appointed by the Board of Directors of the GCIU. The Trustee have appointed a Plan Administrator who has the responsibility of keeping the records of the Fund and Plan and making benefit payments.

The names and address of the Board of Trustees are as follows:

George Tedeschi, Chairman
President, GCIU
1900 L Street, N.W.
Washington, D.C. 20036

Gerald Deneau, Secretary
Secretary-Treasurer, GCIU
1900 L Street, N.W.
Washington, D.C. 20036

Philip Roberts
International Representative
GCIU
408 Covington Bend
White House, TN 37188

David A. Grabhorn

Duncan Brown

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 25

International Vice President,
GCIU
1900 L Street, NW
Washington, DC 20036

International Vice President,
GCIU
2600 Skymark Avenue
Mississauga, Ontario, Canada
L4W 5B2

The name, address and telephone number of the Plan Administrator is:

> John Marshall
> Plan Administrator
> GCIU Officers, Representatives & Organizers
> Retirement Plan
> 1900 L Street, N.W.
> Washington, DC  20036
> Telephone(202)721-0561

The Employer Identification Number (EIN) assigned to the Board of Trustees by the Internal Revenue Service is 62-0247360.  The number assigned to the Plan by the Board of Trustees is 001.

For purposes of maintaining the Fund's fiscal records, the year-end date is June 30.

The Board of Trustees has been designated as the agent for the service of legal process.

## Type of Plan

The Plan is a defined benefit pension plan.

## Funding Medium

Benefits are provided from the Fund's assets which are accumulated under the provisions of the Agreement and Declaration of Trust and the Plan Document.  The assets are held in trust to provide benefits for covered participants and their beneficiaries, and to pay reasonable administrative expenses.

## Contribution Source

Substantial contributions are made to the Fund by the GCIU on a periodic basis.  The amounts contributed are sufficient to fund all of the benefits on a scheduled basis as required by law.  No contributions are made to the Fund by participants.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 26

**Benefit Limitations Under Federal Law**

Federal law imposes a maximum dollar limit on the amount of benefit payable from pension plans. This limit applies to the combined benefits payable to you from all the qualified pension plans sponsored by the GCIU. If you are effected by these limits, you will be notified by the Plan Administrator.

**Amendment and Termination of the Plan**

It is the intention of the Board of Trustees that this Plan be a permanent arrangement. However, the Board of Trustees reserves the right to amend, discontinue or terminate this Plan in whole or in part subject to the terms of any applicable collective bargaining agreements. In the event of Plan termination or discontinuance, you will not accrue any further benefits under the Plan. However, the benefits you already have accrued will become vested, that is, nonforfeitable, to the extent your benefits can be funded by the Plan assets allocated for such benefits.

If there are more than enough assets available to pay the expenses of termination and fund all of the benefits described in the Plan, the Trustees will distribute any surplus in a way that it determines best achieves the purposes of the Plan. The assets will be used only to pay benefits to participants (or their families, beneficiaries or dependents), to pay the cost of administering the Plan or for other purposes of the Plan.

If, however, there are not enough assets to pay for all of the benefits described in the Plan after providing for the expenses of termination, the remaining assets will be allocated in accordance with Section 7.02 of the Plan Document and as otherwise required by law. In general, that Section provides that benefits will be divided into four categories of descending order of priority. Available assets will be allocated first to the first category which, as a general rule, includes pensions that were in pay status three years prior to the termination or would have been in pay status at that time if the participant had chosen to retire. If there are enough assets to pay for all benefits in this category, the excess will be allocated to each of the remaining categories in succession. No assets will be allocated to any category unless there are enough assets to fund all benefits in the preceding category. It is important to note that this is only a brief and general description of the allocation procedures. if you desire a full description, please consult Section 7.02 of the Plan Document.

**The Pension Benefit Guaranty Corporation**

Your pension benefits under this plan are insured by the Pension Benefit Guaranty Corporation (PBGC), a federal insurance agency. If the plan terminates (ends) without enough money to pay all benefits, the PBGC will step in to pay pension benefits. Most people receive all of the pension benefits they would have received under their plan, but some people may lose certain benefits. The PBGC guarantee generally covers: (1) Normal

and early retirement benefits; (2) disability benefits if you become disabled before the plan terminates; and (3) certain benefits for your survivors. The PBGC guarantee generally does not cover: (1)Benefits greater than the maximum guaranteed amount set by law for the year in which the plan terminates; (2) some or all of benefit increases and new benefits based on plan provisions that have been in place for fewer than 5 years at the time the plan terminates; (3) benefits that are not vested because you have not worked long enough for the International; (4) benefits for which you have not met all of the requirements at the time the plan terminates;(5) certain early retirement payments (such as supplemental benefits that stop when you become eligible for Social Security) that result in an early retirement monthly benefit greater than your monthly benefit at the plan's normal retirement age; and (6) non-pension benefits, such as health insurance, life insurance, certain death benefits, vacation pay, and severance pay.

Even if certain of your benefits are not guaranteed, you still may receive some of those benefits from the PBGC depending on how much money your plan has and on how much the PBGC collects from employers. For more information about the PBGC and the benefits it guarantees, ask the Plan Administrator or contact the PBGC's Technical Assistance Division, 1200 K Street N.W., Suite 930, Washington, D.C. 20005-4026 or call 202-326-4000 (not a toll-free number). TTY/TDD users may call the federal relay service toll-free at 1-800-877-8339 and ask to be connected to 202-326-4000. Additional information about the PBGC's pension insurance program is available through the PBGC's website on the Internet at http://www.pbgc.gov.

## Statement of Rights Under the Employee Retirement Income Security Act of 1974

As a participant in GCIU Officers, Representatives and Organizers Retirement Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

## Receive Information About Your Plan and Benefits

Examine, without charge, at the plan administrator's office all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 28

Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

Obtain a statement telling you whether you have a right to receive a pension at normal retirement age (age 60) and if so, what your benefits would be at normal retirement age if you stop working under the plan now. If you do not have a right to a pension, the statement will tell you how many more years you have to work to get a right to a pension. This statement must be requested in writing and is not required to be given more than once every twelve (12) months. The plan must provide the statement free of charge.

## Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your rights under ERISA.

## Enforce Your Rights

If your claim for a pension benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

GCIU Officers, Representatives and Organizers Retirement Plan
Summary Plan Description
Page 29

## Assistance with Your Questions

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## GCIU PRESCRIPTION DRUG PLAN

| Schedule of Benefits | Network Benefits[1,2] | Non-Network Benefits[3] |
|---|---|---|
| Deductible (retail and mail order) | None | None |
| **Retail:** | | |
| Generic | $2 copay | $10 copay; 80% |
| Brand Name | $7 copay | $10 copay; 80% |
| **Mail Order (90 day supply)** | | |
| Generic | $2 copay | No Benefit |
| Brand Name | $7 copay | No Benefit |
| Mandatory Generic | Required | |
| Covered Drugs | Oral Contraceptives | |
| | Insulin | |
| | Other Injectables | |
| | Needles/Syringes | |
| | Vitamins that require a Prescription | |
| | Pediatric/Prenatal Vitamins | |
| | Allergy Serums | |
| | Infertility | |
| | Lupron | |
| | Smoking Cessation | |
| | HIV Medications | |
| | Cosmetic Applications (e.g. Efudex) | |

[1] All coinsurance payments are based on National Prescription Administrator's (NPA's) negotiated discount from average wholesale price.

[2] Copay may be greater than listed and subject to participant reimbursement.

[3] All coinsurance payments are based on retail charges submitted by pharmacy.

---

## GRAPHIC COMMUNICATIONS INTERNATIONAL UNION

Eligibility Rules Under the Graphic Communications National Health and Welfare Plan

### Eligibility for Active Employees:

Active employees of the GCIU are eligible for health and welfare coverage under the Graphic Communications National Health and Welfare Plan ("the National Plan") after completion of 60 days of employment with the GCIU. Coverage continues uninterrupted until the employee terminates employment with the GCIU or retires. Upon attainment of age 65, employees must enroll in Medicare Part B. The premium will be paid by the GCIU.

In the event of termination of employment with the GCIU (other than by retirement), coverage under the National Plan continues through the last day of the month in which the employee's termination occurred. The former employee is then eligible to continue coverage in the National Plan at his or her own expense in accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). See page ___ for details.

### Eligibility for Retirees

In the event the employee retires directly from employment with the GCIU and is eligible for retirement benefits from a GCIU-sponsored pension plan or pension plan in which the GCIU participates, coverage under the National Plan will continue, at the GCIU's expense, until the employee attains age 65. Upon attainment of age 65, Medicare becomes the primary insurer and supplemental coverage is provided by the GCIU though AARP.

### In the Event of Death

In the event of the death of an active employee or retiree of the GCIU who was covered by the National Plan at the time of death, coverage for his or her dependents who were covered by the Plan at the time of the employee's death, will continue, at the GCIU's expense, for 24 months. After the expiration of the 24-month period, coverage under the National Plan is available to the dependents in accordance with COBRA.

NOTE: The GCIU reserves the right, subject to the terms of any applicable collective bargaining agreement, to amend these eligibility rules at any time and from time to time including retiree benefits.



PLAINTIFF'S
EXHIBIT
E

Blumberg No. 5113

## GCIU STAFF DENTAL PLAN

| Schedule of Benefits | |
| --- | --- |
| **Dental Deductible¹** | |
| Per Individual, per year | None |
| Per Family, per year | None |
| Annual Maximum Benefit | ~~$2,000~~  2,500.00 |
| **Class I Diagnostic and Preventative Services** | |
| Prophylaxis | 100% |
| Oral Examination | 100% |
| Topical Fluoride | 100% |
| Space Maintainers | 100% |
| X-Rays | 100% |
| **Class II Minor Restorative Services** | |
| Fillings | 80% |
| Periodontics | 80% |
| Endodontics – Root Canal Surgery | 80% |
| Extractions | 80% |
| Prosthodontics – First Installation | 80% |
| Repair of Prosthodontics – Crowns, inlays,    bridgework, or dentures | 80% |
| Prescription Drugs | 80% |
| **Class III Major Restorative Services** | |
| Inlays/Onlays | 80% |
| Crowns | 80% |
| Prosthodontics – Fixed | 80% |
| Bridgework, first installation | 80% |
| Dental Implants | 80% |
| **Orthodontia** | |
| Child | 100% |
| Adult | 100% |
| Lifetime Maximum Benefit | $1,200 |

¹ Plan deductible is waived for preventive services only.

## GCIU STAFF VISION PLAN

$4/00

Members are provided with a flat rate of ~~$200~~ every two years per covered person for vision care.

## GCIU STAFF MEDICAL PLAN

| Schedule of Benefits | Network[1] | Non-Network[2] |
|---|---|---|
| **Comprehensive Medical Benefits** | | |
| **Major Medical Deductible** | | |
| Per Individual, per year | None | $150 |
| Per Family, per year | None | $300 |
| **Out-of-Pocket Amount (not including deductible)** | | |
| Per Individual, per year | $500 | $500 |
| Per Family, per year | $1,000 | $1,000 |
| Maximum Lifetime Benefit, per individual | Unlimited | Unlimited |
| **Hospital In-Patient** | **Room & Board + Other** | **Room & Board + Other** |
| Maternity | 100% | 100% |
| Mental and Nervous Disorder Treatment (45 days/year) | 100% | 100% |
| Alcoholism and Drug Abuse Treatment (30 days/year) | 100% | 100% |
| Other | 100% | 100% |
| **Hospital Out-Patient** | | |
| Emergency Services[3] | $50 copay | $50 copay |
| Other | **Surgery  Other** | **Surgery  Other** |
| | 100%      90% | 100%      80% |
| **Physician Services** | | |
| Primary Care Visits | $10 copay | 80% |
| Specialist Visits | $10 copay | 80% |
| Surgery (including varicose veins) | 90% | 80% |
| Diagnostic Services | 90% | 80% |
| Allergy injections during office visit | 100% | 80% |
| **Outpatient:** | | |
| Maternity | 90% | 80% |
| Mental and Nervous Disorder Treatment | 90% (visits 1-50) 80% (visits 31+) | 80% |
| Alcoholism and Drug Abuse Treatment (30 days/year) | 90% | 80% |
| Preoperative Testing | 90% | 80% |
| In Vitro Fertilization, Artificial Insemination or GIFT | 90% | 70% |
| Surgical Sterilization | 90% | 80% |
| Chiropractic Care (20 visits/year) | 90% | 80% |
| Foot Care[4] | 90% | 80% |

# GCIU STAFF MEDICAL PLAN (cont.)

| Other Services | | |
|---|---|---|
| Orthopedic Appliance Implants | 90% | 80% |
| Orthopedic Braces and Appliances | 90% | 80% |
| Prosthetic Devices or Implants | 90% | 80% |
| Physical, Occupational and Speech Therapy | 90% | 80% |
| Visiting Nurses | 90% | 70% |
| Skilled Nursing Facility | 90% | 80% |
| TMJ ($2,500 lifetime max) | 90% | 80% |
| Second Surgical Opinion (Not Mandatory) | 100% | 100% |
| Pre-Admission Testing | 100% | 100% |
| Organ Transplant | 90% | 80% |
| Renal Dialysis | 90% | 80% |
| Durable Medical Equipment | 90% | 90% |
| Home Health Care (100 visits per year max) | 90% | 90% |
| Hospice Care | 90% | 90% |
| Ambulance Service | 90% | 90% |
| Wellness Benefits | | |
| Routine Physical/Gynecological Exam | 100% | No Benefit |
| Pap Smear (18 years and older) | 100% | 100% |
| Mammogram (1 yearly women age 40-75) | 100% | 100% |
| Well-Child Care | | |
| Birth to 18 months (9 visits during first 2 years) | 100% (visits 1-5) $10 copay (visits 6-9) | No Benefit |
| | $10 copay | |
| 19 months to 24 months | 100% | No Benefit |
| Ages 2-6 years (1 visit) | $10 copay | No Benefit |
| Ages 7-12 years (1 visit) | | No Benefit |
| Ages 13-18 years (1 visit) | | No Benefit |

[1] All coinsurance payments for Network services are based on the PHCS PPO discounted fee schedule.

[2] All coinsurance payments for Non-Network services are based on reasonable and customary (R&C) charges as determined by CDS.

[3] If emergency room visit results in an admission, copayment is waived.

[4] Defined as the treatment of weak, strained or flat feet, instability or imbalance, orthopedic shoes or other supportive devices. Also cutting, removal or treatment of corns, calluses, bunions or toenails.

K
08-873
CKK

JS-44
(Rev. 1/05 DC)

**CIVIL COVER SHEET**

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br><br>MADELINE M. COX | **DEFENDANTS**<br><br>GRAPHIC COMMUNICATIONS CONF./INT'L<br>BROTHERHOOD OF TEAMSTERS, et al. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Geoffrey M. Bohn
BOHN & KOURETAS, PLC
P.O. Box 17811, Arlington, VA 22216
(703) 599-7076

Case: 1:08-cv-00873
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 5/22/2008
Description: Labor - ERISA

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

---

| ○ E. *General Civil (Other)*   OR   ○ F. *Pro Se General Civil* | | | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

KB

O

**G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

**H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment
(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

**I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

**J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

**⊙ K.** *Labor/ERISA (non-employment)*

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☒ 791 Empl. Ret. Inc. Security Act

**L.** *Other Civil Rights (non-employment)*

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

**M.** *Contract*

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

**N.** *Three-Judge Court*

☐ 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
29 U.S.C. Section 1132, plaintiff seeks recovery of health and welfare benefits under ERISA wrongfully denied by defendants.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint
JURY DEMAND:  YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE 5/21/08    SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.