**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MADELINE M. COX** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **Case No. 1:08-cv-00873--CKK** |
| | ) |
| **GRAPHIC COMMUNICATIONS** | ) |
| **CONFERENCE OF THE** | ) |
| **INTERNATIONAL BROTHERHOOD** | ) |
| **OF TEAMSTERS,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **GRAPHIC COMMUNICATIONS NATIONAL** | ) |
| **HEALTH AND WELFARE FUND,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **BOARD OF TRUSTEES OF THE GRAPHIC** | ) |
| **COMMUNICATIONS NATIONAL** | ) |
| **HEALTH AND WELFARE FUND,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **GEORGE TEDESCHI, Individually** | ) |
| **and as President of the** | ) |
| **GRAPHIC COMMUNICATIONS** | ) |
| **CONFERENCE OF THE** | ) |
| **INTERNATIONAL BROTHERHOOD** | ) |
| **OF TEAMSTERS,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MOTION TO DISMISS OR, IN THE ALTERNATIVE,**
**FOR SUMMARY JUDGMENT OF THE DEFENDANTS**

The Defendants, the Graphic Communications Conference of the International

Brotherhood of Teamsters ("GCC/IBT" or "Employer"), the Graphic Communications National

Health and Welfare Fund ("Trust Fund" or "Fund" or "Plan"), the Board of Trustees of the Fund

and George Tedeschi, individually and as President of the GCC/IBT, respectfully move to

dismiss Plaintiff Madeline Cox's Complaint with prejudice, in accordance with Rule 12(b)6 of

the Federal Rules of Civil Procedure, for failure to state a claim upon which relief may be

granted.

In the alternative, as there are no genuine issues of material fact and Defendants are

entitled to judgment as a matter of law, the Defendants request that the Court grant them

summary judgment in accordance with Rule 56 of the FRCP.

In support of this motion, the Defendants have filed a Statement of Material Facts to

which the Defendants Contend There Is No Genuine Issue; a Memorandum of Points and

Authorities in Support of the Motion; the Declaration of George Tedeschi with attached exhibits

and the Declaration of Teresa Bauer with attached exhibits.  A proposed Order is attached.


Respectfully submitted,

O'DONNELL, SCHWARTZ & ANDERSON, P.C.


Dated:  August 5, 2008                    By:___/s/  Peter Leff_____
                                            Peter J. Leff
                                            DC Bar No. 457476
                                            1300 L Street NW
                                            Suite 1200
                                            Washington, D.C. 20005
                                            (202) 898-1707/FAX (202) 682-9276
                                            pleff@odsalaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **MADELINE M. COX** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:08-cv-00873--CKK** |
| | ) | |
| **GRAPHIC COMMUNICATIONS** | ) | |
| **CONFERENCE OF THE** | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF TEAMSTERS,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GRAPHIC COMMUNICATIONS NATIONAL** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BOARD OF TRUSTEES OF THE GRAPHIC** | ) | |
| **COMMUNICATIONS NATIONAL** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GEORGE TEDESCHI, Individually** | ) | |
| **and as President of the** | ) | |
| **GRAPHIC COMMUNICATIONS** | ) | |
| **CONFERENCE OF THE** | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF TEAMSTERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE
MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT OF THE DEFENDANTS**

## Table of Contents

Table of Contents……………………………………………………………………………..i

Table of Authorities……………………………………………………………………………iii

I. INTRODUCTION ....................................................................................1

II. STATEMENT OF FACTS........................................................................3

    A. Madeline Cox Chooses to Voluntarily Leave Employment Even Though She Is Informed that She Will Lose Health Care Coverage If She Does So ..................................................3

    B. When Employed by the GCC/IBT Madeline Cox Received her Health Benefit Coverage Through a Taft-Hartley Multi-Employer Benefit Fund which Provides an Appeals Process to Challenge Benefit Determinations....................................................4

    C. Ms. Cox Failed to File an Appeal with the Fund Challenging the Denial of Her Continued Eligibility to Receive Fund Benefits within the 120 Day Period Required by the Plan Document and SPD……………………………………………………………………10

III. ARGUMENT .......................................................................................11

    A. Claim Under 29 U.S.C. § 1132(a)(1)(B).........................................................11

        1. George Tedeschi and the GCC/IBT Must be Dismissed from Ms. Cox's Denial of Benefits Claim because They Are Not Plan Fiduciaries..............................................11

        2. Ms. Cox's 29 U.S.C. § 1132(a)(1)(B) Claim Must Be Dismissed with Prejudice for Failure to Timely Exhaust the Administrative Remedies in the Fund's Benefit Plan...................................................................................16

    B. Ms. Cox's 29 U.S.C. § 1140 Claim Must Be Dismissed Because It Was Not Filed within the One Year Statute of Limitations Applicable to such Claims ......................................20

    C. Claim for Breach of Contract ...........................................................25

        1. ERISA Preempts Any State Law Breach of Contract Claim being asserted by Ms. Cox that is based on any of the Plan's Documents ....................................................25

        2. If Ms. Cox's Breach of Contract Claim is based on the Collective Bargaining Agreement between the GCC/IBT and OPEIU, the Claim Is Preempted by the LMRA and Subject to Dismissal because Ms. Cox Was Not a Member of the Bargaining Unit or, Alternatively, Her Claim Is Time Barred by the Applicable Six Month Statute of Limitations ..............................................................................28

i

a.  The LMRA Preempts Any State Law Claim that Depends Upon the Meaning of a Collective Bargaining Agreement.........................................................................29

b.  Ms. Cox Was Not a Covered Employee Under the Collective Bargaining Agreement between the GCC/IBT and the OPEIU ...............................................30

c.  If Ms. Cox Is Covered by the Collective Bargaining Agreement between the GCC/IBT and the OPEIU, then Her Breach of Contract Claim Must Be Dismissed for Failure to be Filed within the Applicable Six-Month Statute of Limitations...31

IV.  CONCLUSION...............................................................................................................36

## Table of Authorities

**Page**

*Aetna Health Inc. v. Davila,*
542 U.S. 200 (2004).................................................................................................26, 28

*Alessi v. Raybestos-Manhattan, Inc.,*
451 U.S. 504 (1981)...........................................................................................................26

*Andes v. Ford Motor Co.,*
70 F. 3d 1332 (D.C. Cir. 1995)........................................................................................21

*Anderson v. Alpha Portland Industries, Inc.,*
752 F. 2d 1293 (8th Cir. 1985), *cert. denied* 471 U.S. 1102 (1985)...............................35

*Amato v. Bernard,*
618 F.2d 559 (9th Cir. 1980)............................................................................................16

*Avco Corp. v. Aero Lodge No.735,*
390 U.S. 557 (1968)...........................................................................................................29

*Bd. Of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,*
296 F.3d 164 (3d Cir. 2002)..............................................................................................12

*Berger v. AXA Network, LLC,*
370 F. Supp. 2d 751 (N.D. I11.2005), *aff'd* 459 F.3d 804 (7th Cir. 2006) ...................22

*Bowen v. United States Postal Service,*
459 U.S. 212 (1983)...........................................................................................................33

*Burrey v. Pac. Gas & Elec. Co.,*
159 F. 3d 388 (9th Cir. 1998) ...........................................................................................22

*Byrd v. MacPapers, Inc.,*
961 F. 2d 157 (11th Cir. 1992) .........................................................................................22

*Cephas v. MVM, Inc.,*
520 F. 3d 480 (D.C. Cir. 2008) ................................................................................. 29-31

*Cleveland Elec. Illuminating Co. v. Utility Workers Union of America,*
440 F.3d 809 (6th Cir. 2006) ...........................................................................................35

*\*Communications Workers of America v. American Telephone and Telegraph Company,*
40 F. 3d 426 (D.C. 1994) ..........................................................................................16, 18

*Commuc'ns Workers v. Mich. Bell Tel. Co.,*
820 F. 2d 189 (6th Cir. 1987) ............................................................................35

*Counts v. Am. Gen. Life and Accident Ins. Co.,*
111 F. 3d 105 (11th Cir. 1997) ..........................................................................19

*Crown Cork & Seal Co., Inc. v. International Ass'n of Machinists and Aerospace Workers, AFL-CIO,*
501 F.3d 912 ( 8th Cir. 2007) ............................................................................35

*Czosek v. O'Mara,*
397 U.S. 25 (1970).............................................................................................33

**Delcostello v. International Broth. Of Teamsters,*
462 U.S. 151 (1983)....................................................................................... 31-33

*Doe v. MAMSI Life and Health Insurance Company,*
471 F. Supp. 2d 139 (D.D.C 2007) .................................................................. 16-17

*Firestone Tire & Rubber Co. v. Bruch,*
489 U.S. 101 (1989)...........................................................................................18

*Fitts v. Federal Nat. Mortg. Ass'n ,*
44 F. Supp.2d 317 (D.D.C. 1999), *aff'd* 236 F.3d 1 (D.C. Cir. 2001)...........................12

*Franchise Tax Bd. V. Contr. Laborers Vacation Trust,*
463 U.S. 1 (1983)...............................................................................................29

*Gallegos v. Mt. Sinai Med. Cir.,*
210 F.3d 803 (7th Cir. 2000), *cert. denied* 531 U.S. 827 (2000)....................................19

*Gavalik v. Cont'l Can Co.,*
812 F. 2d 834 (3d Cir. 1987), *cert. denied* 484 U.S. 979 (1987)...................................22

*Gayle v. United Parcel Service,*
401 F. 3d 222 (4th Cir. 2005) ............................................................................19

*Hall v. Baptist Healthcare System, Inc.,*
2007 WL 4119035 (W.D. Ky. Nov. 14, 2007) ..........................................................19

*Hartline v. Sheet Metal Workers' National Pension Fund,*
134 F. Supp. 2d 1 (D.D.C. 2000), *aff'd* 286 F. 3d 598 (D.C. Cir. 2002)...............................12, 15

*Held v. Mfrs. Hanover Leasing Corp.,*
912 F. 2d 1197 (10th Cir. 1990) .........................................................................22

*Hines v. Anchor Motor Freight,*
424 U.S. 554 (1976)....................................................................................33

*Hunter v. Metropolitan Life Insurance Company,*
251 F. Supp. 2d 107 (D.D.C. 2009), *aff'd* 2003 WL 22240321 (D.C.Cir. 2003).........13-14, 18-19

*Ingersoll-Rand Co., v. McClendon,*
498 U.S. 122 (1990)....................................................................................26, 28

*Int'l Union (UAW) v. Yard-Man, Inc.,*
716 F. 2d 1476 (6th Cir. 1983), *cert denied* 465 U.S. 1007 (1984)................................35

*Johnson v. Antioch Univ.,*
 1992 WL 88028 (D.D.C. 1992) ....................................................................28

*Johnson v. Georgia - Pacific Corp.,*
19 F. 3d 1184 (7th Cir. 1994) ......................................................................15

*\*Kamen v. International Brotherhood of Electrical Workers,*
505 F. Supp. 2d 66 (D.D.C. 2007).................................................................21-23

*Kopilas v. Disipingna,*
1992 WL 96360 (S.D.NY. 1992) .................................................................12

*Krooth & Altman v. N. Am. Life Assurance Co.,*
134 F. Supp. 2d 96 (D.D.C. 2001) ...............................................................28

*Laborers' Pension Fund v. Litgen Concrete Cutting & Coring Co.,*
709 F. Supp. 140 (N.D. I11. 1989) ...............................................................12

*Leemis v. Med. Servs. Research Group, Inc.,*
75 Fed. Appx. 986 (6th Cir. 2003)................................................................22

*Lingle v. Norge Div. of Magic Chef, Inc.,*
486 U.S. 399 (1988)...............................................................................29-30

*In re Luna,*
406 F.3d 1192 (10th Cir. 2005) ...................................................................12

*Madera v. Marsh USA, Inc.,*
426 F.3d 56 (1st Cir. 2005).........................................................................19

*McClure v. Zoecon, Inc.,*
 936 F.2d 777 (5th Cir. 1991) ......................................................................22

*Mertens v. Hewitt,*
508 U.S. 248 (1993)........................................................................................................12

*Metro Life Ins. Co. v. Taylor,*
481 U.S. 59 (1987)..........................................................................................................26

*Moore v. Blue Cross and Blue Shield of the Nat'l Capital Area,*
70 F. Supp. 2d 9 (D.D.C. 1999).....................................................................................28

*Northlake Regional Medical Ctr. v. Waffle House System Employee Benefit Plan,*
160 F.3d 1301 (11th Cir. 1998)......................................................................................19

*North Star Steel v. Thomas,*
515 U.S. 29 (1994)..........................................................................................................21

*Pilot Life Ins. Co. v Dedeaux,*
481 U.S. 41 (1987)…………………………………………………………………....26-27

*Republic Steel Corp. V. Maddox,*
379 U.S. 650 (1965)........................................................................................................32

*Sanberg v. KPMG Peak Marwick, LLP,*
111 F. 3d 331 (2d Cir. 1997)..........................................................................................22

*Shaw v. Delta Air Lines, Inc.,*
463 U.S. 85 (1983)......................................................................................................26-27

*\*Stewart v. National Educ. Ass'n,*
404 F. Supp. 2d 122 (D.D.C. 2005), *aff'd* 471 F.3d 169 (D.C. Cir. 2006)............................26-27

*Terry v. Bayer Corp.,*
145 F. 3d 28 (1st Cir.1998)............................................................................................19

*Teumer v. Gen. Motors Corp.,*
34 F.3d 542 (7th Cir. 1994) ...........................................................................................22

*Textile Workers Union v. Lincoln Mills of Ala.,*
353 U.S. 448 (1957)........................................................................................................29

*United Steelworkers v. Canron, Inc.,*
580 F.2d 77 (3d Cir. 1978).............................................................................................35

*United Parcel Service, Inc. v. Mitchell,*
451 U.S. 56 (1981)..........................................................................................................33

*Vaca v. Sipes,*
 386 U.S. 171 (1967)................................................................................................33

*Varity Corp. v. Howe,*
516 U.S. 489 (1996)................................................................................................12

*Voyk v. Brotherhood of Locomotive Engineers,*
198 F. 3d 599 (6th Cir. 1999) ................................................................................15

*\*Watts v. Parking Management,*
2006 WL 627153 (D.D.C. March 12, 2006), *aff'd* 210 Fed. Appx. 13 (D.C. Cir. 2006) ........ 21-23

*Wislon v. Garcia,*
471 U.S. 261 (1985)................................................................................................21

*Zipf v. Am. Tel. & Tel. Co.,*
799 F. 2d 889 (3rd Cir. 1986) ................................................................................17

**Statutes:**

**Page**

29 U.S.C. § 185................................................................................. 29, 32-33, 36

29 U.S.C. § 1002.................................................................................5, 12, 15

29 U.S.C. § 1132 ................................................................................. passim

29 U.S.C. § 1140................................................................................. passim

29 U.S.C. § 1144…………………………………………………………...26-28

D.C. Code § 2-1402.11(a)(1)…………………………………………………24

D.C. Code § 2-1403.16(a)…………………………………………………24

D.C. Code § 32-1514………………………………………………………24

D.C. Code § 32-1542………………………………………………………24

## I.  INTRODUCTION

Plaintiff Madeline Cox has filed a three Count Complaint in this Court all relating to her allegation that she was wrongfully denied retiree health care from her health benefit plan, the Graphic Communications National Health and Welfare Fund ("Fund" or "Trust Fund" or "Plan"), after she left employment with her employer, the Graphic Communications Conference of the International Brotherhood of Teamsters ("GCC/IBT" or "Employer"), on March 31, 2006.

Count I – Violation of ERISA Plan – alleges that all of the defendants, the Employer, the Fund, the Board of Trustees of the Fund and George Tedeschi, individually and as President of the Employer, wrongfully denied her retiree health care coverage benefits in violation of Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Complaint at ¶¶ 39-42.  The Employer and Mr. Tedeschi should be dismissed with prejudice from Count I of the Complaint because they are not Trust Fund fiduciaries and therefore are not subject to suit under ERISA § 502(a)(1)(B).  Moreover, all of the defendants should be dismissed with prejudice from Count I because Ms. Cox failed to exhaust her administrative remedies prior to initiating this lawsuit by failing to file an appeal with the Fund or its Board of Trustees challenging her termination of benefits within the 120 day time limit set forth in Fund documents.

Count II – Interference with Right to Benefits – alleges that Mr. Tedeschi, individually and as President of the Employer, discriminatorily denied Ms. Cox retiree health care coverage benefits in violation of ERISA § 510, 29 U.S.C. § 1140. Complaint at ¶¶ 44-45.  Count II is subject to dismissal with prejudice as untimely as the claim was not brought within the one year statute of limitations applicable to ERISA § 510 claims.

Count III – Breach of Contract – alleges that the Employer breached an unspecified contract by denying retiree health care coverage benefits to Ms. Cox. Complaint at ¶¶ 47-51.  If the contract that was allegedly breached is one of the Fund documents, such as its trust agreement, plan document or summary plan description, then the breach of contract claim is preempted by ERISA and dismissible because the breach of contract claim would relate to an employee welfare benefit plan and the breach of contract claim would be duplicative of the denial of benefits claim set forth in Count I.

If, on the other hand, the contract that was allegedly breached was the collective bargaining agreement between the Employer and its staff union, the Office and Professional Employees International Union ("OPEIU"), then the breach of contract claim is preempted by the Labor Management Relations Act ("LMRA"), because resolution of the breach of contract claim would be dependent on interpretation of a collective bargaining agreement.  Under the terms of the collective bargaining agreement between the Employer and the OPEIU, Ms. Cox, as an Executive Secretary to the President and Executive Assistant to the President, was specifically excluded from the bargaining unit covered by the terms of the collective bargaining agreement. Therefore, Ms. Cox cannot pursue a breach of contract claim against the Employer based on an alleged violation of the collective bargaining agreement between the Employer and the OPEIU because Ms. Cox was not covered by that agreement.  Alternatively, even if Ms. Cox was covered by the collective bargaining agreement between the GCC/IBT and the OPEIU, Ms. Cox's breach of contract claim was untimely.  Ms. Cox failed to pursue her claim within the six month statute of limitations time period applicable to such claims.

Accordingly, as Ms. Cox cannot pursue any of her claims against any of the defendants, her Complaint should be dismissed with prejudice.  Alternatively, as there is no genuine issue of

material fact and the defendants are entitled to judgment as a matter of law, summary judgment should be afforded to the defendants.

## II.  STATEMENT OF FACTS

### A.  <u>Madeline Cox Chooses to Voluntarily Leave Employment Even Though She Is Informed that She Will Lose Health Care Coverage If She Does So</u>.

Plaintiff Madeline Cox was employed by the Graphic Communications Conference of the International Brotherhood of Teamsters ("GCC/IBT" or "Employer"), or its predecessor the Graphic Communications International Union ("GCIU"), as an Executive Secretary to the President and Executive Assistant to the President from 1997 until she voluntarily left employment on March 31, 2006.[1] Complaint at ¶ 7, 26.  Ms. Cox was age 55 when she voluntarily left employment at the GCC/IBT. *Id.*

According to a memorandum dated March 31, 2006 that Ms. Cox submitted to the Officers and General Board Members of the Employer, Ms. Cox decided to voluntarily leave employment at age 55, effective March 31, 2006, in order to avoid detrimental changes to her pension benefits that would have occurred had she remained an active employee participating in those pension funds. Declaration of George Tedeschi at ¶ 15 and Exhibit 1 attached thereto.

On or about March 9, 2006, Ms. Cox informed George Tedeschi, the President of the Employer, that she would be retiring on March 31st and that she expected to have her health care

---

[1]     The Graphic Communications Conference of the International Brotherhood of Teamsters ("GCC/IBT" or "Employer") is a labor organization that represents employees in the graphic communications industry throughout the United States and Canada. Declaration of George Tedeschi at ¶ 2.  The GCC/IBT is headquartered in Washington, D.C. *Id.*  The GCC/IBT is the successor entity to the Graphic Communications International Union ("GCIU").  The GCC/IBT is a result of the January 1, 2005 merger of the GCIU and the International Brotherhood of Teamsters. *Id.*

benefits paid for by the GCC/IBT after she left employment. *Id*. at ¶ 12; Complaint at ¶ 27.  At

that time, Mr. Tedeschi informed Ms. Cox that it was the policy of the Employer that health care

premiums would not be paid on behalf of employees who left employment prior to age 60 absent

extraordinary circumstances, none of which were present in her case. Tedeschi Dec. at ¶ 12;

Complaint at ¶ 27.  Accordingly, Mr. Tedeschi informed Ms. Cox that the Employer would not

continue to pay her health care premiums if she left employment prior to age 60. *Id*. at ¶ 12;

Complaint at ¶ 27.

Despite being informed by the Employer that her health care premiums would not be paid

by the GCC/IBT if she left employment prior to age 60, Ms. Cox left employment at the

GCC/IBT on March 31, 2006.  In her March 31, 2006 memorandum, Ms. Cox informed the

GCC/IBT that she had retained legal counsel to challenge the GCC/IBT's policy. Tedeschi Dec.

at ¶ 16 and Exhibit 1 attached thereto.  Also, in that memorandum, Ms. Cox indicated that she

wanted to appeal Mr. Tedeschi's statement concerning the GCC/IBT's health care premium

payment policy to the Employer's General Board. *Id*.; Complaint at ¶ 31.  On May 25, 2006, Ms.

Cox was informed by Mr. Tedeschi that under the GCC/IBT Constitution and Laws, only

members of the GCC/IBT, not its employees, could file appeals to the General Board of the

GCC/IBT. Tedeschi Dec. at ¶ 17 and Exhibit 2 attached thereto; Complaint at ¶ 31.

    B.  <u>When Employed by the GCC/IBT Madeline Cox Received her Health Benefit
Coverage Through a Taft-Hartley Multi-Employer Benefit Fund which Provides an
Appeals Process to Challenge Benefit Determinations</u>.

The GCC/IBT is an employer who participates in the Graphic Communications National

Health and Welfare Fund ("Fund" or "Trust Fund" or "Plan") on behalf of its employees so they

will be provided with health benefit coverage. Tedeschi Dec. at ¶ 6; Declaration of Teresa Bauer

at ¶ 5.

The Fund is a multi-employer, Taft-Hartley employee welfare benefit plan, as that term is defined in 29 U.S.C. § 1002 (1). Bauer Dec. at ¶ 2. The Fund was established by and is governed by an Agreement and Declaration of Trust ("Trust Agreement"). *Id*. at ¶ 3; Exhibit A to the Complaint. The purpose of the Fund is to provide health, disability and life insurance benefits in a cost-effective manner to Fund participants. Bauer Dec. at ¶ 4; Exhibit A to the Complaint at pp. 1-2.

The Fund is administered by a Board of Trustees made up of an equal number of management representatives and union representatives. Bauer Dec. at ¶ 6; Exhibit A to the Complaint at p. 7. Trustees on the Board of Trustees for the Fund have the power to perform the following duties (which is not an exclusive list): establish and administer lawful employee benefit plans; hire an administrator[2]; determine the details of the benefit plans; make amendments to benefit plans; provide benefits; enter into contracts; establish a reserve; pay taxes; receive premiums and contributions; and invest or reinvest all Trust assets. Bauer Dec. at ¶ 7; Exhibit A to the Complaint at pp.12-16. Additionally, Trustees of the Fund are "the sole judges of [ ] all factual determinations; the standard of proof required in any case; application and interpretation of the Plan; and entitlement to or amount of benefits payable." Bauer Dec. at ¶ 7; Exhibit A to the Complaint at p. 16. Neither Mr. Tedeschi nor any Officer or employee of the GCC/IBT is a member of the Board of Trustees of the Fund. Tedeschi Dec. at ¶ 7; Bauer Dec. at ¶ 8.[3] Neither Mr. Tedeschi nor the Employer is involved in any way with the management,

---

[2]    The Board of Trustees of the Fund has hired a third-party administrator, CDS Administrators, Inc., to assist with the administration of the plan of benefits offered and the payment of benefits in response to participant claims. Bauer Dec. at ¶ 1.

[3]    The Secretary of the Fund is an Officer of the Employer.  However, the Secretary of the

administration or assets of the Fund, its trust agreement, its plan document or its summary plan description.  Tedeschi Dec. at ¶ 8; Bauer Dec. at ¶ 10.  Neither Mr. Tedeschi nor the Employer provide benefits, adjudicate benefit claims, make any administrative decisions such as which medical provider network or prescription drug distributor to utilize, collect or determine premiums, make any management decisions such as hiring professional advisors or a third party administrator, handle Plan assets or make investment decisions on behalf of the Fund. Tedeschi Dec. at ¶ 9; Bauer Dec. at ¶ 11.

The plan of benefits provided to participants of the Fund is governed by the Graphic Communications National Health and Welfare Fund Plan Document ("Plan Document"). Bauer Dec. at ¶ 12 and Exhibit 1 attached thereto.  The Plan Document contains definitions and general administrative procedures which govern the Fund. *Id*. and Exhibit 1 attached thereto at p. 1.

The Plan Document provides a number of eligibility rules for employees of participating employers and their dependents. *Id*. at ¶ 13 and Exhibit 1 attached thereto at pp. 18-23.  With respect to retiree eligibility, the Plan Document defines a "Retiree" at Section 2.59 as "a person who is receiving monthly pension benefits from an [sic] qualified retirement plan and who satisfies the eligibility rules set forth in Section 3.02 [of the Plan Document]." *Id*. and Exhibit 1 attached thereto at p. 15.  Section 3.02 of the Plan Document "Retiree Eligibility" provides:

(a) A retiree shall continue to be an Eligible Person for all Retiree benefits to which he is entitled under the Plan upon proper application to the Fund, provided the Retiree is:
(1) an Eligible Employee in the month immediately preceding the month in which his retirement is effective, and
(2) eligible to receive a pension from an Employer's qualified retirement plan or from a jointly trusteed, multiemployer pension plan established for employees in the graphic communications industry.

---

Fund is not a Trustee, is not entitled to vote and his sole duty is to keep and distribute minutes and records of all meetings. Tedeschi Dec. at ¶ 7; Bauer Dec. at ¶ 9; Exhibit A to the Complaint at p. 18.

*Id*. at ¶ 14 and Exhibit 1 attached thereto at p. 19.

The Fund's Plan Document provides an appeals procedure for participants to utilize to challenge decisions of the Fund.  Section 14.04 of the Plan Document states in relevant part:

(a) <u>Right of Appeal</u>
Any individual (or his duly appointed representative) whose claim for benefits under this Plan has been denied, in whole or in part, or whose claim for benefits against the Plan otherwise is denied, may petition the Committee for review of the denial of claim.

(b) <u>Documentation for Appeals</u>
The petition for review shall be in writing, and shall state the name and address of the claimant, the fact that the claimant is disputing the denial of claim giving the date of the notice of denial and, in clear and concise terms, the reason or reasons for disputing the denial.  It shall be accompanied by any pertinent documentary material not already furnished to the Committee and shall be delivered or mailed to the Committee within 120 days after the date shown on the notice to the claimant of the denial.

      *         *         *         *         *

(c) <u>Review or Hearing on the Appeal</u>
The Committee shall grant a hearing on the petition to receive and hear any evidence or argument which cannot be presented satisfactorily by correspondence.  The failure to file a petition for review in a timely manner or the failure to appear and participate in any such hearing shall constitute a waiver of the claimant's right to review of the denial.

      *         *         *         *         *

(d) <u>Decision by the Committee</u>
A decision by the Committee shall be made within 60 days of receipt of petition for review unless special circumstances require an extension of time for processing, in which case a decision shall be rendered as soon as possible, but not later than one hundred and twenty days (120) after receipt of the request for review.  The claimant shall be advised of the decision in writing. Stating the specific reasons for the decision in a manner calculated to be understood by the claimant and the specific references to the Plan provisions or other applicable rules upon which the decision is based.  The decision of the Committee with respect to a petition for review shall be final and binding upon all parties, including the claimant and any person claiming under the claimant.

*Id*. at ¶ 15 and Exhibit 1 attached thereto at pp. 70-71.[4]

---

[4]      The Board of Trustees of the Fund has appointed an equal number of union and

In accordance with Section 15.02 of the Plan Document, the Executive Committee of the Fund administers and interprets the Plan Document, has the authority to take all actions and make all decisions necessary and proper to carry out the Plan Document, and has the power and duty, among other things, to interpret the Plan Document and resolve ambiguities, inconsistencies and omissions and to decide on questions concerning the Plan Document and the eligibility of any Employee to participate in the Fund. *Id.* at ¶ 17 and Exhibit 1 attached thereto at p. 73.[5]

The Fund also distributes a Summary Plan Description ("SPD") to its participants. Bauer Dec. at ¶ 19. When the GCC/IBT joined the Fund on May 1, 1998, the Fund mailed the GCC/IBT a stack of "welcome kits" which contained the SPD, to distribute to all of its employees participating in the Fund, including Ms. Cox. *Id.* at ¶ 20. In March 2000, the Fund reissued an updated SPD directly to all participants in the Fund, including Ms. Cox. *Id.* at ¶ 21 and Exhibit 2 attached thereto; Complaint at ¶ 19.

The SPD summarizes the Fund's eligibility rules for employees of participating employers and their dependents. The March 2000 SPD defined Retiree as an individual "who is receiving monthly pension benefits from a qualified retirement plan established for Employees in the graphic communications industry." *Id.* at ¶ 22 and Exhibit 2 attached thereto at p. 10; Complaint at ¶ 22. The SPD also contained a supplement setting forth the specific terms of Ms.

---

management Trustees from the Fund's Board of Trustees to an Appeals Committee to hear appeals, develop a factual record, deliberate on the merits of the appeal and make a determination as to whether to grant or deny the appeal. Bauer Dec. at ¶ 16. The Appeals Committee then communicates its decision to the individual who filed the appeal. *Id.* If the individual disagrees with the determination of the Appeals Committee, he or she may pursue a claim in federal court. *Id.*

[5]    The Executive Committee of the Fund is made up of four union Trustees and four management Trustees selected from the Fund's Board of Trustees. Bauer Dec. at ¶ 18.

Cox's GCC/IBT-provided health coverage benefits.  On the last page of the supplement the

"Eligibility Rules Under the Graphic Communications National Health and Welfare Plan" were

stated.  Under the subsection of "Eligibility for Retirees," it stated:

> In the event the employee retires directly from employment with the GCIU and is
> eligible for retirement benefits from a GCIU-sponsored pension plan or pension plan in
> which the GCIU participates, coverage under the National Plan will continue, at the
> GCIU's expense, until the employee attains age 65.  Upon attainment of age 65,
> Medicare becomes the primary insurer and supplemental coverage is provided by the
> GCIU though [sic] AARP.

*Id*. at ¶ 23 and Exhibit 2 attached thereto; Complaint at ¶ 23.

The SPD also provides the following:

> **Discretionary Authority of the Board of Trustees and its Designees**
> In carrying out their respective responsibilities under the Plan, the Board of
> Trustees, the Administrator and other individuals with delegated responsibility for
> the administration of the Plan, will have discretionary authority to interpret the
> terms of the Plan and to determine eligibility and entitlement to Plan Benefits in
> accordance with the terms of the Plan.  Any interpretation or determination will
> be given full force and effect, unless it can be shown that the interpretation or
> determination was arbitrary and capricious.

*Id*. at ¶ 24 and Exhibit 2 attached thereto at p. 67.

As with the Plan Document, the SPD provides for a review procedure to challenge the

denial of benefits.  The appeals procedure provision states in relevant part:

> Your request for review or reconsideration must be made in writing to the
> Graphic Communications National Health and Welfare Fund at Five Gateway Center,
> Suite 620, 60 Boulevard of the Allies, Pittsburgh, PA 15222, within 120 days after you
> receive notice of denial.

*Id*. at ¶ 25 and Exhibit 2 attached thereto at p. 47.[6]

---

[6]    In 2004, participants of the Fund or their representatives filed 30 appeals challenging
Fund decisions. Bauer Dec. at ¶ 26.  In 2005, thirty-one appeals were filed. *Id*.  In 2006, eight
appeals were filed. *Id*.  And, in 2007, twelve appeals were filed. *Id*.  Although appeals
challenging whether a participant, a participant's spouse or a participant's dependents are
eligible to receive benefits are not commonplace, when such appeals are filed, the Appeals
Committee of the Fund gives those appeals full consideration in determining whether the
participant or his or her spouse or dependent meets the eligibility requirements of the Fund. *Id*. at

C.  Ms. Cox Failed to File an Appeal with the Fund Challenging the Denial of Her
Continued Eligibility to Receive Fund Benefits within the 120 Day Period Required
by the Plan Document and SPD.

On April 4, 2006, four days after Ms. Cox had retired, the Employer submitted a

"Termination and Change Form" to the Fund indicating that Ms. Cox had left employment with

the GCC/IBT on March 31, 2006, and therefore her health insurance coverage should be

terminated effective April 1, 2006. Bauer Dec. at ¶ 31 and Exhibit 7 attached thereto.  The Fund

received no health care coverage premium payments on behalf of Ms. Cox from the GCC/IBT

after April 1, 2006. *Id*. at ¶ 32.  On April 7, 2006, the Fund sent Ms. Cox a "Termination of

Health Insurance Coverage" notice and "COBRA Continuation Coverage Notice" informing Ms.

Cox that her and her spouse and dependents were no longer eligible to receive benefits under the

Fund as of April 1, 2006, which was the date of her qualifying event, and that she had the option

to continue her present health benefits for 18 months by electing to continue coverage under

COBRA. *Id*. at ¶ 33 and Exhibit 8 attached thereto; Complaint at ¶ 30.  Ms. Cox did not elect for

COBRA Continuation Coverage under the Fund. Bauer Dec. at ¶ 34.

Since Ms. Cox left her employment with the GCC/IBT on March 31, 2006, neither Ms.

Cox nor her spouse or dependents have ever filed a claim for benefits with the Fund. Bauer Dec.

---

¶ 27.  For instance, in March 2003, a participant filed an appeal challenging a determination that
her college-attending daughter was not eligible for Fund benefits. *Id*. at ¶ 28 and Exhibit 3
attached thereto.  In May 2003, the Appeals Committee of the Fund denied the eligibility appeal
because, although the participant's child was attending college, she was age 23 and not mentally
or physically disabled and therefore did not qualify as a dependent under the rules of the Fund.
*Id*. and Exhibit 4 attached thereto.  Additionally, in April 2003, a participant by his
representative filed an appeal claiming that his newborn child should have been eligible for Fund
benefits beginning on her date of birth in December 2002. *Id*. at ¶ 29 and Exhibit 5 attached
thereto.  The Appeals Committee of the Fund denied the appeal because, in accordance with
Fund eligibility rules, notice of the birth was not provided within 60 days of the date of birth. *Id*.
and Exhibit 6 attached thereto.  Coverage was provided for this participant's child beginning
April 1, 2003, because the Fund was notified of the birth of the child in March 2003. *Id*.

at ¶ 35.

After being informed on April 7, 2006 by the Fund that Ms. Cox and her spouse and dependents were no longer eligible to be covered under the Fund and that her health care benefits were being terminated as of April 1, 2006, neither Ms. Cox nor her representative filed an appeal with the Fund challenging that eligibility determination within the required 120 day period set forth in the Plan Document and SPD. *Id.* at ¶ 36.

It was not until almost one year later that the Fund received any correspondence from Ms. Cox or her representative. Complaint at ¶ 32. On April 2, 2007, Ms. Cox's representative submitted a "Notice of Claim of Plan Benefits" to the Fund Office. *Id.*; Bauer Dec. at ¶ 37 and Exhibit 9 attached thereto.

On May 22, 2008, over two years after Ms. Cox was informed that she would be denied the right to continue to receive health care coverage benefits if she left employment with the GCC/IBT, Ms. Cox filed the instant lawsuit.

### III. ARGUMENT

    A.  <u>Claim Under 29 U.S.C. § 1132(a)(1)(B)</u>

        1.  <u>George Tedeschi and the GCC/IBT Must be Dismissed from Ms. Cox's Denial of Benefits Claim because They Are Not Plan Fiduciaries.</u>

ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a civil action may be brought by a plan participant to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. Ms. Cox brought such a claim, commonly known as a "denial of benefits claim," against the Fund, its Board of Trustees, her former employer, the GCC/IBT, and its President, George Tedeschi, in this lawsuit alleging that she was wrongfully denied retiree health

care coverage from the time she left employment with the Employer on March 31, 2006.

Complaint at ¶¶ 39-42. However, a denial of benefits civil action cannot be brought against

either the GCC/IBT or Mr. Tedeschi, because they are not fiduciaries of the Fund.

Section 502(d)(2) of ERISA, 29 U.S.C. § 1132(d)(2), provides:

> Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter.

An entity cannot be liable for ERISA damages under 29 U.S.C. § 1132 unless that entity

is a fiduciary of the benefit plan alleged to have been violated. *Fitts v. Federal Nat. Mortg.*

*Ass'n*, 44 F.Supp.2d 317, 325 (D.D.C. 1999)(citing *Mertens v. Hewitt*, 508 U.S. 248, 262

(1993)), *aff'd* 236 F.3d 1 (D.C. Cir. 2001). An entity is a fiduciary with respect to a benefit plan

and, therefore, is subject to ERISA fiduciary duties to the extent that the entity "exercises any

discretionary authority or discretionary control respecting management" of the benefit plan,

"exercises any authority or control respecting management or disposition of [benefit plan]

assets" or "has any discretionary authority or discretionary responsibility in the administration"

of the benefit plan. *Hartline v. Sheet Metal Workers' National Pension Fund*, 134 F.Supp.2d 1, 9

(D.D.C. 2000)(citing *Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996)(citing 29 U.S.C. §

1002(21)(A)(i) and (iii))), *aff'd.* 286 F.3d 598 (D.C. Cir. 2002). Employers who participate in

multi-employer benefit plans are typically not fiduciaries of that benefit plan. See *In re Luna*,

406 F.3d 1192, 1205-06 (10th Cir. 2005)(delinquent participating employer is not a benefit plan

fiduciary); *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d

164, 174 (3d Cir. 2002) (same); *Kopilas v. Disipigna,* 1992 WL 96360, No. 90-CIV. 5075(JFK),

at *3 (S.D.N.Y. 1992) (same); *Laborers' Pension Fund v. Litgen Concrete Cutting & Coring*

*Co.,* 709 F.Supp. 140, 145 (N.D.Ill.1989) (same).

Neither the GCC/IBT nor Mr. Tedeschi performed any fiduciary functions for or on behalf of the Fund.  The Fund is administered and managed by a Board of Trustees made up of an equal number of management representatives and union representatives. Bauer Dec. at ¶ 6;Exhibit A to the Complaint at p. 7.  Neither Mr. Tedeschi nor any Officer or employee of the GCC/IBT serves on the Board of Trustees of the Fund. Tedeschi Dec. at ¶ 7;  Bauer Dec. at ¶ 8. Neither Mr. Tedeschi nor the Employer has any role in establishing or administering the Fund's employee benefit plans, determining the details of the benefit plans, making benefit determinations or providing benefits. Tedeschi Dec. at ¶ 8; Bauer Dec. at ¶ 10.  These functions are solely and exclusively reserved to and performed by the Trustees of the Fund. Exhibit A to the Complaint at pp.12-16.  Additionally, neither Mr. Tedeschi nor the Employer handle any Fund assets or make any investment decisions involving Fund assets. Tedeschi Dec. at ¶ 8; Bauer Dec. at ¶ 10.  These functions are also solely and exclusively reserved to and performed by the Trustees of the Fund.  Moreover, neither Mr. Tedeschi nor the Employer make any management decisions pertaining to the Fund such as hiring professional advisors or a third party administrator or determining health care provider networks or prescription drug distributors, as these functions are solely and exclusively reserved to and performed by the Trustees of the Fund. Tedeschi Dec. at ¶ 9; Bauer Dec. at ¶ 11.

In *Hunter v. Metropolitan Life Insurance Company*, plaintiff's long-term disability benefits were cancelled by her employer's insurance carrier, because plaintiff's employer submitted a letter to the carrier that it had received from plaintiff's treating physician that plaintiff was available for part-time work. 251 F.Supp.2d 107, 108-09 (D.D.C. 2003), *aff'd* 2003 WL 22240321 (D.C.Cir. 2003).  The Court held that the employer was not a fiduciary subject to an ERISA denial of benefits claim, because the insurance carrier was provided with the

discretion to interpret the terms of the long-term disability benefits plan and to make benefit

determinations and there was no indication that the employer had any authority to determine

plaintiff's claim. *Id*. at 113. The employer's provision of information to the carrier that enabled

the carrier to make a determination to cease the plaintiff's benefits was not sufficient to convert

the employer into a fiduciary when the carrier had the sole ability to determine whether the

plaintiff continued to receive benefits. *Id*.

  Similarly, neither the Employer nor Mr. Tedeschi has any discretion to determine

eligibility for benefits under the Fund. In fact, the Fund's Trust Agreement explicitly states:

"Trustees shall be the sole judges of . . . entitlement to or amount of benefits payable." Bauer

Dec. at ¶ 9; Exhibit A to the Complaint at 16. The Plan Document affords the Executive

Committee of the Fund's Board of Trustees, which is made up of Trustees, the power and duty to

"decide on questions concerning the Plan and the eligibility of any Employee to participate."

Bauer Dec. at ¶ 17 and Exhibit 1, p. 73 attached thereto. And, the SPD states that the Fund's

Board of Trustees or its designees have the "discretionary authority to interpret the terms of the

Plan and to determine eligibility and entitlement to Plan Benefits in accordance with the terms of

the Plan." *Id*. at ¶ 24 and Exhibit 3, p. 67 attached thereto. The provision of information to the

Fund that Ms. Cox had left employment with the Employer at age 55 is not sufficient to convert

either the GCC/IBT or Mr. Tedeschi into fiduciaries as it was the Fund that made the

determination to terminate Ms. Cox's eligibility for benefits and informed her so on April 7,

2006. *Id*. at ¶ 33 and Exhibit 8 attached thereto.

  If anything, the Employer's only role was establishing an internal policy for employee

eligibility for health benefits and communicating application of that policy to the Fund. These

are not fiduciary functions. "Employers decide who receives ... benefits and in what amounts,

select levels of funding, adjust myriad other details of pension plans, and may decide to terminate the plan altogether. In doing these things, ... they are no more the employees' 'fiduciaries' than when they decide what wages to offer or whether to close the plant and lay the workers off." *Johnson v. Georgia-Pacific Corp.,* 19 F.3d 1184, 1188 (7th Cir.1994); *see also Voyk v. Brotherhood of Locomotive Engineers*, 198 F.3d 599, 604-06 (6th Cir. 1999)(the union, as an employer, did not act in a fiduciary capacity in setting and enforcing a policy that its retired officers and employees were required to make a contribution in order to maintain their health benefits).  At most, the designation of an employee eligibility policy for benefits is a settlor-type function as opposed to a fiduciary act. *Hartline v. Sheet Metal Workers' National Pension Fund*, 134 F.Supp.2d 1, 9-16 (D.D.C. 2000), *aff'd* 286 F.3d 598 (D.C. Cir. 2002).

Virtually every employer that participates in an employee welfare benefit plan establishes eligibility rules for employees to receive the benefits (for instance, full-time employees receive benefits, part-time employees do not; collectively bargained employees receive benefits, non-collectively bargained employees do not; the establishment of a probationary period prior to receipt of benefits; and, at its most basic level, the requirement that the individual be working for the employer in order to receive benefits) and communicates those eligibility rules to the benefit plan (for instance, by informing the benefit plan of when employees start employment and therefore become eligible for benefits and when they cease employment and therefore cease to be eligible for benefits).  If performance of these functions were sufficient for the establishment of a fiduciary act, then every employer who participated in a benefit plan would be a fiduciary. Clearly, this is contrary to Congress' intent in establishing criteria for fiduciary status. 29 U.S.C. § 1002(21)(A).

As neither the GCC/IBT nor Mr. Tedeschi functioned as a fiduciary with respect to the

termination of Ms. Cox's health benefits, they are not appropriate defendants in a 29 U.S.C. §

1132(a)(1)(B) suit and must be dismissed.

      2.   Ms. Cox's 29 U.S.C. § 1132(a)(1)(B) Claim Must Be Dismissed with
          Prejudice for Failure to Timely Exhaust the Administrative Remedies in the
          Fund's Benefit Plan.

      Prior to initiating this lawsuit, Ms. Cox failed to timely exhaust the administrative

remedies available to her under the benefit plan provided by the Fund.  Accordingly, her 29

U.S.C. § 1132(a)(1)(B) denial of benefits claim is subject to dismissal with prejudice.[7]

      "[P]arties aggrieved by decisions of pension plan administrators must exhaust the

administrative remedies available to them under their pension plans before challenging those

decisions in court." *Communications Workers of America v. American Telephone and Telegraph*

*Company*, 40 F.3d 426, 428 (D.C. Cir. 1994).  Courts apply this requirement as a matter of

judicial discretion. *Id*. at 432.  The exhaustion requirement in the ERISA context serves several

important purposes including preventing premature judicial interference with a benefit plan's

decision making process; enabling plan administrators to apply their expertise and exercise their

discretion to manage the plan's funds, correct errors, make considered interpretations of plan

provisions, and assemble a factual record that will assist the court in reviewing the

administrators' actions; and potentially render subsequent judicial review unnecessary due to a

benefit plan's own remedial procedures resolving the claim. *Id*.; see also *Doe v. MAMSI Life and*

*Health Insurance Company*, 471 F.Supp.2d 139, 150 (D.D.C. 2007)(quoting *Amato v. Bernard*,

618 F.2d 559, 567 (9th Cir. 1980)(noting that the purposes of the exhaustion requirement are "to

help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment

---

[7]     Even if Mr. Tedeschi and the GCC/IBT could be sued under 29 U.S.C. § 1132(a)(1)(B)
as plan fiduciaries, Ms. Cox's denial of benefits claim against them, as her denial of benefits
claim against the Fund and its Board of Trustees, would be dismissible for failure to exhaust.

of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned")).  For these reasons, "[w]hen a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants first to address their complaints to the fiduciaries to whom Congress, in Section 503 [of ERISA], assigned the primary responsibility for evaluating claims for benefits." *Id*. at 150-51 (quoting *Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 892 (3d Cir. 1986)).

On April 7, 2006, Ms. Cox was notified by the Fund that her eligibility to receive benefits under the plan had been terminated effective April 1, 2006. Bauer Dec. at ¶ 33 and Exhibit 8 attached thereto.  Thereafter, Ms. Cox did not submit a claim for benefits to the Fund. *Id*. at ¶ 35. In her Complaint, Ms. Cox alleges that she exhausted her internal Plan remedies. Complaint at ¶ 36.  However, as set forth in both the Plan Document and the SPD, the Fund requires that appeals of administrator decisions be filed with the Fund within 120 days of receipt of the notice of denial of benefits. *Id*. at ¶¶ 15, 25 and Exhibits 1, pp. 70-71 and 2, p. 47 attached thereto.  Ms. Cox did not file an appeal challenging her eligibility to receive benefits under the Plan within 120 days after receipt of the April 7, 2006 notice denying her continued eligibility to receive Fund benefits. *Id*. at ¶ 36.  Neither the Fund nor its Board of Trustees received any correspondence from Ms. Cox or her representative until her counsel submitted a letter on April 2, 2007. *Id*. at ¶ 37 and Exhibit 9 attached thereto; Complaint at ¶ 32.  If this letter was intended as an appeal of the denial of Ms. Cox's eligibility for benefits, it was received well outside the 120 day required time limit for the filing of an appeal of a benefit decision.  Accordingly, by failing to file an appeal within the 120-day time limit, Ms. Cox thwarted a central purpose of the exhaustion requirement which is to resolve eligibility and benefit issues quickly so as to avoid incurring large potential liability for a benefit plan.

17

Additionally, the Fund gives its Plan administrator, the Board of Trustees, discretionary authority to apply and interpret the terms of the Plan Document and to determine eligibility for and the amount of benefits payable under the terms of the Plan Document. Exhibit A attached to the Complaint at p. 16; Bauer Dec. at ¶¶ 17, 24 and Exhibits 1, p. 73 and 2, p. 67 attached thereto.  Under these provisions, decisions of the Plan administrator must be afforded deference absent a determination of an abuse of discretion. *Communication Workers*, 40 F.3d at 433 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  For purposes of judicial review, "it is important for the plan to provide a final, fully considered, and reasoned explanation for the court to evaluate."*Id*.  When the plan administrator is not afforded the opportunity to render a final decision, and thus never afforded an opportunity to provide a fully reasoned explanation for such a decision, the District Court has nothing before it to which it can defer. *Id*. The U.S. Court of Appeals for the District of Columbia Circuit has held: "By permitting [plaintiff's] ERISA claim to proceed before obtaining a final decision from the Plan, the District Court [is] unable to apply properly the *Firestone* rule of deference." *Id*.

In *Hunter v. Metropolitan Life Insurance Company*, 251 F.Supp.2d 107, 111 (D.D.C. 2003), the benefit plan issued the plaintiff a notice of termination of long-term disability benefits and plaintiff thereafter failed to challenge the termination through the plan's appeals process. The Court stated, "Metlife's notice of the termination of LTD benefits beginning on September 6 was the *initial* determination of the claim.  It does not reflect a determination based on a review and, therefore, is not sufficient to exhaust the administrative remedies provided by the Plan." *Id*. (Emphasis is original).  Similarly, the Fund issued Ms. Cox a notice of termination of health care benefits and she thereafter failed to challenge the notice through the Plan's appeal process within the 120 day period required by the Plan. Bauer Dec. at ¶ 36.  Accordingly, Ms. Cox failed to

exhaust her administrative remedies under the Plan prior to initiating this lawsuit and she

therefore cannot pursue her 29 U.S.C. § 1132(a)(1)(B) claim. See *Madera v. Marsh USA, Inc.*,

426 F.3d 56, 62 (1st Cir. 2005)(individual fails to exhaust administrative remedies when he fails

to appeal termination of benefits and fails to seek benefits once notified they were being

terminated).  Moreover, as Ms. Cox's opportunity for pursuing administrative remedies under the

Plan is now foreclosed, dismissal of her denial of benefits claim with prejudice is appropriate.

*Hunter*, 251 F.Supp.2d at 112, n. 10 (citing *Counts v. Am. Gen. Life and Accident Ins. Co.*, 111

F.3d 105 (11th Cir. 1997)(affirming dismissal with prejudice of lawsuit seeking judicial review of

denial of disability benefits because plaintiff failed to appeal initial denial within 60 days of

receiving termination letter as required by the plan); see also *Gayle v. United Parcel Service*, 401

F.3d 222, 226-230 (4th Cir. 2005)("[I]nternal appeal limitations periods in ERISA plans are to be

followed just as ordinary statutes of limitations."); *Gallegos v. Mt. Sinai Med. Ctr.*, 210 F.3d

803, 808 (7th Cir. 2000)("Failure to file a request for review within [a plan's] limitations period

is one means by which a claimant may fail to exhaust her administrative remedies."); *Northlake*

*Regional Medical Ctr. v. Waffle House System Employee Benefit Plan*, 160 F.3d 1301, 1302 (11th

Cir. 1998)(dismissing claim as time barred when plaintiff failed to file suit within the 90 day

period provided in the plan); *Terry v. Bayer Corp.*, 145 F.3d 28, 40 (1st Cir. 1998); *Hall v.*

*Baptist Healthcare System, Inc*, 2007 WL 4119035, *1 (W.D. Ky. Nov. 14, 2007)(dismissal

without prejudice is only appropriate whenever a claim for benefits can still be brought).[8]

---

[8]    Neither of the two extremely limited exceptions to the ERISA exhaustion requirement are
available to Ms. Cox here.  One is that if a plaintiff can establish that resort to administrative
remedies would have been clearly useless, typically by establishing that the plan administrator's
position on an issue is already established, that there is no possible way to change that decision
and that denial of the claim is a certainty, then exhaustion is excused as futile. *Communication*
*Workers of America*, 40 F.3d at 432-33.  In this case, Ms. Cox cannot establish that resorting to
the appeals remedies of the Fund would have been futile.  The Board of Trustees of the Fund has

B. **Ms. Cox's 29 U.S.C. § 1140 Claim Must Be Dismissed Because It Was Not Filed within the One Year Statute of Limitations Applicable to such Claims.**

Ms. Cox's second cause of action is against George Tedeschi, individually and as President of the GCC/IBT, for violation of Section 510 of ERISA, 29 U.S.C. § 1140, alleging that he discriminatorily denied her health benefits on the ground that she retired prior to age 60, treated her differently than similarly-situated employees, and exhibited personal animus towards her. Complaint at ¶¶ 26, 29, 44.

Section 510 of ERISA states in relevant part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

---

carefully considered eligibility appeals in the past and ensured that eligibility decisions were being made in accordance with the terms and conditions of the Plan. Bauer Dec. at ¶¶ 27-29 and Exhibits 3-6 attached thereto. The Board of Trustees of the Fund has never been presented with an appeal addressing an issue of retiree eligibility for Plan benefits; consequently, the Board of Trustees has not been afforded the opportunity to interpret or apply the retiree eligibility language set forth in the Plan Document and SPD. *Id*. at ¶ 30. Accordingly, as appealing the termination of benefits would have afforded Ms. Cox with an opportunity to have the Fund Board of Trustees evaluate and issue a decision concerning her claim that she was entitled to retiree benefits, the filing of an appeal would not have been futile.

The second exception to the exhaustion requirement is a showing of the threat of irreparable. However, the irreparable harm exception arises in the context of the administrative procedure being available but taking too long to exhaust given the harm engendered. When, as here, the exhaustion procedure time frame has expired, irreparable harm cannot be utilized as a reason to excuse the failure to exhaust (this would be akin to excusing the running of statutes of limitations because of irreparable harm). And, certainly irreparable harm cannot be utilized in a context where the plaintiff waited almost a year to submit any challenge to her termination of benefits and over two years to file suit in Court. Had Ms. Cox filed a timely appeal challenging her termination of benefits, she would have received a decision from the Plan administrator and have exhausted her administrative remedies prior to the time her representative first contacted the Fund about the termination of her benefits. *Id*. at ¶ 21 and Exhibit 2, p. 47 attached thereto.

20

29 U.S.C. § 1140.

Section 510 of ERISA and the applicable enforcement provision, 29 U.S.C. § 1132, do not provide a specific statute of limitations for actions alleging violations of Section 510. Accordingly, the appropriate limitations period is determined by reference to the state statute of limitations governing cases most analogous to the cause of action asserted by the plaintiff. *Kamen v. International Brotherhood of Electrical Workers*, 505 F.Supp.2d 66, 77 (D.D.C. 2007)(citations omitted); *Watts v. Parking Management*, 2006 WL 627153, *3 (D.D.C. March 12, 2006)(citing *North Star Steel Co. v. Thomas*, 515 U.S. 29, 33 (1995) and *Wilson v. Garcia*, 471 U.S. 261, 266-67 & n. 12 (1985)), *aff'd* 210 Fed. Appx. 13 (D.C. Cir. 2006). In following the guidance of the United States Court of Appeals for the District of Columbia Circuit, this Court on two occasions, including in a decision issued by Her Honor, have held that the one-year statute of limitations set forth in the District of Columbia Human Rights Act (DCHRA) is the appropriate state statute of limitations to borrow in ERISA Section 510 actions that contain allegations that resemble allegations in employment discrimination suits.

In *Watts*, the plaintiff claimed that the employer had terminated him because of his age so as to prevent him from receiving retirement benefits. *Id*. at *3. As a result, this Court found that the plaintiff's allegations were "precisely the kind of facts and type of allegations one would expect to see in a claim for wrongful or discriminatory terminations based on age." *Id*. Therefore, this Court held that "the statute most closely analogous to Section 510 would be the District of Columbia's wrongful discharge/employment discrimination statute-the DCHRA." *Id*.

The Court stated that its "reasoning is consonant with both the suggestions of the D.C. Circuit and the holdings of virtually every other jurisdiction." *Id*. at *4 (citing *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1337 n. 7 (D.C. Cir. 1995)("When confronted with the question of the

appropriate limitations for § 510, the courts of appeals have often applied a state's wrongful

discharge or employment discrimination statute.") and decisions of the Second, Third, Fifth,

Sixth, Seventh, Ninth, Tenth and Eleventh Circuits).[9]

Accordingly, because both a claim for wrongful discharge as a result of employment

discrimination and a claim alleging discrimination in connection with workers' compensation

benefits must be brought within one year in the District of Columbia, and that the one-year

statute of limitations is to be strictly construed, the *Watts* Court held that plaintiff's Section 510

claim must be dismissed with prejudice as untimely because he failed to file his lawsuit until 17

½ months after his claim that he was terminated because of age in an effort to preclude him from

receiving pension benefits accrued. *Id*. at *3, *5 (citations omitted).

Similarly, in *Kamen*, plaintiff alleged that his employment was terminated in order to

---

[9]     The *Watts* Court cited to the following decisions:

*Sanberg v. KPMG Peat Marwick, LLP,* 111 F.3d 331, 336 (2d Cir.1997) (a Section 510 claim is most analogous to claims involving wrongful discharge to prevent an employee from obtaining workers' compensation benefits); *Gavalik v. Cont'l Can Co.,* 812 F.2d 834, 843-46 (3d Cir.1987), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987) (holding that the district court did not err in determining that a Section 510 action most closely resembles action for employment discrimination); *McClure v. Zoecon, Inc.,* 936 F.2d 777, 778 (5th Cir.1991) (affirming district court's decision to apply the statute of limitations applicable to "wrongful discharge and employment discrimination claims" to a Section 510 action); *Leemis v. Med. Servs. Research Group, Inc.,* 75 Fed. Appx. 986, 987-88 (6th Cir.2003) (per curium) (noting that "neither party on appeal disputes the conclusion of the district court that Leemis's federal complaint 'is most analogous to a wrongful discharge or retaliatory discharge claim' "); *Teumer v. Gen. Motors Corp.,* 34 F.3d 542, 549-50 (7th Cir.1994) (the statute of limitations applicable to retaliatory discharge actions is applicable to Section 510 claims); *Burrey v. Pac. Gas & Elec. Co.,* 159 F.3d 388, 396 (9th Cir.1998) (affirming district court that applied the statute of limitations period for wrongful discharge to a Section 510 claim); *Held v. Mfrs. Hanover Leasing Corp.,* 912 F.2d 1197, 1205 (10th Cir.1990) (agreeing with district court that claim most analogous to a Section 510 action is a claim for employment discrimination); *Byrd v. MacPapers, Inc.,* 961 F.2d 157, 160 (11th Cir.1992) (concluding that a Section 510 claim was most closely analogous to a claim for retaliatory discharge for filing a workers' compensation claim); *see also Berger v. AXA Network, LLC,* 370 F.Supp.2d 751, 754 (N.D.Ill.2005) (under New York law, Section 510 claim is most analogous to a retaliatory discharge claim under New York's Workers' Compensation statute).

interfere with his continued receipt of health benefits and defendant argued that his claim was time-barred because his termination occurred more than one year before his lawsuit was filed. 505 F.Supp.2d at 77. The Court held that the gravamen of plaintiff's complaint was that his employer wrongfully terminated his employment because of his sexual orientation, and therefore, his ERISA § 510 claim most closely resembled a discrimination claim under the DCHRA and that the one-year statute of limitations from the DCHRA should be borrowed. *Id*. at 78.

In this action, as in *Watts* and *Kamen*, the gravamen of Ms. Cox's ERISA § 510 claim most closely resembles an employment discrimination claim under the DCHRA. Ms. Cox's allegations are of the type that would typically be found in an employment discrimination lawsuit based on a protected characteristic such as age. Ms. Cox alleges that Mr. Tedeschi discriminatorily denied her an employee benefit, entitlement to retiree health care coverage, because she had not reached a required age. She alleges that she was treated differently than similarly-situated employees. And, she alleges that she met the requirements to receive retiree health care coverage and that the decision to deny her this employee benefit was motivated by a personal animus towards her. Complaint at ¶¶ 26, 29, 44. Discrimination in the provision of an employee benefit based on age, differential treatment from similarly-situated employees and employer animus are all hallmark components of a typical employment discrimination charge.

In this instance, the statute most closely analogous to Ms. Cox's ERISA § 510 claim is the employment discrimination portion of the DCHRA which provides

> It shall be an *unlawful discriminatory practice to do any of the following acts*, wholly or partially *for a discriminatory reason based upon* the actual or perceived . . . *age* [  ] of any individual:
>
> (1) *By an employer.* -- To fail or refuse to hire, or to discharge, any individual; *or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employmen*t, including promotion; or to limit,

23

segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee[.]

D.C. Code § 2-1402.11(a)(1)(emphasis added).

Within the District of Columbia, a claim of employment discrimination or disparate treatment in terms and conditions of employment is governed by the one-year statute of limitations set forth in the DCHRA. See D.C. Code § 2-1403.16(a)("A private cause of action pursuant to [the DCHRA] shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof[.]").  Accordingly, it is appropriate for the Court to apply a one-year statute of limitations to Ms. Cox's ERISA § 510 claim.

The latest possible date when Ms. Cox became aware that she would not be receiving retiree health care coverage was April 7, 2006, when she was notified that her health benefits were being discontinued. Bauer Dec. at ¶ 33 and Exhibit 8 attached thereto.  As Ms. Cox did not file the instant lawsuit until May 22, 2008, over two years after she learned of the alleged discrimination, her ERISA § 510 claim is time barred and must be dismissed with prejudice as untimely.[10]

---

[10]    Even if the Court were to determine that the most analogous District of Columbia claim to Ms. Cox's ERISA § 510 claim was an action alleging discrimination in connection with application for workers' compensation benefits, the applicable statue of limitations would still be one year. See D.C. Code § 32-1542 ("It shall be unlawful for any employer or his duly authorized agent to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim compensation from such employer. . . ."); D.C. Code § 32-1514 (establishing one-year limitations period for filing cause-of-action for discrimination in connection with workers' compensation benefits).

C.   <u>Claim for Breach of Contract</u>

Ms. Cox's third Count alleges that the GCC/IBT "breached the applicable contracts that obligated the defendant Health & Welfare Fund to provide her with vested, continuing, fully paid retiree health care benefits." Complaint at ¶ 47. It is unclear as to which "contracts" Ms. Cox believes were breached by the Employer. In any case, irrespective of which "contracts" are at issue, Ms. Cox cannot pursue a breach of contract claim against the GCC/IBT or any of the defendants. If Ms. Cox were to assert a breach of any of the Fund documents, such as the Trust Agreement, Plan Document or SPD, that claim would be preempted by ERISA and addressed under the ERISA § 502(a)(1)(B) denial of benefits claim, which, as stated above, is subject to dismissal against the GCC/IBT and Mr. Tedeschi because they are not Plan fiduciaries and subject to dismissal against all defendants for failure to exhaust administrative remedies. If Ms. Cox is asserting a breach of the collective bargaining agreement between the GCC/IBT and the OPEIU, that claim would be preempted by the Labor Management Relations Act ("LMRA") and dismissed because Ms. Cox was not a bargaining unit member covered by the collective bargaining agreement or, alternatively, because the claim was not filed within the six-month statute of limitations applicable to such claims.

1.   <u>ERISA Preempts Any State Law Breach of Contract Claim being asserted by Ms. Cox that is based on any of the Plan's Documents.</u>

To the extent that Ms. Cox's state law breach of contract claim is based on any document of the Fund, such as the Trust Agreement, Plan Document or SPD, that allegedly obligated the Employer to contribute to the Fund on behalf of Ms. Cox in order that she be provided with retiree health care coverage, that claim is preempted by ERISA.

The underlying goal of ERISA is to provide a uniform regulatory regime under federal

law for employee benefit plans. *Stewart v. National Educ. Ass'n*, 404 F.Supp.2d 122, 137 (D.D.C. 2005)(citing *Aetna Health Inc. v. Davila,* 542 U.S. 200 (2004)), *aff'd* 471 F.3d 169 (D.C. Cir. 2006). In order to effectuate this goal, Congress included "expansive" preemption provisions in ERISA to "ensure that employee benefit plan regulation is 'exclusively a federal concern.' " *Id*. at 137 (citing *Aetna Health Inc.*, 542 U.S. at 208 (quoting *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523 (1981)(citations omitted))). ERISA's preemption clause, section 514(a), 29 U.S.C. § 1144(a), provides that "[ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The Supreme Court, most recently in *Aetna Health Inc. v. Davila* and in a host of earlier decisions, has repeatedly emphasized the expansive scope of this provision. *Stewart*, 404 F.Supp.2d at 137 (citing *Aetna Health Inc.,* 542 U.S. at 208-13; *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133 (1990); *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58 (1987); *Pilot Life Ins. Co. v Dedeaux*, 481 U.S. 41 (1987); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85 (1983)).

A state law is said to "relate to" an employee benefit plan if it has a "connection with or reference to" such a plan. *Id*. (citing *Shaw,* 463 U.S. at 97). Explained another way, a cause of action may relate to an ERISA plan within the meaning of Section 514(a) when it is premised on the existence of a plan and when a court must focus its inquiry on the plan in order to resolve the claim. *Id*. (citing *Ingersoll-Rand,* 498 U.S. at 140). Further, as the Court held in *Aetna Health Inc.,* a cause-of-action under ERISA's civil enforcement scheme in Section 502(a) preempts other causes of action provided by state or common law if the other cause-of-action "duplicates, supplements, or supplants the ERISA civil enforcement remedy...." *Id*. (quoting *Aetna Health Inc.,* 542 U.S. at 209). Such duplication or supplementation would conflict with legislative intent to make the ERISA remedy exclusive, and "[t]he policy choices reflected in the inclusion

of certain remedies and the exclusion of others under [ERISA Section 502(a) ] would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Id.* (quoting *Pilot Life,* 481 U.S. at 54).

Ms. Cox's state law breach of contract claim is preempted by ERISA, to the extent that the contract that Ms. Cox is asserting was breached was a Fund document, both because the claim "relates to" an employee welfare plan and because it duplicates the ERISA civil enforcement remedy.

Ms. Cox's state law breach of contract claim asserts the failure to provide her with retiree health care coverage that she believes she is entitled to under the terms of the Plan.  As the Fund is an ERISA employee welfare benefit plan, Ms. Cox's breach of contract claim is preempted because it "relates to" that employee welfare benefit plan within the meaning of section 514(a), 29 U.S.C. § 1144(a), as the claim for wrongful denial of a benefit she believes she is owed has a "connection with or reference to" that plan." See *Shaw,* 463 U.S. at 97.  Without reference to the Fund's employee welfare benefit plan, there can be no determination as to whether Ms. Cox is entitled to the benefit she seeks and whether any contract was breached by denying her that benefit.  Accordingly, determination of Ms. Cox's breach of contract claim is inextricably linked to the terms of the Plan and therefore preempted by ERISA.

Additionally, the civil enforcement mechanism provided by ERISA in section 502(a), 29 U.S.C. § 1132(a)(1)(B), relied upon by Ms. Cox in Count I of her Complaint, preempts her state law claim of breach of contract in Count III. See *Stewart*, 404 F.Supp.2d at 137-38.  The breach of contract claim asserted in Court III of her Complaint and the ERISA denial of benefits claim in Count I of her Complaint assert the same wrong (denial of retiree health care coverage) and

seek the same remedy (reinstatement of retiree health care coverage).  Therefore, these two

claims "duplicate[ ], supplement[ ], or supplant [ ]" each other. *Aetna Health Inc.,* 542 U.S. at

208.  As such, Ms. Cox's breach of contract claim is preempted under Section 514(a) of the

ERISA statute. 29 U.S.C. § 1144(a); *see Ingersoll-Rand,* 498 U.S. at 140.  In order to recover

benefits she believes she is entitled to under the Plan, Ms. Cox cannot rely on a state law breach

of contract claim, but must rely exclusively on the remedies provided for in ERISA.[11]

Consequently, Ms. Cox's breach of contract claim is preempted by ERISA and must be

dismissed.

> 2. <u>If Ms. Cox's Breach of Contract Claim is based on the Collective Bargaining Agreement between the GCC/IBT and OPEIU, the Claim Is Preempted by the LMRA and Subject to Dismissal because Ms. Cox Was Not a Member of the Bargaining Unit or, Alternatively, Her Claim Is Time Barred by the Applicable Six Month Statute of Limitations.</u>

To the extent that Ms. Cox's state law breach of contract claim is based on a claim that

the collective bargaining agreement between the GCC/IBT and its staff employees represented

by the OPEIU obligated the Employer to contribute to the Fund on behalf of Ms. Cox in order

that she be provided with retiree health care coverage, that claim is preempted by the LMRA

because resolution of the claim is dependent on interpretation of the collective bargaining

agreement.  The claim must then be dismissed because Ms. Cox was not a member of the

bargaining unit covered by the collective bargaining agreement or, in the alternative, because she

failed to bring her claim for violation of the collective bargaining agreement within the six

---

[11]     This Court has found repeatedly that ERISA preempts breach of contract claims related to employee benefit plans. *See, e.g., Krooth & Altman v. N. Am. Life Assurance Co.,* 134 F.Supp.2d 96 (D.D.C.2001); *Moore v. Blue Cross and Blue Shield of the Nat'l Capital Area,* 70 F.Supp.2d 9 (D.D.C.1999); *Johnson v. Antioch Univ.,* Civ. No. 91-0133, 1992 WL 88028 (D.D.C.1992).

month statute of limitations applicable to such claims.

          a.   <u>The LMRA Preempts Any State Law Claim that Depends Upon the Meaning of a Collective Bargaining Agreement</u>.

Section 301(a) of the LMRA, 29 U.S.C. § 185, provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court ... without respect to the amount in controversy [and] without regard to the citizenship of the parties.

The Supreme Court has held § 301(a) is a source of substantive federal common law, *Textile Workers Union v. Lincoln Mills of Ala.,* 353 U.S. 448, 456-57 (1957), and provides a federal right of action, *see Avco Corp. v. Aero Lodge No. 735,* 390 U.S. 557 (1968). *Cephas v. MVM, Inc.*, 520 F.3d 480, 483-84 (D.C. Cir. 2008).

Section 301 completely preempts any action predicated upon state law if that action "depends upon the meaning of a collective-bargaining agreement." *Id.* at 484 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405-06 (1988)). As the Supreme Court has explained,

> the pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action "for violation of contracts between an employer and a labor organization." Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301.

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 23 (1983) (citing *Avco Corp.,* 390 U.S. 557).

Ms. Cox's Complaint charges GCC/IBT breached applicable contracts that obligated the Fund to provide her with retiree health care benefits. Complaint at ¶ 47. If the applicable contract that was allegedly breached was the collective bargaining agreement between the GCC/IBT and the OPEIU, then the questions that arose under Ms. Cox's breach of contract

action; that is, whether there was a contract that covered Ms. Cox, whether that contract required that she be provided with retiree health care and whether retiree health care as required by that contract was not provided, depend entirely upon the meaning of the collective bargaining agreement and is, therefore, completely preempted by § 301 of the LMRA. See *Cephas*, 520 F.3d at 484 (citing *Lingle,* 486 U.S. at 405-06).

 

> b. <u>Ms. Cox Was Not a Covered Employee Under the Collective Bargaining Agreement between the GCC/IBT and the OPEIU.</u>

As set forth in her Complaint, Ms. Cox worked as an Executive Secretary to the President and the Executive Assistant to the President of the GCC/IBT until she left employment with the GCC/IBT. Complaint at ¶¶ 7, 26.

Article II, Section 2.01 of the Agreement between The Graphic Communications International Union and The Office and Professional Employees International Union, Local No. 2, effective October 1, 2005 through September 30, 2007 states in relevant part:

> The Employer recognizes the Union as the exclusive bargaining agent for all office and professional employees (**excluding the secretaries of the President, the Secretary Treasurer, and the Executive Assistant to the President**) employed by the Employer, including those employees who are normally assigned to work less than five (5) full days a week.

Exhibit B, p. 2 to the Complaint (Emphasis added).

In a May 25, 2006 memo to the GCC/IBT Officers and General Board Members, Ms. Cox acknowledges that although she voluntarily paid dues to the union in order to become a member, she "could not take part in collective bargaining" because of "the confidentiality of [her] position." Tedeschi Dec. at ¶ 18 and Exhibit 3 attached thereto.

As Ms. Cox was not covered by the terms of the collective bargaining agreement between the GCC/IBT and the OPEIU, the Employer could not have breached that contract by failing to provide Ms. Cox with a benefit she alleges was required by the terms of that agreement.

  c. <u>If Ms. Cox Is Covered by the Collective Bargaining Agreement between the GCC/IBT and the OPEIU, then Her Breach of Contract Claim Must Be Dismissed for Failure to be Filed within the Applicable Six-Month Statute of Limitations</u>.

If, despite the clear language of the collective bargaining agreement between the GCC/IBT and the OPEIU that Ms. Cox was not a bargaining unit member, Ms. Cox was covered by that collective bargaining agreement, her preempted breach of contract claim is still subject to dismissal because it was not filed within the six-month statute of limitations applicable to such claims.

A breach of collective bargaining agreement claim is subject to a six-month statute of limitations if the underlying claim could have been resolved through the grievance procedure of the collective bargaining agreement. *Cephas*, 520 F.3d at 486-89 (finding that the six-month statute of limitations did not apply because the employer admitted that the alleged breach at issue was not subject to the agreement's grievance and arbitration provisions). When a collective bargaining agreement provides a grievance or arbitration remedy, an employee is required to exhaust it prior to pursuing a claim that an employer breached the terms of the collective bargaining agreement. *Delcostello v. International Broth. Of Teamsters*, 462 U.S. 151, 163-64 (1983)(citations omitted).   Normally, an employee is bound by the outcome of the grievance or arbitration remedy set forth in a collective bargaining agreement.  However, the Supreme Court has created a narrow exception whereby an employee dissatisfied with the outcome of the

collective bargaining agreement's grievance or arbitration remedy can pursue a hybrid claim against his union and employer. *Id*. at 164.  Such a suit, as a formal matter, comprises two causes of action -- the suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement and the suit against the union is one for breach of the union's duty of fair representation. *Id*.  To prevail against either the company or the Union, employees must not only show breach of contract but must also carry the burden of demonstrating a breach of duty by the Union. *Id*. at 164-65 (citations omitted).  The employee may, if he chooses, sue the employer and not the union; but the case he must prove is the same whether he sues one, the other, or both. *Id*. at 165.  And, the statute of limitations to be applied to such suits is six months. *Id*. at 170-72.

Although Ms. Cox is bringing a claim solely against the Employer, if she is suing on the collective bargaining agreement, she has brought a classic hybrid § 301 breach of contract/breach of the duty of fair representation claim which is subject to the six-month statute of limitations.  Article XIV of the applicable collective bargaining agreement addresses the provision of health benefit coverage. Complaint at ¶ 18 and Exhibit B, pp. 17-19 attached thereto.  Article XII of the applicable collective bargaining agreement provides a grievance and arbitration mechanism to resolve "any controversy or dispute arising between the parties hereto relating to any matter of wages, hours and working conditions, or any dispute between the parties involving interpretation or application of any provision of this Agreement." Exhibit B, pp. 14-15 to the Complaint.  If Ms. Cox was covered by the collective bargaining agreement, then she was obligated to exhaust its grievance and arbitration provision regarding provision of retiree health care coverage prior to bringing a breach of contract provision against her employer in Court. See *Delcostello* 462 U.S. at 164 (citing *Republic Steel Corp. v. Maddox,* 379 U.S. 650 (1965)).  If

Ms. Cox disagreed with the outcome of that grievance and believed that the union acted arbitrarily, discriminatorily or in bad faith in making that determination, she then had the right to pursue a hybrid claim against her union and/or her employer. *Id*. (citing *Vaca v. Sipes,* 386 U.S. 171 (1967); *Hines v. Anchor Motor Freight,* 424 U.S. 554 (1976); *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56 (1981); *Bowen v. United States Postal Service,* 459 U.S. 212 (1983); *Czosek v. O'Mara,* 397 U.S. 25 (1970)).

In fact, Ms. Cox pursued a hybrid § 301 breach of contract/breach of the duty of fair representation claim against the OPEIU and the GCC/IBT before the National Labor Relations Board ("NLRB").  On September 20, 2006, Ms. Cox filed unfair labor practice charges against the OPEIU and the GCC/IBT with the NLRB.  Ms. Cox's charge against the OPEIU stated:

> The OPEIU, Local 2 (the Union) breached its duty to fairly represent me, by arbitrarily refusing to process a grievance against my employer.  I was entitled to fully paid health care benefits during the term of my employment and during my retirement up to age 65, pursuant to the terms of the collective bargaining agreement between the Union and my employer, the Graphic Communications Conference/International Brotherhood of Teamsters.  The GCC/IBT refused to provide the health care benefits after my retirement on March 31, 2006, and the Union has refused to assert a grievance on my behalf.

Tedeschi Dec. at ¶ 19 and Exhibit 4 attached thereto.

Ms. Cox's charge against the GCC/IBT stated:

> The employer has unilaterally and arbitrarily refused to provide me health benefits upon my retirement.  I was employed by the Graphic Communications Conference/International Brotherhood of Teamsters and its predecessors (Employer) in accordance with the terms and conditions of employment set forth in collective bargaining agreements between the Employer and the Office and Professional Employees International Union, Local 2 until my retirement on March 31, 2006.  As a covered employee I was entitled to fully paid health care benefits during my employment, and during my retirement until age 65, pursuant to the agreement and one or more of the benefits plans in which I was a participant as a result of my employment.  Following my retirement, the Employer has refused to provide such benefits.

*Id*. at ¶ 19 and Exhibit 5 attached thereto.

On November 22, 2006, the NLRB approved Ms. Cox's withdrawal of the unfair labor practice charge against the GCC/IBT. *Id*. at ¶ 20 and Exhibit 7 attached thereto. On November 27, 2006, the NLRB approved Ms. Cox's withdrawal of the unfair labor practice charge against the OPEIU. *Id*. at ¶ 20 and Exhibit 6 attached thereto.

That Ms. Cox chose in this action only to sue her employer for breach of the collective bargaining agreement, and not also her former union for breach of the duty of fair representation, does not vitiate the hybrid nature of the claim. As the claim for retiree health care arose out of the terms of the collective bargaining agreement and resolution of a dispute over the provision of that benefit was subjected to the grievance and arbitration procedure set forth in that collective bargaining agreement, Ms. Cox presents a classic hybrid claim that is subject to a six-month statute of limitations. As Ms. Cox did not bring her breach of contract claim until more than two years after the alleged breach arose, her breach of contract claim, to the extent that it rests on the terms of the collective bargaining agreement between the GCC/IBT and the OPEIU, must be dismissed with prejudice as untimely.

Ms. Cox, however, asserts that the grievance and arbitration procedure set forth in the collective bargaining agreement between the GCC/IBT and the OPEIU was not available to her to challenge the Employer's decision on the provision of retiree health care because she was retired. Complaint at ¶ 48. This argument is unavailing. Ms. Cox admits that the GCC/IBT denied her retiree health care on March 9, 2006, a time when she was still employed by the GCC/IBT. Complaint at ¶ 27. Thus, the dispute over the provision of retiree health care arose when Ms. Cox was still an active employee who would have had access to the grievance and

arbitration mechanism set forth in the collective bargaining agreement, had she been covered by that agreement. Had Ms. Cox waited to file the grievance until the day she retired on March 31, 2006, she would have missed the ten day time limit set forth in the collective bargaining agreement for filing grievances. Exhibit B, p. 14 to the Complaint.  Moreover, it has been repeatedly held by numerous Courts of Appeals that an individual's status as a retiree does not prevent her former union from pursuing a grievance on her behalf regarding retiree benefits unless specifically prohibited by the terms of the collective bargaining agreement. See *Crown Cork & Seal Co., Inc. v. International Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 501 F.3d 912 (8th Cir. 2007); *Cleveland Elec. Illuminating Co. v. Utility Workers Union of America*, 440 F.3d 809 (6th Cir. 2006) (the presumption of arbitrability of retiree benefit disputes is particularly applicable where the arbitration clause provides for arbitration of any controversy involving the interpretation of the CBA); *Commc'ns Workers v. Mich. Bell Tel. Co.,* 820 F.2d 189, 193 (6th Cir.1987); *Anderson v. Alpha Portland Industries, Inc.,* 752 F.2d 1293 (8th Cir.1985); *Int'l Union, (UAW) v. Yard-Man, Inc.,* 716 F.2d 1476, 1486 (6th Cir.1983) (noting that the union, as a signatory to the contract, could bring an action for third party beneficiary retirees because it has a direct interest in maintaining the integrity of the retiree benefits created by the collective bargaining agreement); *United Steelworkers v. Canron, Inc.,* 580 F.2d 77, 80-81 (3d Cir.1978)("[T]he union has a legitimate interest in protecting the rights of the retirees and is entitled to seek enforcement of the applicable contract provisions.").  As stated above, the provisions of the applicable collective bargaining agreement provide the union with the right to pursue a grievance over "any controversy or dispute arising between the parties hereto relating to any matter of wages, hours and working conditions, or any dispute between the parties involving interpretation or application of any provision of this Agreement." Exhibit B, p. 14 to the

35

Complaint.  Accordingly, the fact that Ms. Cox retired did not eliminate her ability to pursue a grievance and arbitration under an applicable collective bargaining agreement or convert a hybrid Section 301/breach of the duty of fair representation claim into some other cause of action.

Thus, if Ms. Cox is claiming that the GCC/IBT breached its collective bargaining agreement with the OPEIU, and Ms. Cox is covered by that agreement, Ms. Cox was obligated to bring her claim within six months after it arose in March 2006.  Having failed to do so, she is barred from bringing that claim now.

## IV. CONCLUSION

For the above-stated reasons, the Court should dismiss all counts of Ms. Cox's Complaint with prejudice.  Alternatively, the Court should grant summary judgment to the defendants as there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law.

Respectfully submitted,

O'DONNELL, SCHWARTZ & ANDERSON, P.C.

Dated:   August 5, 2008                    By:___/s/  Peter Leff_____
                                             Peter J. Leff
                                             DC Bar No. 457476
                                             1300 L Street NW
                                             Suite 1200
                                             Washington, D.C. 20005
                                             (202) 898-1707/FAX (202) 682-9276
                                             pleff@odsalaw.com

**Certificate of Service**

I hereby certify that I have this day caused the following people to be served by Electronic Mail through the Court's Electronic Case Filing system with a copy of the foregoing Motion to Dismiss or, in the alternative, for Summary Judgment of the Defendants; Statement of Material Facts to which the Defendants Contend There Is No Genuine Issue; Memorandum of Points and Authorities in Support of the Motion to Dismiss or, in the alternative, for Summary Judgment of the Defendants; the Declaration of George Tedeschi with attached exhibits; the Declaration of Teresa Bauer with attached exhibits and a proposed Order:

Charles R. Both
LAW OFFICES OF CHARLES R. BOTH
1666 Connecticut Avenue, NW
Suite 500
Washington, DC 20009
chas@crbothlaw.com

Geoffrey M. Bohn
Robert A. Battey
BOHN & KOURETAS, PLC
P.O. Box 17811
Arlington, VA 22216
bohn_kouretas_plc@yahoo.com

August 5, 2008                              _____/s/ Peter J. Leff_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **MADELINE M. COX** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:08-cv-00873--CKK** |
| | ) | |
| **GRAPHIC COMMUNICATIONS** | ) | |
| **CONFERENCE OF THE** | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF TEAMSTERS,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GRAPHIC COMMUNICATIONS NATIONAL** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BOARD OF TRUSTEES OF THE GRAPHIC** | ) | |
| **COMMUNICATIONS NATIONAL** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GEORGE TEDESCHI, Individually** | ) | |
| **and as President of the** | ) | |
| **GRAPHIC COMMUNICATIONS** | ) | |
| **CONFERENCE OF THE** | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF TEAMSTERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**STATEMENT OF MATERIAL FACTS TO WHICH
THE DEFENDANTS CONTEND THERE IS NO GENUINE ISSUE**

In accordance with Local Rule 7(h), the Defendants, the Graphic Communications Conference of the International Brotherhood of Teamsters ("GCC/IBT" or "Employer"), the Graphic Communications National Health and Welfare Fund ("Trust Fund" or "Fund" or "Plan"), the Board of Trustees of the Fund and George Tedeschi, individually and as President of the GCC/IBT, file the following Statement of Material Facts to which The Contend There Is No Genuine Issue:

1. Plaintiff Madeline Cox was employed by the Graphic Communications Conference of the International Brotherhood of Teamsters ("GCC/IBT" or "Employer"), or its predecessor the Graphic Communications International Union ("GCIU"), as an Executive Secretary to the President and Executive Assistant to the President from 1997 until she voluntarily left employment on March 31, 2006. Complaint at ¶ 7, 26.

2. Ms. Cox was age 55 when she voluntarily left employment at the GCC/IBT. Complaint at ¶ 7.

3. On or about March 9, 2006, Ms. Cox informed George Tedeschi, the President of the Employer, that she would be retiring on March 31st and that she expected to have her health care benefits paid for by the GCC/IBT after she left employment. Complaint at ¶ 27; Declaration of George Tedeschi at ¶ 12.

4. On or about March 9, 2006, Mr. Tedeschi informed Ms. Cox that it was the policy of the Employer that health care premiums would not be paid on behalf of employees who left employment prior to age 60 absent extraordinary circumstances, none of which were present in her case, and therefore, the Employer would not continue to pay her health care premiums if she left employment prior to age 60. Complaint at ¶ 27; Tedeschi Dec. at ¶ 12.

5.  The GCC/IBT is an employer who participates in the Graphic Communications National Health and Welfare Fund ("Fund" or "Trust Fund") on behalf of its employees so they will be provided with health benefit coverage. Tedeschi Dec. at ¶ 6; Declaration of Teresa Bauer at ¶ 5.

6.  The Fund is a multi-employer, Taft-Hartley employee welfare benefit plan, as that term is defined in 29 U.S.C. § 1002 (1). Bauer Dec. at ¶ 2.

7.  The Fund was established by and is governed by an Agreement and Declaration of Trust ("Trust Agreement"). Bauer Dec. at ¶ 3; Exhibit A to the Complaint.

8.  The purpose of the Fund is to provide health, disability and life insurance benefits in a cost-effective manner to Fund participants. Bauer Dec. at ¶ 4; Exhibit A to the Complaint at pp. 1-2.

9.  The Fund is administered by a Board of Trustees made up of an equal number of management representatives and union representatives. Bauer Dec. at ¶ 6; Exhibit A to the Complaint at p. 7.

10. Trustees of the Fund are "the sole judges of [ ] all factual determinations; the standard of proof required in any case; application and interpretation of the Plan; and entitlement to or amount of benefits payable." Bauer Dec. at ¶ 7; Exhibit A to the Complaint at p. 16.

11. Neither Mr. Tedeschi nor any Officer or employee of the GCC/IBT is a member of the Board of Trustees of the Fund. Tedeschi Dec. at ¶ 7; Bauer Dec. at ¶ 8.

12. Neither Mr. Tedeschi nor the Employer provide benefits, adjudicate benefit claims, make any administrative decisions such as which medical provider network or prescription drug distributor to utilize, collect or determine premiums, make any management decisions such as hiring professional advisors or a third party administrator, handle Plan

assets or make investment decisions on behalf of the Fund. Tedeschi Dec. at ¶ 9; Bauer

Dec. at ¶ 11.

13. The plan of benefits provided to participants of the Fund is governed by the Graphic

Communications National Health and Welfare Fund Plan Document ("Plan Document").

Bauer Dec. at ¶ 12 and Exhibit 1 attached thereto.

14. With respect to retiree eligibility, the Plan Document defines a "Retiree" at Section 2.59

as "a person who is receiving monthly pension benefits from an [sic] qualified retirement

plan and who satisfies the eligibility rules set forth in Section 3.02 [of the Plan

Document]." Bauer Dec. at ¶ 13 and Exhibit 1 attached thereto at p. 15.

15. Section 3.02 of the Plan Document "Retiree Eligibility" provides:

    (a) A retiree shall continue to be an Eligible Person for all Retiree benefits to which he is
        entitled under the Plan upon proper application to the Fund, provided the Retiree is:
        (1) an Eligible Employee in the month immediately preceding the month in which his
            retirement is effective, and
        (2) eligible to receive a pension from an Employer's qualified retirement plan or from
            a jointly trusteed, multiemployer pension plan established for employees in the
            graphic communications industry.

    Bauer Dec. at ¶ 14 and Exhibit 1 attached thereto at p. 19.

16. The Fund's Plan Document provides an appeals procedure for participants to utilize to
    challenge decisions of the Fund.  Section 14.04 of the Plan Document states in relevant
    part:

    (a) Right of Appeal
    Any individual (or his duly appointed representative) whose claim for benefits under this
    Plan has been denied, in whole or in part, or whose claim for benefits against the Plan
    otherwise is denied, may petition the Committee for review of the denial of claim.

    (b) Documentation for Appeals
    The petition for review shall be in writing, and shall state the name and address of the
    claimant, the fact that the claimant is disputing the denial of claim giving the date of the
    notice of denial and, in clear and concise terms, the reason or reasons for disputing the
    denial.  It shall be accompanied by any pertinent documentary material not already
    furnished to the Committee and shall be delivered or mailed to the Committee within 120
    days after the date shown on the notice to the claimant of the denial.

*        *        *        *        *

(c) <u>Review or Hearing on the Appeal</u>
The Committee shall grant a hearing on the petition to receive and hear any evidence or argument which cannot be presented satisfactorily by correspondence.  The failure to file a petition for review in a timely manner or the failure to appear and participate in any such hearing shall constitute a waiver of the claimant's right to review of the denial.

*        *        *        *        *

(d) <u>Decision by the Committee</u>
A decision by the Committee shall be made within 60 days of receipt of petition for review unless special circumstances require an extension of time for processing, in which case a decision shall be rendered as soon as possible, but not later than one hundred and twenty days (120) after receipt of the request for review.  The claimant shall be advised of the decision in writing. Stating the specific reasons for the decision in a manner calculated to be understood by the claimant and the specific references to the Plan provisions or other applicable rules upon which the decision is based.  The decision of the Committee with respect to a petition for review shall be final and binding upon all parties, including the claimant and any person claiming under the claimant.

Bauer Dec. at ¶ 15 and Exhibit 1 attached thereto at pp. 70-71.

17. The Board of Trustees of the Fund has appointed an equal number of union and management Trustees from the Fund's Board of Trustees to an Appeals Committee to hear appeals, develop a factual record, deliberate on the merits of the appeal and make a determination as to whether to grant or deny the appeal and communicate the decision to the participant who filed the appeal. Bauer Dec. at ¶ 16.

18. If an individual disagrees with a determination of the Appeals Committee, he or she may pursue a claim in federal court. Bauer Dec. at ¶ 16.

19. In accordance with Section 15.02 of the Plan Document, the Executive Committee of the Fund administers and interprets the Plan Document, has the authority to take all actions and make all decisions necessary and proper to carry out the Plan Document, and has the power and duty, among other things, to interpret the Plan Document and resolve

5

ambiguities, inconsistencies and omissions and to decide on questions concerning the

Plan Document and the eligibility of any Employee to participate in the Fund. Bauer Dec.

at ¶ 17 and Exhibit 1 attached thereto at p. 73.

20. The Executive Committee of the Fund is made up of four union Trustees and four

management Trustees selected from the Fund's Board of Trustees. Bauer Dec. at ¶ 18.

21. The Fund distributes a Summary Plan Description ("SPD") to its participants. Complaint

at ¶ 19; Bauer Dec. at ¶ 19.

22. In March 2000, the Fund reissued an updated SPD directly to all participants in the Fund,

including Ms. Cox. Complaint at ¶ 19; Bauer Dec. at ¶ 21 and Exhibit 2 attached thereto.

23. The March 2000 SPD defined Retiree as an individual "who is receiving monthly pension

benefits from a qualified retirement plan established for Employees in the graphic

communications industry."  Complaint at ¶ 22; Bauer Dec. at ¶ 22 and Exhibit 2 attached

thereto at p. 10.

24. The SPD contained a supplement setting forth the specific terms of Ms. Cox's GCC/IBT-

provided health coverage benefits.  On the last page of the supplement the "Eligibility

Rules Under the Graphic Communications National Health and Welfare Plan" were

stated.  Under the subsection of "Eligibility for Retirees," it stated:

> In the event the employee retires directly from employment with the GCIU and is
> eligible for retirement benefits from a GCIU-sponsored pension plan or pension plan
> in which the GCIU participates, coverage under the National Plan will continue, at the
> GCIU's expense, until the employee attains age 65.  Upon attainment of age 65,
> Medicare becomes the primary insurer and supplemental coverage is provided by the
> GCIU though [sic] AARP.

Complaint at ¶ 23; Bauer Dec. at ¶ 23 and Exhibit 2 attached thereto.

25. The SPD provides the following:

**Discretionary Authority of the Board of Trustees and its Designees**

In carrying out their respective responsibilities under the Plan, the Board of Trustees, the Administrator and other individuals with delegated responsibility for the administration of the Plan, will have discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan Benefits in accordance with the terms of the Plan. Any interpretation or determination will be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

Bauer Dec. at ¶ 24 and Exhibit 2 attached thereto at p. 67.

26. The SPD provides for a review procedure to challenge the denial of benefits, which states in relevant part:

Your request for review or reconsideration must be made in writing to the Graphic Communications National Health and Welfare Fund at Five Gateway Center, Suite 620, 60 Boulevard of the Allies, Pittsburgh, PA 15222, within 120 days after you receive notice of denial.

Bauer Dec. at ¶ 25 and Exhibit 2 attached thereto at p. 47.

27. On April 4, 2006, four days after Ms. Cox had retired, the Employer submitted a "Termination and Change Form" to the Fund indicating that Ms. Cox had left employment with the GCC/IBT on March 31, 2006, and therefore her health insurance coverage should be terminated effective April 1, 2006. Bauer Dec. at ¶ 31 and Exhibit 7 attached thereto.

28. The Fund received no health care coverage premium payments on behalf of Ms. Cox from the GCC/IBT after April 1, 2006. Bauer Dec. at ¶ 32.

29. On April 7, 2006, the Fund sent Ms. Cox a "Termination of Health Insurance Coverage" notice and "COBRA Continuation Coverage Notice" informing Ms. Cox that her and her spouse and dependents were no longer eligible to receive benefits under the Fund as of April 1, 2006, which was the date of her qualifying event, and that she had the option to continue her present health benefits for 18 months by electing to continue coverage under COBRA. Complaint at ¶ 30; Bauer Dec. at ¶ 33 and Exhibit 8 attached thereto.

30. Ms. Cox did not elect for COBRA Continuation Coverage under the Fund. Bauer Dec. at ¶ 34.

31. Since Ms. Cox left her employment with the GCC/IBT on March 31, 2006, neither Ms. Cox nor her spouse or dependents have ever filed a claim for benefits with the Fund. Bauer Dec. at ¶ 35.

32. After being informed on April 7, 2006 by the Fund that Ms. Cox and her spouse and dependents were no longer eligible to be covered under the Fund and that her health care benefits were being terminated as of April 1, 2006, neither Ms. Cox nor her representative filed an appeal with the Fund challenging that eligibility determination within the required 120 day period set forth in the Plan Document and SPD. Bauer Dec. at ¶ 36.

33. On April 2, 2007, Ms. Cox's representative submitted a "Notice of Claim of Plan Benefits" to the Fund Office. Complaint at ¶ 32; Bauer Dec. at ¶ 37 and Exhibit 9 attached thereto.

34. On May 22, 2008, Ms. Cox filed the instant lawsuit. See Complaint.

35. Article II, Section 2.01 of the Agreement between The Graphic Communications International Union and The Office and Professional Employees International Union, Local No. 2, effective October 1, 2005 through September 30, 2007 states in relevant part:

> The Employer recognizes the Union as the exclusive bargaining agent for all office and professional employees (excluding the secretaries of the President, the Secretary Treasurer, and the Executive Assistant to the President) employed by the Employer, including those employees who are normally assigned to work less than five (5) full days a week.

Exhibit B, p. 2 to the Complaint.

36. Article XIV of the Agreement between The Graphic Communications International Union and The Office and Professional Employees International Union, Local No. 2, effective October 1, 2005 through September 30, 2007 addresses the provision of health benefit coverage. Complaint at ¶ 18 and Exhibit B, pp. 17-19 attached thereto.

37. Article XII of the Agreement between The Graphic Communications International Union and The Office and Professional Employees International Union, Local No. 2, effective October 1, 2005 through September 30, 2007 provides a grievance and arbitration mechanism to resolve "any controversy or dispute arising between the parties hereto relating to any matter of wages, hours and working conditions, or any dispute between the parties involving interpretation or application of any provision of this Agreement." Exhibit B, pp. 14-15 to the Complaint.

38. On September 20, 2006, Ms. Cox filed unfair labor practice charges against the OPEIU and the GCC/IBT with the National Labor Relations Board ("NLRB"). Tedeschi Dec. at ¶ 19 and Exhibits 4-5 attached thereto.

39. On November 22, 2006, the NLRB approved Ms. Cox's withdrawal of the unfair labor practice charge against the GCC/IBT. On November 27, 2006, the NLRB approved Ms. Cox's withdrawal of the unfair labor practice charge against the OPEIU. Tedeschi Dec. at ¶ 20 and Exhibits 6-7 attached thereto.

Respectfully submitted,

O'DONNELL, SCHWARTZ & ANDERSON, P.C.

Dated:   August 5, 2008                    By:____/s/  Peter Leff_____
                                                Peter J. Leff
                                                DC Bar No. 457476
                                                1300 L Street NW
                                                Suite 1200
                                                Washington, D.C. 20005
                                                (202) 898-1707/FAX (202) 682-9276
                                                pleff@odsalaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MADELINE M. COX** | ) |
| | ) |
|    **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 1:08-cv-00873--CKK** |
| | ) |
| **GRAPHIC COMMUNICATIONS CONFERENCE OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **BOARD OF TRUSTEES OF THE GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **GEORGE TEDESCHI, Individually and as President of the GRAPHIC COMMUNICATIONS CONFERENCE OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS,** | ) |
| | ) |
|    **Defendants.** | ) |

**ORDER**

IT IS THIS _____ day of _____, 2008 that it is HEREBY

ORDERED that the Motion to Dismiss or, in the alternative, for Summary Judgment of the

Defendants is GRANTED.


The Defendants are DISMISSED from this action WITH PREJUDICE.


SO ORDERED.


_____
UNITED STATES DISTRICT COURT JUDGE

Deliver to:

Charles R. Both
LAW OFFICES OF CHARLES R. BOTH
1666 Connecticut Avenue, NW
Suite 500
Washington, DC 20009
chas@crbothlaw.com

Geoffrey M. Bohn
Robert A. Battey
BOHN & KOURETAS, PLC
P.O. Box 17811
Arlington, VA 22216
bohn_kouretas_plc@yahoo.com

Peter J. Leff
O'DONNELL, SCHWARTZ & ANDERSON, P.C.
1300 L Street, NW
Suite 1200
Washington, DC 20005
pleff@odsalaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MADELINE M. COX                                    )
                                                   )
        Plaintiff,                                 )
                                                   )
v.                                                 )        Case No. 1:08-cv-00873--CKK
                                                   )
GRAPHIC COMMUNICATIONS                             )
CONFERENCE OF THE                                  )
INTERNATIONAL BROTHERHOOD                          )
OF TEAMSTERS,                                      )
                                                   )
and                                                )
                                                   )
GRAPHIC COMMUNICATIONS NATIONAL                    )
HEALTH AND WELFARE FUND,                           )
                                                   )
and                                                )
                                                   )
BOARD OF TRUSTEES OF THE GRAPHIC                   )
COMMUNICATIONS NATIONAL                            )
HEALTH AND WELFARE FUND,                           )
                                                   )
and                                                )
                                                   )
GEORGE TEDESCHI, Individually                      )
and as President of the                            )
GRAPHIC COMMUNICATIONS                             )
CONFERENCE OF THE                                  )
INTERNATIONAL BROTHERHOOD                          )
OF TEAMSTERS,                                      )
                                                   )
        Defendants.                                )
                                                   )

## DECLARATION OF GEORGE TEDESCHI

I, George Tedeschi, in lieu of an affidavit as permitted by 28 U.S.C. Section l746, declare as follows:

1. I am the President of the Graphic Communications Conference of the International Brotherhood of Teamsters (GCC/IBT) and its predecessor, the Graphic Communications International Union (GCIU). I have held this position since June 2000.

2. The GCC/IBT is a labor organization that represents employees in the graphic communications industry throughout the United States and Canada. The GCC/IBT is headquartered in Washington, D.C. The GCC/IBT is the successor entity to the GCIU. The GCC/IBT is a result of the January 1, 2005 merger of the GCIU and the International Brotherhood of Teamsters.

3. The GCC/IBT employs, among other individuals, a group of staff employees that assists the GCC/IBT in conducting its business.

4. The GCC/IBT has entered into a series of collective bargaining agreements with the Office and Professional Employees International Union (OPEIU) that covers the terms and conditions of employment of employees that are employed by the GCC/IBT in staff positions.

5. By the specific terms of the collective bargaining agreements that the GCC/IBT entered into with the OPEIU, individuals employed as secretaries of the President, the Secretary Treasurer and the Executive Assistant to the President of the GCC/IBT otherwise known as confidential secretaries, as well as supervisory employees, are not covered by the terms of those collective bargaining agreements.

6. The GCC/IBT is an employer who participates in the Graphic Communications National Health and Welfare Fund (GCNHWF) on behalf of its employees so they will be provided with health benefit coverage through the GCNHWF Plan.

7. I am not a member of the Board of Trustees of the GCNHWF. No Officer or employee

2

of the GCC/IBT is a member of the Board of Trustees of the GCNHWF.  GCC/IBT

Secretary-Treasurer Robert Lacey serves as the Secretary of the GCNHWF.

8.  Neither I nor the GCC/IBT is involved in any way with the management, administration

or assets of the GCNHWF Plan, its Trust Agreement, its Plan Document or its Summary

Plan Description.

9.  Neither I nor the GCC/IBT establish or administer employee benefit plans, determine the

details of the benefit plans, make benefit determinations, provide benefits, adjudicate

benefit claims, make any administration decisions such as which medical provider

network or prescription drug distributor to utilize, collect or determine premiums, make

any management decisions such as hiring professional advisors or a third party

administrator, handle Plan assets or make any investment decisions on behalf of or for the

GCNHWF or any of its participants.

10. Madeline Cox was hired by the GCC/IBT's predecessor the GCIU on January 17, 1997,

as an Executive Secretary to the President.  Beginning in 2000, she held the position of

Executive Secretary to the Executive Assistant to the President until she voluntarily left

employment on March 31, 2006.  Both Executive Secretary positions were confidential

secretary positions.

11. As an Executive Secretary to the President and Executive Assistant to the President, Ms.

Cox was not covered by the collective bargaining agreement entered into between the

GCC/IBT and the OPEIU.

12. On or about March 9, 2006, Ms. Cox informed me that she would be retiring on March

31, 2006 and that she expected to have her health care benefits paid for by the GCC/IBT

after she left employment until she reached age 65.  At that time, I informed Ms. Cox that

3

it was the policy of the GCC/IBT that health care premiums would not be paid on behalf of employees who left employment prior to age 60 absent extraordinary circumstances. This policy of the GCC/IBT had been communicated to Ms. Cox and the other employees of the GCC/IBT on several occasions by me and my predecessor. I informed Ms. Cox that her situation presented no extraordinary circumstances that would cause the GCC/IBT to provide her with health insurance coverage until age 65 if she left employment prior to age 60. I informed Ms. Cox that the GCC/IBT would not continue to pay her health care premiums if she left employment prior to age 60.

13. Despite my explanation of the GCC/IBT policy that health care premiums would not be paid by the GCC/IBT if an employee left employment prior to age 60, absent extraordinary circumstances, Ms. Cox left employment at the GCC/IBT on March 31, 2006.

14. Ms. Cox was age 55 when she voluntarily left employment at the GCC/IBT on March 31, 2006.

15. On or about March 31, 2006, Ms. Cox submitted a memorandum to me, the other Officers of the GCC/IBT and the General Board Members of the GCC/IBT stating that she decided to voluntarily leave employment at age 55, effective March 31, 2006, in order to avoid detrimental changes to her pension benefits that would have occurred had she remained an active employee participating in those pension funds. A true and accurate copy of the March 31, 2006 memorandum submitted to me by Ms. Cox is attached hereto as Exhibit 1.

16. In her March 31, 2006 memorandum, attached hereto as Exhibit 1, Ms. Cox informed the GCC/IBT that she had retained legal counsel to challenge the GCC/IBT's policy. Also,

4

in that memorandum, Ms. Cox indicated that she wanted to appeal the GCC/IBT's retiree health care premium payment policy to the GCC/IBT's General Board.

17. On May 25, 2006, Ms. Cox was informed by the GCC/IBT that under the GCC/IBT Constitution and Laws, only members of the GCC/IBT, not its employees, could file appeals to the General Board of the GCC/IBT. A true and accurate copy of the May 25, 2006 letter is attached hereto as Exhibit 2.

18. On or about May 25, 2006, Ms. Cox submitted a memorandum to me, the other Officers of the GCC/IBT and the General Board Members of the GCC/IBT acknowledging that although she voluntarily paid dues to the OPEIU in order to become a member, she "could not take part in collective bargaining" because of "the confidentiality of [her] position" with the GCC/IBT. A true and accurate copy of the May 25, 2006 memorandum submitted to me by Ms. Cox is attached hereto as Exhibit 3.

19. On September 20, 2006, Ms. Cox filed unfair labor practice charges against the OPEIU and the GCC/IBT with the National Labor Relations Board (NLRB). A true and accurate copy of the charge that Ms. Cox filed against the OPEIU is attached hereto as Exhibit 4. A true and accurate copy of the charge that Ms. Cox filed against the GCC/IBT is attached hereto as Exhibit 5.

20. On November 22, 2006, the NLRB approved Ms. Cox's withdrawal of the unfair labor practice charge against the GCC/IBT. On November 27, 2006, the NLRB approved Ms. Cox's withdrawal of the unfair labor practice charge against the OPEIU. A true and accurate copy of the NLRB's approval of the withdrawal of the charge that Ms. Cox filed against the OPEIU is attached hereto as Exhibit 6. A true and accurate copy of the NLRB's approval of the withdrawal of the charge that Ms. Cox filed against the

GCC/IBT is attached hereto as Exhibit 7.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 1, 2008 at Washington, District of Columbia


_____
George Tedeschi

# MEMORANDUM

**TO:**       GCC/IBT Officers and General Board Members

**FROM:**    Madeline M. Cox

**DATE:**    March 31, 2006

---

It is with bittersweet emotions that I announce my retirement from the GCC/IBT effective March 31, 2006.

Normally, you have time to plan for that special day but with the announcement of the changes in the Supplemental Retirement and Disability Fund, and the impending changes in the Inter-Local Pension Fund, I was left with only a few weeks notice to make my decision.

I have worked in this building for almost thirty-three years, having started in the Contract & Research Department in August 1973. I then began working for former Administrator of the SRDF, Frank Lee until his retirement and continued working for Administrator Chip Griesbauer until January 1997. I then had the privilege of working as the Executive Secretary to President James Norton. When the new administration came on board in 2000, I began working for Executive Assistant to the President, Rich Whitworth. I am sure you will agree that my decision to retire was not an easy one; on a professional level as well as a personal level – saying goodbye to a job I love, the wonderful professionals I deal with on a daily basis, and my union, does not come without reservation.

Prior to the changes in the retirement and pension funds, my long-term plan was to work a few more years until I was personally ready to move on to the next phase of my life. But as many of you would hopefully agree, it is in the best interest of some employees' futures to opt for early retirement given the pending changes.

So this brings be to the present: I informed President Tedeschi that I would be retiring on March 31st and that I expected to have my health care benefits paid by the union. President Tedeschi has chosen to deny me of my health care benefits, even though he has made it known to all those involved that he would not be replacing me, and therefore saving on my salary as well as contributions into the Employer Retirement Fund, the Supplemental Retirement & Disability Fund, as well as the Officers, Representatives and Organizers Pension Fund of which I belong. He says the "policy," *although not written in any form*, is that health care is provided to retirees at age 60. There have been instances where health care coverage has been extended to retirees prior to the age of 60.



EXHIBIT
1

**Page two**

I have reviewed the plan documents with the Graphic Communications Health & Welfare Fund and the eligibility for coverage for retirees is defined as:

> In the event the employee retires directly from employment with the GCIU and is eligible for retirement benefits from a GCIU-sponsored pension plan or pension plan in which the GCIU participates, coverage under the National Plan will continue, at the GCIU's expense, until the employee attains age 65. Upon attainment of age 65, Medicare becomes the primary insurer and supplemental coverage is provided by the GCIU through AARP.

Furthermore, and to demonstrate my commitment to this union and my benefits, I have been working on the Founding Convention of the GCC since the merger with the Teamsters and have offered my services to continue working on the convention without pay in exchange for my health care benefits. I have not received a response from President Tedeschi.

When I met with President Tedeschi he offered me a stipend of $5-6,000 to be used towards purchasing my own health care. I told him that a stipend was not comparable to the health care benefits I was expecting and that he left me no alternative but to seek legal counsel, which I have. He said in that case that he would just use the $5,000 towards legal fees and that he believed I would not prevail.

I am respectfully appealing President Tedeschi's decision to the General Board for denying my health care benefits. I am aware that the next Board meeting is not until June, however, since I have had no other choice but to enter into a very costly COBRA situation for health care, I am requesting your attention to this matter prior to the next scheduled meeting.

In closing, I wish I had had the opportunity to say good-bye to you personally in Santa Monica and want to say that it has been a pleasure knowing you and working with you over the years.

With warmest regards,

Madeline M. Cox

copy: Richard J. Whitworth
      Martin R. Ganzglass, Esq.
      James R. Hoffa, General President, IBT
      Thomas Keegel, General Secretary-Treasurer, IBT



GRAPHIC COMMUNICATIONS CONFERENCE
INTERNATIONAL BROTHERHOOD OF TEAMSTERS
1900 L STREET, N.W., WASHINGTON, D.C. 20036-5080

202/462-1400
E mail gtedeschi@gciu.org
Fax: 202/721-0600

GEORGE TEDESCHI
PRESIDENT

May 25, 2006

Ms. Madeline M. Cox
2613 Apple Way
Dunkirk, MD  20754

**RE:    Post Retirement Health Care Benefits**

Dear Madeline:

I have received a copy of your May 19th letter to Acting Secretary-Treasurer Bob Lacey appealing to the General Board from my decision denying continuation of health care benefits following your retirement.

Under the Constitution, only members of the GCC are entitled to appeal actions of the Conference of Local Union Officers to the General Board.  I do not intend to place your letter on the agenda for the June General Board Meeting.  It is not an appeal and is not properly before the Board.

With best wishes, I am

Sincerely and fraternally,

*George Tedeschi*

George Tedeschi
President

GT:ks
cc:    GCC/IBT General Board
       Richard J. Whitworth

EXHIBIT
2

*Madeline M. Cox*
*2613 Apple Way*
*Dunkirk, MD 20754*



MAY 3 1 2006

THE OFFICE OF
THE PRESIDENT

# MEMORANDUM

**TO:**      GCC/IBT Officers and General Board Members

**FROM:**    Madeline M. Cox

**DATE:**    May 25, 2006

---

This second correspondence with you, the General Board, is to serve as a respectful appeal to President Tedeschi's decision to deny my health care benefits.

Although I have been a member of the Office and Professional Employees International Union, Local 2 and paid union dues, because of the confidentiality of my position, I was excused from union meetings and could not take part in collective bargaining. With the changes in the pension funds and prior to my retirement, I expected that I would be treated the same as past employees of the GCIU who were under the age of 60 and received health care benefits.

My working career with the International has been very rewarding. While extremely busy, I also had the privilege of being an integral part of the functions and schedules of the International Union and have worked to improve my professional skills to assure a constant upgrading in the services I have provided.

For an impeccable record of loyal service, I am respectfully requesting that the General Board reverse the decision of President Tedeschi and provide me health care benefits as a retiree as defined under the Graphic Communications National Health & Welfare Fund. I have taken the necessary steps to have this issue placed on the agenda and treated as an appeal for the General Board meeting, June 17-19, 2006.

Attached for your convenience is my letter of March 31, 2006, which explains my situation in further detail.

Sincerely and fraternally yours,

Madeline M. Cox

Enclosures: Letter dated March 31, 2006
            Request for Appeal to S/T Lacey

EXHIBIT
3

INTERNET
FORM NLRB-508
(5-90)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST LABOR ORGANIZATION
OR ITS AGENTS**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 5-CB-10052 | 9/20/06 |

INSTRUCTIONS: File an original and 4 copies of this charge and an additional copy for each organization, each local, and each individual named in Item 1 with the NLRB Regional Director of the region in which the alleged unfair labor practice occurred or is occurring.

**1. LABOR ORGANIZATION OR ITS AGENTS AGAINST WHICH CHARGE IS BROUGHT**

| a. Name | b. Union Representative to contact |
|---|---|
| Office and Professional Employees International Union Local 2 | George Kapanoske |

| c. Telephone No. | d. Address (street, city, state and ZIP code) |
|---|---|
| 301-608-8080 | 8455 Colesville Road, Suite 1250, Silver Spring, MD 20910 |

e. The above-named organization(s) or its agents has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(b), subsection(s) (list subsections) (1) (A) of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act.

**2. Basis of the Charge** (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

The OPEIU, Local 2, (the Union) breached its duty to fairly represent me, by arbitrarily refusing to process a grievance against my employer. I was entitled to fully paid health care benefits during the term of my employment and during my retirement up to age 65, pursuant to the terms of the collective bargaining agreement between the Union and my employer, the Graphic Communications Conference/International Brotherhood of Teamsters. The GCC/IBT refused to provide the health care benefits after my retirement on March 31, 2006, and the Union has refused to assert a grievance on my behalf.

| 3. Name of Employer | 4. Telephone No. |
|---|---|
| Graphic Communications Conference/International Brotherhood of Teamsters | 202-462-1400 |

| 5. Location of plant involved (street, city, state and ZIP code) | 6. Employer representative to contact |
|---|---|
| 1900 L Street, NW, Washington, DC 20036 | George Tedeschi, President |

| 7. Type of establishment (factory, mine, wholesaler, etc.) | 8. Identify principal product or service | 9. Number of workers employed |
|---|---|---|
| International Labor Union | Printing and publishing | 43 + |

10. Full name of party filing charge
Madeline M. Cox

| 11. Address of party filing charge (street, city, state and ZIP code) | 12. Telephone No. |
|---|---|
| 2613 Apple Way, Dunkirk, MD 20754 | 301-855-7823, cell: 202-320-6839 |

**13. DECLARATION**

I declare that I have read the above charge and that the statements therein are true to the best of my knowledge and belief.

| By _(signature)_ | (title or office, if any) | |
|---|---|---|
| (signature of representative or person making charge) | | |
| Address 2613 Apple Way, Dunkirk, MD 20754 | 301-855-7823 | September 11, 2006 |
| | (Telephone No.) | (date) |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U. S. CODE, TITLE 18, SECTION 1001)**

*U.S. GPO: 2000-464-840/29074

EXHIBIT
4

INTERNET
FORM NLRB-501
(11-94)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| | DO NOT WRITE IN THIS SPACE |
|---|---|
| | Case: 5-CA-33244 | Date Filed: 9/20/06 |

**INSTRUCTIONS:**
File an original and 4 copies of this charge with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | b. Number of Workers Employed |
|---|---|
| Graphic Communications Conference/International Brotherhood of Teamsters | 43 + |

| c. Address (street, city, State, ZIP Code) | d. Employer Representative | e. Telephone No. 202-462-1400 |
|---|---|---|
| 1900 L Street, NW Washington, DC 20036 | George Tedeschi, President | Fax No. 202-721-0600 |

| f. Type of Establishment (factory, mine, wholesaler, etc.) | g. Identify Principal Product or Service |
|---|---|
| International Labor Union | Printing and publishing |

h. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and (list subsections) __(3)__ of the National Labor Relations Act, and these unfair labor practices are unfair practices affecting commerce within the meaning of the Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices.)

The employer has unilaterally and arbitrarily refused to provide me health benefits upon my retirement. I was employed by the Graphic Communications Conference/International Brotherhood of Teamsters and its predecessors (Employer) in accordance with the terms and conditions of employment set forth in collective bargaining agreements between the Employer and the Office and Professional Employees International Union, Local 2 until my retirement on March 31, 2006. As a covered employee I was entitled to fully paid health care benefits during my employment, and during my retirement until age 65, pursuant to the agreement and one or more of the benefits plans in which I was a participant as a result of my employment. Following my retirement, the Employer has refused to provide such benefits.

By the above and other acts, the above-named employer has interfered with, restrained, and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act.

| 3. Full name of party filing charge (if labor organization, give full name, including local name and number) |
|---|
| Madeline M. Cox |

| 4a. Address (street and number, city, State, and ZIP Code) | 4b. Telephone No. 301-855-7823, cell: 202320-6839 |
|---|---|
| 2613 Apple Way Dunkirk, MD 20754 | Fax No. |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)

### 6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| By *(signature)* Madeline M. Cox | | |
|---|---|---|
| (Signature of representative or person making charge) | | (Title, if any) |
| Address 2613 Apple Way, Dunkirk, MD 20754 | Fax No. 301-855-7823 (Telephone No.) | September 11, 2006 (Date) |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

EXHIBIT
5



**United States Government**

**NATIONAL LABOR RELATIONS BOARD**

**Region 5**

**103 South Gay Street, 8th Floor**

**Baltimore, MD   21202-4061**

(410) 962-2822

November 27, 2006

Mr. George Kapanoske
Office and Professional Employees
International Union, Local 2
845 Colesville Rd., Suite 1250
Silver Spring, MD 20910

Re:  Office and Professional Employees International
Union, Local 2
(Graphic Communications Conference
International Brotherhood of Teamsters)
Case 5-CB-10052

Dear Mr. Kapanoske:

This is to advise that with my approval the charge in the above matter has been withdrawn.

Very truly yours,

Steven L. Shuster
Acting Regional Director

cc:  see page 2

EXHIBIT

6

cc:    Dimitris Kouretas, Esq.
       Bohn & Kouretas
       P. O. Box 17811
       Arlington, VA 22216

       Ms. Madeline M. Cox
       2613 Apple Way
       Dunkirk, MD 20754

       Mr. George Tedeschi
       President
       Graphic Communications Conference
       International Brotherhood of Teamsters
       1900 L St., N. W.
       Washington, D. C. 20036

       Mr. Bert Haft
       Director of Organizing
       Graphic Communications Conference
       International Brotherhood of Teamsters
       1900 L St., N. W.
       Washington, D. C. 20036

       Mr. Rich Whitworth
       Executive Assistant to the President
       Graphic Communications Conference
       International Brotherhood of Teamsters
       1900 L St., N. W.
       Washington, D. C. 20036

       Michael C. Murphy, Esq.
       International Brotherhood of
       Teamsters (IBT)
       25 Louisiana Ave., N. W.
       Washington, D. C. 20001

       Peter Leff, Esq.
       General Counsel
       O'Donnell, Schwartz & Anderson
       1900 L St., N. W., Suite 800
       Washington, D. C. 20036



**United States Government**

**NATIONAL LABOR RELATIONS BOARD**

**Region 5**

**103 South Gay Street, 8th Floor**

**Baltimore, MD   21202-4061**



NOV 2 8 2006

THE OFFICE OF
THE PRESIDENT

(410) 962-2822

November 22, 2006

Mr. George Tedeschi
President
Graphic Communications Conference
International Brotherhood of Teamsters
1900 L St., N. W.
Washington, D. C. 20036

Re:  Graphic Communications Conference/International
Brotherhood of Teamsters
Case 5-CA-33244

Dear Mr. Tedeschi:

This is to advise that with my approval the charge in the above matter has been withdrawn.

Very truly yours,

Steven L. Shuster
Acting Regional Director

cc:  Mr. Bert Haft
Director of Organizing
Graphic Communications Conference
International Brotherhood of Teamsters
1900 L St., N. W.
Washington, D. C. 20036

Mr. Rich Whitworth
Executive Assistant to the President
Graphic Communications Conference
International Brotherhood of Teamsters
1900 L St., N. W.
Washington, D. C. 20036

Michael C. Murphy, Esq.
International Brotherhood of
Teamsters, (IBT)
25 Louisiana Ave., N. W.,
Washington, D. C. 20001

Peter Leff, Esq.
General Counsel
O'Donnell, Schwartz & Anderson, P. C.
1900 L St., N. W., Suite 800
Washington, D. C. 20036

Mr. Dimitris Kouretas, Esq.
Bohn & Couretas, DLC
P. O. Box 17811
Arlington, VA 22216

Ms. Madeline M. Cox
2613 Apple Way
Dunkirk, MD 20754

EXHIBIT
7
Blumberg No. 6119

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MADELINE M. COX** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:08-cv-00873--CKK** |
| | ) | |
| **GRAPHIC COMMUNICATIONS** | ) | |
| **CONFERENCE OF THE** | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF TEAMSTERS,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GRAPHIC COMMUNICATIONS NATIONAL** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BOARD OF TRUSTEES OF THE GRAPHIC** | ) | |
| **COMMUNICATIONS NATIONAL** | ) | |
| **HEALTH AND WELFARE FUND,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GEORGE TEDESCHI, Individually** | ) | |
| **and as President of the** | ) | |
| **GRAPHIC COMMUNICATIONS** | ) | |
| **CONFERENCE OF THE** | ) | |
| **INTERNATIONAL BROTHERHOOD** | ) | |
| **OF TEAMSTERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF TERESA L. BAUER

I, Teresa L. Bauer, in lieu of an affidavit as permitted by 28 U.S.C. Section 1746, declare as follows:

1. I am the third-party administrator for the Graphic Communications National Health and Welfare Fund (GCNHWF). I have held this position since April 1997. I work for a company named CDS Administrators, Inc. (CDS) located at Five Gateway Center, Suite 620, 60 Boulevard of the Allies, Pittsburgh, Pennsylvania 15222. CDS was retained by the Board of Trustees of the GCNHWF to act as the third-party administrator for the Plan. My job duties are to assist the Board of Trustees of the GCNHWF with the administration of the plan of benefits offered by the GCNHWF and to assist with the payment of benefits in response to participant claims.

2. The GCNHWF is a multi-employer, Taft-Hartley employee welfare benefit plan governed by the Employee Retirement Income and Security Act (ERISA).

3. The GCNHWF was established by and is governed by an Agreement and Declaration of Trust (Trust Agreement).

4. The purpose of the GCNHWF is to provide health, disability and life insurance benefits in a cost-effective manner to plan participants

5. The GCC/IBT is an employer who participates in the GCNHWF on behalf of its employees.

6. The GCNHWF is administered by a Board of Trustees made up of an equal number of management representatives and union representatives.

7. Trustees on the Board of Trustees for the GCNHWF, in accordance with the terms of the Trust Agreement, have the power to perform the following duties (which is not an exclusive list): establish and administer lawful employee benefit plans; hire an administrator; determine the details of the benefit plans; make amendments to benefit plans; provide benefits; enter into contracts; establish a reserve; pay taxes; receive

2

premiums and contributions; and invest or reinvest all Trust assets.   Additionally, in accordance with the terms of the Trust Agreement, Trustees are the sole judges of all factual determinations; the standard of proof required in any case; application and interpretation of the Plan; and entitlement to or amount of benefits payable.

8. Neither George Tedeschi nor any Officer or employee of the GCC/IBT is a member of the Board of Trustees of the GCNHWF.

9. The Secretary of the GCNHWF, Robert Lacey, is an Officer of the GCC/IBT.  However, in accordance with the terms of the Trust Agreement, the Secretary of the GCNHWF is not a Trustee, and therefore, Mr. Lacey is not entitled to vote, administer or manage the Plan or invest any of its assets.  In accordance with the terms of the Trust Agreement, Mr. Lacey's sole duty is to keep and distribute minutes and records of all meetings.

10. Neither Mr. Tedeschi nor the GCC/IBT is involved in any way with the management, administration or assets of the GCNHWF Plan, its Trust Agreement, its Plan Document or its Summary Plan Description.

11. Neither Mr. Tedeschi nor the GCC/IBT establish or administer the GCNHWF Plan's employee benefit plans, determine the details of those benefit plans, make benefit determinations under those benefit plans, provide benefits under those benefit plans, adjudicate benefit claims submitted by participants, make any administration decisions for the GCNHWF Plan such as which medical provider network or prescription drug distributor to utilize, collect or determine premiums for participation in those employee benefit plans, make any management decisions for the GCNHWF Plan such as hiring professional advisors or a third party administrator, handle Plan assets or make investment decisions on behalf of the Plan.

3

12. The plan of benefits provided to participants of the GCNHWF is governed by the Graphic Communications National Health and Welfare Fund Plan Document (Plan Document). The Plan Document contains definitions and general administrative procedures which govern the Plan. A true and accurate copy of the Plan Document of the GCNHWF in effect in March 2006 is attached hereto as Exhibit 1

13. The Plan Document in effect in March 2006 provides a number of eligibility rules for employees of participating employers and their dependents at pages 18-23. With respect to retiree eligibility, the Plan Document defines a "Retiree" at Section 2 59, page 15 as "a person who is receiving monthly pension benefits from an [sic] qualified retirement plan and who satisfies the eligibility rules set forth in Section 3 02 [of the Plan Document] "

14. Section 3 02 of the Plan Document at page 19, "Retiree Eligibility" provides:

(a) A retiree shall continue to be an Eligible Person for all Retiree benefits to which he is entitled under the Plan upon proper application to the Fund, provided the Retiree is:
   (1) an Eligible Employee in the month immediately preceding the month in which his retirement is effective, and
   (2) eligible to receive a pension from an Employer's qualified retirement plan or from a jointly trusteed, multiemployer pension plan established for employees in the graphic communications industry.

15. The GCNHWF's Plan Document provides an appeals procedure for participants to utilize to challenge decisions of the GCNHWF  Section 14 04 of the Plan Document at pages 70-71, states in relevant part:

(a) Right of Appeal
Any individual (or his duly appointed representative) whose claim for benefits under this Plan has been denied, in whole or in part, or whose claim for benefits against the Plan otherwise is denied, may petition the Committee for review of the denial of claim.

(b) Documentation for Appeals
The petition for review shall be in writing, and shall state the name and address of the claimant, the fact that the claimant is disputing the denial of claim giving the date of the notice of denial and, in clear and concise terms, the reason or reasons for disputing the denial. It shall be accompanied by any pertinent documentary material not already

furnished to the Committee and shall be delivered or mailed to the Committee within 120 days after the date shown on the notice to the claimant of the denial

    \*        \*        \*        \*        \*

(c) <u>Review or Hearing on the Appeal</u>
The Committee shall grant a hearing on the petition to receive and hear any evidence or argument which cannot be presented satisfactorily by correspondence  The failure to file a petition for review in a timely manner or the failure to appear and participate in any such hearing shall constitute a waiver of the claimant's right to review of the denial.

    \*        \*        \*        \*        \*

(d) <u>Decision by the Committee</u>
A decision by the Committee shall be made within 60 days of receipt of petition for review unless special circumstances require an extension of time for processing, in which case a decision shall be rendered as soon as possible, but not later than one hundred and twenty days (120) after receipt of the request for review.  The claimant shall be advised of the decision in writing. Stating the specific reasons for the decision in a manner calculated to be understood by the claimant and the specific references to the Plan provisions or other applicable rules upon which the decision is based  The decision of the Committee with respect to a petition for review shall be final and binding upon all parties, including the claimant and any person claiming under the claimant.

16  The Board of Trustees of the GCNHWF has appointed an equal number of union and

management Trustees from the GCNHWF Board of Trustees to an Appeals Committee to

hear appeals, develop a factual record, deliberate on the merits of the appeal and make a

determination as to whether to grant or deny the appeal.  The Appeals Committee then

communicates its decision to the individual who filed the appeal   If the individual

disagrees with the determination of the Appeals Committee, he or she may pursue a claim

in federal court.

17  In accordance with Section 15 02 of the Plan Document, page 73, the Executive

Committee of the GCNHWF administers and interprets the Plan, has the authority to take

all actions and make all decisions necessary and proper to carry out the Plan, and has the

power and duty, among other things, to interpret the Plan and resolve ambiguities,

5

inconsistencies and omissions and to decide on questions concerning the Plan and the eligibility of any Employee to participate.

18. The Executive Committee of the GCNHWF is made up of four union Trustees and four management Trustees

19. The GCNHWF distributes a Summary Plan Description (SPD) to its participants.

20. When the GCC/IBT joined the GCNHWF on May 1, 1998, the GCNHWF mailed the GCC/IBT a stack of "welcome kits" which contained the SPD, to distribute to all of its employees participating in the GCNHWF, including Ms. Cox.

21. In March 2000, the GCNHWF reissued an updated SPD directly to all participants in the Fund, including Ms. Cox   The March 2000 SPD was in effect in March 2006. A true and accurate copy of the March 2000 SPD is attached hereto as Exhibit 2.

22. The SPD contains a number of eligibility rules for employees of participating employers and their dependents. The March 2000 SPD at page 10 defined "Retiree" as an individual "who is receiving monthly pension benefits from a qualified retirement plan established for Employees in the graphic communications industry."

23. The March 2000 SPD also contained a supplement setting forth the specific terms of Ms. Cox's GCC/IBT-provided health coverage benefits. On the last page of the supplement the "Eligibility Rules Under the Graphic Communications National Health and Welfare Plan" were stated. Under the subsection of "Eligibility for Retirees," it stated:

> In the event the employee retires directly from employment with the GCIU and is eligible for retirement benefits from a GCIU-sponsored pension plan or pension plan in which the GCIU participates, coverage under the National Plan will continue, at the GCIU's expense, until the employee attains age 65. Upon attainment of age 65, Medicare becomes the primary insurer and supplemental coverage is provided by the GCIU though [sic] AARP.

24. The SPD at page 67 also provides the following:

6

**Discretionary Authority of the Board of Trustees and its Designees**
In carrying out their respective responsibilities under the Plan, the Board of
Trustees, the Administrator and other individuals with delegated responsibility for
the administration of the Plan, will have discretionary authority to interpret the
terms of the Plan and to determine eligibility and entitlement to Plan Benefits in
accordance with the terms of the Plan. Any interpretation or determination will
be given full force and effect, unless it can be shown that the interpretation or
determination was arbitrary and capricious.

25. As with the Plan Document, the SPD at page 47 provides for a review procedure to

challenge the denial of benefits. The appeals procedure provision states in relevant part:

Your request for review or reconsideration must be made in writing to the
Graphic Communications National Health and Welfare Fund at Five Gateway Center,
Suite 620, 60 Boulevard of the Allies, Pittsburgh, PA 15222, within 120 days after you
receive notice of denial.

26. In 2004, participants of the GCNHWF or their representatives filed 30 appeals

challenging Fund decisions. In 2005, thirty-one appeals were filed. In 2006, eight

appeals were filed. In 2007, twelve appeals were filed.

27. Although appeals challenging whether a participant, a participant's spouse or a

participant's dependents are eligible to receive benefits are not commonplace, when such

appeals are filed, the Appeals Committee of the GCNHWF gives those appeals full

consideration in determining whether the participant or his or her spouse or dependent

meets the eligibility requirements of the Fund.

28. In March 2003, a participant filed an appeal challenging a determination that her college-

attending daughter was not eligible for Plan benefits. A true and accurate copy of the

appeal is attached hereto as Exhibit 3. In May 2003, the Appeals Committee of the

GCNHWF denied the eligibility appeal because, although the participant's child was

attending college, she was age 23 and not mentally or physically disabled and therefore

did not qualify as a dependent under the rules of the Plan. A true and accurate copy of

7

the appeal denial letter is attached hereto as Exhibit 4.

29. In April 2003, a participant by his representative filed an appeal claiming that his newborn child should have been eligible for benefits beginning on her date of birth in December 2002. A true and accurate copy of the appeal is attached hereto as Exhibit 5. The Appeals Committee of the GCNHWF denied the appeal because, in accordance with Plan eligibility rules, notice of the birth was not provided within 60 days of the date of birth. A true and accurate copy of the appeal denial letter is attached hereto as Exhibit 6. Coverage was provided for this participant's child beginning April 1, 2003, because the GCNHWF was notified of the birth of the child in March 2003.

30. To the best of my knowledge, the Board of Trustees of the GCNHWF has never been presented with an appeal addressing an issue of retiree eligibility for Plan benefits; consequently, the Board of Trustees has not been afforded the opportunity to interpret or apply the retiree eligibility language set forth in the Plan Document and SPD.

31. On April 4, 2006, the GCC/IBT submitted a "Termination and Change Form" to the GCNHWF indicating that Ms. Cox had left employment with the GCC/IBT on March 31, 2006, and therefore her health insurance coverage should be terminated effective April 1, 2006. A true and accurate copy of the "Termination and Change Form" is attached hereto as Exhibit 7.

32. The GCNHWF received no health care coverage premium payments on behalf of Ms. Cox from the GCC/IBT after April 1, 2006.

33. On April 7, 2006, the GCNHWF sent Ms. Cox a "Termination of Health Insurance Coverage" notice and "COBRA Continuation Coverage Notice" informing Ms. Cox that her and her spouse and dependents were no longer eligible to receive benefits under the

8

GCNHWF Plan as of April 1, 2006, which was the date of her qualifying event, and that she had the option to continue her present health benefits for 18 months by electing to continue coverage under COBRA. A true and accurate copy of the "Termination of Health Insurance Coverage" notice and "COBRA Continuation Coverage Notice" is attached hereto as Exhibit 8.

34. Ms. Cox did not elect for COBRA Continuation Coverage under the GCNHWF Plan after she was sent the "Termination of Health Insurance Coverage" notice and "COBRA Continuation Coverage Notice" on April 7, 2006.

35. Since Ms. Cox left employment from the GCC/IBT on March 31, 2006, neither Ms. Cox nor her spouse or dependents have ever filed a claim for benefits with the GCNHWF.

36. After being informed on April 7, 2006 by the GCNHWF that Ms. Cox and her spouse and dependents were no longer eligible to be covered under the GCNHWF Plan and that her health care coverage benefits were being terminated as of April 1, 2006, neither Ms. Cox nor her representative filed an appeal challenging that eligibility determination within the required 120 day period set forth in the Plan Document and SPD.

37. On April 2, 2007, Ms. Cox's representative submitted a "Notice of Claim of Plan Benefits" to the Fund Office. A true and accurate copy of the "Notice of Claim of Plan Benefits" is attached hereto as Exhibit 9.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 4, 2008 at Pittsburgh, Pennsylvania

Teresa L. Bauer

# GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND

# PLAN DOCUMENT



EXHIBIT

1

# TABLE OF CONTENTS

PAGE

## ARTICLE I.  INTRODUCTION

## ARTICLE II.  DEFINITIONS

| | | |
|---|---|---|
| 2.01 | "Alcoholism and Drug Abuse" | 2 |
| 2.02 | "Annual Maximum Benefit" | 2 |
| 2.03 | "Attending Physician" | 2 |
| 2.04 | "Beneficiary" | 2 |
| 2.05 | "Birthing Center" | 2 |
| 2.06 | "Board of Trustees" | 3 |
| 2.07 | "Coinsurance" | 3 |
| 2.08 | "Collective Bargaining Agreement" | 3 |
| 2.09 | "Committee" | 3 |
| 2.10 | "Co-payment" | 3 |
| 2.11 | "Covered Employment" | 3 |
| 2.12 | "Covered Expense" | 4 |
| 2.13 | "Deductible" | 4 |
| 2.14 | "Dentist" | 4 |
| 2.15 | "Dependent" | 4 |
| 2.16 | "Disability or Disabled" | 5 |
| 2.17 | "Durable Medical Equipment" | 5 |
| 2.18 | "Effective Date" | 5 |
| 2.19 | "Effective Treatment of Alcoholism or Drug Abuse" | 5 |
| 2.20 | "Eligible Dependent" | 6 |
| 2.21 | "Eligible Employee" | 6 |
| 2.22 | "Eligible Person" | 6 |
| 2.23 | "Eligible Retiree" | 6 |
| 2.24 | "Employee" | 6 |
| 2.25 | "Employer" | 6 |
| 2.26 | "ERISA" | 6 |
| 2.27 | "Exclusions" | 7 |
| 2.28 | "Experimental or Investigational Medical Treatment" | 7 |
| 2.29 | "Fund" | 9 |
| 2.30 | "General Exclusions" | 9 |
| 2.31 | "GCIU" | 9 |
| 2.32 | "Health Plan" | 9 |
| 2.33 | "Home Health Care" | 10 |
| 2.34 | "Home Health Care Agency" | 10 |
| 2.35 | "Home Health Care Plan" | 10 |
| 2.36 | "Hospice" | 10 |
| 2.37 | "Hospital" | 11 |
| 2.38 | "Illness" | 11 |

i

2.39   "Injury" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.40   "In-Network Services" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.41   "Lifetime Maximum Benefit" . . . . . . . . . . . . . . . . . . . . . . . . . 11
2.42   "Maximum Benefits" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.43   "Medical Emergency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.44   "Medically Necessary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.45   "Medicare" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.46   "Mental and Nervous Disorders" . . . . . . . . . . . . . . . . . . . . . . 12
2.47   "Mental Health Practitioner" . . . . . . . . . . . . . . . . . . . . . . . . . 13
2.48   "Nurse" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
2.49   "Nurse-Midwife" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
2.50   "Organ Transplant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
2.51   "Out-of-Network Services" . . . . . . . . . . . . . . . . . . . . . . . . . . 14
2.52   "Outpatient Facility" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
2.53   "Participating Local Union Fund" . . . . . . . . . . . . . . . . . . . . . . 14
2.54   "Physician" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
2.55   "Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
2.56   "Predecessor Plan" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
2.57   "Preferred Provider Organizations" . . . . . . . . . . . . . . . . . . . . 15
2.58   "Rehabilitation Care" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
2.59   "Retiree" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
2.60   "Schedule of Benefits" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
2.61   "Skilled Nursing Care" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
2.62   "Skilled Nursing Facility" . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
2.63   "Trust Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
2.64   "Union . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
2.65   "Usual and Customary" or "UC" . . . . . . . . . . . . . . . . . . . . . . 17
2.66   "Well Child Care" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**ARTICLE III.  ELIGIBILITY**
3.01   Employee Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
3.02   Retiree Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
3.03   Dependent Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
3.04   Death of Employee or Retiree . . . . . . . . . . . . . . . . . . . . . . . . 21
3.05   Eligibility Contingent on Premium Payment . . . . . . . . . . . . . . . 21

**ARTICLE IV.  TERMINATION OF COVERAGE**
4.01   Date of Termination of Coverage . . . . . . . . . . . . . . . . . . . . . . 22
4.02   Termination for Non-Payment of Premium . . . . . . . . . . . . . . . 23
4.03   Plan and Coverage Termination . . . . . . . . . . . . . . . . . . . . . . . 23
4.04   Effect of Termination of Coverage . . . . . . . . . . . . . . . . . . . . . 23

**ARTICLE V.  CONTINUATION COVERAGE**
| | | |
|---|---|---|
| 5.01 | Definitions | 24 |
| 5.02 | Right to Continue Coverage | 24 |
| 5.03 | Continuation Coverage | 25 |
| 5.04 | Termination of Continuation Coverage | 25 |
| 5.05 | COBRA Premium | 25 |
| 5.06 | Notification and Administrative Procedures | 26 |

**ARTICLE VI.  COMPREHENSIVE MEDICAL BENEFITS**
| | | |
|---|---|---|
| 6.01 | General | 27 |
| 6.02 | Comprehensive Medical Benefit | 29 |
| 6.03 | Second Surgical Opinion | 43 |
| 6.04 | Comprehensive Medical Benefit Limitations | 43 |

**ARTICLE VII.  ANCILLARY MEDICAL BENEFITS**
| | | |
|---|---|---|
| 7.01 | General Wellness Benefit | 45 |
| 7.02 | Well Child Care | 46 |
| 7.03 | Pap Smear and Mammogram Expense | 46 |

**ARTICLE VIII.  DENTAL BENEFITS**
| | | |
|---|---|---|
| 8.01 | Benefit Payable | 47 |
| 8.02 | Dental Deductible | 47 |
| 8.03 | Advanced Claim Review | 47 |
| 8.04 | Covered Dental Care | 47 |
| 8.05 | Limitations | 50 |
| 8.06 | Orthodontic Limitations | 51 |

**ARTICLE IX.  VISION BENEFITS**
| | | |
|---|---|---|
| 9.01 | Vision Care Benefit | 53 |
| 9.02 | Limitations | 53 |

**ARTICLE X.  PRESCRIPTION DRUG BENEFITS**
| | | |
|---|---|---|
| 10.01 | Prescription Drug Coverage | 55 |
| 10.02 | Limitations | 55 |
| 10.03 | Right to Inquire | 55 |

**ARTICLE XI.  NONMEDICAL BENEFITS**
| | | |
|---|---|---|
| 11.01 | Life Insurance Benefit | 56 |
| 11.02 | Accidental Death and Dismemberment | 57 |
| 11.03 | Weekly Disability Benefit | 58 |

**ARTICLE XII.  GENERAL EXCLUSIONS**
12.01  Comprehensive Medical Benefits, Ancillary Medical Benefits and Other
Medical Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
12.02  Medical and Nonmedical Benefits . . . . . . . . . . . . . . . . . . . . . . . . . 64

**ARTICLE XIII.  COORDINATION OF BENEFITS**
13.01  General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
13.02  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
13.03  Order of Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
13.04  Coordination with No-fault Auto Insurance . . . . . . . . . . . . . . . . . 67
13.05  Coordination with Medicare . . . . . . . . . . . . . . . . . . . . . . . . . . 67
13.06  Coordination with Champus . . . . . . . . . . . . . . . . . . . . . . . . . . 67
13.07  Right to Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
13.08  Right to Make Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
13.09  Right to Recover Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**ARTICLE XIV.  CLAIMS PROCEDURES, APPEALS AND ARBITRATION**
14.01  Payment of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
14.02  Timeliness of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
14.03  Denial of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
14.04  Appeal of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
14.05  Claims and Review Procedure for Insured Benefits . . . . . . . . . . . . . 71

**ARTICLE XV.  ADMINISTRATION**
15.01  Appointment of the Committee . . . . . . . . . . . . . . . . . . . . . . . . 73
15.02  Rights and Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
15.03  Reliance on Advisors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
15.04  Fiduciary Responsibility and Indemnity . . . . . . . . . . . . . . . . . . . 74
15.05  Administrative Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

**ARTICLE XVI.  AMENDMENT OR TERMINATION OF PLAN**
16.01  Amendment by the Board of Trustees . . . . . . . . . . . . . . . . . . . . 76
16.02  No Diversion of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
16.03  Termination of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

**ARTICLE XVII.  FUNDING**
17.01  Funding of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**ARTICLE XVIII.  MISCELLANEOUS**
18.01  Agreement and Declaration of Trust . . . . . . . . . . . . . . . . . . . . . 78
18.02  Subrogation and Reimbursement . . . . . . . . . . . . . . . . . . . . . . . 78
18.03  Workers' Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
18.04  Assignment of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
18.05  Disclaimer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18.06  Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80
18.07  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  80
18.08  Severability and Savings Clause . . . . . . . . . . . . . . . . . . . . .  80
18.09  Titles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  81
18.10  Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  81

APPENDIX A

APPENDIX B

APPENDIX C

APPENDIX D

APPENDIX E

APPENDIX F

# GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND
## PLAN DOCUMENT
## ARTICLE I.  INTRODUCTION

The Graphic Communications International Union (GCIU) established the Graphic Communications National Health and Welfare Fund Plan (hereafter "Plan") effective March 1, 1997 for the exclusive benefit of Eligible Persons, as defined in Section 2.22, to provide the following benefits:

- medical,
- dental,
- vision,
- prescription drug,
- life insurance,
- accidental death and dismemberment, and
- weekly disability.

A list of the Participating Local Union Funds and the specific Plan benefits to which Eligible Persons covered by each Participating Local Union Fund are entitled are identified in the Appendices to this Plan document.

This document contains definitions and general administrative procedures which govern the Plan.  The Plan is intended to qualify as a "welfare benefit plan" under Section 419(e) of the Internal Revenue Code of 1986, as amended, funded as a voluntary employees' beneficiary association under Section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and to meet the requirements of any other applicable provisions of law, including the Employee Retirement Income Security Act of 1974, as amended.

The Plan is established with the intention of being maintained for an indefinite period of time and with the intention that its terms relating to coverage and benefits are legally enforceable. The terms of this Plan are intended to be the official text governing the operation of the Plan.

# ARTICLE II.  DEFINITIONS

**2.01**   **"Alcoholism and Drug Abuse"** means alcohol and/or drug dependency as defined by the current edition of the International Classification of Diseases (ICD-9-CM) manual.  See the definition of Mental and Nervous Disorders, herein.

**2.02**   **"Annual Maximum Benefit"** means the maximum amount of benefits payable each Plan Year on account of certain medical and dental expenses incurred by any covered Eligible Person under this Plan or a Predecessor Plan.

**2.03**   **"Attending Physician"** means the Physician who assumes responsibility for the care and treatment of an Eligible Person.

**2.04**   **"Beneficiary"** means the person(s) designated by an Eligible Employee to receive benefits under the Plan, in accordance with the procedures established by the Board of Trustees.

**2.05**   **"Birthing Center"** means a public or private facility, licensed and operating according to law, other than private offices or clinics of Physicians, that meets the free-standing birthing center requirements of the Department of Health in the State where the covered person receives the services.  The Birthing Center must provide:

    (1)      a facility that has been established, equipped and operated for the purpose of providing prenatal care, delivery, immediate post partum care, and care of a child born at the center;

    (2)      supervision by at least one Physician who is a specialist in obstetrics and gynecology;

    (3)      a Physician or Nurse-Midwife in attendance at all births and immediate post partum period;

    (4)      extended staff privileges to Physicians who practice obstetrics and gynecology in an area Hospital;

(5)    at least 2 beds or 2 birthing rooms;

(6)    full time nursing services directed by a Nurse or a Nurse-Midwife;

(7)    arrangements for diagnostic x-rays and laboratory services; and

(8)    the capacity to administer local anesthetic and to perform minor surgery.

The Birthing Center must accept only patients with low-risk pregnancies, have a written agreement with a Hospital for emergency transfers, and maintain medical records on each patient and child.

**2.06**    **"Board of Trustees"** means those persons, and their successors, who are appointed in accordance with the terms of the Trust Agreement to administer the Fund.

**2.07**    **"Coinsurance"** means the portion of a Covered Expense for which an Eligible Person has financial responsibility, as designated in Appendix B or as otherwise provided herein.

**2.08**    **"Collective Bargaining Agreement"** means the formal written document entered into between an Employer and a GCIU local union together with any modifications, supplements or amendments thereto which covers wages, hours, fringe benefit payments, and conditions of employment.

**2.09**    **"Committee"** means the committee established by the Board of Trustees in accordance with Section 15.01 to administer the Plan.

**2.10**    **"Co-payment"** means the set dollar amount of a Covered Expense for which an Eligible Person is responsible, as designated in Appendix B or as otherwise provided herein.

**2.11**    **"Covered Employment"** means work in a job category by an Employee for which an Employer is required to make contributions to a Participating Local Union Fund pursuant to a Collective Bargaining Agreement or other written agreement with the Board of Trustees.

II/3

**2.12** **"Covered Expense"** means an expense for medical or dental services or supplies, to the extent it is Medically Necessary, as defined by the Plan; the charge is Medically Necessary, Usual and Customary; which is not excluded from coverage under the General Exclusions of the Plan; and is not excluded or limited by any Maximum Benefits, Lifetime Maximum Benefits or any other limitations or exclusions under the Plan. No amount in excess of the actual charges for a service or supply shall be considered a Covered Expense.

**2.13** **"Deductible"** means the amount of expenses that must be paid by an Eligible Person each calendar year before the Plan begins to pay benefits, as designated in Appendix B or as otherwise provided herein.

**2.14** **"Dentist"** means a person who is duly licensed and acting within the scope of his license to practice dentistry, and includes a Physician furnishing dental care which he is licensed to provide.

**2.15** **"Dependent"** means:

(a)    an Employee's or Retiree's lawful spouse;

(b)    an unmarried child of an Employee or Retiree, subject to the limitations of Section 3.03(a), if the child is:

    (1)    a natural or legally adopted child or a child placed with the Employee or Retiree for adoption, or any other child who is supported by the Employee or Retiree and lives with the Employee or Retiree in a parent-child relationship; and

    (2)    under age 19, or under age 23 if attending an accredited educational institution as a full-time student and dependent solely on the Employee or Retiree for financial support; and

    (3)    any child listed in (a) above who is prevented from earning a living because of a physical or mental Disability, if the child:

        (A)    is Disabled while a Dependent prior to reaching age 19 (or age 23 if a full-time student) and continues to be so Disabled; and

      (B)     is chiefly dependent upon the Employee or Retiree for financial support.

The Plan may require proof of full-time student status, Disability, age and financial support from time to time in a manner consistent to all individuals in like circumstances under similar conditions.

(c)     No person may be covered both as an Employee and Dependent; and no person may be covered as a Dependent of more than one Employee or Retiree.

**2.16**    **"Disability or Disabled"** means, for an Employee, the inability to perform his or her duties with the Employer as a result of a non-occupational Illness or Injury. For a Dependent, Disability means the inability to perform the normal functions and activities of a person of like sex and age.

**2.17**    **"Durable Medical Equipment"** means equipment that:

(a)     can withstand repeated use; and

(b)     is primarily and customarily used for a medical purpose and is not generally useful in the absence of an Injury or Illness; and

(c)     is not disposable or non-durable.

Durable Medical Equipment includes, but is not limited to, apnea monitors, blood sugar monitors, commodes, electric hospital beds (with safety rails), electric and manual wheelchairs, nebulizers, oximeters, oxygen and supplies, and ventilators.

**2.18**    **"Effective Date"** means March 1, 1997.

**2.19**    **"Effective Treatment of Alcoholism or Drug Abuse"** means a program, approved through the utilization management program, of Alcoholism or Drug Abuse therapy that is prescribed and supervised by a Physician and either:

(a)     has a follow-up outpatient therapy program directed by a Physician on at least a monthly basis; or

(b)    includes meetings at least twice a month with organizations recognized by the
        Committee as devoted to the treatment of Alcoholism or Drug Abuse.

Effective Treatment of Alcoholism or Drug Abuse does not mean detoxification or
maintenance care.

**2.20**    **"Eligible Dependent"** means a Dependent who is an Eligible Person.

**2.21**    **"Eligible Employee"** means an Employee who is an Eligible Person.

**2.22**    **"Eligible Person"** means an Employee, Retiree, or a Dependent of an Employee or
Retiree who satisfies the requirements for coverage set forth in Article III hereof.

**2.23**    **"Eligible Retiree"** means a Retiree who is an Eligible Person.

**2.24**    **"Employee"** means a person who works in Covered Employment or any other person
employed by an Employer who satisfies the requirements established by the Board of
Trustees for participation in the Plan and on whose behalf an Employer makes contributions
to a Participating Union Local Fund.  Employee does not include any person who has a
direct or indirect interest in a sole proprietorship or partnership which is an Employer.

**2.25**    **"Employer"** means any employer in the graphic communications industry who,
pursuant to the terms of a Collective Bargaining Agreement with a local union, is required to
make periodic contributions to a Participating Local Union Fund on behalf of Employees.
The term "Employer" can also include a GCIU local union, GCIU entity, a joint GCIU-
Employer entity or a Participating Local Union Fund.

**2.26**    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**2.27** **"Exclusions"** means those specific conditions and circumstances for which the Plan does not provide benefits, and other limitations on benefits, set forth in Articles VIII, XI and XII.

**2.28** **"Experimental or Investigational Medical Treatment"** means a service or supply will be deemed to be Experimental and/or Investigational if, in the opinion of the Committee, based on the information and resources available at the time the service was performed or the supply was provided, or the service or supply was considered for precertification under the Plan's utilization management program, any of the following conditions were present with respect to one or more essential provisions of the service or supply:

(a)     The service or supply is described as an alternative to more conventional therapies in the protocols or consent document of the health care provider that performs the service or prescribes the supply;

(b)     The prescribed service or supply may be given only with the approval of an Institutional Review Board as defined by federal law;

(c)     In the opinion of the Committee, there is a preponderance of authoritative medical, dental or scientific literature:

    (1)     published in the United States; and

    (2)     written by experts in the field;

that shows that recognized medical, dental or scientific experts:

    (1)     classify the service or supply as experimental and/or investigational; or

    (2)     indicate that more research is required before the service or supply could be classified as equally or more effective than conventional therapies;

(d)     With respect to services or supplies regulated by the Food and Drug Administration (FDA):

    (1)     FDA approval is required in order for the service and supply to be lawfully marketed; and it has not been granted at the time the service or supply is prescribed or provided; or

    (2)     A current investigational new drug or new device application has been submitted and filed with the FDA.

However, a drug will not be considered Experimental and/or Investigational if it is:

(1)     approved by the FDA as an "investigational new drug for treatment use"; or

(2)     classified by the National Cancer Institute as a Group C cancer drug when used for treatment of a "life threatening disease" as that term in defined in FDA regulations; or

(3)     approved by the FDA for the treatment of cancer and has been prescribed for the treatment of a type of cancer for which the drug was not approved for general use, and the FDA has not determined that such drug should not be prescribed for a given type of cancer.

(e)     The prescribed service or supply is available to the covered person only through participation in Phase I or Phase II clinical trials; or Phase III experimental or research clinical trials or corresponding trials sponsored by the FDA, the National Cancer Institute or the National Institutes of Health.

(f)     In determining if a service or supply is or should be classified as Experimental and/or Investigational, the Committee will rely only on the following specific information and resources that are available at the time the service or supply was performed, provided, or considered for precertification under the Plan's utilization management program:

(1)     Medical or dental records of the covered person;

(2)     The consent document signed, or required to be signed, in order to receive the prescribed service or supply;

(3)     Protocols of the Health Care Provider that renders the prescribed service or prescribes or dispenses the supply;

(4)     Authoritative peer reviewed medical or scientific writings that are published in the United States regarding the prescribed service or supply for the treatment of the covered person's diagnosis, including, but not limited to:

(A)     "United States Pharmacopeia"; and

(B)     "American Hospital Formulary Service";

(5)     The published opinions of:

II/8

(A)    the American Medical Association (AMA), such as "The AMA Drug Evaluations" and "The Diagnostic and Therapeutic Technology Assessment (DATTA) Program, etc.; or

(B)    specialty organizations recognized by the AMA; or

(C)    the National Institutes of Health (NIH); or

(D)    the Center for Disease Control (CDC); or

(E)    the Office of Technology Assessment; or

(F)    the American Dental Association (ADA), with respect to dental services or supplies.

(6)    Federal laws or final regulations that are issued by or applied to the FDA or Department of Health and Human Services regarding the prescribed service or supply.

(7)    the latest edition of "The Medicare Coverage Issues Manual."

(g)    To determine how to obtain a precertification of any procedure that might be deemed to be Experimental and/or Investigational, see the subsection on utilization management in Section 6.01 this document. The Committee has the discretion and authority to determine if a service or supply is or should be classified as Experimental and/or Investigational Medical Treatment.


**2.29**    **"Fund"** means the Graphic Communications National Health and Welfare Fund, the trust fund provided for in the Agreement and Declaration of Trust, and shall mean generally the monies, insurance policies and other things of value which comprise the corpus, income and additions to the trust fund.


**2.30**    **"General Exclusions"** means the General Exclusions set forth in Article XII.


**2.31**    **"GCIU"** means the Graphic Communications International Union.


**2.32**    **"Health Plan"** means a group health benefit plan, other than this Plan, that provides medical coverage on an insured or uninsured basis.  This includes, but is not limited to,

group blanket or franchise insurance, group Blue Cross, group Blue Shield, group practice or any prepaid coverage plan, Health Maintenance Organization (HMO), Preferred Provider Organization (PPO), labor-management trusteed plan, union welfare plan, employer organization plan, coverage under a governmental program, and individual or private insurance policies.

**2.33** "**Home Health Care**" means intermittent Skilled Nursing Care services provided by a licensed Home Heath Care Agency as defined below.

**2.34** "**Home Health Care Agency**" means an agency licensed or certified and operating according to law and that meets all of the following requirements:

(a)     it primarily provides skilled nursing and other therapeutic services under the supervision of Physicians or Nurses;

(b)     it is run according to rules established by a group of professional medical providers including Physicians and Nurses;

(c)     it maintains clinical records on all patients;

(d)     it is licensed by the jurisdiction where it is located if licensure is required, and operates according to the laws of that jurisdiction pertaining to agencies providing Home Health Care; and

(e)     it is certified by Medicare.

**2.35** "**Home Health Care Plan**" means a plan that provides for the care and treatment of an Illness or Injury.  The care and treatment must be:

(a)     prescribed in writing by a Physician; and

(b)     an alternative to confinement in a Hospital or Skilled Nursing Facility.

**2.36** "**Hospice**" means a facility or organization licensed and operating according to law and certified by Medicare that administers a program of palliative and supportive health care services providing physical, psychological, social and spiritual care for terminally ill persons assessed to have a life expectancy of six months or less.  Hospice care is intended to let the

terminally ill spend their last days with their families at home or in a home-like setting, with emphasis on keeping the patient as comfortable and free from pain as possible, and providing emotional support to the patient and his or her family.

**2.37**    "**Hospital**" means a public or private facility or institution that is accredited as a Hospital by the Joint Commission on Accreditation of Hospitals and Healthcare Organizations (JCAHHO), or is approved by the Committee, or any similar Hospital in a foreign country. A Hospital shall not include rest or nursing homes, convalescent homes or institutions, sanatariums or similar institutions which primarily operate training schools for patients or primarily provide custodial or institutional care.  To be considered a Hospital for purposes of this Plan, a Hospital must provide care and treatment by Physicians and Nurses on a 24-hour basis for Illness or Injury through the medical, surgical and diagnostic facilities on its premises.

**2.38**    "**Illness**" means any bodily disease or sickness, including any congenital abnormality of a newborn child, as diagnosed by a Physician and as compared to the person's previous condition.  Pregnancy of an Eligible Person is considered an Illness only for the purpose of coverage under the Plan.

**2.39**    "**Injury**" means any damage to a body part sustained accidentally and by external force.

**2.40**    "**In-Network Services**" means services provided by a Health Care Provider that is a member of the Plan's Preferred Provider Organization (PPO), as distinguished from Out-of-Network Services that are provided by a Health Care Provider that is not a member of the PPO.

**2.41**    "**Lifetime Maximum Benefit**" means the maximum amount of benefits payable by the Plan during the entire time an Eligible Person is covered under this Plan or a Predecessor Plan.

**2.42**  **"Maximum Benefits"** means the maximum amount of benefits payable by the Plan on account of medical or dental expenses incurred by any Eligible Person under this Plan or a Predecessor Plan.

**2.43**  **"Medical Emergency"** means a sudden unexpected onset of a medical condition, not normally treatable in a Physician's office, that manifests itself by such acute symptoms of sufficient severity that urgent and immediate medical attention is required without regard to the time of day or night either to prevent serious impairment of body functions or serious and/or permanent impairment or dysfunction of any body organ or part, or because the patient's life is threatened.

**2.44**  **"Medically Necessary"** means those services or supplies that the Committee determines to be furnished or prescribed by a Physician or other licensed health care practitioner to identify or treat a diagnosed or reasonably suspected Illness or Injury, the furnishing of which is consistent with the diagnosis and treatment of the Illness or Injury, in accordance with generally accepted standards of medical practice, is not provided solely for the convenience of the patient, Physician, or other licensed treatment facility, hospital, or health care practitioner; and is the most appropriate level of service or supply that can be provided safely for the patient.  Inpatient care in a Hospital is Medically Necessary when the patient's medical symptoms and condition are such that the service or supply cannot be provided safely to the patient on an outpatient basis.  The fact that services or supplies are prescribed by a Physician or other licensed provider does not mean that services or supplies are Medically Necessary.

**2.45**  **"Medicare"** means the health insurance benefits provided under Title XVIII of the Social Security Act of 1965, as amended.

**2.46**  **"Mental and Nervous Disorders"** mean disorders, conditions and diseases as defined within the mental disorders section of the current edition of the International Classification of

Diseases (ICD-9-CM) manual, which includes, among other things, autism, depression, schizophrenia, and Alcoholism and Drug Abuse, except as provided in Article XII.

**2.47** **"Mental Health Practitioner"** means a Physician, certified mental health counselor, or social worker who:

(a)   is legally licensed and/or legally authorized to practice or provide service, care or treatment of Mental and Nervous Disorders under the laws of the State or jurisdiction where the services are rendered; and

(b)   acts within the scope of his or her license; and

(c)   is not the patient or the parent, spouse, sibling (by birth or marriage) or child of the patient.

**2.48** **"Nurse"** means a person legally licensed as a registered nurse (RN), certified registered nurse anesthetist (CRNA), nurse practitioner, licensed practical nurse (LPN), licensed vocational nurse (LVN), psychiatric mental health nurse, or any equivalent designation, under the laws of the State or jurisdiction where the services are rendered, who:

(a)   acts within the scope of his or her license; and

(b)   is not the patient or the parent, spouse, sibling (by birth or marriage) or child of the patient.

**2.49** **"Nurse-Midwife"** is a member of the American College of Nurse-Midwifery who is duly certified to practice midwifery.

**2.50** **"Organ Transplant"** means, within the limitations of Section 6.04 and Article XII, the transfer of organs (such as the heart, kidney, liver) or living tissues or cells (such as bone marrow or skin) from a donor to a recipient with the intent to maintain the functional integrity of the transplanted tissue in the recipient.

(a)   "Autologous" refers to transplants of organs, tissues or cells from one part of the body to another.  Bone marrow and skin transplants are often autologous.

(b)    "Allogenic" refers to transplants of organs, tissues or cells from one person to another person.  Heart transplants are always allogenic.

(c)    "Xenographic" refers to transplants of organs, tissues or cells from one species to another (for example, the transplant of an organ from a baboon to a human).

**2.51    "Out-of-Network Services"** means services provided by a health care provider who is not a member of the Plan's Preferred Provider Organization (PPO), as distinguished from In-Network Services which are provided by a health care provider who is a member of the PPO.

**2.52    "Outpatient Facility"** means a clinic or other establishment that maintains and operates facilities for surgery, diagnosis, and treatment on an outpatient basis, which facility shall have an attending medical staff consisting of at least one Physician and anesthesiologist (or a CRNA under the supervision of a Physician).  This term shall not  mean a convalescent home, nursing home, home for the needy, home for nursing and domiciliary care, infirmary or orphanage, sanatarium,  maternity home for pre-natal or post-natal care, mental health facility, or other home or institution primarily providing custodial care.

Outpatient facilities include alternative care facilities such as emergency centers, urgent care centers or 24-hour clinics.  Other facilities, not otherwise covered by the Plan, may be approved in advance by the Committee if they fall within generally accepted medical practice and such treatment is recommended by a Physician.

**2.53    "Participating Local Union Fund"** means a Taft-Hartley, GCIU local union health and welfare benefit fund which has been accepted for participation in the Plan and whose board of trustees has agreed in writing to be bound by the terms of the Agreement and Declaration of Trust.  A Participating Local Union Fund can also include a GCIU Local Union, GCIU entity or a joint GCIU-Employer entity which has agreed to be bound to the terms of the Agreement and Declaration of Trust with respect to the health and welfare plan established for the benefit of its employees.

II/14

2.54    **"Physician"** means a person legally licensed and, acting within the scope of his or her license, authorized to practice medicine, to perform surgery and to prescribe and administer drugs under the laws of the State or jurisdiction where the services are rendered, or a legally licensed health care practitioner performing services, under the direction of a Physician and within the scope of his or her license which would be covered under the Plan if performed by a Physician.  Physician shall include a doctor of medicine, osteopathy, dental surgery, podiatry or chiropractic services.

2.55    **"Plan"** means the Graphic Communications National Health and Welfare Plan, as amended from time to time.

2.56    **"Predecessor Plan"** means the former Graphic Communications International Union Health and Welfare Pooling Fund and any other health and welfare fund or plan that agrees, pursuant to Section 2.53 above, to participate in the Plan.

2.57    **"Preferred Provider Organizations"** (PPO) means a group or network of health care providers under contract with the Fund to provide health care services and supplies at negotiated discounted rates as payment in full, except with respect to any defined Deductible, Coinsurance and Co-payment which an Eligible Person is responsible for paying.

2.58    **"Rehabilitation Care"** means cardiac, occupational, physical, pulmonary or speech therapy, prescribed by a Physician when the bodily function has been restricted or diminished as a result of illness, injury or surgery, with the goal of improving or restoring bodily function by a significant and measurable degree as close as reasonably and medically possible to the condition that existed before the Injury, Illness or surgery, and performed by a licensed therapist acting within the scope of his or her license.

2.59    **"Retiree"** means a person who is receiving monthly pension benefits from an qualified retirement plan and who satisfies the eligibility rules set forth in Section 3.02, herein.

II/15

**2.60** **"Schedule of Benefits"** means the Schedule of Benefits, Co-payments, Coinsurance and Deductibles set forth in Appendix B and Appendix C.

**2.61** **"Skilled Nursing Care"** means services performed by a licensed Nurse if the services:

    (1)    are ordered by and provided under the direction of a Physician; and

    (2)    are intermittent and part-time, generally not exceeding 16 hours a day, and are usually provided on less-than-daily basis; and

    (3)    require the skills of a Nurse because the services are so inherently complex that they can be safely and effectively performed only by or under the supervision of a Nurse.

Examples of Skilled Nursing Care services include, but are not limited to the initiation of intravenous therapy and the initial management of medical gases such as oxygen.

**2.62** **"Skilled Nursing Facility"** means a public or private facility, licensed and operated according to law, that primarily provides skilled nursing and related services to people who require medical or nursing care and that rehabilitates injured, disabled or sick people, and that meets all of the following requirements:

    (1)    It is accredited by the Joint Commission on Accreditation of Hospitals and Healthcare organizations (JCAHHO) as a Skilled Nursing Facility or is certified by Medicare as a Skilled Nursing Facility; and

    (2)    It maintains on its premises all facilities necessary for medical care and treatment; and

    (3)    It provides services under the supervision of Physicians; and

    (4)    It provides nursing services by or under the supervision of a licenses Registered Nurse, with one licensed Registered Nurse on duty at all times; and

    (5)    It is not (other than incidentally) a place for rest, domiciliary care, or care of people who are aged, alcoholic, blind, deaf, drug addicts, mentally deficient, or suffering from tuberculosis; and

    (6)    It is not a hotel or motel.

**2.63**   **"Trust Agreement"** means the Graphic Communications National Health and Welfare Fund Agreement and Declaration of Trust, as amended and restated from time to time.

**2.64**   **"Union** means the Graphic Communications International Union ("GCIU") or any of its affiliated locals or councils.

**2.65**   **"Usual and Customary" or "UC"** means a level of charges that does not exceed the prevailing level generally charged by providers in the "locality" for like or comparable services or supplies.  The term "locality" means a geographical area that includes a cross-section of persons or entities regularly furnishing the type of treatment, services, or supplies for which the charge is made.  In determining whether charges are Usual and Customary, consideration shall be given to the condition being treated and to any medical complications or unusual circumstances that may require additional time, skill, or experience.  Benefits are payable according to the Plan's UC scale as determined and changed from time to time by the Board of Trustees.  Where appropriate, the UC charges shall be based upon the scale promulgated by Medical Data Research (MDR); however, other industry sources shall be used if the MDR scale is unavailable or no longer determined appropriate by the Board of Trustees.  In no event shall the Covered Expenses up to the Usual and Customary level under this Plan exceed the actual amount charged for a service or supply.

**2.66**   **"Well Child Care"** means health care services, detailed in Section 7.02 and Appendix B, provided to a healthy newborn or child through age 12 as a wellness benefit under the Plan.

## ARTICLE III.  ELIGIBILITY

**3.01    Employee Eligibility**

(a)    <u>Initial Eligibility</u>

An Employee shall become an Eligible Employee on:

(1)     the first day of the calendar month following the month in which the Employee completes one month of Covered Employment, or

(2)     as otherwise provided by the Collective Bargaining Agreement and as approved by the Committee.

If an Employee is confined to a Hospital or Disabled on the date eligibility under the Plan would otherwise begin, the Employee will become an Eligible Employee only after the Employee returns to full-time Covered Employment for one full day.

(b)    <u>Coverage under a Predecessor Plan</u>

If an Employee was covered as an active Employee under a Predecessor Plan during the one-month period immediately preceding the date that a Predecessor Plan joins the Fund, such Employee shall be an Eligible Employee on the first day of the month for which Employer premium payments are made on his behalf.  The Committee may establish and amend from time to time special rules to avoid breaks in Employee's insurance coverage when a Predecessor Plan joins the Fund.

(c)    <u>Eligibility during Military Service</u>

If an Eligible Employee enlists, is drafted or is called into active military duty, coverage for the Eligible Employee and his Eligible Dependents may be continued at the Eligible Person's expense for up to 18 months.  Upon discharge and return to Covered Employment within the time prescribed by law, coverage for the Eligible Employee and his Eligible Dependents shall be reinstated on the first date the Eligible Employee returns to Covered Employment.  An Eligible Employee who does not return to Covered Employment within the time prescribed by law, must requalify under Section 3.01(a) or 3.01(b) above.  Notwithstanding the provisions of this Section, any such Employee shall be entitled to all rights and privileges to the extent required under the Uniformed Services Employment and Reemployment Rights Act

(USERRA), as amended, and any other applicable federal law.  For purposes of this Section, "military" includes all uniformed services of the United States provided for under USERRA.

(d)    Reinstatement of Eligibility

An Employee whose eligibility for coverage under this Plan is discontinued must requalify for coverage under Sections 3.01(a) or 3.01(b) above.

**3.02    Retiree Eligibility**

(a)    A Retiree shall continue to be an Eligible Person for all Retiree benefits to which he is entitled under the Plan upon proper application to the Fund, provided the Retiree is:

(1)    an Eligible Employee in the month immediately preceding the month in which his retirement is effective, and

(2)    eligible to receive a pension from an Employer's qualified retirement plan or from a jointly trusteed, multiemployer pension plan established for employees in the graphic communications industry.

(b)    A Retiree who refuses Retiree coverage at the time of initial eligibility, or who elects to terminate existing Retiree coverage, shall not be allowed to reenroll at a later date.

(c)    Retiree benefits cover comprehensive medical, dental, vision, and prescription drug expenses.  Retiree benefits do not include life, accidental death or dismemberment, or weekly disability income.

(d)    Upon the death of an Eligible Retiree, the Retiree's surviving spouse and/or Eligible Dependents shall have the right and option to continue coverage under the Plan, as set forth in Article 5.

(e)    A Retiree who returns to Covered Employment, and who subsequently retires a second time, shall be eligible for Retiree benefits if the Retiree was eligible for and elected Retiree coverage at his initial Retirement.

(f)    Retiree coverage shall be suspended as set forth in Section 4.01(b) for Retirees who perform any amount of employment in the graphic communications industry or related industry as an Employee, or self-employed, in Union or non-Union employment.

III/19

(g)    Retiree coverage may be delayed if the Retiree is confined for medical reasons at home or elsewhere on the date Plan coverage would otherwise take effect, or if the Retiree is confined to a Hospital or nursing home within 31 days before the date coverage would otherwise take effect. Coverage shall be delayed until the Retiree:

(1)    has not been confined for medical reasons for at least 31 days; or

(2)    submits evidence of good health.

## 3.03    Dependent Eligibility

(a)    A Dependent of an Eligible Employee or Eligible Retiree shall be an Eligible Dependent under the Plan on the later of the date the Employee or Retiree becomes an Eligible Person or the date the Dependent becomes a "Dependent" as defined in Section 2.15 herein. If an Employee or Retiree acquires a Dependent after becoming an Eligible Person and enrolls the Dependent within 60 days of acquiring the Dependent, the Dependent shall be an Eligible Person as of the enrollment date. If the enrollment occurs more than 60 days after the Employee or Retiree becomes an Eligible Person, the Dependent shall be an Eligible Person on the first day of the month following enrollment. The Committee may require satisfactory proof of marriage to a spouse or proof of a child's Dependent status in accordance with Section 13.02 herein.

(b)    Any Dependent of a Retiree, who is an Eligible Dependent on the pension annuity starting date, shall be eligible for coverage in accordance with the provisions relating to Dependents in Articles II and III.

(c)    Dependent coverage may be delayed if the Dependent is confined for medical reasons at home or elsewhere on the date coverage would otherwise take effect, or if the Dependent was confined to a Hospital within 31 days before the date it would take effect. Coverage shall be delayed until the Dependent:

(1)    has not been confined for medical reasons for at least 31 days; or

(2)    submits evidence of good health.

(d)     The Plan shall cover a child under a court order, judgement or decree or order of an appropriate state administrative agency which is approved by the Committee as a Qualified Medical Child Support Order (QMCSO) under Section 609(a) of ERISA.

**3.04    Death of Employee or Retiree**

(a)     An Eligible Dependent of a deceased Eligible Employee who is covered at the time of the Eligible Employee's death or, in the case of a newborn child, is covered within 60 days of birth, shall remain eligible for coverage for the 12-month period beginning after the last month in which the Eligible Employee worked in Covered Employment.

(b)     Following the 12-month period described in Section 3.04(a), a covered Eligible Dependent of a deceased Eligible Employee shall be entitled to continuation coverage as set forth in Article V herein.

(c)     An Eligible Dependent of a deceased Eligible Retiree who is covered at the time of the Eligible Retiree's death shall remain eligible for coverage, provided that:

   (1)     an Eligible Dependent who is the surviving spouse must not have attained age 65 at the time of the Retiree's death; and

   (2)     no new Dependent shall be enrolled, other than the newborn or adopted child of the deceased Retiree within 60 days of birth or adoption.

**3.05    Eligibility Contingent on Premium Payment**

Notwithstanding any other provision of this Plan, eligibility for coverage under the Plan as an Eligible Person is contingent on the Fund's receipt of the required monthly premium payment as described in the Trust Agreement, in accordance with the terms and procedures established by the Board of Trustees.

III/21

## ARTICLE IV.  TERMINATION OF COVERAGE

**4.01   Date of Termination of Coverage**

Except as provided in Article V, coverage under the Plan shall terminate as follows:

(a)   <u>Eligible Employees</u>

The coverage of an Eligible Employee shall terminate when the Employer ceases to make premium payments on his or her behalf.  However, the coverage of an Eligible Employee shall terminate on the date the Plan is terminated if earlier than the date described in this subsection (a).

(b)   <u>Eligible Retirees</u>

The coverage of an Eligible Retiree under Section 3.02 shall terminate on the earliest of:

(1)   date the Retiree dies;

(2)   the last day of the month in which the Retiree ceases to satisfy the eligibility requirements of Section 3.02; or

(3)   the first day of the month in which a Retiree returns to work in the graphic communications industry as a self-employed person or as an Employee, in Union or non-Union employment.

(c)   <u>Eligible Dependents</u>

Coverage for Eligible Dependents shall terminate on the last day of the month in which the Eligible Dependent ceases to satisfy the eligibility requirements of Sections 2.15 and 3.03, or the end of the 12-month period provided in Section 3.04(a), if earlier.

(d)   <u>Surviving Eligible Dependents</u>

(1)   Coverage for surviving Eligible Dependents who are eligible for coverage under Section 3.04(b) shall terminate on the earliest of:

(A)   the end of the 12-month period provided in Section 3.04(a) Employee's continuing eligibility period; or

(B)   the date the surviving spouse remarries; or

IV/22

(C)    the last day of the month in which an Eligible Dependent no longer satisfies the eligibility requirements of Sections 2.15 and 3.03.

(2)    Coverage for surviving Eligible Dependents who are eligible for coverage under Section 3.04(c) shall terminate on the earliest of: the last day of the month following the Employee's or Retiree's death; or the date the surviving spouse remarries; or the last day of the month in which the Eligible Dependent no longer satisfies the eligibility requirements of Sections 2.15 and 3.03.

## 4.02    Termination for Non-Payment of Premium

Notwithstanding any other provision of the Plan, in the event a required premium payment is not made pursuant to the terms of the Trust Agreement, an Employee's, Dependent's and Retiree's eligibility under the Plan shall cease on the last day of the month for which premium payments have been made.

## 4.03    Plan and Coverage Termination

If the Plan is terminated or a class of coverage under the Plan is terminated, then the termination of coverage provisions set forth in Section 4.01 shall be superseded by the terms of this Section. In such an event, Plan coverage shall terminate in accordance with the provisions of this Section on the earlier of the date on which the Plan is terminated or the date on which a class of coverage under the Plan is terminated.

## 4.04    Effect of Termination of Coverage

Upon an Eligible Person's termination of coverage, no benefits shall be payable under the Plan except for Covered Expenses incurred prior to the date coverage terminates.

IV/23

## ARTICLE V.  CONTINUATION COVERAGE

### 5.01  Definitions

For purposes of this Article, certain terms are defined as follows:

(a)  "Comprehensive Medical Benefits" means the benefits set forth in Article VI hereof.

(b)  "Ancillary Medical Benefits" means the benefits set forth in Article VII hereof.

(c)  "Supplemental Medical Benefits" means the benefits set forth in Articles VIII, IX, and X hereof.

(d)  "Nonmedical Benefits" means all benefits set forth in Article XI hereof.

(e)  "Qualified Beneficiary" means a person who is an Eligible Person under the Plan on the day before a Qualifying Event.  "Qualified Beneficiary" also means a child who is born to or placed for adoption with an Eligible Employee or Eligible Retiree during the period of continuation coverage.

(f)  "Qualifying Event" means any of the following events which results in loss of coverage under the Plan:

(1)  termination or reduction of hours, as required to maintain eligibility under Article III, of an Eligible Employee's employment for any reason other than the Eligible Employee's gross misconduct;

(2)  death of an Eligible Employee;

(3)  divorce or legal separation of an Eligible Employee and spouse;

(4)  a Dependent's ceasing to be an Eligible Dependent under the Plan; or

(5)  an Eligible Person becoming entitled to Medicare.

### 5.02  Right to Continue Coverage

An Eligible Person, who is a Qualified Beneficiary, may elect to continue group health coverage under the Plan pursuant to Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") as set forth in this Article.  A Qualified Beneficiary shall have the right and option to continue, at his or her own expense, Comprehensive Medical Benefits, Ancillary Medical Benefits or benefits under Articles VIII, IX and X, if such benefits would otherwise terminate due to a Qualifying Event.

### 5.03    Continuation Coverage

(a)    The period of continuation coverage shall be limited to:

    (1)    18 months from the date of the Qualifying Event, for termination or reduction in hours of employment required to meet eligibility under Article III;

    (2)    29 months from the date of the Qualifying Event, for an Eligible Employee upon termination or reduction of hours required to meet eligibility under Article III or his or her Dependent, provided such Eligible Employee or Dependent is determined to be Disabled by the Social Security Administration no later than 60 days after the date of the Qualifying Event; and

    (3)    36 months from the date of the Qualifying Event, for any Qualifying Event other than those described in (1) or (2) above.

(b)    If a second Qualifying Event occurs during the initial continuation coverage period, a Qualified Beneficiary may elect to continue coverage for an additional 18 months, provided, however, that the total period of continuation coverage shall not exceed 36 months in any event.


### 5.04    Termination of Continuation Coverage

Continuation coverage shall terminate on the earliest to occur of the following:

(a)    the last day of the month preceding the month for which the required COBRA premium under Section 5.05 is not paid;

(b)    the date the Qualified Beneficiary becomes covered under another Health Plan, as defined in Section 2.31;

(c)    the date the Qualified Beneficiary becomes entitled to Medicare;

(d)    the date the Plan terminates; or

(e)    the last day of the period of continuation coverage.


### 5.05    COBRA Premium

The COBRA premium for continuation coverage shall be an amount determined by the Committee and shall not exceed 102% (150% for a Disabled Employee who is a Qualified Beneficiary if the continuation period is extended for an additional 11 months) of the total

cost for coverage under the Plan of such person in the same or similar geographic location. Such premium must be paid by the Qualified Beneficiary to the Fund on a timely basis within 45 days after the election to continue coverage is made and the first day of each month of coverage thereafter under procedures developed by the Committee.

## 5.06    Notification and Administrative Procedures

The Committee shall establish notification and administrative procedures for the election and implementation of continuation coverage and the payment of premiums, as required by law.

## ARTICLE VI.  COMPREHENSIVE MEDICAL BENEFITS

**6.01    General**

Subject to the Article XII and the limitations herein, an Eligible Person shall be entitled to benefits for the Covered Expenses listed in Section 6.02 below.  Services provided by a PPO provider shall be covered at the In-Network level shown in Appendix B.  Services provided by a non-PPO provider shall be covered at the Out-of-Network level shown in Appendix B.

(a)    <u>Benefit Payable</u>

    (1)    Subject to the Deductible, Co-payments and the maximum out-of-pocket expenses shown in Appendix B, Covered Expenses shall be payable in an amount equal to the percentage of the negotiated fee or Usual and Customary charge incurred, up to the Lifetime Maximum Benefit set forth in Appendix B.

    (2)    The maximum out-of-pocket expense for an Eligible Person or family annually includes the Coinsurance amounts not paid by the Plan, indicated in Appendix B.  The maximum out-of-pocket expense does not include the annual Deductible amount or Co-payment requirements of the Plan.  Once an Eligible Person or family has paid the Deductible and maximum out-of-pocket expense for a year, the Plan shall pay 100% of the negotiated fee or Usual and Customary charges for Covered Expenses, subject to any required Co-payments.

    (3)    Services provided by an Out-of-Network provider who is also out of the PPO region, as defined by the PPO, shall be covered at 80% of Usual and Customary Charges.

(b)    <u>Comprehensive Medical Deductible</u>

    (1)    <u>Amount</u>

        The comprehensive medical Deductible shall be the Deductible listed in Appendix B.  Except as otherwise provided herein, the comprehensive medical Deductible applies separately to each Eligible Person in each calendar year.

VI/27

(2)    <u>Family Limit</u>

The comprehensive medical Deductible for a family of Eligible Persons shall be satisfied after Eligible Persons of the family collectively satisfy the family comprehensive medical Deductible in the same calendar year.

(c)    <u>Lifetime Maximum Benefit - Amount Payable</u>

The amount payable under the Plan on behalf of each Eligible Person, with respect to the aggregate of all benefits paid as comprehensive medical benefits under this Article VI, for all Illnesses or Injuries occurring during an Eligible Person's entire lifetime participation in this Plan or Predecessor Plan, shall not exceed the Lifetime Maximum Benefit listed in Appendix B.  In no event shall an increase in the Lifetime Maximum Benefit apply to claims incurred by an Eligible Person who has exhausted the Lifetime Maximum Benefit prior to the effective date of any subsequent increase in the Lifetime Maximum Benefit unless determined otherwise by the Board of Trustees.

(d)    <u>Covered Comprehensive Medical Care</u>

Covered comprehensive medical care consists of Covered Expenses incurred for Hospital, surgical, and medical expenses up to the Lifetime Maximum Benefit shown in the Appendix B.

(e)    <u>Utilization Management Program</u>

To determine the appropriateness and medical necessity of health care services such as hospitalization, surgical and diagnostic procedures, the Committee has adopted a Utilization Management Program to control unnecessary health care costs by avoiding unnecessary services or services that are more costly than others but can achieve the same result. The Utilization Management Program may consist of, but is not limited to pre-admission certification, concurrent review, retrospective review, catastrophic case management, prior approval, discharge planning, and psychiatric procedure review). For In-Network services, benefits may be reduced if Utilization Management Program procedures are not followed.  A penalty, as shown in Appendix B, may be imposed on an Eligible Person for failure to obtain precertification for Hospital care provided by an Out-of-Network provider.  The Plan's Utilization Management Program may be administered by an independent, professional Utilization Management Company

operating under contract with the Plan. In carrying out its responsibilities under the Plan, the UM Company may be given discretionary authority by the Committee to determine if a course of care or treatment is Medically Necessary and appropriate with respect to the patient's condition and within the terms and provisions of the Plan. All treatment decisions, however, rest with the patient and the Physician or other Health Care Practitioner.

(f)     Emergency Services

In the event of a Medical Emergency, an Eligible Person may obtain care from the nearest available Hospital emergency room or free-standing emergency or urgent care center. An Eligible person who is covered on an In-Network basis, must notify the PPO within 48 hours of the emergency care to enable the PPO to assist with discharge plans, determine the need for continued medical services, and/or advise the Attending Physician or other health care practitioner of any recommendation, option or alternatives for medical care. If the Eligible Person is admitted to an Out-of-Network Hospital, the PPO will determine whether such person shall be moved to an In-Network Hospital. Such determination shall be made in a manner which is nondiscriminatory for all persons similarly situated based on the facts and circumstances.

**6.02    Comprehensive Medical Benefit**

(a)     Hospital Expenses

Subject to Article XII and the limitations herein, Covered Expenses shall include those Hospital expenses specified below as comprehensive medical expenses. Covered Expenses incurred by an Eligible Person who is confined in a Hospital as a result of pregnancy, childbirth, miscarriage, or related medical condition also shall be payable as a Hospital expense. Covered Expenses incurred by an Eligible Person for inpatient and outpatient Hospital expenses shall be payable as a Hospital expense.

(1)     Covered Hospital Care

Covered Expenses incurred for Hospital services and supplies furnished to an Eligible Person as a result of an Illness or Injury include the following:

VI/29

(A)    room and board, subject to Section 6.02(a)(2) below;

(B)    operating, delivery, recovery and treatment room and available equipment fees;

(C)    diagnostic laboratory and pathology tests, as described in Section 6.02(f), including electrocardiogram and electroencephalograms that cannot be provided on an outpatient basis;

(D)    X-ray examinations;

(E)    radiotherapy including use of X-ray and other high-energy modalities, radon, radium, cobalt, and other radioactive substances;

(F)    services or supplies furnished by a Hospital for treatment in the outpatient department, emergency room or ambulatory surgical facility;

(G)    pre-operative tests;

(H)    bandages, surgical dressings, casts, splints, trusses, braces, and crutches;

(I)    prescription drugs taken or administered during hospitalization;

(J)    anesthesia and its administration;

(K)    oxygen and its administration;

(L)    whole blood, blood plasma, plasma extenders, and blood transfusions;

(M)    routine nursery care of a newborn child of an Eligible Employee or Eligible Retiree;

(N)    in-patient treatment of a Mental or Nervous Disorder;

(O)    confinement for medical complications of alcoholism or drug abuse, such as cirrhosis, delirium tremens, detoxification, hepatitis;

(P)    general nursing care services of a Nurse; and

(Q)    intensive or coronary care unit services.

(2)    <u>Room and Board</u>

Covered Expenses incurred for room and board shall be payable for a semi-private room, unless isolation in a private room is Medically Necessary, subject to the Deductible, Coinsurance and Co-payment rules as shown in Appendix B.

VI/30

(3)    Limitations

Covered Expenses for comprehensive medical benefits under this Article for Hospital care do not include:

(A)    hospitalization for dental care unless Medically Necessary and due to Injury to sound natural teeth, and/or as certified by a Physician as necessary to protect an Eligible Person's life or health;

(B)    hospitalization primarily for diagnostic study directed toward a definite Illness or Injury where treatment is by means of physical therapy, hydrotherapy or occupational therapy, unless the services can be provided only on an inpatient basis and the patient's physical condition requires hospitalization.

(b)    Surgical Expenses

Subject to the Article XII and the limitations herein, Covered Expenses shall be include those expenses specified below which are performed in a Hospital or Outpatient Facility or Physician's office, or which are performed in connection with pregnancy, childbirth, miscarriage, or related medical condition.

(1)    Covered Surgical Procedures

Covered Expenses incurred for surgical procedures include the following:

(A)    an incision, excision, or electrocauterization of any organ or part of the body;

(B)    treatment of a fracture;

(C)    cosmetic, plastic or reconstructive surgery to repair or alleviate damage resulting from or caused by Injury, congenital defect as provided in Section 6.02(b)(3), or disfigurement related to disease, incurred while covered under this Plan;

(D)    reduction of a dislocation;

(E)    an endoscopic procedure;

(F)    suturing of wounds;

(G)    X-ray, radium therapy or laser therapy if used in lieu of a cutting operation; or

VI/31

(H)    injection treatment of hernias, hemorrhoids, or varicose veins.

(2)    <u>Covered Surgical Services</u>

Covered Expenses incurred for surgical services include the following:

(A)    anesthesia services performed by a Physician or certified registered nurse anesthetist (CRNA) who is a private practitioner for covered surgical procedures provided such services are not covered as a Hospital expense;

(B)    assistant surgeon fees not to exceed 20% of the expense of the covered surgical procedure unless otherwise determined by the Committee to be Medically Necessary; and

(C)    services of a Dentist or Physician for covered dental care required as a result of Injury to sound natural teeth.

(3)    <u>Limitation</u>

No comprehensive medical benefit shall be payable for surgery for birth defects unless the individual is also eligible for Dependent coverage at birth.

(c)    <u>Covered Medical Care</u>

Covered Expenses shall include the following services and supplies furnished to an Eligible Person on an inpatient basis or as an outpatient in an emergency room of a Hospital, in a Physician's office or an Outpatient Facility:

(1)    Physician visits, provided, however, that no benefit shall be payable for a visit in the Hospital in connection with a surgical procedure or post-operative care unless the visit is by a Physician other than the surgeon performing the operation;

(2)    services of a Nurse-Midwife shall be available to Eligible Employees or the spouse of an Eligible Employee or Eligible Retiree up to an amount that does not exceed the amount that would be payable under the Plan if the services are performed by a Physician;

(3)    rental of a wheelchair, hospital-type bed, mechanical device for treatment of respiratory paralysis or other Durable Medical Equipment as provided in Section 6.02(d);

VI/32

    (4)     orthopedic appliance implants;

    (5)     services by a licensed practitioner for physical therapy, hydrotherapy, or occupational therapy;

    (6)     . speech therapy through the use of appropriate programs for treatment of developmental speech dysfunction resulting from Injury or Illness;

    (7)     renal dialysis when performed in a Medicare-approved facility;

    (8)     ambulance service for emergency transportation of an Eligible Person to or from the nearest Hospital equipped to provide the required medical care;

    (9)     orthopedic braces and appliances;

    (10)    prosthetic devices or implants;

    (11)    oxygen;

    (12)    visiting nurses; and

    (13)    services of a Dentist or Physician for covered dental care required as a result of Injury to sound natural teeth.

(d)    <u>Durable Medical Equipment</u>

Subject to the Article XII and limitations herein, Covered Expenses shall include the rental or purchase of Durable Medical Equipment which is prescribed by a Physician. Purchase of equipment shall be a Covered Expense only when the purchase price is expected to be less costly than long term rental or when the item is not available for rental. Rental fees may be applied to the purchase price with the agreement of the vendor. Expenses for the repair or replacement of Durable Medical Equipment shall be Covered Expenses, provided, however, that replacement expenses shall be covered only if the replacement is needed due to a change in the Eligible Person's physical condition or if a replacement is likely to cost less than to repair the existing equipment or to rent like equipment. Durable Medical Equipment must be prescribed and certified in writing by a Physician as Medically Necessary for the treatment of an Illness or Injury or to improve body function lost as a result of Illness, Injury or congenital abnormality or to enable the patient to perform essential activities of daily living related to the patient's health and hygiene with minimal or no assistance from others.

VI/33

(e)     Home Health Care Expense

(1)     Subject to Article XII and limitations herein, Covered Expenses shall include Home Health Care expenses as follows:

    (A)     part-time or intermittent care by an RN, or by an LPN if an RN is not available;

    (B)     part-time or intermittent home health aide services for patient care;

    (C)     physical, occupational and speech therapy;

    (D)     medical supplies, drugs and medicines prescribed by a Physician including intravenous drugs; and

    (E)     lab services provided by or for a home health care agency.

(2)     Covered Home Health Care Expenses

Covered Expenses shall be payable for the following services and supplies furnished to an Eligible Person if:

    (A)     the charge is made by a Home Health Care Agency;

    (B)     the care is given under Home Health Care Plan;

    (C)     the care is given to the Eligible Person in the home;

    (D)     the care starts within 7 days after the discharge from a Hospital as an inpatient; and

    (E)     the care is for the same condition that caused the hospital stay, or one related to it.

(3)     Limitations

Covered Expenses for comprehensive medical benefits under this Article shall not include Home Health Care expenses incurred for:

    (A)     services or supplies which are not a part of the Home Health Care Plan;

    (B)     services of a person who usually lives with the Eligible Person or is a member of the Eligible Person's or the Eligible Person's spouse's family;

    (C)     services of a social worker;

    (D)     transportation; and

VI/34

  (E) more than forty visits annually or as may be determined by the Board of Trustees on an annual basis. Each visit by a Nurse or therapist shall be considered one visit. Each visit up to 4 hours by a home health aide under the supervision of a Nurse shall be considered one visit.

(f) <u>Outpatient Preoperative Testing</u>

  (1) Subject to the Article XII and the limitations herein, Covered Expenses shall include laboratory and pathology tests and X-ray examinations while an outpatient before scheduled surgery.

  (2) <u>Limitations</u>

   Covered Expenses for preoperative testing shall not include the following:

   (A) tests done more than seven days prior to scheduled surgery; and

   (B) tests repeated in or by the hospital or surgery center where the surgery is done.

(g) <u>Organ Transplant</u>

  (1) Subject to Article XII and the limitations herein, Covered Expenses for comprehensive medical benefits shall include Organ Transplants to Eligible Persons and related services for a covered transplant procedure. Covered Expenses shall be payable up to the negotiated fee or to the extent Usual and Customary, at the percentages shown in Appendix B.

  (2) <u>Covered Organ Transplant Services</u>

   Covered Expenses includes Organ Transplant services as follows:

   (A) organ and tissue procurement consisting of the removal from a cadaver, preservation, storage, and transportation of the organ or tissue, if the recipient is an Eligible Person;

   (B) reasonable expenses of an uninsured live donor as a recipient's Covered Expense, if the recipient is an Eligible Person;

   (C) reasonable charges for transportation of the Eligible Person to the transplant facility;

   (D) if an Eligible Person is a donor for a covered transplant procedure, reasonable expenses for donor testing and charges for removing the

VI/35

organ or tissue, and other reasonable expenses shall be provided in the same manner as for treatment of Illness; and

(E)     any other service which would be a Covered Expense under this Article.

(3)     <u>Covered Organ Transplant Procedures</u>

Covered Expenses includes transplant procedures for autologous and allogenic Organ Transplants if they are generally accepted by the medical profession as a safe, effective and appropriate treatment for the patient's medical condition.

(4)     <u>Authorization</u>

A written request for preauthorization must be made prior to the covered transplant procedure in accordance with such procedures for obtaining pre-authorization as the Committee, in its sole discretion, shall establish and may change from time to time. The Committee may waive the requirement for preauthorization due to extenuating circumstances.

(5)     <u>Limitations</u>

Covered Expenses for Organ Transplants shall not include the following:

(A)     an organ or tissue transplantation not covered in Section 6.02(g)(3) above;

(B)     a non-human organ;

(C)     charges for procedures that are not generally accepted by the medical profession as a safe, effective, and appropriate treatment of the patient's medical condition;

(D)     charges for lodging or for the preservation, storage or transportation of a tissue or organ of a donor who is an Eligible Person unless the recipient is also an Eligible Person.

(h)     <u>Hospice Care</u>

Subject to the Article XII and the limitations herein, Covered Expenses for an Eligible Person who is "terminally ill" shall include Hospice care.

VI/36

(1) <u>Terminally Ill</u>

An Eligible Person shall be considered "terminally ill" when a Physician certifies that the Eligible Person is not expected to live longer than six more months.

(2) <u>Covered Hospice Care</u>

Covered Expenses for Hospice care include medical care furnished to a Eligible Person who is "terminally ill" as follows:

(A)  home visits by Nurses and other health care professionals;

(B)  medical social service under the direction of a Physician;

(C)  dietary counseling;

(D)  consultation or case management services by a Physician;

(E)  physical or occupational therapy;

(F)  part-time or intermittent home health aide services for up to 8 hours in any one day;

(G)  pain management treatment;

(H)  medical treatments as prescribed by a Physician;

(I)  instruction and supervision for family members in the care of the patient;

(J)  help in obtaining medical equipment, supplies or medication;

(K)  psychological counseling and emotional support to the patient and family; and

(L)  inpatient confinement in a Hospice facility, Hospital, or convalescent facility.

(3) <u>Limitations</u>

Hospice care shall not include the following:

(A)  bereavement counseling;

(B)  funeral arrangements;

(C)  pastoral counseling;

(D)  financial or legal counseling;

VI/37

    (E)    homemaker or caretaker services; and

    (F)    respite care.

(i)    <u>Rehabilitation Care in Skilled Nursing Facility</u>

Subject to the Article XII and the limitations herein, an Eligible Person is entitled to coverage for Covered Expenses for covered Rehabilitation Care furnished in a Skilled Nursing Facility.

(j)    <u>Birthing Center Expenses</u>

Subject to the Article XII and the limitations herein, Covered Expenses shall include Birthing Center expenses as provided below.

    (1)    Birthing Center expenses include expenses incurred for:

        (A)    prenatal care;

        (B)    delivery of a child or children; and

        (C)    postpartum care rendered within 24 hours after the delivery.

    (2)    Birthing Center expenses shall not include charges incurred in connection with a pregnancy for which pregnancy-related expenses are not included as a covered medical expense.

(k)    <u>Outpatient In Vitro Fertilization, Artificial Insemination or Gamete Intra-Fallopian Transfer (GIFT) Expenses</u>

Subject to Article XII and the limitations herein, Covered Expenses shall include, for an Eligible Person who is a female, outpatient in vitro fertilization, artificial insemination or gamete intra-fallopian transfer (GIFT) expenses as provided below.

    (1)    Covered Expenses consist of outpatient in vitro fertilization, artificial insemination or GIFT expenses incurred for procedures performed while the Eligible Person is not confined to a Hospital or any other facility as an inpatient.

    (2)    Covered Expenses for outpatient in vitro fertilization, artificial insemination or GIFT expenses shall not include charges in connection with procedures performed on a surrogate parent.  Covered Expenses under this Section 6.02(k) shall not exceed $5,000 per calendar year.

VI/38

(l)    Mental and Nervous Disorders, and Alcoholism or Drug Abuse

   (1)    Benefit Payable

   Subject to Article XII and the limitations herein, Covered Expenses shall include treatment for Mental and Nervous Disorders, and Alcoholism or Drug Abuse as shown in Appendix B.

   (2)    Covered Mental and Nervous Disorder, and Alcoholism or Drug Abuse Inpatient Expenses

   (A)    Covered Expenses for Mental and Nervous Disorders include medical care furnished to an Eligible Person who is confined to a Hospital or Treatment Facility for treatment of Mental and Nervous Disorders, or complications thereof, for a maximum of 30 days in a calendar year.

   (B)    Covered Expenses for Alcoholism or Drug Abuse include medical care furnished to an Eligible Person who is confined to a Hospital or Treatment Facility for Effective Treatment of Alcoholism or Drug Abuse, or complications thereof, for a maximum of 30 days per calendar year.

   (C)    Covered Expenses are charges related to Hospital or treatment facility confinement that are charged by the facility or are generally charged by such facility.  Covered Expenses include, but are not limited to:

   (i)    room and board;

   (ii)    other necessary supplies and services;

   (iii)    psychological testing;

   (iv)    prescription drugs;

   (v)    laboratory tests;

   (vi)    drug screening; and

   (vii)    individual or group therapy.

   (D)    Covered Expenses are charges related to Effective Treatment of Alcoholism or Drug Abuse that are charged by a Hospital, treatment facility or Physician.  Outpatient charges for Effective Treatment of

VI/39

Alcoholism or Drug Abuse shall not be covered for visits in excess of the outpatient visits maximum in each calendar year.

(E)    If an Eligible Person is confined as an inpatient in a Hospital for the treatment of a medical complication of Alcoholism or Drug Abuse (such as cirrhosis of the liver, delirium tremens, detoxification or hepatitis), the Plan shall cover such confinement to the same extent as for any other Illness.

(F)    <u>Treatment Facilities</u>

To qualify as a treatment facility, an institution or a unit of a Hospital shall meet all applicable licensing standards of the jurisdiction in which it is located and shall:

(i)    primarily engage in providing, for compensation from its patients and on a full-time basis, a program for diagnosis, evaluation, and effective treatment of Alcoholism or Drug Abuse, whichever condition is being treated;

(ii)    provide all medical detoxification services necessary as an adjunct to its effective treatment programs continuously on a 24-hour basis;

(iii)    provide all normal infirmary-level medical services required for the treatment of any Illness or Injury manifested during the treatment period, whether or not related to the Alcoholism or Drug Abuse, continuously on a 24-hour basis; and provide, or have an agreement with a Hospital in the area to provide, any other medical services that may be required during the treatment period;

(iv)    function under the supervision of a staff of Physicians on a continuous 24-hour basis and provide skilled nursing services by licensed nursing personnel under the direction of a full-time Nurse; and

      (v)     prepare and maintain a written individual plan of treatment for each patient based on a diagnostic assessment of the patient's medical, psychological and social needs with documentation that the plan is under the supervision of a Physician.

(3)    <u>Covered Mental and Nervous Disorder, and Alcoholism or Drug Abuse Outpatient Expenses</u>

    (A)    Covered Expenses for Mental and Nervous Disorders include treatment of Mental and Nervous Disorders provided on an outpatient basis by a Mental Health Practitioner.  Covered expenses include:

        (i)     psychological testing;

        (ii)    prescription drugs;

        (iii)   laboratory tests;

        (iv)   drug screening; and

        (v)     individual or group therapy.

Outpatient charges shall not be covered for visits in excess of 50 outpatient visits per calendar year.

    (B)    Covered Expenses for Alcoholism or Drug Abuse include Effective Treatment of Alcoholism or Drug Abuse provided on an outpatient basis by a Mental Health Practitioner.  Covered expenses include:

        (i)     psychological testing;

        (ii)    prescription drugs;

        (iii)   laboratory tests;

        (iv)   drug screening; and

        (v)     individual or group therapy.

Outpatient charges shall not be covered for visits in excess of 30 outpatient visits per calendar year.

(m)    <u>Chiropractic Care</u>

Subject to the Article XII and the limitations herein, Covered Expenses shall include expenses incurred for chiropractic care as provided below.

(1)    Covered Expenses for chiropractic care consists of expenses incurred for the following:

    (A)    the initial office visit including patient history, examination and diagnostic X-rays;

    (B)    follow-up visits for manipulation for treatment of spinal maladjustments or subluxation.

(2)    Chiropractic care shall not include a follow-up visit unless a chiropractic manipulation is performed during the visit. Chiropractic care shall be limited to 20 visits per calendar year and shall be limited to two additional modalities per day in addition to the chiropractic manipulation. Chiropractic care shall not include expenses for laboratory tests.

(n)    <u>Temporomandibular Joint (TMJ) Dysfunction Treatment</u>

Subject to Article XII and the limitations herein, Covered Expenses shall include expenses for TMJ treatment as provided herein. Charges by a Physician or Dentist for diagnostic services and Medically Necessary treatment which is recognized by the dental profession as effective and appropriate treatment for TMJ dysfunctions and its symptoms. Covered Expenses for TMJ treatment are payable up to a Lifetime Maximum Benefit of $2,500.

(o)    <u>Surgical Sterilization Expenses</u>

Subject to Article XII and the limitations herein, Covered Expenses shall include expenses for surgical sterilization. Covered Expenses shall be payable in an amount equal to the actual charge, up to the negotiated fee or to the extent Usual and Customary. Covered Expenses incurred for surgical sterilization include charges for a vasectomy or tubal ligation.

(p)    <u>Maternity Services</u>

Subject to Article XII and limitations herein, Covered Expenses for Maternity Services shall include those expenses specified below:

(1)    Hospital and Birthing Center charges and Physician fees for Medically Necessary maternity services;

VI/42

(2)  amniocentesis or chorionic villus sampling for pregnant women if the procedure is Medically Necessary as determined by the Utilization Management Program; and

(3)  termination of pregnancy for a female Employee, Retiree, or spouse.

## 6.03  Second Surgical Opinion

(a)  Subject to Article XII and the limitations herein, Covered Expenses shall include expenses for a second surgical opinion. Covered Expenses shall include consultation with a Physician and for tests in connection with determining whether proposed non-emergency, elective surgery is Medically Necessary. Covered Expenses incurred for a third surgical opinion also shall be payable if the second surgical opinion does not confirm the need for the proposed surgery. Services that may be provided in connection with a second surgical opinion may include, but are not limited to, an examination by a Physician, x-ray and lab work, and a written report by the Physician who renders the opinion.

(b)  Covered Expenses for a second surgical opinion shall not include the following:

(1)  consultation with a Physician who is not certified as a specialist in the medical field of the proposed surgery;

(2)  more than two consultations in connection with the proposed surgery;

(3)  a consultation with a Physician or associate of the Physician who performs the surgery or has a financial interest in the outcome of the recommendation;

(4)  a consultation in connection with proposed surgery for which a surgical benefit would not be payable under the Plan;

(5)  a consultation unless the patient is examined in person by the Physician rendering the second or third medical opinion; or

(6)  a consultation obtained after surgery is performed.

## 6.04  Comprehensive Medical Benefit Limitations

Covered Expenses for comprehensive medical benefits shall not include the following:

(a)  routine physical examinations;

VI/43

(b)     eye refraction unless following accidental injury, eyeglasses, contact lenses, lens implants or the fitting thereof except as necessary in connection with cataract surgery (see Vision Care, Article VIII);

(c)     charges for furniture installation, set-up, or maintenance or modifications to home or car (see Section 6.02(d)(2), limitation on Durable Medical Equipment);

(d)     pregnancy, childbirth or miscarriage of an Employee or Dependent spouse unless it occurs while the mother is an Eligible Person;

(e)     educational training for natural childbirth;

(f)     charges for delivery by a Physician for the same delivery services rendered by a Nurse-Midwife unless the Physician's services are rendered as a result of complication of pregnancy.  Complication of pregnancy means any pregnancy other than one terminating by normal delivery or miscarriage; and

(g)     the pregnancy, childbirth, or miscarriage of a Dependent child unless treatment is necessary to save the life of the Dependent child or the pregnancy, childbirth or miscarriage is the result of violent or criminal acts.

## ARTICLE VII.  ANCILLARY MEDICAL BENEFITS

**7.01   General Wellness Benefit**

(a)   <u>Benefit Payable</u>

Subject to Article XII and the limitations herein, charges covered shall include expenses incurred for wellness care as shown in Appendix B.

(b)   <u>Routine Physical Exam Expenses</u>

(1)   Charges covered are Physician charges related to routine physical examinations of an Eligible Person.  Charges covered include, but are not limited to:

(A)   x-rays, pap smears, laboratory and other tests,

(B)   immunizations for infectious disease; and

(C)   testing for tuberculosis.

(2)   To qualify as a charge covered, a routine physical examination must include at least:

(A)   a review and written record of the patient's complete medical history;

(B)   a check of all body systems;

(C)   a review and discussion of the examination results with patient or with the parent or guardian.

(3)   Limitations

Charges covered for wellness care shall not include the following:

(A)   for examinations given to Eligible Persons under the age of 12:

(i)   more than 5 examinations in the first 18 months of the child's life; and

(ii)   more than one examination in each year of life thereafter;

(B)   for examinations given to Eligible Persons age 12 and over, charges for more than the amount shown in Appendix B;

(C)   services which are covered to any extent under any other part of this Plan or under any other group plan of your Employer;

(D)   services which are for diagnosis or treatment of a suspected or identified Illness or Injury;

VII/45

(E)    examinations given while the person is confined in a Hospital or other place for medical care;

(F)    services which are not given by a Physician or under his direction;

(G)    medicines, drugs, appliances, equipment or supplies;

(H)    psychiatric, psychological, personality or emotional testing or examinations;

(I)    examinations in any way related to employment;

(J)    premarital examinations; or

(K)    vision, hearing or dental examinations.

## 7.02    Well Child Care

(a)    Subject to Article XII, Eligible Dependents, from birth through age 12, of an Eligible Employee are entitled to coverage for Well Child Care, including pediatric preventive health care services, to the extent provided in Appendix B.

(b)    Pediatric preventive health care consists of the following:

(1)    Physician's visits;

(2)    routine immunizations including, but not limited to, the following:

(A)    diphtheria/tetanus/pertussis (DTP);

(B)    measles/mumps/rubella (MMR);

(C)    poliomyelitis;

(D)    influenza; or

(E)    hepatitis.

## 7.03    Pap Smear and Mammogram Expense

Subject to Article XII, an Eligible Person is entitled to coverage for pap smear and mammogram expenses. Covered pap smear expenses consist of charges incurred for one routine pap smear each calendar year, or more often if recommended by a Physician. Covered mammogram expenses consist of charges incurred for one routine mammogram each calendar year between the ages of 40 and 75, or as recommended by a Physician.

VII/46

# ARTICLE VIII.  DENTAL BENEFITS

## 8.01    Benefit Payable

Subject to the Article XII and the limitations herein, an Eligible Person shall be entitled to a dental benefit.  Charges covered for dental care shall be subject to a Deductible and shall be payable as shown in Appendix C.

## 8.02    Dental Deductible

(a)    The dental Deductible shall be the Deductible listed in Appendix C and shall apply separately to each Eligible Person.

(b)    The family Deductible shall be the family Deductible listed in Appendix C and shall apply to each Eligible Employee and his Eligible Dependents.  When the family Deductible is met, each Eligible Person in the family will be considered to have met the dental Deductible.

## 8.03    Advanced Claim Review

Whenever charges for a proposed dental service or series of services are expected to exceed $300, an Eligible Person shall have the Dentist submit a claim form showing the recommended treatment and fees, together with diagnostic X-rays to the claims administrator for review.  The Eligible Person shall be notified of the claims administrator's determination regarding coverage of the recommended course of treatment.  The claims administrator's determination shall indicate the extent to which an Eligible Person would be reimbursed for the recommended treatment and fees.

## 8.04    Covered Dental Care

Charges covered for dental care include expenses incurred for the treatment of abnormalities, Illness or Injury of the teeth and their surrounding structure, the restoration and replacement of defective or missing teeth, and preventive care as follows:

VIII/47

(a)    Class I Diagnostic and Preventive Services:

   (1)    Prophylaxis:  Professional cleaning and scaling of teeth, for two services performed in any period of 12 consecutive months.

   (2)    Oral Examination:  Two examinations in any period of 12 consecutive months.

   (3)    Topical Fluoride Application (for individuals under 15 years of age):  One series of treatments during any period of 12 consecutive months.

   (4)    Space Maintainers:  An oral appliance for a child after early loss of a first tooth to prevent other teeth from drifting, while maintaining sufficient space for a permanent tooth to emerge.

   (5)    X-Rays:

      (A)    One complete series of intra-oral radiographs (with or without bitewings) during any 36-month period;

      (B)    Single intra-oral radiographs:  periapical, bitewing and occlusal, limited to two charges for bitewings during any 12 month period;

      (C)    Extra-oral radiographs:  posteroanterior and lateral skull and facial bone - survey film;

      (D)    Extra-oral radiographs:  temporomandibular joint - single film; and

      (E)    Extra-oral radiographs:  panoramic maxillary and mandibular - single film.

   (6)    Topical application of sealants on a posterior tooth (for individuals under 15 years of age):  One treatment per tooth during any period of 36 consecutive months.

(b)    Class II Restorative Services:

   (1)    Fillings:  Dental restorations inserted in the teeth, including amalgam, silicate, acrylic, plastic, or composite resin (gold fillings, if used, are included under subsection (c) below covered as a Class III Restorative Service);

   (2)    Periodontics:  Treatment of diseases of the gums and supporting structures of the teeth;

   (3)    Endodontics:  Treatment of the dental pulp including root canal therapy;

   (4)    Extractions:  Simple extractions and surgical extractions of the natural teeth;

VIII/48

(5)    Anesthetics:  When Medically Necessary and administered in connection with oral or dental surgery;

(6)    Oral Surgery:  Excision of impacted teeth, excision of tooth root without extraction of entire tooth, and other procedures on the gums and tissues not performed in connection with the extraction of teeth;

(7)    Prosthodontics:  First installation of full and partial removable dentures including any precision attachments, and/or replacement of an existing removable denture or fixed bridgework by a new denture or by adding of teeth to a partial removable denture;

(8)    Repair of Prosthodontics:  Repair or recementing of crowns, inlays, bridgework, or dentures; relining of dentures;

(9)    Drugs:  Prescription drugs, including injection of antibiotic drugs by the attending Dentist; and

(10)   Relining of dentures.

(c)    Class III Restorative Services:

(1)    Inlays/Onlays:  Dental restorations inserted in or on the teeth including gold and porcelain inlays;

(2)    Crowns:  Restoration covering the whole exposed portion of a tooth, including plastic, acrylic, gold, porcelain, or stainless steel;

(3)    Prosthodontics:  Installation of full and partial fixed bridgework including any precision attachments, and/or replacement of an existing removable denture or fixed bridgework by a new fixed bridgework;

(d)    Orthodontics:  Subject to Section 8.06, preventive and corrective treatment of dental irregularities (crooked teeth) which result from growth, and which require repositioning to establish occlusion or appearance, payable up to the maximum shown in Appendix C.

(e)    If Hospital confinement is required due to a dental Injury or Illness, inpatient Hospital expenses and expenses for the Dentist and/or anesthesiologist shall be payable under Article VI.

**8.05    Limitations**

Charges covered for dental care shall not include the following:

(a)    more than one set of diagnostic X-rays during any 36-month period, except X-rays required to diagnose a specific condition or its treatment;

(b)    more than one charge for bitewings during a 6-month period;

(c)    a consultation if another service is rendered to the Eligible Person on the date of the consultation or during the three-month period immediately following the date of the consultation;

(d)    replacement of a lost or stolen prosthetic device;

(e)    dental services and supplies rendered solely for cosmetic purposes unless required as a result of an Illness or Injury sustained while an Eligible Person under the Plan or unless expressly provided otherwise including personalization or characterization of dentures;

(f)    treatment by anyone other than a Dentist, except that cleaning, scaling, and polishing of teeth may be performed by a licensed dental hygienist if the services are rendered under the supervision and direction of a Dentist, but no more than two such services performed in any 12 consecutive month period;

(g)    more than one oral examination in any six consecutive month period;

(h)    replacement of an existing partial or full denture, splint, or fixed bridgework, or the addition of teeth to an existing partial removable denture or bridgework to replace extracted natural teeth unless:

(1)    the replacement or addition of teeth is required to replace natural teeth extracted while covered under the Plan;

(2)    a period of five years has elapsed since the initial installation and the existing bridgework cannot be made serviceable; or

(3)    the existing denture is an immediate temporary denture and replacement is required and takes place within 12 months immediately following the installation of the immediate temporary denture;

(i)    crowns and/or inlays installed as multiple abutments and splints for periodontal treatment if a claim under the Plan has been paid toward the cost of the crown and/or

VIII/50

inlay originally installed, unless a period of three years has elapsed from the initial installation of the replaced crown or inlay;

(j)     a prosthetic appliance, fixed or removable, used as an adjunct to periodontal treatment, unless the appliance replaces a missing tooth, if a claim under the Plan has been paid toward the cost of the appliance originally, unless a period of at least three years has elapsed since the initial installation of the prosthetic appliance;

(k)     a drug, medicine or supply intended for personal hygiene, such as toothpaste and cleaning devices;

(l)     charges for plaque control programs;

(m)     charges for implantology;

(n)     charges in excess of UC;

(o)     charges for crowns and pontics placed on, or replacing, teeth other than the ten upper and lower anterior teeth;

(p)     charges for orthodontic treatment, including correction of malocclusion, except as provided in Section 8.04(d);

(q)     charges for services performed or prosthetic devices, bridges or crowns ordered and/or fitted prior to the date the person became an Eligible Person under this Plan, or which were ordered while the patient was an Eligible Person but are installed or delivered more than 30 days after coverage terminated;

(r)     charges for the replacement of a tooth that was missing at the time the patient became an Eligible Person under this Plan, unless coverage for the Eligible Person has been in effect for at least 24 consecutive months;

(s)     charges for a plan of treatment, where a less expensive plan of treatment may be utilized to achieve a resolution of the dental problem;

(t)     charges covered under the medical benefits provided with this Plan; and

(u)     charges for the treatment of Temporomandibular Joint (TMJ) dysfunction.


**8.06     Orthodontic Limitations**

(a)     If orthodontic treatment is terminated, benefits shall be paid for services incurred through the date of termination.  If orthodontic treatment is resumed, benefits shall

VIII/51

again be payable but only to the extent that the total charges covered do not exceed the maximum orthodontic benefit shown in Appendix C.

(b)     Orthodontic benefits shall be payable only for charges incurred during the periods in which coverage is in force.

(c)     No orthodontic benefit shall be payable for replacement or repair of orthodontic appliances.

VIII/52

## ARTICLE IX.  VISION BENEFITS

### 9.01    Vision Care Benefit

Subject to Article XII and the limitations herein, Eligible Persons shall be entitled to a vision care benefit.  Charges covered  for vision care shall be payable up to the maximum(s) listed in Appendix D.  Charges covered for vision care includes expenses incurred for any service or supply shown in Appendix D which is furnished or prescribed by a duly licensed ophthalmologist or optometrist.  Charges covered include but are not limited to:

(a)    one examination or vision analysis in a 12-month period performed by a licensed optometrist or ophthalmologist;

(b)    prescription contact lenses following cataract surgery or where necessary to correct visual acuity or for cosmetic purposes if new lenses are required because of a change in prescription; and

(c)    one pair of prescription contact lenses or prescription eyeglass lenses (including bifocals or trifocals) with frames, if needed, including oversize or plastic lenses.

### 9.02    Limitations

Charges covered for vision care shall not include the following:

(a)    a vision care service or supply which is a covered expense in whole or in part under any other part of this Plan or under any other plan of group benefits provided through your Employer;

(b)    a vision care service or supply for which a benefit is provided in whole or in part under any workers' compensation law or any other law of like purpose;

(c)    special procedures, such as orthoptics or vision training;

(d)    special supplies, such as nonprescription sunglasses and subnormal vision aids;

(e)    anti-reflective coatings;

(f)    tinting;

(g)    prescription sunglasses or light sensitive lenses in excess of the amount which would be covered for non-tinted lenses;

IX/53

(h)    an eye exam which is required by an employer as a condition of employment, or which an employer is required to provide under a labor agreement, or which is required by any law of a government;

(i)    replacement of lenses or frames that are lost or stolen or broken;

(j)    duplicate or spare eyeglasses or lenses or frames for them;

(k)    a service or supply received while the person is not covered; and

(l)    lenses and frames furnished or ordered because of an eye exam performed before the date the person becomes covered.

IX/54

# ARTICLE X.  PRESCRIPTION DRUG BENEFITS

## 10.01  Prescription Drug Coverage

Subject to the Article XII and the limitations herein, an Eligible Person shall be entitled to prescription drug benefits.  Covered Expenses incurred for prescription drugs include legend drugs, injectable insulin, or other State-controlled drugs which, by law, must be prescribed by a Physician and dispensed by a licensed pharmacist.

## 10.02  Limitations

Covered Expenses for prescription drugs shall not include the following:

(a)     a non-legend patent or proprietary drug, medicine or medication not requiring a prescription, except insulin, unless the drug, medicine, or medication is a compound of two or more drugs, medicines, or medications, which compound, by law, must be prescribed;

(b)     separate charges for medication, legend or non-legend, that is consumed or administered, in whole or in part, at the place where it is dispensed; and

(c)     nonprescription drugs and vitamins, minerals, laetrile, enzymes, diet foods, or dietary supplements whether prescribed or not;

(d)     a drug that is not F.D.A.-approved.

## 10.03  Right to Inquire

To ensure the appropriate use of prescription drug coverage, the Committee shall have the right to inquire into the facts and circumstances of an Eligible Person's purchase under the Plan of any prescription drug, including prescription and refill details.

X/55

## ARTICLE XI.  NONMEDICAL BENEFITS

### 11.01  Life Insurance Benefit

(a)     Benefit Payable

Subject to the Article XII and the limitations herein, an Eligible Employee shall be entitled to a life insurance benefit payable to the Eligible Employee's designated Beneficiary upon the death of the Eligible Employee.  The benefits shall be payable by an insurance company selected by the Board of Trustees, and the benefits and terms under which they are provided shall be subject to the terms of the insurance policy, which is incorporated herein by reference, and as may be amended from time to time.

(1)     If a husband and wife are both Eligible Employees, this Plan shall be considered two separate plans for purposes of this Section 11.01.

(2)     If the life insurance benefit is payable to a minor, it may be paid to the legally appointed guardian of the minor or, if there is no guardian, to the adult(s) assuming physical custody and principal support of the minor.

(3)     Designated Beneficiary

Designated Beneficiary means the person(s) named by an Eligible Employee to receive benefits under the Plan.

(4)     Procedure for Naming a Designated Beneficiary

The naming of a designated Beneficiary shall be in writing on a form provided by the Committee, and may be changed from time to time.  No designation or change shall be binding unless it is received by the Committee in the required form.  Upon receipt, it shall be effective as of the date of execution but without prejudice to the Fund on account of a payment made or an action taken or permitted by the Fund before receipt of the designation or change.  Consent of the designated Beneficiary shall not be required to change the designation.

(5)     Distribution to Multiple Beneficiaries

If more than one beneficiary is named, the beneficiaries shall share the life insurance benefit equally.  If a beneficiary predeceases the Eligible Employee or if one beneficiary predeceases the other, any remaining beneficiaries shall share the life insurance benefit equally.

(6)     Failure to Name a Designated Beneficiary

If, at the time of an Eligible Employee's death, a beneficiary designation has not been filed with the Committee, or if the designated Beneficiary does not survive the Eligible Employee, the life insurance benefit (or portion thereof) for which there is no designated Beneficiary shall be payable as follows:

(A)     to the surviving spouse, if any, of the Eligible Employee; if there is no surviving spouse,

(B)     to the surviving child(ren), if any, of the Eligible Employee in equal shares; if no surviving spouse or no surviving child(ren),

(C)     to the surviving parent(s), if any, of the Eligible Employee in equal shares; if no surviving spouse, child(ren), or parents,

(D)     to the estate of the Eligible Employee.

(b)     Limitations

No life insurance benefit shall be payable unless a certified copy of the death certificate and written request for the life insurance benefit is provided to the Committee within the period stated in Section 12.02(d).


**11.02  Accidental Death and Dismemberment**

(a)     Benefit Payable

Subject to Article XII and the limitations herein, an Eligible Employee who suffers accidental death or dismemberment shall be entitled to a benefit based on the loss suffered.  The accidental death benefit shall be payable to the Eligible Employee's designated Beneficiary in addition to the life insurance benefit payable under Section 11.01 hereof, and shall be payable by an insurance company selected by the Board of Trustees, and the benefits and terms under which they are provided shall be subject to

XI/57

the terms of the insurance contract.  The dismemberment benefit shall be payable to the Eligible Employee through an insurance company selected by the Board of Trustees, and the benefits and terms under which they are provided shall be subject to the terms of the insurance contract.  Payment of the accidental death and dismemberment benefit shall be made in accordance with the claims procedure under Section 12.02.  The designated Beneficiary shall be named in accordance with Section 11.01(a)(4).

(b)    Limitations

No accidental death or dismemberment benefits shall be payable:

(1)    unless the death or dismemberment is suffered within 13 weeks of an external, violent and accidental means;

(2)    unless, for the loss of a hand or foot, severance is at or above the wrist or ankle joint;

(3)    unless, for loss of an eye, sight is lost totally and irrevocably; or

(4)    if the death or dismemberment results directly or indirectly from the following:

(A)    bodily or mental infirmity;

(B)    suicide or intentionally self-inflicted Injury;

(C)    war or any act of war;

(D)    non-commercial air travel;

(E)    an Illness, ptomaine, or bacterial infection (except a pyogenic infection that occurs with and through an accidental cut or wound); or

(F)    medical or surgical treatment, unless required as the result of an Injury sustained by an Eligible Employee while coverage was in effect under the Plan.

## 11.03  Weekly Disability Benefit

(a)    Benefit Payable

Subject to the Article XII and the limitations herein, an Eligible Employee who becomes Disabled as a result of a non-occupational Injury or Illness shall be entitled

XI/58

to a weekly disability benefit.  A non-occupational Injury or Illness is one that does not arise out of or in the course of employment and is not compensable under workers' compensation laws or similar laws.  The benefit payable shall be paid by the Fund in accordance with the Schedule of Benefits set forth in Appendix E.

(b)    Payment of Benefit

Payment of the weekly disability benefit shall be made in accordance with Section 12.02 hereof and shall commence as provided in Appendix E.  The weekly disability benefit shall be payable to the Eligible Employee, if living, but  if not, to the Eligible Employee's designated Beneficiary pursuant to Section 11.01(a).

(c)    Successive Periods of Disability

Successive periods of Disability shall be considered a single period of Disability unless the Eligible Employee returns to full-time work in Covered Employment for at least two weeks or unless the later period of Disability is due to an Injury or Illness entirely unrelated to the cause(s) of the earlier period of Disability.

(d)    Limitations

No weekly disability benefit shall be payable for or on account of a period of Disability:

(1)    which commences prior to the date the Eligible Employee comes under the care of a Physician;

(2)    if the Eligible Employee performs work of any kind for compensation or profit; or

(3)    if the Eligible Employee is retired and receiving a pension from a qualified retirement plan accrued while working in the graphic communications industry, unless the Retiree returns to work and meets the eligibility requirements as a new Employee under Article III.

(e)    Right to Recover

An Eligible Employee who recovers from a Disability must notify the Committee of recovery within a reasonable period of recovery, and any disability payments received after the date of recovery must be returned to the Fund.  The amount of

XI/59

overpayments plus a reasonable interest charge shall be deducted from any subsequent benefit payments from the Fund until the overpayment is returned to the Fund.

(f)    Proof of Disability

To determine eligibility for Disability or whether Disability is to continue, the Committee reserves the right to request updated medical reports or to require the Eligible Employee to submit to periodic physical examinations by a Physician selected by the Committee and paid for by the Fund.  Failure to furnish updated medical reports as requested by the Committee, or failure to submit to a periodic physical examination, may result in the termination of weekly disability benefits for the Eligible  Employee.

XI/60

# ARTICLE XII.  GENERAL EXCLUSIONS

## 12.01  Comprehensive Medical Benefits, Ancillary Medical Benefits and Other Medical Benefits

(a)   No benefits shall be payable as a comprehensive medical benefit under Article VI hereof, an ancillary medical benefit under Article VII hereof, or as a benefit under Articles VIII, IX and X, hereof, unless the charge incurred is a Covered Expense.

(b)   Covered Expenses under Articles VI, VII, VIII shall not include charges incurred in connection with the following:

    (1)   medical services or supplies, including prescription drugs, considered educational, Experimental or Investigational Medical Treatment, including any treatment, drug, or supply that is not recognized as acceptable or legal medical practice in the United States or any items requiring governmental approval not granted at the time service is rendered;

    (2)   medical services or supplies available without cost or which are not legally required to be paid for in absence of the Plan;

    (3)   medical services or supplies furnished in or by a Federal, State, or local government, agency, or program or in or by a Hospital or institution owned thereby unless required by law;

    (4)   medical services or supplies, including prescription drugs, furnished in or by a nursing home, sanatarium, rest home, convalescent home, extended care facility or similar establishment unless it satisfies the definition of Convalescent Facility as set forth in Section 2.09;

    (5)   private duty nursing care, unless ordered by a Physician and determined to be Medically Necessary, custodial care, or domiciliary care regardless of the facility where provided;

    (6)   medical services or supplies furnished by an individual who ordinarily resides in the patient's home or is related to the patient by blood or marriage;

    (7)   transsexual surgery;

    (8)   services to reverse voluntary, surgically induced infertility;

(9)    therapeutic devices, including, but not limited to, hypodermic needles, syringes, support garments, or other nonmedical substances purchased for self-use, except paraphernalia necessary for the administration of insulin;

(10)    replacement or repair of a prosthetic appliance unless outgrown;

(11)    orthotics: orthopedic shoes (except when joined to braces) or supportive devices for the feet, including, but not limited to, arch supports and heel lifts;

(12)    routine care of feet, including callus or corn paring, trimming or excision of toenail, or treatment of chronic conditions of the foot including, but not limited to, weak or fallen arches, flat or pronated foot metatarsalgia, or foot strain;

(13)    disturbances of the temporomandibular joint (TMJ), except as provided in Section 6.02(n);

(14)    radial keratotomy;

(15)    acupuncture;

(16)    Alcohol or Drug Abuse except as provided in Section 6.02(l) hereof;

(17)    Organ Transplants, except as provided in Section 6.02(g);

(18)    orthodontic supplies or services except as provided in Article VIII;

(19)    therapy for marriage-related problems;

(20)    physical, occupational, myofunctional therapy, or pulmonary rehabilitation, except following Illness or Injury;

(21)    learning disabilities, mental retardation, developmental delay, attention deficit disorder, autistic disease of childhood, behavioral problem, special education;

(22)    hypnotism, stress management, or goal-oriented behavior modification therapy;

(23)    exogenous obesity;

(24)    cosmetic, plastic, or reconstructive surgery, except to repair or alleviate damage resulting from or caused by Injury, or congenital defect as provided in Section 6.02(b)(3), or disfigurement related to disease, incurred while covered under this Plan;

(25)    construction, services, purchase or rental of supplies, appliances, or equipment for personal hygiene, beautification, comfort or convenience including, but not

XII/62

limited to, cosmetics, air conditioners, dehumidifiers, health club fees, vaporizers, heaters, speech teaching aides, Braille training tests, exercise equipment, whirlpools, tanning beds, water beds, telephones, televisions, or other items not essential for treatment of an Illness or Injury;

(26)   travel or lodging, whether or not recommended by a Physician, except as provided for Organ Transplant purposes under Section 6.02(g)(2)(C);

(27)   transportation of a family member or medical personnel, equipment or supplies, except local ambulance service and transportation as provided in Sections 6.02(c)(8) and (g)(2) hereof;

(28)   hearing aids;

(29)   fees for services and supplies in excess of the negotiated fee or the Usual and Customary level;

(30)   expenses that are not Medically Necessary unless specifically stated elsewhere;

(31)   vision care, except as provided in Article IX;

(32)   expenses that are not ordered by a Physician or a Dentist with respect to Dental benefits;

(33)   services rendered primarily for training or educational purposes;

(34)   services or supplies rendered, to the extent that benefits are available under personal injury protection or compulsory medical payments provisions of any motor vehicle insurance contract required under federal or state no-fault motor vehicle insurance, whether or not the patient properly asserts his rights under such motor vehicle insurance contract;

(35)   charges paid or payable by another plan as provided in Article XIII hereof;

(36)   Dental care, except as provided in Articles VI and VIII; and

(37)   Covered Expenses incurred prior to the date of an Eligible Person's coverage under the Plan.

XII/63

**12.02  Medical and Nonmedical Benefits**

No benefits under Article VI, ancillary medical benefits under Article VII, supplemental medical benefits under Articles VIII, IX, and X, or nonmedical benefits under Article XI shall be payable for or in connection with the following:

(a)  an Injury or Illness or services or supplies that arise out of or in the course of employment and that are compensable under workers' compensation, occupational disease, or similar laws, whether or not the right therefor is asserted, except as may be provided as a nonmedical benefit under the Plan;

(b)  an Injury or Illness resulting from past or present military service or caused by or arising from an act of war, whether declared or not, or a conflict involving armed forces;

(c)  third party liability claims, except as provided in Section 13.03 hereof;

(d)  claims not submitted within one year of the time the service was rendered or the event occurred; or

(e)  charges for failure to keep a scheduled appointment or for the completion of any form.

# ARTICLE XIII.  COORDINATION OF BENEFITS

## 13.01  General

Benefits payable under this Plan for expenses of an Eligible Person who is covered under another Health Plan shall be coordinated so that the total amount payable from all plans shall not exceed 100 percent of Covered Expenses or expenses actually incurred, whichever is the lesser amount. When this Plan is a Secondary Plan, this Plan shall provide benefits for Covered Expenses that were not paid under the Primary Plan or any other Health Plan, subject to any Co-payment, Deductible, and Coinsurance amounts.  In no event shall the benefits provided by this Plan exceed the benefits that would have been provided by this Plan as the Primary Plan.

## 13.02  Definitions

For purpose of this Article, certain terms are defined as follows:

(a)     "Primary Plan" means a Health Plan which is responsible for payment of Covered Expenses first without regard to benefits payable by any other Health Plan.

(b)     "Secondary Plan" means any Health Plan which is responsible for payment of Covered Expenses following payment by the Primary Plan.

## 13.03  Order of Responsibility

The following shall be the order of responsibility for payment of Covered Expenses:

(a)     Any Health Plan which does not have a coordination of benefits provision shall be the Primary Plan and this Plan shall be the Secondary Plan.

(b)     Any Health Plan, including this Plan, which covers the Eligible Person as an Employee shall be the Primary Plan, and any Health Plan which covers the Eligible Person in any other capacity shall be the Secondary Plan for purposes of providing benefits on behalf of the Employee.

(c)     Any Health Plan, including this Plan, which covers the Eligible Person in any capacity other than as a Dependent shall be the Primary Plan, and a Health Plan

which covers the Eligible Person as a Dependent shall be the Secondary Plan for purposes of providing benefits to that Dependent.

(d)     Any Health Plan, including this Plan, which covers a child as a Dependent of the person whose birthday falls earlier in the calendar year shall be the Primary Plan, and any Health Plan covering the child as a Dependent of the person whose birthday falls later in the calendar year shall be the Secondary Plan for purposes of providing benefits on behalf of such Dependent child.  This provision shall apply only if the other Health Plan also follows the "birthday rule."

(e)     In cases of divorce or legal separation:

(i)     If the parent with legal custody of the child has not remarried, the benefits of the Health Plan which covers the child as a Dependent of the custodial parent shall be the Primary Plan and the Health Plan which covers the child as a Dependent of the noncustodial parent shall be the Secondary Plan for purposes of providing benefits on behalf of such Dependent child.

(ii)    If the custodial parent of the child has remarried, the benefits of the Health Plan which covers the child as a Dependent of the custodial parent shall be the Primary Plan and the Health Plan which covers the child as a Dependent of the custodial parent's spouse shall be the Secondary Plan for purposes of providing benefits on behalf of the Dependent child.  The Health Plan which covers the child as a Dependent of the noncustodial parent shall pay benefits after the Secondary Plan for purposes of providing benefits on behalf of the Dependent child.

(iii)   Notwithstanding these provisions, if a court order, judgement or decree establishes financial responsibility for the medical, dental, or other health care expenses of a child, the benefits of the Health Plan designated by the court to cover the child shall be the Primary Plan.  Any other Health Plan which covers that child as a Dependent shall be the Secondary Plan or pay after the Secondary Plan pursuant to the foregoing for purposes of providing benefits on behalf on the Dependent child.

XIII/66

(f)     Where the order of responsibility cannot be determined pursuant to the provisions set forth above, the Health Plan which has covered the Eligible Person for the longest period of time shall be the Primary Plan, and the Health Plan which has covered the Eligible Person for shorter periods of time shall be the Secondary Plan for purposes of providing benefits on behalf of the Eligible Person.

(g)     Where there are two or more Secondary Plans, the order of responsibility in subsections (a) through (f) above shall be repeated until this Plan's responsibility has been determined with respect to each other Health Plan.

(h)     When this Plan is the Primary Plan, the benefits payable by any Secondary Plan shall be ignored for the purpose of determining the benefits payable under this Plan.

## 13.04  Coordination with No-fault Auto Insurance

Where Covered Expenses are payable by a no-fault automobile insurer, or other automobile insurer which pays without regard to fault, this Plan shall always be the Secondary Plan.

## 13.05  Coordination with Medicare

(a)     Certain Eligible Retirees shall be entitled to benefits, supplemental to those provided by Medicare, to the extent provided in Appendix F.  Coordination with Medicare for Eligible Retirees not covered in Appendix F is provided in Section 13.05(b).

(b)     Medicare shall be the Secondary Plan with respect to any Eligible Employee who is Medicare-eligible and with respect to any Dependent of such Eligible Employee, except with respect to a Dependent who is eligible for Medicare.  Medicare shall be the Primary Plan with respect to an Eligible Retiree and any Dependent who is Medicare-eligible.

## 13.06  Coordination with Champus

In any case in which a Eligible Person is also eligible for coverage under the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), CHAMPUS shall be the Secondary Plan.

XIII/67

**13.07  Right to Information**

For the purpose of determining the applicability of, and implementing the terms of this provision or any provision of similar purpose of any other Health Plan, the Committee without the consent of or notice to any person, may release to or may obtain from any insurance company, organization or person any information which the Committee deems necessary for such purposes.  Any individual claiming benefits from this Plan shall furnish, upon request, to the Committee in writing such information as may be necessary to implement this provision.  This Plan shall not be required to determine the existence of any other Health Plan or the amount of benefits for Covered Expenses payable under any other Health Plan.     Should the Committee not be provided with full and complete information, the Committee reserves the right to withhold any and all benefit payments until such information is provided.

**13.08  Right to Make Payments**

Whenever payments which should have been made under this Plan in accordance with this Article have been made under any other Health Plan, the Committee shall have the right, exercisable alone and at its sole discretion, to pay over to any organization making such other payments or, if appropriate, to an Eligible Person, any amounts it shall determine to be warranted in order to satisfy the intent of this Article, and amounts so paid shall be deemed to be benefits provided under this Plan and, to the extent of such payments, this Plan shall be fully discharged from liability.

**13.09  Right to Recover Payments**

Whenever payments have been made by this Plan of Covered Expenses in an amount in excess of the maximum amount of payment necessary at that time to satisfy the intent of this provision, irrespective of to whom paid, the Fund shall have the right to recover such payments, to the extent of such excess, from one or more of the following, as the Committee shall determine:  any person to or for or with respect to whom such payments were made, any parties, provider, insurance company, or any other entity.

## ARTICLE XIV.  CLAIMS PROCEDURES, APPEALS AND ARBITRATION

**14.01  Payment of Claims**

All benefits shall be payable by the Plan upon receipt of a claim by the Fund in a form satisfactory to the Committee.  Benefits shall be payable directly to the Eligible Person unless otherwise provided in a Qualified Medical Child Support Order, pursuant to Section 3.03(e) hereof, or unless otherwise approved by the Committee.

**14.02  Timeliness of Claims**

Benefits will be paid by the Plan only if notice of claim is made by or on behalf of the Eligible Person within one year from the date on which expenses with respect to the claim are first incurred, unless the Committee finds that there are extenuating circumstances which may have prevented a timely filing.

**14.03  Denial of Claims**

(a)     If a claimant has not received a decision on a claim for benefits within 90 days, the claimant may request a review of the claim.

(b)     If a claim is denied in whole or in part, the claimant shall be notified in writing within 90 days of receipt of the claim and given an opportunity for a review.  The notice shall state the following:

   (i)      specific reason(s) for the denial;

   (ii)     a reference, when appropriate, to the specific Plan provision(s) on which the denial is based;

   (iii)    a description of any additional material or information required to process the claim and an explanation of why such material or information is needed; and

   (iv)    an explanation of the Plan's claim review procedures and the claimant's right to seek review.

Such notice shall be provided to the claimant no later than ninety days after the receipt by the Committee of the claim unless special circumstances require an

XIV/69

extension of time for processing the claim. If such special circumstances exist, written notice of the extension shall be furnished to the claimant prior to the termination of the initial ninety-day period, which notice shall indicate the circumstances requiring an extension as well as the date by which the Committee expects to render a decision. In no case shall an extension of time exceed a period of ninety days from the end of the initial period.

## 14.04  Appeal of Claims

(a)    Right of Appeal

Any individual (or his duly appointed representative) whose claim for benefits under this Plan has been denied, in whole or in part, or whose claim for benefits against the Plan otherwise is denied, may petition the Committee for review of the denial of claim.

(b)    Documentation for Appeals

The petition for review shall be in writing, and shall state the name and address of the claimant, the fact that the claimant is disputing the denial of claim giving the date of the notice of denial and, in clear and concise terms, the reason or reasons for disputing the denial. It shall be accompanied by any pertinent documentary material not already furnished to the Committee and shall be delivered or mailed to the Committee within 120 days after the date shown on the notice to the claimant of the denial. During such period, the claimant or his representative shall be provided an opportunity to review pertinent Plan documents upon written request to the Committee, and may submit issues or comments in writing. Upon good cause shown, the Committee shall permit the petition to be amended or supplemented.

(c)    Review or Hearing on the Appeal

The Committee shall grant a hearing on the petition to receive and hear any evidence or argument which cannot be presented satisfactorily by correspondence. The failure to file a petition for review in a timely manner or the failure to appear and participate in any such hearing shall constitute a waiver of the claimant's right to review of the denial. Such failure will not, however, preclude the claimant from establishing

XIV/70

eligibility for benefits at a later date based on additional information and evidence which was not available to the claimant at the time of the denial or hearing.

(d) <u>Decision by the Committee</u>

A decision by the Committee shall be made within 60 days of receipt of petition for review unless special circumstances require an extension of time for processing, in which case a decision shall be rendered as soon as possible, but not later than one hundred and twenty days (120) after receipt of the request for review. The claimant shall be advised of the decision in writing, stating the specific reasons for the decision in a manner calculated to be understood by the claimant and the specific references to the Plan provisions or other applicable rules upon which the decision is based. The decision of the Committee with respect to a petition for review shall be final and binding upon all parties, including the claimant and any person claiming under the claimant.

## 14.05  Claims and Review Procedure for Insured Benefits

(a) Notwithstanding anything to the contrary, if the benefit is provided through an insurance contract, any claim relating to a determination which is to be made by the insurer shall be made in writing to the insurer. If such claim is filed with an Employer or the Committee, it shall be forwarded to the insurer.

(b) Upon receipt by the claimant of written notice of denial of the claim or if the claim has not been granted within 120 days, the claimant may, not later than 90 days thereafter and after exhausting all appeal procedures of the insurer, file a written request with the Committee requesting that it conduct a full and fair review of such claim and the insurer's handling thereof, in accordance with the review procedures set forth in Section 14.04 above.

(c) The Committee shall file with the claimant, as well as the insurer, a written report of its review, not later than 60 days after the receipt of the claimant's request for review, unless special circumstances (such as the need to hold a hearing, if necessary) require an extension of time for processing, in which case the 60-day period may be extended for up to 120 days, provided written notice of the extension is given to the

claimant prior to the expiration of the 60-day period. If appropriate, the Committee's report may contain a request that the insurer review its disposition of the claim. Notwithstanding anything herein to the contrary, the Committee's review and report shall not be binding on the insurer.

(d)    If the Committee determines that the insurer's disposition of the claimant's claim is improper and that such disposition is not in the best interest of the Plan and the claimant, then the Committee may institute a lawsuit or take such other action which it deems appropriate against the insurer; provided, however, that no such suit or action shall be instituted or undertaken without the claimant's approval or joinder. The Committee's decision regarding whether or not the Plan shall institute such lawsuit or take such action shall be conclusive and binding upon all persons, including the claimant and his beneficiary; provided, however, that failure of the Plan to institute such lawsuit shall not prevent an Eligible Person from instituting, in an individual capacity, whatever action he may deem appropriate against the insurer.

# ARTICLE XV.  ADMINISTRATION

## 15.01  Appointment of the Committee

The general administration of the Plan and the responsibility for carrying out the provisions of the Plan shall be placed in the Committee, either the Executive Committee or a subcommittee of the Executive Committee of not less than four persons, two Union representatives and two Employer representatives, appointed from time to time by the Board of Trustees to serve at the pleasure of the Board of Trustees.  Any person who is appointed to the Committee shall signify his or her acceptance by filing a written acceptance with the Board of Trustees.  Any member of the Committee may resign by delivering his written resignation to the Board to Trustees.

## 15.02  Rights and Duties

The Committee shall administer and interpret the Plan and shall have the authority and discretion to take all actions and to make all decisions necessary and proper to carry out the Plan.  The determination of the Committee as to any questions involving the general administration and interpretation of the Plan shall be conclusive as to all parties thereto.  Any discretionary actions to be taken under the Plan by the Committee with respect to benefits under the Plan shall be uniform in nature and applicable to all persons similarly situated. Without limiting the generality of the foregoing, the Committee shall have the following powers and duties and the power to specifically delegate the following powers and duties:

(a)     to require any person to furnish such information as it may reasonably request for the purposes of the proper administration of the Plan as a condition of receiving any benefit under the Plan;

(b)     to make and enforce the rules and regulations and prescribe the use of such forms deemed necessary for the administration of the Plan;

(c)     to interpret the Plan and to resolve ambiguities, inconsistences, and omissions;

(d)     to decide on questions concerning the Plan and the eligibility of any Employee to participate;

XV/73

(e)     to determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan;

(f)     to maintain accounts showing the fiscal transactions of this Plan;

(g)     to appoint agents or other delegates to make payments or to execute or deliver documents on its behalf;

(h)     to employ such agents, counsel, consultants, and actuaries as may be required to assist in the administration of this Plan and to delegate such duties and powers of the Committee necessary to such persons to fulfill their role; and

(i)     to appoint a custodian to hold the Fund assets;

Each interpretation and decision made by the Committee in the fulfillment of their responsibilities under the Plan shall be final and binding on all parties unless a court with proper jurisdiction over the matter issues a final decision that the determination of the Committee was arbitrary, capricious, or made in bad faith and had no rational basis.

## 15.03  Reliance on Advisors

The Committee and any other person to whom it may delegate any duty or power in connection with administering this Plan shall be entitled to rely conclusively upon, and shall be fully protected in any action taken or suffered by them in good faith in reliance upon any actuary, accountant, counsel, specialist or other person selected by the Committee.

## 15.04  Fiduciary Responsibility and Indemnity

The Committee, the Fund, the Board of Trustees, and any officer, employee or agent of such shall not incur any liability individually or on behalf of any other individuals or on behalf of the Committee, the Fund, or the Board of Trustees for any act, or failure to act, made in the good faith performance of their duties in relation to the Plan or the Fund.  However, this limitation shall not act to relieve any such individual  or the Board of Trustees from a responsibility or liability for any fiduciary responsibility, obligation or duty under Part 4, Title I of ERISA.  The officers, employees and agents of the Committee,  the Fund and the Board of Trustees shall be indemnified directly or through purchase of insurance out of the good faith performance of their duties against any and all liabilities arising in relation to the

XV/74

Plan or the Fund, including without limitation, expenses reasonably incurred in the defense of any claim relating to the Plan or the Fund, and amounts paid in any compromise or settlement relating to the Plan or the Fund, except for actions or failures to act made in bad faith.

## 15.05  Administrative Expenses

All expenses incurred prior to termination of the Plan which arise in connection with the administration of the Plan, including but not limited to administrative expenses, compensation and other expenses and charges of any actuary, accountant, counsel, specialist, or other person who shall be employed by the Committee, the Fund or the Board of Trustees in connection with the administration of the Plan, shall be paid as administrative expenses by the Fund.

## ARTICLE XVI.  AMENDMENT OR TERMINATION OF PLAN

### 16.01  Amendment by the Board of Trustees

The Board of Trustees, by action taken at a meeting held either in person or by telephone or other electronic means, or by unanimous written consent in lieu of a meeting, reserves the right, at any time and from time to time, and retroactively if deemed necessary or appropriate but upon a nondiscriminatory basis:

(a)     to terminate, or amend or suspend the Plan for any reason, in whole or in part, and

(b)     to alter or postpone the method of payment of any benefits; and

(c)     to amend or rescind any other provisions of this Plan;

without the consent of any Employer or other person.

### 16.02  No Diversion of Assets

In the event this Plan is terminated, the Board of Trustees shall use any remaining funds to satisfy existing and arising claims for benefits under the terms of this Plan and to pay reasonable administrative expenses until such funds are exhausted.  Any remaining funds shall be used for the sole and exclusive purpose of providing benefits for Eligible Persons.

No amendment or suspension of the Plan shall be made which would cause the Fund assets either to be used or diverted for any purpose other than the exclusive benefit of Eligible Persons under the Plan, before satisfying all liabilities with respect to them, or to cause or permit the Fund assets to inure to the benefit of any private individual, except by payments made pursuant to the Plan for benefits hereunder.

### 16.03  Termination of the Plan

Upon termination of the Plan, the Board of Trustees shall direct that all remaining assets held with respect to the Plan shall be held in the Fund for payment of benefits to each Eligible Person to whom benefits are payable on the date of termination.

XVI/76

## ARTICLE XVII.  FUNDING

### 17.01  Funding of Benefits

The Plan is self-funded through a voluntary employees' beneficiary association within the meaning of Section 501(c)(9) of the Internal Revenue Code of 1986, as amended.  The Board of Trustees may, but shall not be required to, purchase and hold insurance contracts and policies to provide some or all of the benefits under this Plan.  Premium payments shall be made in such amounts and at such times, in accordance with the terms of each Collective Bargaining Agreement with the respective Union, as may be necessary to fund the cost of benefits or insurance coverage under the Plan.  Premium payments shall be forwarded by each Participating Local Union Fund to the Fund.

# ARTICLE XVIII.  MISCELLANEOUS

## 18.01  Agreement and Declaration of Trust

The provisions of these rules and regulations are subject to and controlled by the provisions of the Trust Agreement, and in the event of any conflict between the provisions of this Plan Document and the provisions of the Trust Agreement, the provisions of the Trust Agreement shall prevail.  Further, in the event of a conflict between this document and the summary plan description furnished to Participants, the language of this Plan Document shall control.

## 18.02  Subrogation and Reimbursement

(a)    Subrogation

If the Plan pays benefits to any Eligible Person or assignee for any injury, illness, expense or loss caused by a third party, the Plan will be subrogated for the full amount of such payments to all rights the Eligible Person and/or assignee against any person, firm, corporation or other entity in connection with any claim related to the injury, illness, expense or loss.   All recoveries from a third party (whether by lawsuit, settlement or otherwise) must be used to reimburse the Plan for benefits paid.   The Plan's recovery will not be reduced for any reason unless the Committee agrees in writing to a reduction.

(b)    Assignment of Rights to the Plan

Prior to payment by the Plan to an Eligible Person or assignee of benefits for any injury, illness, expense or loss caused by a third party, the Eligible Person and/or assignee may be asked to execute a written assignment to the Plan of all rights, claims, interests, or causes of action which the Eligible Person and/or assignee has to the full extent of such benefits.   Further, the Eligible Person and/or assignee may be asked to authorize the Plan, at the Plan's expense, to sue, compromise or settle, in his or her name or otherwise, all such rights, claims, interests or causes of action to the full extent of the benefits paid and shall do nothing to prejudice the Plan's rights under this Article.   In addition, the Eligible Person and/or assignee may be asked to covenant that he or she has

XVIII/78

not discharged or released any such rights, claims, interests or causes of action. Failure to request or obtain any such document prior to payment by the Plan to an Eligible Person or assignee of benefits for any injury, illness, expense or loss caused by a third party will not in any way diminish the Plan's rights of subrogation and reimbursement.

(c)    Prosecution of Claims

Pursuant to directions received from the Committee, or its designee, an Eligible Person and/or assignee shall assist the Plan. Such cooperation shall include, if requested, the institution of legal proceedings against any appropriate persons, firms, corporations or other entities.

(d)    Reimbursement

If the Plan pays for benefits to any Eligible Person or assignee for any injury, illness, expense or loss caused by a third party, and the Eligible Person and/or assignee later obtains any recovery in connection with the injury, illness, expense or loss, the Plan is entitled to full reimbursement from the Eligible Person and/or assignee to the extent of the Plan's payments. All recoveries from a third party (whether by lawsuit, settlement or otherwise) must be used to reimburse the Plan for benefits paid. The Plan's recovery will not be reduced for any reason unless the Committee agrees in writing to a reduction.


## 18.03  Workers' Compensation

Unless the Plan specifically provides otherwise, no benefits are payable under the Plan for an expense, charge or fee incurred in connection with any bodily injury or illness for which benefits are payable under any workers' compensation law, occupational disease law or similar legislation.


## 18.04  Assignment of Benefits

The rights and benefits payable hereunder shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge by any person, except that an Eligible Person may authorize the Plan to issue payment of health benefits directly to the provider of the medical services or supplies. However, the Plan reserves the right to pay all health benefits to the Eligible Person directly, and except as provided in Section 13.03 herein

or as may be required for payment of benefits pursuant to a court order, judgment or decree which has been approved by the Committee, or its designee, as a Qualified Child Medical Support Order under Section 609(a) of ERISA.

## 18.05  Disclaimer

None of the benefits provided in this Plan is guaranteed by the Committee, any Participating Local Fund, contributing employer, Union or any other individual or entity. The benefits may be provided only from amounts in the Fund collected and available for such purpose.

## 18.06  Offset

In the event any payment is made by the Plan to any person, firm, corporation or other entity who or which is not entitled to such payment, the Committee or its designee, shall have the right to reduce any future payments due to such person, firm, corporation or other entity by the amount of any such erroneous payment. This right of offset shall not limit any right of the Plan to recover such overpayments in any other manner.

## 18.07  Governing Law

All questions pertaining to the validity or construction of this Plan and of the acts and transaction of the parties hereto shall be determined in accordance with ERISA and in accordance with the laws of the District of Columbia as to matters not preempted by ERISA.

## 18.08  Severability and Savings Clause

Should any provision of this Plan be held to be unlawful, or unlawful as to any person or instance, such fact shall not adversely affect the other provisions herein contained or the application of said provisions to any other person or instance, unless such illegality shall make impossible the functioning of this Fund.

XVIII/80

**18.09  Titles**

The title of any article, section or provision is for convenience and reference only and is not to be considered in interpreting the terms and conditions of this Plan or construed so as to alter any of the terms hereof.

**18.10  Interpretation**

Words in the masculine gender shall include the feminine and neuter genders, and the singular shall include the plural and vice versa, unless qualified by the context.

XVIII/81

## ACCEPTANCE OF RULES AND REGULATIONS

We do hereby accept the foregoing plan document provisions of the Graphic Communications National Health and Welfare Fund for providing benefits for Eligible Persons effective March 1, 1997.

Attest:  For the Graphic Communications International Union:

_____

Lawrence Martinez, International Vice President

Attest:  For Participating Local Union Funds

Detroit Local 20B Fund

_____          _____
Union Trustee                                            Employer Trustee

Detroit Local 289M Fund

_____          _____
Union Trustee                                            Employer Trustee

Evansville Local 571M Fund

_____          _____
Union Trustee                                            Employer Trustee

Grand Rapids Local 550M Fund

_____          _____
Union Trustee                                            Employer Trustee

Indianapolis Local 303M Fund

_____          _____
Union Trustee                                            Employer Trustee

82

# FIRST AMENDMENT
## TO
## THE GRAPHIC COMMUNICATIONS
## NATIONAL HEALTH AND WELFARE PLAN

WHEREAS, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

WHEREAS, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

WHEREAS, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

NOW THEREFORE, BE IT RESOLVED, that the Plan be and hereby is amended as follows:

1. Section 6.02(p)(3) of the Plan is amended by deleting it in its entirety and adding a new Section 6.02(p)(3) effective March 1, 1997 to read as follows:

   (3)    voluntary termination of pregnancy.

2. Section 12.02(c) of the Plan is amended by deleting it in its entirety and adding a new Section 12.02(c) effective March 1, 1997 to read as follows:

   (c)    third party liability claims, except as provided in Section 13.03 hereof and except that weekly disability benefits under Section 11.03 shall be payable until payment is made or begins and, in such event, the Plan shall have subrogation rights and reimbursement rights as provided in Section 18.02;

3. Appendix A of the Plan is amended by deleting it in its entirety and adding a new Appendix A, as attached hereto and made a part hereof, effective June 1, 1997.

IN WITNESS WHEREOF, we hereunto set our seals this the _____ day of _____, 1997.

Attest:  For the Graphic Communications National Health and Welfare Fund:

_____
Lawrence Martinez, Secretary

Attest:  For Participating Local Union Funds

Detroit Local 20B Fund


_____          _____
Union Trustee                            Employer Trustee

Detroit Local 289M Fund


_____          _____
Union Trustee                            Employer Trustee

Evansville Local 571M Fund


_____          _____
Union Trustee                            Employer Trustee

Grand Rapids Local 550M Fund


_____          _____
Union Trustee                            Employer Trustee

Indianapolis Local 303M Fund


_____          _____
Union Trustee                            Employer Trustee

Kansas City Local 16C and 60B Fund


_____          _____
Union Trustee                            Employer Trustee


_____          _____
Union Trustee                            Employer Trustee

Kansas City 235M Fund

_____        _____
Union Trustee                    Employer Trustee

Los Angeles Local 404M Fund

_____        _____
Union Trustee                    Employer Trustee

Philadelphia Local 14M Fund

_____        _____
Union Trustee                    Employer Trustee

Washington 144B

_____        _____
Union Trustee                    Employer Trustee

Washington, D.C. Local 449S Fund

_____        _____
Union Trustee                    Employer Trustee

Washington, D.C. Local 285M Fund

_____        _____
Union Trustee                    Employer Trustee

Wisconsin Local 77P Fund

_____        _____
Union Trustee                    Employer Trustee

3

**SECOND AMENDMENT**
**TO**
**THE GRAPHIC COMMUNICATIONS**
**NATIONAL HEALTH AND WELFARE PLAN**

WHEREAS, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

WHEREAS, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

WHEREAS, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

NOW THEREFORE, BE IT RESOLVED, that the Plan be and hereby is amended as follows:

1.  Section 6.04(d) and (g) of the Plan are amended by deleting them in their entirety and adding a new Section 6.04(d) effective March 1, 1997 to read as follows:

    (d) pregnancy, childbirth or miscarriage unless it occurs while the mother is an Eligible Person.

2.  A new Section 14.06 is added to the Plan effective March 1, 1997 to read as follows:

    14.06  Alternative Benefits Option

    Under the alternative benefits option, the Committee has the authority to determine the most effective way to provide services.  Requests for approval of alternative benefits will be forwarded to the Committee for consideration.  The Committee may authorize the payment of a less costly medically appropriate alternative to a Plan benefit.  Alternative benefits are subject to ongoing review and the Committee may decide to resume regular Plan benefits at its sole discretion at any time.  Approval of an alternative benefit is not a guarantee of any future alternative benefits.  The decision to offer an alternative benefit is solely the Committee's and may be withdrawn at any time.

    IN WITNESS WHEREOF, we hereunto set our seals this the _____ day of _____, 1997.

Attest:  For the Graphic Communications National Health and Welfare Fund:

_____

Lawrence Martinez, Secretary

Los Angeles Local 404M Fund


_____          _____
Union Trustee                            Employer Trustee

Philadelphia Local 14M Fund


_____          _____
Union Trustee                            Employer Trustee

Washington 144B


_____          _____
Union Trustee                            Employer Trustee

Washington, D.C. Local 449S Fund


_____          _____
Union Trustee                            Employer Trustee

Washington, D.C. Local 285M Fund


_____          _____
Union Trustee                            Employer Trustee

Wisconsin Local 77P Fund


_____          _____
Union Trustee                            Employer Trustee

**THIRD AMENDMENT
TO
THE GRAPHIC COMMUNICATIONS
NATIONAL HEALTH AND WELFARE PLAN**

WHEREAS, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

WHEREAS, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

WHEREAS, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

NOW THEREFORE, BE IT RESOLVED, that the Plan be and hereby is amended as follows:

1.  Effective March 1, 1998, Evansville Local 571-M shall increase the maximum weekly disability benefit payable to an Eligible Employee from $200 to $275. The increased maximum benefit shall apply to new claimants with Disabilities beginning on or after March 1, 1998.

2.  Appendix E of the Plan is amended by deleting it in its entirety and adopting a new Appendix E in lieu thereof, as attached hereto and made a part hereof, effective March 1, 1998.

IN WITNESS WHEREOF, we hereunto set our seals this the _____ day of _____, 1998.


Attest:  For the Graphic Communications National Health and Welfare Fund:


_____
Lawrence Martinez, Secretary

Attest:  For Participating Local Union Funds

Detroit Local 20B Fund


_____          _____
Union Trustee                              Employer Trustee

Detroit Local 289M Fund

_____          _____
Union Trustee                            Employer Trustee

Evansville Local 571M Fund

_____          _____
Union Trustee                            Employer Trustee

Grand Rapids Local 550M Fund

_____          _____
Union Trustee                            Employer Trustee

Indianapolis Local 303M Fund

_____          _____
Union Trustee                            Employer Trustee

Kansas City Local 16C and 60B Fund

_____          _____
Union Trustee                            Employer Trustee

_____          _____
Union Trustee                            Employer Trustee

Kansas City 235M Fund

_____          _____
Union Trustee                            Employer Trustee

Los Angeles Local 404M Fund

_____          _____
Union Trustee                            Employer Trustee

2

Philadelphia Local 14M Fund


_____          _____
Union Trustee                        Employer Trustee

Washington 144B


_____          _____
Union Trustee                        Employer Trustee

Washington, D.C. Local 449S Fund


_____          _____
Union Trustee                        Employer Trustee

Washington, D.C. Local 285M Fund


_____          _____
Union Trustee                        Employer Trustee

Wisconsin Local 77P Fund


_____          _____
Union Trustee                        Employer Trustee

3

**APPENDIX E**
(as amended March 1, 1998)
GCIU HEALTH AND WELFARE FUND
SCHEDULE OF BENEFITS AND DEDUCTIBLES

WEEKLY DISABILITY BENEFIT

| Participating Local Union Fund | Benefits Start | Maximum Payment Period | Weekly Benefit Amount* |
|---|---|---|---|
| Detroit 20B | after 7 days for Illness, immediately if confined to hospital or for injury | 13 weeks | 55% of basic weekly earnings, $400 maximum, $20 minimum |
| Detroit 289 | after 7 days for Illness, immediately for injury | 26 weeks | 60% of basic weekly earnings, $20 minimum |
| Evansville 571M | after 7 days for Illness, immediately for injury | 26 weeks | 60% of basic weekly earnings, $275 maximum, $20 minimum |
| Grand Rapids 550M | after 7 days for Illness, immediately if confined to hospital or for injury | 26 weeks | 60% of basic weekly earnings, $200 maximum, $20 minimum |
| Indianapolis 303M | after 7 days for Illness, immediately if confined to hospital or for injury | 13 weeks | 66 2/3% of basic weekly earnings, $200 maximum, $20 minimum |
| Kansas City 16C & 60B | after 7 days for Illness, immediately if confined to hospital or for injury | 26 weeks | 50% of basic weekly earnings rounded to nearest dollar, $200 maximum, $20 minimum |
| Kansas City 235M | after 7 days for Illness, immediately if confined to hospital or for injury | 17 weeks | $200 |
| Washington 144B | after 7 days for Illness, immediately if confined to hospital or for injury | 26 weeks | Journeymen and Apprentices — $250 for first 13 weeks, $125 for next 13 weeks. All other employees — $210 first 13 weeks, $105 next 13 weeks |

| Participating Local Union Fund | Benefits Start | Maximum Payment Period | Weekly Benefit Amount* |
|---|---|---|---|
| Washington 285 | after 4 days for Illness, immediately if confined to hospital or for injury | 26 weeks | 70% of basic weekly earnings, $200 maximum, $20 minimum |
| Washington 499S | 8 day waiting period; retroactive to the third day for Illness | 26 weeks | Not more than 70% of basic weekly earnings |
| Wisconsin 77P - DP Plan | after 3 days for Illness or Injury | 26 weeks | $260 |

*The amount shown will be reduced by any weekly amount the Employee is eligible for under any workers' compensation or similar laws for time lost from work. The amount shown may not be more than 70% of average weekly earnings. At any time that other benefits are payable, this amount may be reduced so that, when added to other income benefits, the total does not exceed 70% of average weekly earnings.

TSC_WASH:47044.1

APPENDIX E/2

## FOURTH AMENDMENT TO THE GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE PLAN

WHEREAS, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

WHEREAS, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

WHEREAS, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth:

NOW THEREFORE, BE IT RESOLVED, that the Plan be and hereby is amended as follows, effective March 1, 1998 unless otherwise indicated:

*The first sentence of Section 6.01(m), Chiropractic Care, Subparagraph (2) shall be amended to read as follows:*

Except in the event that it is specifically counter indicated, a follow-up Chiropractic care visit shall not include a follow-up visit unless a chiropractic manipulation is performed during the visit.

*Section 6.02 of the Plan is amended by adding a new Subsection 6.02(q), effective September 1, 1998, to read as follows:*

"(q) Notwithstanding any other provision of this Plan to the contrary, this Plan will be operated in accordance with the requirements of Sections 711 and 712 of the Employee Retirement Income Security Act of 1974 (ERISA), as amended and any successor provisions thereto, as further interpreted in applicable regulations issued thereunder. Thus, except as otherwise permitted by Section 711(a)(2) of ERISA, this Plan shall not restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child, following a normal vaginal delivery to less than 48 hours, or following a cesarean section to less than 96 hours and, for the period for which it is in effect, shall observe the restrictions on lifetime and annual limits on mental health benefits imposed by Section 712 of ERISA by making mental health benefits subject to the annual and lifetime caps for medical and surgical benefits."

*In Section 7.01(b), Subparagraph (3)(A)(I) is amended by replacing the phrase "18 months" with the phrase "24 months."*

*Section 13.03 of the Plan is amended by adding a new Subsection 13.03(j) to read as follows:*

"(j) Notwithstanding any other provision of this Article 13, effective March 1, 1998, the Coordination of Benefits provisions of this Article 13 will apply between spouses who are both employees of the same contributing employer."

*Appendix "E" is amended to read as follows:*

**APPENDIX E**
(as amended March 1, 1998)
GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE PLAN
SCHEDULE OF WEEKLY BENEFITS AND DEDUCTIBLES

**WEEKLY DISABILITY BENEFIT**

| Participating Local Union Fund | Benefits Start | Maximum Payment Period | Weekly Benefit Amount* |
|---|---|---|---|
| Detroit 20B | After 7 days for Illness, immediately if treatment in a | 13 weeks | 55% of basic weekly earnings, $400 maximum, $20 minimum |
| Detroit 289 | After 7 days for Illness, immediately if treatment in a | 26 weeks | 60% of basic weekly earnings, $20 minimum |
| Evansville 571M | After 7 days for Illness, immediately if treatment in a | 26 weeks | 60% of basic weekly earnings, $275 maximum, $20 minimum |
| Grand Rapids 550M | After 7 days for Illness, immediately if treatment in a | 26 weeks | 60% of basic weekly earnings, $200 maximum, $20 minimum |
| Indianapolis 303M | After 7 days for Illness, immediately if treatment in a | 13 weeks | 66-2/3% of basic weekly earnings, $200 maximum, $20 minimum |
| Kansas City 16C & 60B | After 7 days for Illness, immediately if treatment in a | 26 weeks | 50% of basic weekly earnings rounded to nearest dollar, $200 maximum, $20 |
| Kansas City 235M | After 7 days for Illness, immediately if treatment in a | 17 weeks | $200 |

| Participating Local Union Fund | Benefits Start | Maximum Payment Period | Weekly Benefit Amount* |
|---|---|---|---|
| Washington 144B | After 7 days for Illness, immediately if treatment in a | 26 weeks | Journeymen and Apprentices—$250 for first 13 weeks, $125 for next 13 weeks |
| Washington 285 | After 4 days for Illness, immediately if treatment in a | 26 weeks | 70% of basic weekly earnings, $200 maximum, $20 minimum |
| Washington 449S | 8-day waiting period, retroactive to the third day for Illness immediately | 26 weeks | Not more than 70% of basic weekly earnings |
| Wisconsin 77P-DP Plan | After 3 days for Illness or Injury; immediately if treatment in a | 26 weeks | $260 |

*The amount shown will be reduced by any weekly amount for which the Employee is eligible under any workers' compensation or similar laws for time lost from work. The amount shown may not be more than 70% of average weekly earnings. At any time that other benefits are payable, this amount may be reduced so that, when added to other income benefits, the total does not exceed 70% of average weekly earnings.

** In determining whether treatment in a hospital is required, the Plan may rely on the opinion of the attending Physician.

3

*A new Appendix "F" is added to read as follows:*

## APPENDIX F

### GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE PLAN MEDICARE SUPPLEMENTAL BENEFITS

### SCHEDULE OF MEDICARE SUPPLEMENTAL BENEFITS

| MEDICARE SUPPLEMENT BENEFITS | MODEL HIGH OPTION (all except Wisconsin) | Wisconsin 77P | Wisconsin 77P DH Plan | Wisconsin 77P CL Plan |
|---|---|---|---|---|
| *Plan Type* | Indemnity | Indemnity | Indemnity | Indemnity |
| *Network* | In/Out of Network | In/Out of Network | In/Out of Network | In/Out of Network |
| *Deductible, per individual, per year[1]* | $50 | $200 | $100 | $50 |
| *Out of Pocket Maximum, per individual per year* | $500 | $1,500 | None | $1,000 |
| *Coinsurance* | 80% | 80% | 80% | 80% |
| *Full Coordination of Benefits[2]* | X | X | X | X |

**Notes:**
[1] Deductible does not apply to Out-of-Pocket Maximum.
[2] Plan pays benefits on Covered Expenses not paid by Medicare, plus Out-of-Pocket Covered Expenses in excess of the Out-of-Pocket Maximum, up to 100% of Covered Expenses.

IN WITNESS WHEREOF, I have affixed my signature below this _____ day of _____, 1998.

_____
Lawrence Martinez, Secretary
Attest: For the Graphic Communications
National Health and Welfare Fund

TSC_WASH:48100.1

4

## FIFTH AMENDMENT TO THE GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE PLAN

WHEREAS, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

WHEREAS, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

WHEREAS, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth:

NOW THEREFORE, BE IT RESOLVED, that all of the schedules included in Appendix B to the Plan document (Schedule of Medical Benefits and Deductibles) shall be amended by the inclusion of the following note:

Note: Effective March 1, 1998, all In-Network Physician services performed in the office of an In-Network primary care Physician or a Specialist which, as of February 28, 1998, were of the type that were payable at 90%, will be paid at 100%. However, any such In-Network primary care Physician or Specialist services rendered in connection with the treatment of the condition for which the patient is being seen in the primary care Physician's or Specialist's office that are not performed in the office of such primary care Physician or Specialist will continue to be paid at 90%. This amendment shall not affect the rate of payment for Out-of-Network Physician services.

IN WITNESS WHEREOF, I have affixed my signature below this _____ day of _____, 1998.


_____
Lawrence Martinez, Secretary
Attest: For the Graphic Communications
National Health and Welfare Fund

TSC_WASH:48101.1

## SIXTH AMENDMENT TO THE
## GRAPHIC COMMUNICATIONS
## NATIONAL HEALTH AND WELFARE PLAN

**WHEREAS**, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective _____;

**WHEREAS,** under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS,** the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED,** that the Plan be and hereby is amended as follows:

Article XIII, **Coordination of Benefits**, Section 13.01 of the Plan- **General**, is amended by adding a second paragraph to read as follows:

> For any Employee or Beneficiary who is eligible to receive benefits from any other health plan, including another group health plan, Medicare, Medicaid, individual insurance, or other health care coverage; no payment will be made for any benefits that are not paid by the other plan due to failure by the Employee or Beneficiary to comply with a term or condition for receipt of benefits. This exclusion includes, but is not limited to, failure to comply with the other plan's utilization, preauthorization or case management rules.

Article XIII, **Coordination of Benefits**, Section 13.05 of the Plan –**Coordination with Medicare**, shall be amended by adding new sections (c), (d) and (e) to read as follows:

(c)  This Plan will not pay any Benefits for any health care services and/or supplies received, if an Eligible Person chooses to obtain Medicare benefits through Medicare Part C ("Medicare+Choice), and does not comply with the rules of the Medicare Part C plan. This includes, but is not limited to failure to comply with any utilization management, preauthorization or case management requirement.

(d)  This Plan will not pay benefits for any health care services and/or supplies received pursuant to a private contract with certain Health Care Practitioners that agree not to submit claims or receive any payments from Medicare.

(e)  Once an Eligible Person who is a Medicare participant opts-out of the Plan, they

forfeit their eligibility under the Plan.

Article XII, **General Exclusions**, Section 12.01 of the Plan- **Comprehensive Medical Benefits, Ancillary Medical Benefits and Other Medical Benefits**, paragraph (b), subparagraph (35), shall be amended to read as follows:

(35)    Charges paid or payable by another plan as provided in Article XIII hereof, including benefits that are not paid by the other plan due to failure by the Eligible Person to comply with a term or condition for receipt of benefits;

Article III, **Eligibility**, Section 3.04 of the Plan – **Death of Employee or Retiree**, shall be amended by adding a new section (d) to read as follows:

(f)    An Eligible Dependent who is a surviving spouse of a deceased Eligible Employee/Retiree may elect to continue coverage under this Plan.  Coverage is available until the widowed spouse is eligible for coverage with a new employer; is eligible for Medicare; or fails to pay 100% of the premium cost.  Upon completion of COBRA continuation coverage benefits (Article V), the widowed spouse will have 60 days to select continued coverage under this Plan.

Article IV. **Termination of Coverage**, Section 4.01 of the Plan –**Date of Termination of Coverage**, section (d) shall be amended by adding a new subsection (3) to read as follows:

(3)    Coverage for Eligible Dependents who are widowed spouses of Eligible Employees/Retirees, will terminate if the widowed spouse fails to elect the Plan's continuation coverage or fails to pay the premiums, as described in Section 3.04.

Article V, **Continuation Coverage**, Section 5.03 of the Plan- **Termination of Continuation Coverage**, shall be amended by adding a new section (f) to read as follows:

(f)    60 days after the last day of COBRA continuation coverage, if the widowed spouse of an Eligible Employees/Retirees fails to elect the Plan's continuation coverage, as described in Section 3.04.

### SEVENTH AMENDMENT TO THE
### GRAPHIC COMMUNICATIONS
### NATIONAL HEALTH AND WELFARE PLAN

**WHEREAS**, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS**, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED**, that the Plan be and hereby is amended, effective March 1, 1999, as follows:

*Article III, **Eligibility**, Section 3.04 of the Plan – **Death of Employee or Retiree**, shall be amended by adding a new section (d) to read as follows:*

(d)     An Eligible Dependent of a deceased Eligible Employee or Retiree may elect to continue coverage under this Plan after COBRA continuation coverage is exhausted.  Coverage is available provided the Eligible Dependent pays 100% of the premium cost.  Upon completion of COBRA continuation coverage (Article V), the Eligible Dependent will have 60 days to select continued coverage under this Plan.

*Article IV. **Termination of Coverage**, Section 4.01 of the Plan –**Date of Termination of Coverage**, section (d) shall be amended by adding a new subsection (3) to read as follows:*

(3)     Coverage for Eligible Dependents of Eligible Employees or Retirees and who are eligible for coverage under Section 3.04(d), shall terminate if the Eligible Dependent fails to elect the Plan's continuation coverage, or fails to pay 100% of the premium cost, as described in Section 3.04.  No additional coverage under COBRA continuation coverage provisions of this Plan is available after termination of coverage under these provisions.

*Article V, **Continuation Coverage**, Section 5.03 of the Plan- **Termination of Continuation Coverage**, shall be amended by adding a new section (d) to read as*

*follows:*

(d) 60 days after the last day of COBRA continuation coverage, if the Eligible Dependent of an Eligible Employee or Retiree fails to elect the Plan's continuation coverage, as described in Section 3.04.

*Article XII, **General Exclusions**, Section 12.01 of the Plan- Comprehensive Medical Benefits, Ancillary Medical Benefits and Other Medical Benefits, paragraph (b), subparagraph (35), shall be amended to read as follows:*

(35)    Charges paid or payable by another Health Plan as provided in Article XIII hereof, including benefits that are not paid by the other plan due to failure by the Eligible Person to comply with a term or condition for receipt of benefits;

*Article XII, **General Exclusions**, Section 12.01 of the Plan- Comprehensive Medical Benefits, Ancillary Medical Benefits and Other Medical Benefits, paragraph (b), shall be amended by adding a new subparagraph (38), to read as follows:*

(38)This Plan will not pay benefits for any health care services and/or supplies received pursuant to a private contract with certain Physicians or other health care practitioners that agree not to submit claims to, or receive any payments from, Medicare per Section 1802 of the Social Security Act.

*Article XIII, **Coordination of Benefits**, Section 13.01 of the Plan- General, is amended by adding a second paragraph to read as follows:*

For any Eligible Person who is eligible to receive benefits from any other Health Plan, no payment will be made for any health care services and/or supplies that are not paid by the other Health Plan due to failure by the Eligible Person to comply with a term or condition for receipt of benefits under the other Health Plan. This exclusion includes, but is not limited to, failure to comply with the other Health Plan's utilization, preauthorization or case management rules.

*Article XIII, **Coordination of Benefits**, Section 13.05 of the Plan –Coordination with Medicare, shall be amended by adding new sections (c), (d) and (e) to read as*

*follows:*

(c)     This Plan will not pay any Benefits for any health care services and/or supplies received, if an Eligible Person chooses to obtain Medicare benefits through Medicare Part C ("Medicare+Choice"), and does not comply with the rules of the Medicare Part C plan. This includes, but is not limited to failure to comply with any utilization, preauthorization or case management requirement.

(d)     This Plan will not pay benefits for any health care services and/or supplies received pursuant to a private contract with certain Physicians or other health care practitioners that agree not to submit claims to, or receive any payments from, Medicare per Section 1802 of the Social Security Act.

(e)     A Retiree and/or a Retiree's spouse who is a Medicare beneficiary and who refuses Retiree coverage or elects to terminate existing Retiree coverage under this Plan, shall not be allowed to reenroll at a later date.

**IN WITNESS WHEREOF,** we hereunto set our seals this _____ day of _____, 2000.

Attest:   For the Graphic Communications National Health and Welfare Fund;

_____

Lawrence Martinez
Secretary

Draft 1/6/99

# EIGHTH AMENDMENT TO THE
# GRAPHIC COMMUNICATIONS
# NATIONAL HEALTH AND WELFARE PLAN

**WHEREAS**, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS**, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS**, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED**, that the Plan be and hereby is amended ~~as follows;~~ effective March 1, 1999: as follows

1.    Section 7.01 of the Plan - **General Wellness Benefit**, paragraph (b) - <u>Routine Physical Exam Expenses</u>, subparagraph (3)(B) under <u>Limitations</u>, is amended to read as follows:

> (B)    for examinations given to Eligible Persons age 12 and over, charges for more than one routine physical exam in any 12-month period or charges in excess of $100 for each routine physical exam as set forth in Appendix B.

2.    Plan M1, Appendix B, Schedule of Benefits and Deductibles, Wellness Benefit Schedule is amended to read as follows:

| | In Network | Out of Network |
|---|---|---|
| Wellness Benefit: | | |
| Routine Physical Exam<br>Ages 13 and above | 1 annual visit<br>$100 annual maximum | No Benefit |
| Well-Child Care:<br>Birth to 24 months | 5 visits in total<br>plus immunizations | No Benefit |
| Ages 2 through 6 | 1 annual visit<br>plus immunizations | No Benefit |
| Ages 7 through 12 | 1 annual visit<br>plus immunizations | No Benefit |

Eighth Amendment to the
Graphic Communications
National Health and Welfare Plan
Page 2

**IN WITNESS WHEREOF**, we hereunto set our seals this _____ day of _____, 1998.


Attest: For the Graphic Communications National Health and Welfare Fund:


_____
Lawrence Martinez, Secretary

# NINTH AMENDMENT TO THE
# GRAPHIC COMMUNICATIONS
# NATIONAL HEALTH AND WELFARE PLAN

**WHEREAS**, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1. 1997;

**WHEREAS,** under Section 16.01 of the Plan. the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS**, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED**. that the Plan be and hereby is amended, effective March 1, 2000, as follows:

*Article VI, **Comprehensive Medical Benefits**, Section 6.01 of the Plan –* ***General**, shall be amended by relettering the current sections (b)-(f) to (c)-(g) and adding a new section (b) to read as follows:*

(b) Transition Benefits

The following transition benefits shall apply when a new group (any new Participating Local Union Fund ) joins the Fund.  Transition benefits are applicable only to those persons who are Eligible Persons on the new group's effective date.

1.  Any Eligible Person in the course of treatment (defined as "a planned series of procedures or treatments prescribed by a Physician") prior to the effective date of the new group's coverage while under the care of an Out-of-Network provider. can continue such course of treatment at In-Network benefit levels for a period not to exceed thirty (30) days. provided:

- such treatment is deemed  Medically Necessary ;

- such treatment is a Covered Expense; and

- if the Eligible Person's prior Health Plan was under contract with a PPO. the Out-of-Network provider rendering care under this provision is in the network of the prior Health Plan.

2.      Any Eligible Person (excluding a Dependent Child pursuant to Section 6.04(g) herein) in the course of treatment for a pregnancy beyond the first trimester and prior to the effective date of a new group's coverage while under the care of a Out-of-Network provider, can continue such course of treatment through childbirth and discharge, provided;

- the specific provider previously rendering such services renders all future services; and

- if the Eligible Person's prior Health Plan was under contract with a PPO, the Out-of-Network provider rendering care under this provision is in the network of the prior Health Plan.

Any transition benefits approved in accordance with this provision will be reimbursed at In-Network benefit levels provided prior or timely written notification is made to the Committee.

**IN WITNESS WHEREOF,** we hereunto set our seals this ____ day of _____, 2000.

Attest:   For the Graphic Communications National Health and Welfare Fund;

_____

Lawrence Martinez
Secretary

2

# TENTH AMENDMENT TO THE
# GRAPHIC COMMUNICATIONS
# NATIONAL HEALTH AND WELFARE PLAN

**WHEREAS**, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS**, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS**, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED**, that the Plan be and hereby is amended, effective December 1, 2000, as follows:

1. *Schedule of Benefits and Deductibles, Plan M1, Physician Services, Outpatient, Mental and Nervous Disorder Treatment shall be amended to read as follows:*

| Plan M1 Schedule of Benefits | MAXIMUM BENEFIT | |
|---|---|---|
| | **In-Network** | **Out-of-Network** |
| Physician Services<br><br>Outpatient<br><br>   Mental and Nervous Disorder (subject to 50-Visit annual limit and other limits per plan document) | 90%, but not to exceed 50% of Usual and Customary | 50% of Usual and Customary |

2.    *Schedule of Benefits and Deductibles, Plan M2, Physician Services, Outpatient, Mental and Nervous Disorder Treatment shall be amended to read as follows:*

| Plan M2 Schedule of Benefits | MAXIMUM BENEFIT | |
|---|---|---|
| | In-Network | Out-of-Network |
| Physician Services<br><br>Outpatient<br><br>Mental and Nervous Disorder (subject to 50-Visit annual limit and other limits per plan document) | 90%, but not to exceed 50% of Usual and Customary | 50% of Usual and Customary |

**IN WITNESS WHEREOF,** the undersigned has set forth their signature(s) below this _____ day of _____, 2000.

Attest:   For the Graphic Communications National Health and Welfare Fund;

_____

    Lawrence Martinez
    Secretary

125046/02214.027

2

Exhibit C

## ELEVENTH AMENDMENT TO THE
## GRAPHIC COMMUNICATIONS
## NATIONAL HEALTH AND WELFARE PLAN

**WHEREAS**, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS**, under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS**, Tenth Amendment to the Plan amended Schedule of Benefits and Deductibles, Plan M1 and M2, Physician Services, Outpatient, Mental and Nervous Disorder Treatment, effective December 1, 2000;

**WHEREAS**, the Trustees deem it advisable, after discussions with representatives of the U.S. Department of Labor, to amend the effective date of Tenth Amendment;

**NOW THEREFORE, BE IT RESOLVED**, that the Plan and the Tenth Amendment thereto, be and hereby are amended as follows:

*The effective date of Tenth amendment to the Plan, which amended the Schedule of Benefits and Deductibles, Plan M1, Physician Services, Outpatient, Mental and Nervous Disorder Treatment and Schedule of Benefits and Deductibles, Plan M2, Physician Services, Outpatient, Mental and Nervous Disorder Treatment shall be changed from "December 1, 2000" to "January 1, 1998." Such change shall be effective retroactively as if it had been included in the original version of the Tenth Amendment that was adopted by the Board of Trustees.*

**IN WITNESS WHEREOF**, the undersigned has set forth their signature(s) below this ____ day of _____, 2001.

Attest:  For the Graphic Communications National Health and Welfare Fund;

_____

Lawrence Martinez
Secretary

Exhibit A

## TWELFTH AMENDMENT TO THE
## GRAPHIC COMMUNICATIONS
## NATIONAL HEALTH AND WELFARE PLAN

**WHEREAS,** the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS,** in compliance with the Health Insurance Portability and Accountability Act of 1996, (HIPAA) certain pre-existing condition limitations of the Plan are impermissible,

**NOW THEREFORE, BE IT RESOLVED,** that the Plan be and hereby is amended retroactive to July 1, 1997 as follows:

*Section 6.02(b)(1)(C) is revised to eliminate the phrase at the end of the Section which read, "incurred while covered under this Plan." The new Section will read as follows:*

      (C)    cosmetic, plastic or reconstructive surgery to repair or alleviate damage resulting from or caused by Injury, congenital defect as provided in Section 6.02(b)(3), or disfigurement related to disease;

**IN WITNESS WHEREOF,** the undersigned has set forth their signature(s) below this ____ day of _____, 2001.

Attest:  For the Graphic Communications National Health and Welfare Fund;

_____
Lawrence Martinez
Secretary

# Thirteenth Amendment to the
# Graphic Communications National Health and Welfare Fund
# Plan Document

**WHEREAS,** the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** pursuant to Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, and from time to time;

**WHEREAS,** in accordance with the Department of Labor's final regulations relating to claims and appeals procedures (29 C.F.R. §2560.503-1) issued on November 21, 2000, the Trustees deem it advisable to amend the Plan to reflect the requirements of those regulations;

**NOW, THEREFORE, BE IT RESOLVED,** that the Plan be and is hereby amended effective January 1, 2002, to provide the following:

1. *The title of Section 14.03 Denial of Claims is amended to read as follows:*

    **14.03 Denial of Medical, Dental, Vision, Prescription Drug, Life, and Accidental Death and Dismemberment Claims**

2. *A new Section 14.04 is added to read as follows:*

    **14.04 Denial of Weekly Disability Claims**

    (a) <u>In General</u>.

        (1) If a claim has been denied in whole or in part, the claimant shall be notified in writing within 45 days of receipt of the claim. The Plan may take an additional 30-days to review a claim if there are reasons beyond its control which preclude it from making a decision within the initial 45 days. If an extension is required, a notice shall be sent to the claimant specifically explaining: (i) the circumstances requiring the extension; (ii) the date by which a final decision is expected to be rendered; (iii) the standards on which entitlement to a benefit is based; (iv) the unresolved issues that prevent a decision on the claim; and (v) the additional information necessary to resolve those issues.

        (2) The Plan may take a second 30-day extension period should the Plan determine before the expiration of the first 30-day extension period that such an extension is necessary because a decision cannot be rendered within the first extension period due to reasons beyond the Plan's control. If a second extension is necessary, the notice of the second extension shall be sent to the claimant before the first 30-day extension period expires and shall satisfy the notice requirements as set forth in paragraph 14.04(a)(1) above.

(3) For any extension where unresolved issues prevent a decision on the claim and additional information is needed to resolve the issue, the claimant shall be given 45-days from the receipt of the extension notice to provide the specified information.

(4) The period of time within which a benefit determination is required to be made begins at the time a claim is filed in accordance with the Plan's procedures, without regard to whether all relevant information necessary to make a benefit determination accompanies the filing. In the event a period of time is extended due to a claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination shall be tolled from the date on which the extension notification is sent to the claimant until the date on which the claimant responds to the request for additional information.

(b) <u>Notice of Denial</u>.

(1) If a claim has been denied in whole or in part, the notice of denial shall state the following: (i) specific reason(s) for the denial; (ii) specific reference to the appropriate Plan provision(s) on which the denial is based; (iii) a description of any additional material or information necessary to perfect the claim and an explanation of why such material or information is necessary; (iv) an explanation of the Plan's claim review procedures and the claimant's right to seek review; and (v) a statement about the claimant's right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA") if the benefits are denied after review.

(2) If the Plan relied on an internal rule, guideline, protocol or similar criterion in making its decision to deny the claim, the notice shall also include the specific internal rule, guideline, protocol or similar criterion, or a statement of such, as well as a notice of the claimant's right for a free copy of the internal rule, guideline, protocol or similar criterion upon request.

(3) If the claim was denied based on a medical necessity or experimental treatment or similar exclusion or limit, the Plan shall provide the claimant with an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's medical circumstances, or a statement that such an explanation shall be provided to the claimant free of charge upon request.

(c) <u>Right to Authorized Representative</u>. A claimant has the right to appoint an authorized representative to act on his or her behalf for the purposes of filing a claim and seeking a review of a denied claim. The claimant must notify the Plan in advance, in writing, of the name, address, and phone number of the authorized representative.

3. *Section 14.04 Appeal of Claims is re-numbered as Section 14.05 and the title is amended to read as follows:*

**14.05  Appeal of Medical, Dental, Vision, Prescription Drug, Life, and Accidental Death and Dismemberment Claims**

2

4. *Section 14.05 is re-numbered as Section 14.07 and a new Section 14.06 is added to read as follows*:

**14.06  Appeal of Weekly Disability Claims**

(a) Right of Appeal.  Any individual (or his duly authorized representative) whose claim for benefits under the Plan has been denied, in whole or in part, or whose claim for benefits against the Plan is otherwise denied, may petition the Appeals Committee for a review of the benefit denial.

(b) Documentation for Appeals.

(1) The petition for review shall be in writing, and shall state the name and address of the claimant, the fact that the claimant is disputing the denial of claim giving the date of the notice of denial and, in clear and concise terms, the reason(s) for disputing the denial.  It shall be accompanied by any pertinent documentary material not already furnished to the Appeals Committee, such as written comments, documents, records, and other information relating to the claim for benefits, and shall be delivered or mailed to the Appeals Committee within 180 days from the date shown on the benefit denial notice.

(2) Upon request to the Appeals Committee, the claimant shall be provided reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits free of charge.  A document, record or other information is "relevant" if it:  (i) was relied upon in making the benefit determination; (ii) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether it was relied upon in making the benefit determination; (iii) demonstrates compliance with the administrative processes and safeguards required under federal law; or (iv) constitutes a statement of policy or guidance with respect to the Plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

(3) The Appeals Committee shall also provide the identification of medical or vocational experts whose advice was obtained on behalf of the Fund in connection with the claimant's benefit denial, whether or not the advice was relied upon in making the adverse decision.

(c) Review of the Appeal.  The Appeals Committee shall provide an impartial review that takes into account all comments, documents, records, and other information that the claimant submitted relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.  If the appeal is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug or other item is experimental or investigational, or not medically necessary or appropriate, the Appeals Committee shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.  Should it be necessary for the Appeals Committee to consult with a health care professional, the health care professional shall be an individual

3

who was not consulted in connection with the adverse benefit determination that is the subject of the appeal, nor a subordinate of such individual.

(d) <u>Amending a Petition; Hearings</u>.  Upon good cause shown, the Appeals Committee shall permit a petition to be amended or supplemented and shall grant a hearing on the petition to receive and hear any evidence or argument which cannot be presented satisfactorily by correspondence.  The claimant's failure to file a petition for review within the 180-day period or the failure to appear and participate in any such hearing shall constitute a waiver of the claimant's right to a review of the denial.  Such failure will not, however, preclude the claimant from establishing eligibility for benefits at a later date based on additional information and evidence which was not available to the claimant at the time of the denial or hearing provided such additional evidence is submitted to the Plan within 12 calendar months of the denial notice.

(e) <u>Notification of Decision</u>.

(1) The Appeals Committee shall meet on at least a quarterly basis and shall make a decision on an appeal no later than the date of the Appeals Committee meeting that immediately follows the Plan's receipt of the appeal, unless the appeal is filed within 30 days before the meeting.  If the appeal is filed within 30 days before a meeting, the appeal shall be decided no later than the date of the second meeting following the Plan's receipt of the appeal.  If special circumstances (such as the need to hold a hearing) require a further extension of time, the Appeals Committee shall rule on the appeal no later than the third Appeals Committee meeting following the receipt of the appeal. If such an extension of time is required because of special circumstances, the Plan shall provide the claimant with written notice of the extension before the extension period begins, describing the special circumstances and the date on which the appeal shall be decided.

(2) The Plan shall notify the claimant of the Appeals Committee's decision on appeal in writing as soon as possible, but not later than 5 days after the benefit determination is made. If a claim has been denied in whole or in part, the notice of denial shall state the following:  (i) specific reason(s) for the denial; (ii) specific references to the pertinent Plan provision(s) on which the decision is based; (iii) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits; (iv) a statement describing any additional voluntary appeal procedures offered by the Plan, if any, and the claimant's right to obtain information about such procedures; (v) a statement about the claimant's right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA") if the benefits are denied after review; and (vi) the following statement: "You or your Plan may have other voluntary alternative dispute resolution options, such as mediation.  One way to find out what may be available is to contact your local U.S. Department of Labor Office."

(3) If the Appeals Committee relied on an internal rule, guideline, protocol or similar criterion in making its decision to deny the appeal, the notice shall also include the specific internal rule, guideline, protocol or similar criterion, or a statement of such,

4

as well as a notice of the claimant's right for a free copy of the internal rule, guideline, protocol or similar criterion upon request.

(4) If the appeal was denied based on a medical necessity or experimental treatment or similar exclusion or limit, the Appeals Committee shall provide the claimant with an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's medical circumstances, or a statement that such an explanation shall be provided to the claimant free of charge upon request.

(f) <u>Decision of Appeals Committee</u>. The denial of an application or claim to which the right of review has been waived or the decision of the Appeals Committee with respect to a petition for review, shall be final and binding upon all parties, including the applicant, claimant or petitioner and any person claiming under the application, claimant or petitioner, subject only to judicial review. The provisions of Sections 14.03, 14.04, 14.05 and 14.06 shall apply to and include any and every claim to benefits from the Fund, and any claim or right asserted under the Plan or against the Fund, regardless of the basis asserted for the claim, regardless of when the act or omission upon which the claim is based occurred, and regardless of whether or not the claimant is a "Participant" or "Beneficiary" of the Plan within the meaning of those terms as defined in ERISA.

IN WITNESS WHEREOF, the undersigned has set forth their signature(s) below this ____ day of _____, 2001.

Attest:   For the Graphic Communications National Health and Welfare Fund;

_____

Lawrence Martinez, Secretary

136390/02214.044

5

## *Fourteenth Amendment to the*
## *Graphic Communications National Health and Welfare Fund*
## *Plan Document*

**WHEREAS**, the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS**, pursuant to Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, and from time to time;

**WHEREAS**, the Eleventh Amendment to the Plan amended the Schedule of Benefits and Deductibles, Plans M1 and M2, Physician Services, Outpatient, Mental and Nervous Disorder Treatment, effective December 1, 1998;

**WHEREAS**, the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED**, that the Plan be and hereby is amended, effective retroactively to December 1, 1998, as follows:

1.    *Schedule of Benefits and Deductibles, Plan M1, Physician Services, Outpatient, Mental and Nervous Disorder Treatment shall be amended to read as follows:*

| Plan M1 Schedule of Benefits | MAXIMUM BENEFIT | |
|---|---|---|
| | **In-Network** | **Out-of-Network** |
| Physician Services<br><br>Outpatient<br><br>   Mental and Nervous Disorder (subject to 50-Visit annual limit and other limits per Plan document) | 60% | 50% of Usual and Customary |

2.    *Schedule of Benefits and Deductibles, Plan M2, Physician Services, Outpatient, Mental and Nervous Disorder Treatment shall be amended to read as follows:*

| Plan M2<br><br>Schedule of Benefits | MAXIMUM BENEFIT | |
|---|---|---|
| | **In-Network** | **Out-of-Network** |
| Physician Services<br><br>Outpatient<br><br>   Mental and Nervous Disorder (subject to 50-Visit annual limit and other limits per Plan document) | 60% | 50% of Usual and Customary |

**IN WITNESS WHEREOF,** the undersigned has set forth their signature(s) below this _____ day of _____, 2002.


Attest:   For the Graphic Communications National Health and Welfare Fund;


_____
     Lawrence Martinez
     Secretary


138560/02214.027

Draft 2/05/03

**FIFTEENTH AMENDMENT TO THE
GRAPHIC COMMUNICATIONS
NATIONAL HEALTH AND WELFARE PLAN**

**WHEREAS,** the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** under Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, subject to certain conditions not here relevant;

**WHEREAS,** the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED,** that the Plan be and hereby is amended effective June 1, 2003 as follows:

1.    Section 2.56 "Plan Year", which was added to the Plan by the Third Amendment, is changed to read as follows:

2.56 **"Plan Year"** means the 12-month period beginning June 1 and ending May 31..

**IN WITNESS WHEREOF,** we hereunto set our seals this _____ day of _____, 2003.

Attest: For the Graphic Communications National Health and Welfare Fund:

_____
Lawrence Martinez, Secretary

# Sixteenth Amendment to the
# Graphic Communications National Health and Welfare Fund
# Plan Document

**WHEREAS,** the Board of Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** pursuant to Section 16.01 of the Plan, the Board of Trustees reserves the right to amend the Plan at any time, and from time to time;

**WHEREAS,** the Standards for Privacy of Individually Identified Health Information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the applicable regulations thereunder, require that the Plan documents restrict the uses and disclosures of protected health information ("PHI") by the Board of Trustees (the Plan Sponsor) in order for the Plan to disclose such PHI to the Plan Sponsor;

**WHEREAS,** such restrictions apply only to the Comprehensive Medical, Ancillary Medical, Dental, Vision and Prescription Drug Benefits (the "health components") and not to the Non-Medical Benefits of the Plan;

**WHEREAS,** the Board of Trustees, as Plan Sponsor, seeks to use or disclose protected health information to the extent and in accordance with the uses and disclosures permitted by HIPAA.

**NOW THEREFORE,** this amendment, as required under the Privacy Standards shall be incorporated as Article XIX of the Plan Document and apply effective April 14, 2003, as follows:

## ARTICLE XIX. HIPAA PRIVACY

### 19.01   Use and Disclosure of Protected Health Information

(a)   The Plan will use or disclose protected health information (PHI) to the extent and in accordance with the uses and disclosures permitted by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Such restrictions shall apply only to the Comprehensive Medical, Ancillary Medical, Dental, Vision and Prescription Drug Benefits (the "health components") and not to the Non-Medical Benefits of the Plan. Specifically, the Plan will use and disclose protected health information for purposes related to health care treatment, payment for health care, and health care operations.

"Treatment" is the provision, coordination, or management of health care and related services. It also includes, but is not limited to, consultations and referrals between one or more providers.

"Payment" includes activities undertaken by the Plan to obtain premiums or determine or fulfill its responsibility for coverage and provision of plan benefits that relate to an individual to whom health care is provided. These activities include, but are not limited to, the following:

   (1)   Determination of eligibility, coverage, and cost sharing amounts (e.g. cost of a benefit, plan maximums, and co-payments as determined for an individual's claim);

   (2)   Coordination of benefits;

(3) Adjudication of health benefit claims (including appeals and other payment disputes);

(4) Subrogation of health benefit claims;

(5) Establishing employee contributions;

(6) Risk adjusting amounts due based on enrollee health status and demographic characteristics;

(7) Billing, collection activities and related health care data processing;

(8) Claims management and related health care data processing, including auditing payments, investigating and resolving payment disputes and responding to participant or beneficiary (and their personal representatives') inquiries about payments;

(9) Obtaining payment under a contract for reinsurance (including stop-loss and excess of loss insurance);

(10) Medical necessity reviews, or reviews of appropriateness of care or justification of charges;

(11) Utilization review, including pre-certification, pre-authorization, concurrent review and retrospective review;

(12) Disclosure to consumer reporting agencies related to collection of premiums or reimbursement (the following PHI may be disclosed for payment purposes: name and address, date of birth, SSN, payment history, account number, and name and address of the provider and/or health plan); and

(13) To obtain or provide reimbursement to the Plan for the provision of health care.

"Health Care Operations" include, but are not limited to, the following activities:

(1) Quality assessment;

(2) Population-based activities relating to improving health or reducing health care costs, protocol development, case management and care coordination, disease management, contacting of health care providers and patients with information about treatment alternatives; and related functions;

(3) Rating provider and Plan performance, including accreditation, certification, licensing, or credentialing activities;

(4) Underwriting, premium rating, and other activities relating to the creation, renewal or replacement of a contract of health insurance or health benefits, and ceding, securing, or placing a contract for reinsurance of risk relating to claims for health care (including stop-loss insurance and excess of loss insurance);

(5) Conducting or arranging for medical review, legal services, and auditing functions, including fraud and abuse detection and compliance programs;

(6) Business planning and development, such as conducting cost-management and planning-related analyses related to managing and operating the Plan, including formulary development and administration, development or improvement of methods of payment or coverage policies;

(7) Business management and general administrative activities of the Plan, including, but not limited to:

2

> Management activities relating to implementation of and compliance with the requirements of HIPAA Administrative Simplification;

> Customer service, including the provision of data analyses for policyholders, the plan sponsor, or other customers;

(8) Resolution of internal grievances; and

(9) Due diligence in connection with the sale or transfer of assets to a potential successor in interest, if the potential successor in interest is a covered entity or, following completion of the sale or transfer, will become a covered entity.

(b)    The Plan will use and disclose PHI as required by law and as permitted by authorization of a participant or beneficiary. With an authorization, the Plan will disclose PHI to other employee benefit plans sponsored by one or more of the Participating Local Union Funds for purposes related to administration of these plans.

(c)    For purposes of this section, the Board of Trustees of the Graphic Communications National Health and Welfare Fund is the Plan Sponsor. The Plan will disclose PHI to the Plan Sponsor only upon receipt of a certification from the Plan Sponsor that the Plan documents have been amended to incorporate the provisions below.

(d)    With respect to PHI, the Plan Sponsor agrees to:

(1) Not use or further disclose the information other than as permitted or required by the Plan document or as required by law;

(2) Ensure that any agents, including a subcontractor, to whom the Plan Sponsor provides PHI received from the Plan agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to such information;

(3) Not use or disclose the information for employment-related actions and decisions unless authorized by the individual;

(4) Not use or disclose the information in connection with any other benefit or employee benefit plan of the Plan Sponsor or a Participating Local Union Fund unless authorized by the individual;

(5) Report to the Plan any use or disclosure of the information of which it becomes aware that is inconsistent with the uses or disclosures provided for;

(6) Make available PHI to the individual in accordance with the access requirements of HIPAA;

(7) Make available PHI for amendment and incorporate any amendments to PHI in accordance with HIPAA;

(8) Make available the information required to provide an accounting of disclosures;

(9) Make internal practices, books, and records relating to the use and disclosure of PHI received from the Plan available to the Secretary of HHS for the purposes of determining compliance by the Plan with HIPAA;

3

(10) If feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such information when no longer needed for the purpose for which disclosure was made. If return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction infeasible.

(e)     Adequate separation between the Plan and the Plan Sponsor must be maintained. Therefore, in accordance with HIPAA, only the following individuals or classes of individuals may be given access to PHI.

    (1) Members of the Executive Committee; and

    (2) Members of the Appeals Committee

(f)     The persons described in paragraph (e) may only have access to, and use and disclose PHI, for plan administration functions that the Plan Sponsor performs for the Plan.

(g)     If the persons described in paragraph (e) do not comply with this Article, the Plan Sponsor shall provide a mechanism for resolving issues of noncompliance, including disciplinary sanctions.

**IN WITNESS WHEREOF,** the undersigned has set forth their signature(s) below this 21th day of January , 2005.

Attest:   For the Graphic Communications National Health and Welfare Fund;

Robert Lacey, Secretary

4

*O'DONNELL, SCHWARTZ & ANDERSON, P.C.*

*COUNSELORS AT LAW*

*1900 L STREET, N.W., SUITE 800*

Asher W. Schwartz
Darryl J. Anderson
Martin R. Ganzglass
Lee W. Jackson
Arthur M. Luby
Anton G. Hajjar*
Richard S. Edelman
Peter J. Leff**
Melinda K. Holmes
Rachel Tumidolsky
Daniel B. Smith***
Brenda Zwack†

*WASHINGTON, D. C. 20036*

(202) 898-1824

FAX (202) 429-8928

———————

John F. O'Donnell
(1907-1993)

*1300 L Street, N.W.*
*Suite 1200*
*Washington, D.C. 20005*
(202) 898-1707

*\*Also MD*
*\*\*Also VA*
*\*\*\*MD Bar Only*

## FACSIMILE TRANSMISSION SHEET

**TO:**    **Teresa Bauer**
           **CDS Administrators, Inc.**
           **[Preset #23]**

**FAX NO:**    **412-201-2250**

**FROM:**    **Martin R. Ganzglass**

**DATE:**    **January 27, 2005**

**NO. PAGES:** ___6___ **(Including Cover Sheet)**

| MESSAGE/REMARKS: |
| --- |
| Executed Amendments #16 and #17 attached. |

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY-PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.
Should you have any problems with this transmission or do not receive it in its entirety, please telephone at (202) 898-1824.

# Sixteenth Amendment to the
# Graphic Communications National Health and Welfare Fund
# Plan Document

**WHEREAS,** the Board of Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** pursuant to Section 16.01 of the Plan, the Board of Trustees reserves the right to amend the Plan at any time, and from time to time;

**WHEREAS,** the Standards for Privacy of Individually Identified Health Information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the applicable regulations thereunder, require that the Plan documents restrict the uses and disclosures of protected health information ("PHI") by the Board of Trustees (the Plan Sponsor) in order for the Plan to disclose such PHI to the Plan Sponsor;

**WHEREAS,** such restrictions apply only to the Comprehensive Medical, Ancillary Medical, Dental, Vision and Prescription Drug Benefits (the "health components") and not to the Non-Medical Benefits of the Plan;

**WHEREAS,** the Board of Trustees, as Plan Sponsor, seeks to use or disclose protected health information to the extent and in accordance with the uses and disclosures permitted by HIPAA.

**NOW THEREFORE,** this amendment, as required under the Privacy Standards shall be incorporated as Article XIX of the Plan Document and apply effective April 14, 2003, as follows:

## ARTICLE XIX.  HIPAA PRIVACY

### 19.01   Use and Disclosure of Protected Health Information

(a)     The Plan will use or disclose protected health information (PHI) to the extent and in accordance with the uses and disclosures permitted by the Health Insurance Portability and Accountability Act of 1996 (HIPAA).   Such restrictions shall apply only to the Comprehensive Medical, Ancillary Medical, Dental, Vision and Prescription Drug Benefits (the "health components") and not to the Non-Medical Benefits of the Plan.   Specifically, the Plan will use and disclose protected health information for purposes related to health care treatment, payment for health care, and health care operations.

"Treatment" is the provision, coordination, or management of health care and related services.  It also includes, but is not limited to, consultations and referrals between one or more providers.

"Payment" includes activities undertaken by the Plan to obtain premiums or determine or fulfill its responsibility for coverage and provision of plan benefits that relate to an individual to whom health care is provided.  These activities include, but are not limited to, the following:

(1) Determination of eligibility, coverage, and cost sharing amounts (e.g. cost of a benefit, plan maximums, and co-payments as determined for an individual's claim);

(2) Coordination of benefits;

(3) Adjudication of health benefit claims (including appeals and other payment disputes);

(4) Subrogation of health benefit claims;

(5) Establishing employee contributions;

(6) Risk adjusting amounts due based on enrollee health status and demographic characteristics;

(7) Billing, collection activities and related health care data processing;

(8) Claims management and related health care data processing, including auditing payments, investigating and resolving payment disputes and responding to participant or beneficiary (and their personal representatives') inquiries about payments;

(9) Obtaining payment under a contract for reinsurance (including stop-loss and excess of loss insurance);

(10) Medical necessity reviews, or reviews of appropriateness of care or justification of charges;

(11) Utilization review, including pre-certification, pre-authorization, concurrent review and retrospective review;

(12) Disclosure to consumer reporting agencies related to collection of premiums or reimbursement (the following PHI may be disclosed for payment purposes: name and address, date of birth, SSN, payment history, account number, and name and address of the provider and/or health plan); and

(13) To obtain or provide reimbursement to the Plan for the provision of health care.

"Health Care Operations" include, but are not limited to, the following activities:

(1) Quality assessment;

(2) Population-based activities relating to improving health or reducing health care costs, protocol development, case management and care coordination, disease management, contacting of health care providers and patients with information about treatment alternatives; and related functions;

(3) Rating provider and Plan performance, including accreditation, certification, licensing, or credentialing activities;

(4) Underwriting, premium rating, and other activities relating to the creation, renewal or replacement of a contract of health insurance or health benefits, and ceding, securing, or placing a contract for reinsurance of risk relating to claims for health care (including stop-loss insurance and excess of loss insurance);

(5) Conducting or arranging for medical review, legal services, and auditing functions, including fraud and abuse detection and compliance programs;

(6) Business planning and development, such as conducting cost-management and planning-related analyses related to managing and operating the Plan, including formulary development and administration, development or improvement of methods of payment or coverage policies;

(7) Business management and general administrative activities of the Plan, including, but not limited to:

2

> ➤ Management activities relating to implementation of and compliance with the requirements of HIPAA Administrative Simplification;

> ➤ Customer service, including the provision of data analyses for policyholders, the plan sponsor, or other customers;

(8) Resolution of internal grievances; and

(9) Due diligence in connection with the sale or transfer of assets to a potential successor in interest, if the potential successor in interest is a covered entity or, following completion of the sale or transfer, will become a covered entity.

(b)   The Plan will use and disclose PHI as required by law and as permitted by authorization of a participant or beneficiary.  With an authorization, the Plan will disclose PHI to other employee benefit plans sponsored by one or more of the Participating Local Union Funds for purposes related to administration of these plans.

(c)   For purposes of this section, the Board of Trustees of the Graphic Communications National Health and Welfare Fund is the Plan Sponsor.  The Plan will disclose PHI to the Plan Sponsor only upon receipt of a certification from the Plan Sponsor that the Plan documents have been amended to incorporate the provisions below.

(d)   With respect to PHI, the Plan Sponsor agrees to:

(1) Not use or further disclose the information other than as permitted or required by the Plan document or as required by law;

(2) Ensure that any agents, including a subcontractor, to whom the Plan Sponsor provides PHI received from the Plan agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to such information;

(3) Not use or disclose the information for employment-related actions and decisions unless authorized by the individual;

(4) Not use or disclose the information in connection with any other benefit or employee benefit plan of the Plan Sponsor or a Participating Local Union Fund unless authorized by the individual;

(5) Report to the Plan any use or disclosure of the information of which it becomes aware that is inconsistent with the uses or disclosures provided for;

(6) Make available PHI to the individual in accordance with the access requirements of HIPAA;

(7) Make available PHI for amendment and incorporate any amendments to PHI in accordance with HIPAA;

(8) Make available the information required to provide an accounting of disclosures;

(9) Make internal practices, books, and records relating to the use and disclosure of PHI received from the Plan available to the Secretary of HHS for the purposes of determining compliance by the Plan with HIPAA;

3

(10) If feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such information when no longer needed for the purpose for which disclosure was made. If return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction infeasible.

(e)   Adequate separation between the Plan and the Plan Sponsor must be maintained. Therefore, in accordance with HIPAA, only the following individuals or classes of individuals may be given access to PHI.

(1) Members of the Executive Committee; and

(2) Members of the Appeals Committee

(f)   The persons described in paragraph (e) may only have access to, and use and disclose PHI, for plan administration functions that the Plan Sponsor performs for the Plan.

(g)   If the persons described in paragraph (e) do not comply with this Article, the Plan Sponsor shall provide a mechanism for resolving issues of noncompliance, including disciplinary sanctions.

**IN WITNESS WHEREOF,** the undersigned has set forth their signature(s) below this ____ day of _____, 2005.


Attest:    For the Graphic Communications National Health and Welfare Fund;


_____

Robert Lacey, Secretary

4

## Seventeenth Amendment to the
## Graphic Communications National Health and Welfare Fund
## Plan Document

**WHEREAS,** the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** pursuant to Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, and from time to time;

**WHEREAS,** the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED,** that the Plan be and hereby is amended, effective, as follows:

Section 7.01, General Wellness Benefits, section (3) (A) is amended by changing the number "5" to number "9." It will read as follows:

(3) Limitations

        Charges covered for wellness care shall not include the following:

        (A) for examinations given to Eligible Persons under the age of 12:

            (i)     more than 9 examinations in the first 24 months of a child's life, and

            (ii)    more than one examination in each year thereafter;

**IN WITNESS WHEREOF,** the undersigned has set forth their signature(s) below this 27th day of January, 2005.

Attest:  For the Graphic Communications National Health and Welfare Fund;

_____

Robert Lacey, Secretary

## *Seventeenth Amendment to the*
## *Graphic Communications National Health and Welfare Fund*
## *Plan Document*

**WHEREAS,** the Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** pursuant to Section 16.01 of the Plan, the Trustees reserve the right to amend the Plan at any time, and from time to time;

**WHEREAS,** the Trustees deem it advisable to amend the Plan in the manner hereinafter set forth;

**NOW THEREFORE, BE IT RESOLVED,** that the Plan be and hereby is amended, effective, as follows:

Section 7.01, General Wellness Benefits, section (3) (A) is amended by changing the number "5" to number "9." It will read as follows:

(3) Limitations

      Charges covered for wellness care shall not include the following:

      (A) for examinations given to Eligible Persons under the age of 12:

            (i)     more than 9 examinations in the first 24 months of a child's life, and

            (ii)    more than one examination in each year thereafter;

**IN WITNESS WHEREOF,** the undersigned has set forth their signature(s) below this _____ day of _____, 2005.

Attest:   For the Graphic Communications National Health and Welfare Fund;

_____

Robert Lacey, Secretary

# *Eighteenth Amendment to the Graphic Communications National Health and Welfare Fund Plan Document*

**WHEREAS,** the Board of Trustees adopted the Graphic Communications National Health and Welfare Plan ("Plan") to be effective March 1, 1997;

**WHEREAS,** pursuant to Section 16.01 of the Plan, the Board of Trustees reserves the right to amend the Plan at any time, and from time to time;

**WHEREAS,** in compliance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the Trustees deem it advisable to amend certain eligibility and enrollment provisions of the Plan;

**NOW THEREFORE, BE IT RESOLVED,** that the Plan be and hereby is amended, effective January 1, 2005, as follows:

*1.   Section 3.01(a) is revised to delete the last paragraph which began, "If an Employee is confined to a Hospital…." The new Section will read as follows:*

   (a)   Initial Eligibility
        An Employee shall become an Eligible Employee on:
        (1)   the first day of the calendar month following the month in which the Employee completes one month of Covered Employment, or
        (2)   as otherwise provided by the Collective Bargaining Agreement and as approved by the Committee.

*2.   The following paragraph (e) shall be added to Section 3.01:*

(e)   Special Enrollment for Loss of Other Coverage
        If an Eligible Employee declined coverage because of other health insurance coverage, and the Eligible Employee loses that coverage as a result of loss of eligibility or termination of employer contributions toward coverage, the Eligible Employee may enroll in this Plan provided enrollment is requested within 60 days after the other coverage ends.  Coverage will become effective no later than the first day of the first month following a completed request for enrollment.  Loss of eligibility includes, but is not limited to, termination of employment or exhaustion of COBRA continuation coverage under another plan.  Loss of eligibility shall not include a loss of coverage due to failure of the individual to pay premiums on a timely basis or termination of coverage for cause (such as for fraud).

*`ection 3.02(g) is deleted in its entirety.*

4. *Section 3.03(a) is deleted in its entirety and replaced with the following*:

    A Dependent of an Eligible Employee or Eligible Retiree shall be an Eligible Dependent under the Plan on the later of the date the Employee or Retiree becomes an Eligible Person or the date the Dependent becomes a "Dependent" as defined in Section 2.15 herein.  If an Employee or Retiree acquires a Dependent as a result of marriage, birth, adoption or placement for adoption after becoming an Eligible Person and enrolls the Dependent within 60 days of acquiring the Dependent, the Dependent shall be an Eligible Person as of the date of the marriage, birth, adoption or placement for adoption.  If the request for enrollment occurs more than 60 days after the marriage, birth, adoption or placement for adoption, the Dependent shall be an Eligible Person on the first day of the month following enrollment.  The Board of Trustees may require satisfactory proof of marriage to a spouse or proof of a child's Dependent status in accordance with Section 13.02 herein.

    In addition, if an Eligible Employee declined coverage for a Dependent because of other health insurance coverage, and the Dependent loses that other coverage as a result of loss of eligibility (as defined in Section 3.01(e)) or termination of employer contributions toward coverage, the Dependent may be enrolled in the Plan provided enrollment is requested within 60 days after the other coverage ends.  Coverage will become effective no later than the first day of the first month following a completed request for enrollment.

5. *Section 3.03(c) is deleted in its entirety*.

IN WITNESS WHEREOF, the undersigned has set forth their signature(s) below this _____ day of _____, 2005.

Attest:   For the Graphic Communications National Health and Welfare Fund;

_____

Robert Lacey, Secretary

# GRAPHIC COMMUNICATIONS
# NATIONAL
# HEALTH AND WELFARE FUND



## YOUR HEALTH AND WELFARE PLAN

EXHIBIT

2

## GCIU STAFF MEDICAL PLAN (cont.)

| | | |
|---|---|---|
| **Other Services** | | |
| Orthopedic Appliance Implants | 90% | 80% |
| Orthopedic Braces and Appliances | 90% | 80% |
| Prosthetic Devices or Implants | 90% | 80% |
| Physical, Occupational and Speech Therapy | 90% | 80% |
| Visiting Nurses | 90% | 70% |
| Skilled Nursing Facility | 90% | 80% |
| TMJ ($2,500 lifetime max) | 90% | 80% |
| Pre-Admission Testing | 100% | 100% |
| Second Surgical Opinion (Not Mandatory) | 100% | 100% |
| Organ Transplant | 90% | 80% |
| Renal Dialysis | 90% | 80% |
| Durable Medical Equipment | 90% | 90% |
| Home Health Care (100 visits per year max) | 90% | 90% |
| Hospice Care | 90% | 90% |
| Ambulance Service | 90% | 90% |
| **Wellness Benefits** | | |
| Routine Physical/gynecological Exam | 100% | No Benefit |
| Pap Smear (18 years and older) | 100% | 100% |
| Mammogram (1 yearly women age 40-75) | 100% | 100% |
| Well-Child Care | | |
| Birth to 18 months (9 visits during first 2 years) | 100% (visits 1-5) 100% (visits 6-9) $10 copay | No Benefit |
| 19 months to 24 months | $10 copay 100% 100% $10 copay | No Benefit |
| Ages 2-6 years (1 visit) | $10 copay | No Benefit |
| Ages 7-12 years (1 visit) | | No Benefit |
| Ages 13-18 years (1 visit) | | No Benefit |

1 All coinsurance payments for Network services are based on the FHCS PPO discounted fee schedule.

2 All coinsurance payments for Non-Network services are based on reasonable and customary (R&C) charges as determined by CDS.

3 If emergency room visit results in an admission, copayment is waived.

4 Defined as the treatment of sprain, strained or flat feet, instability or imbalance, orthopedic shoes or other supportive devices. Also cutting, removal or treatment of corns, calluses, bunions or toenails.

<u>GCIU STAFF DENTAL PLAN</u>

<u>GCIU STAFF VISION PLAN</u>

Members are provided with a flat rate of $200 every two years per covered person for vision care.

| Schedule of Benefits | |
|---|---|
| Dental Deductible[1] | |
| Per Individual, per year | None |
| Per Family, per year | None |
| Annual Maximum Benefit | $2,000 |
| **Class I Diagnostic and Preventative Services** | |
| Prophylaxis | 100% |
| Oral Examination | 100% |
| Topical Fluoride | 100% |
| Space Maintainers | 100% |
| X-Rays | 100% |
| **Class II Minor Restorative Services** | |
| Fillings | 80% |
| Periodontics | 80% |
| Endodontics – Root Canal Surgery | 80% |
| Extractions | 80% |
| Prosthodontics – First Installation | 80% |
| Repair of Prosthodontics – Crowns, inlays, bridgework, or dentures | 80% |
| Prescription Drugs | 80% |
| **Class III Major Restorative Services** | |
| Inlays/Onlays | 80% |
| Crowns | 80% |
| Prosthodontics – Fixed | 80% |
| Bridgework, first installation | 80% |
| Dental Implants | 80% |
| **Orthodontia** | |
| Child | 100% |
| Adult | 100% |
| Lifetime Maximum Benefit | $1,200 |

[1] Plan deductible is waived for preventive services only.

GRAPHIC COMMUNICATIONS INTERNATIONAL UNION

## GCIU PRESCRIPTION DRUG PLAN

Eligibility Rules Under the Graphic Communications National Health and Welfare Plan

#### Eligibility for Active Employees:

Active employees of the GCIU are eligible for health and welfare coverage under the Graphic Communications National Health and Welfare Plan ("the National Plan") after completion of 60 days of employment with the GCIU. Coverage continues uninterrupted until the employee terminates employment with the GCIU or retires. Upon attainment of age 65, employees must enroll in Medicare Part B. The premium will be paid by the GCIU.

In the event of termination of employment with the GCIU (other than by retirement), coverage under the National Plan continues through the last day of the month in which the employee's termination occurred. The former employee is then eligible to continue coverage in the National Plan at his or her own expense in accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). See page___ for details.

#### Eligibility for Retirees

In the event the employee retires directly from employment with the GCIU and is eligible for retirement benefits from a GCIU-sponsored pension plan or pension plan in which the GCIU participates, coverage under the National Plan will continue, at the GCIU's expense, until the employee attains age 65. Upon attainment of age 65, Medicare becomes the primary insurer and supplemental coverage is provided by the GCIU though AARP.

#### In the Event of Death

In the event of the death of an active employee or retiree of the GCIU who was covered by the National Plan at the time of death, coverage for his or her dependents who were covered by the Plan at the time of the employee's death, will continue, at the GCIU's expense, for 24 months. After the expiration of the 24-month period, coverage under the National Plan is available to the dependents in accordance with COBRA.

**NOTE: The GCIU reserves the right, subject to the terms of any applicable collective bargaining agreement, to amend these eligibility rules at any time and from time to time including retiree benefits.**

| Schedule of Benefits | Network Benefits[1,2] | Non-Network Benefits[3] |
|---|---|---|
| Deductible (retail and mail order) | None | None |
| Retail: | | |
| Generic | $2 copay | $10 copay; 80% |
| Brand Name | $7 copay | $10 copay; 80% |
| Mail Order (90 day supply) | | |
| Generic | $2 copay | No Benefit |
| Brand Name | $7 copay | No Benefit |
| Mandatory Generic | Required | |
| Covered Drugs | Oral Contraceptives | |
| | Insulin | |
| | Other Injectables | |
| | Needles/Syringes | |
| | Vitamins that require a Prescription | |
| | Pediatric/Prenatal Vitamins | |
| | Allergy Serums | |
| | Infertility | |
| | Lupron | |
| | Smoking Cessation | |
| | HIV Medications | |
| | Cosmetic Applications (e.g. Efudex) | |

[1] All coinsurance payments are based on National Prescription Administrator's (NPA's) negotiated discount from average wholesale price.

[2] Copay may be greater than listed and subject to participant reimbursement.

[3] All coinsurance payments are based on retail charges submitted by pharmacy.

Graphic Communications National Health and Welfare Fund
Five Gateway Center, Suite 620
60 Boulevard of the Allies
Pittsburgh, PA 15222-1219

March, 2000

Dear Participant:

We are pleased to present this booklet describing the benefits provided by the Graphic Communications National Health and Welfare Plan for you and your covered dependents. This restatement of the Plan is effective as of March, 2000.

This booklet will help you understand the medical and nonmedical benefits provided by the Plan, and how to use them wisely. You should review it and show it to your covered family members. The booklet describes:

- the Benefits provided;
- the procedures to follow in submitting claims; and
- your responsibilities under the Plan.

Be sure to read the Exclusions and Definitions sections. Remember, not every expense you incur for health care is covered by the Plan.

**You may not be entitled to all of the benefits in this booklet. A separate Schedule of Benefits describes the benefit program provided for you by your Participating Local Union Fund or Employer. Check your Schedule of Benefits to determine your benefits.**

As the Plan is amended from time to time, the Trustees will send you notices explaining the changes. Those notices should be kept with this booklet as updates. The Trustees reserve the right to amend the Plan from time to time, including retiree benefits.

Be sure to keep this booklet and any notices of Plan changes in a safe and convenient place to refer to when needed.

This booklet is intended to be a summary of the Plan Document for the Graphic Communications National Health and Welfare Plan. Should any discrepancy arise between the Summary Plan Description and the Plan Document, the Plan Document will govern.

We are proud to bring you these benefits on a national unified basis.

Sincerely yours,

THE BOARD OF TRUSTEES

## TABLE OF CONTENTS

                                                                    Page Number

DEFINITIONS ..................................................................................1

ELIGIBILITY .................................................................................12

MEDICAL EXPENSES .....................................................................17

MEDICAL NETWORKS ....................................................................25

AND UTILIZATION MANAGEMENT ................................................25

GENERAL EXCLUSIONS .................................................................29

DENTAL EXPENSES ........................................................................31

VISION EXPENSES ..........................................................................36

PRESCRIPTION DRUGS EXPENSES ..................................................38

WEEKLY DISABILITY BENEFITS ....................................................40

LIFE INSURANCE ...........................................................................42

ACCIDENTAL DEATH ......................................................................44

AND DISMEMBERMENT ..................................................................44

CLAIMS INFORMATION ..................................................................46

DUPLICATE COVERAGE ..................................................................50

CONTINUATION COVERAGE ...........................................................55

YOUR ERISA RIGHTS ....................................................................61

OTHER INFORMATION ....................................................................63

QUICK REFERENCE CHART .............................................................70

## DEFINITIONS

The following are definitions of specific terms and words used in this document. These definitions do not, and should not be interpreted to, extend coverage under the Plan.

| | |
|---|---|
| **Alcoholism and Drug Abuse** | Alcohol and/or drug dependency as defined by the current edition of the ICD-9-CM manual. |
| **Annual Maximum Plan Benefit** | Annual Maximum Plan Benefits are the maximum amount of Benefits payable each Plan Year on account of certain medical and dental expenses incurred by any covered Plan Participant under this Plan and any Predecessor Plan. |
| **Benefit, Benefit Payment, Plan Benefit** | The amount of money payable for a claim after the calculation of all Deductibles, Coinsurance, and Copayments, and after the determination of the Plan's exclusions, limitations and maximums. |
| **Birthing Center** | A public or private facility, licensed and operating according to law, other than private offices or clinics of Physicians, that meets the free-standing birthing center requirements of the Department of Health in the State of where the covered person receives the services. |

The Birthing Center must provide:

- a facility that has been established, equipped and operated for the purpose of providing prenatal care, delivery, immediate postpartum care, and care of a child born at the center; **and**
- supervision by at least one Physician who is a specialist in obstetrics and gynecology; **and**
- a Physician or Certified Nurse Midwife at all births and immediate postpartum period; **and**
- extended staff privileges to Physicians who practice obstetrics and gynecology in an area Hospital; **and**
- at least 2 beds or 2 birthing rooms; **and**
- full time nursing services directed by a Registered Nurse or a Certified Nurse Midwife; **and**
- arrangements for diagnostic x-rays and laboratory services; **and**
- the capacity to administer local anesthetic and to perform minor Surgery.

In addition, the facility must: accept only patients with low-risk pregnancies, have a written agreement with a

1

Hospital for emergency transfers, and maintain medical records on each patient and child.

| | |
|---|---|
| **Board of Trustees** | The Board of Trustees of the Graphic Communications National Health and Welfare Fund as established by the Trust Agreement. |
| **Coinsurance** | That portion of Covered Expenses for which the Employee has financial responsibility. In most instances, you are responsible for paying a percentage of Covered Expenses in excess of the Plan's deductible, but in some instances, you are responsible for paying a higher percentage of those expenses, and in other instances, no coinsurance applies. The Plan's Coinsurance amounts are listed on the Schedule of Benefits. |
| **Collective Bargaining Agreement** | The formal written document entered into between an Employer and a GCIU local union together with any modifications, supplements or amendments thereto which covers wages, hours, fringe benefit payments and conditions of employment. |
| **Copayment, Copay** | The set dollar amount you are responsible for paying when you incur a Covered Expense for certain services. Your Copayment amounts are listed on the Schedule of Benefits. |
| **Covered Employment** | Work by an Employee in a job category for which an Employer is required to make contributions to a Participating Local Union Fund or to the Plan on his or her behalf, as required by a participation agreement. |
| **Covered Expenses** | Expenses for medical, vision, prescription drugs, and/or dental services or supplies, but only to the extent that:<br><br>· they are Medically Necessary; **and**<br>· the charges are Usual and Customary; **and**<br>· the charges do not exceed the applicable fee schedule ; **and**<br>· coverage for the services or supplies is not excluded under the Plan; **and**<br>· the Lifetime Maximum Plan Benefit and/or Annual Maximum Plan Benefits for those services or supplies has not been reached.<br><br>No amount in excess of the actual charges for a service or supply will be considered a Covered Expense. |

| | |
|---|---|
| **Deductible, Individual Deductible, Family Deductible** | The amount of Covered Expenses you are responsible for paying before the Plan begins to pay Benefits. Individual Deductible is the amount one Plan Participant must pay before the Plan begins to pay Benefits for that person. Family Deductible is the amount that all covered family members must pay before the Plan begins to pay Benefits for the family members. Your Deductible amounts are listed on the Schedule of Benefits. |
| **Dental** | Any services performed by or under the supervision of a Dentist, or supplies, including Dental prosthetics, prescribed by a Dentist, even if the services or supplies are necessary because of symptoms, illness or injury affecting another part of the body. Dental services include treatment to alter, correct, fix, improve, remove, replace, reposition, restore or treat:<br><br>· teeth;<br>· gums and tissues around the teeth;<br>· parts of the upper or lower jaws that contain the teeth (the alveolar processes and ridges);<br>· the jaw, any jaw implant, or the joint of the jaw (the temporomandibular joint);<br>· bite alignment, or the meeting of upper or lower teeth, or the chewing muscles; and/or<br>· teeth, gums, jaw or chewing muscles because of pain, injury, decay, malformation, disease or infection. |
| **Dentist** | A person who is legally licensed and authorized to practice dentistry in all its branches under the laws of the state or jurisdiction where the services are rendered and acting within the scope of his or her license. |
| **Dependent, Dependent Child(ren)** | An Employee's or Retiree's lawful Spouse and unmarried child, including any stepchild, or a child placed with the Employee or Retiree for adoption or legally adopted by an Employee or Retiree, or any such child for whom the Employee or Retiree are legally obligated to provide support , provided:<br><br>· the child has not reached age 19; **or**<br>· the child has not reached age 23 **and** attends an accredited college, university or vocational school on a full-time basis and is dependent solely on you for financial support.<br><br>Coverage of a Dependent Child may continue beyond age |

2

3.

19 (or 23 if a full-time student) for any unmarried child who is mentally or physically Disabled and is:

- incapable of self-sustaining employment as a result of that Disability; **and**
- dependent chiefly on you for support and maintenance.

The plan may require proof of full-time student status, Disability, age and financial support from time to time.

A person may be covered both as an Employee or Retiree and as a Dependent Spouse. A person also may be covered as a Dependent of more than one Employee or Retiree. A person may not, however, be covered as both a Dependent Child and an Employee.

| | |
|---|---|
| **Disabled, Disability** | The inability of an Employee to perform his or her duties with the Employer as a result of a non-occupational Illness or Injury, or the inability of a Dependent to perform the normal activities or duties of a person of the same age and sex, as determined by the Administrator. |
| **Durable Medical Equipment** | Equipment that can withstand repeated use, is primarily and customarily used for a medical purpose and is not generally useful in the absence of an injury or illness, and is not disposable or non-durable. |
| | Durable Medical Equipment includes, but is not limited to, apnea monitors, blood sugar monitors, commodes, electric hospital beds (with safety rails) electric and manual wheelchairs, nebulizers, oximeters, oxygen and supplies, and ventilators. |
| **Emergency (Medical)** | See *Medical Emergency*, below. |
| **Employee** | A person in Covered Employment or any other person employed by an Employer who satisfies the requirements for participation in the Plan and on whose behalf an Employer makes contributions to a Participating Local Union Fund or, by special participation agreement, directly to the Plan. An Employee does not include any person who has a direct or indirect interest in a sole proprietorship or partnership which is an Employer. |

| | |
|---|---|
| **Employer** | Any Employer in the graphic communications industry who, pursuant to the terms of a Collective Bargaining Agreement with a GCIU local union, is required to make periodic contributions to a Participating Local Union Fund or to the National Plan on behalf of Employees. A GCIU local union, GCIU entity, a joint GCIU-Employer entity or a Participating Local Union Fund also can be an employer. |
| **Experimental and/or Investigational** | The Board of Trustees has the discretion to determine if a service or supply is Experimental and/or Investigational. A service or supply is Experimental and/or Investigational if, in the opinion of the Board of Trustees, there is a preponderance of authoritative medical, dental or scientific literature published in the United States and written by experts in the field that shows recognized medical, dental or scientific experts: |
| | - classify the service or supply as experimental and/or investigational; **or** |
| | - indicate that more research is required before the service or supply could be classified as equally or more effective than conventional therapies. |
| | A drug will <u>not</u> be considered Experimental and/or Investigational if it is: |
| | - approved by the FDA as an "investigational new drug for treatment use"; **or** |
| | - classified by the National Cancer Institute as a Group C cancer drug when used for treatment of a "life threatening disease" as that term in defined in FDA regulations; **or** |
| | - approved by the FDA for the treatment of cancer and has been prescribed for the treatment of a type of cancer for which the drug was <u>not</u> approved for general use, **and** the FDA has <u>not</u> determined that such drug should not be prescribed for a given type of cancer. |
| **Fund** | The Graphic Communications National Health and Welfare Fund. |
| **Home Health Care** | Intermittent Skilled Nursing Care services provided by a licensed Home Health Care Agency as defined below. |

4

5

| | |
|---|---|
| **Home Health Care Agency** | A licensed or certified agency that primarily provides skilled nursing and other therapeutic services under the supervision of Physicians or Registered Nurses, is run according to rules established by a group of professional medical providers including Physicians and Registered Nurses, maintains clinical records on all patients, and is certified by Medicare. |
| **Home Health Care Plan** | A plan that provides for the care and treatment of an Illness or Injury. The care and treatment must be:

· prescribed by a Physician; **and**
· an alternative to confinement in a Hospital or Skilled Nursing Facility. |
| **Hospice** | A licensed facility or organization certified by Medicare, that administers a program of palliative and supportive health care services providing physical, psychological, social and spiritual care for terminally ill persons with a life expectancy of 6 months or less. Hospice care is intended to let the terminally ill spend their last days with their families at home or in a home-like setting, keeping the patient as comfortable and free from pain as possible, and providing emotional support to the patient and family. |
| **Hospital** | A public or private facility or institution, accredited by the Joint Commission on Accreditation of Hospitals and Healthcare Organizations (JCAHHO) or approved by the Board of Trustees, or similar Hospital in a foreign country, which provides care and treatment by Physicians and Nurses on a 24-hour basis for illness or injury through medical, surgical and diagnostic facilities on its premises. A Hospital does not include rest or nursing homes, convalescent homes or institutions, sanitariums or similar institutions providing custodial or institutional care. |
| **Illness** | Any bodily sickness or disease, including any congenital abnormality of a newborn child, diagnosed by a Physician. Pregnancy of a Plan Participant will be considered to be an Illness for purposes of Plan coverage. |
| **Injury** | Any damage to a body part resulting from trauma from an external source. |
| **In-Network Services** | Services provided by a health care provider in the Plan's Preferred Provider Organization (PPO), as distinguished from Out-of-Network Services provided by a health care provider that is **not** a member of the PPO. |

| | |
|---|---|
| **Lifetime Maximum Plan Benefit** | The maximum amount of Benefits payable by the Plan during the entire time a Plan Participant is covered under this Plan and any Predecessor Plan. |
| **Medical Emergency** | A sudden unexpected onset of a medical condition, not normally treatable in a Physician's office, that manifests itself by such acute symptoms of sufficient severity that urgent and immediate medical attention is required without regard to the time of day or night either to prevent serious impairment of body functions or serious and/or permanent impairment or dysfunction of any body organ or part, or because the patient's life is threatened. |
| **Medically Necessary** | A service or supply which the Board of Trustees determines is:

· provided by or under the direction of a Physician, Dentist or other licensed health care practitioner authorized to do so; **and**
· necessary in terms of generally accepted medical standards in the community in which it is provided; **and**
· consistent with the symptoms or diagnosis and treatment of the illness or injury; **and**
· not provided solely for the convenience of the patient, Physician, Hospital, health care provider, or other licensed treatment facility; **and**
· appropriate given the patient's circumstances and condition.

Your Physician's or Dentist's order, recommendation or approval **does not mean** that a service or supply is Medically Necessary.

A service or supply that can safely and appropriately be furnished in a Physician's or Dentist's office (or other less costly facility) is **not** Medically Necessary if furnished in a Hospital or Specialized Health Care Facility (or other more costly facility). |
| **Medicare** | The Health Insurance for the Aged and Disabled provisions in Title XVIII of the U.S. Social Security Act as it is now amended and as it may be amended in the future. |

| | |
|---|---|
| **Mental and Nervous Disorders** | Certain disorders, conditions and diseases defined within the mental disorders section of the current edition of the International Classification of Diseases (ICD-9-CM) manual, which includes, among other things, depression and schizophrenia. |
| **Mental Health Practitioners** | A Physician, certified mental health counselor, or social worker who is legally licensed or authorized to practice or provide service, care or treatment of Mental and Nervous Disorders under the laws of the State or jurisdiction where the services are rendered, acts within the scope of his or her license, and is not the patient or the parent, spouse, sibling (by birth or marriage) or child of the patient. |
| **Midwife** | A person certified to practice midwifery and who is a member of the American College of Nurse-Midwifery. |
| **Nurse** | A person legally licensed as a Registered Nurse (RN), Certified Registered Nurse Anesthetist (CRNA), Nurse Practitioner, Licensed Practical Nurse (LPN), Licensed Vocational Nurse (LVN), Psychiatric Mental Health Nurse, or any equivalent designation, under the laws of the State or jurisdiction where the services are rendered, who acts within the scope of his or her license and is not the patient or the parent, spouse, sibling (by birth or marriage) or child of the patient. |
| **Out-of-Network Services** | Services provided by a health care provider not in the Plan's Preferred Provider Organization (PPO), as distinguished from In-Network Services provided by a health care provider that is a member of the PPO. |
| **Out-of-Pocket Maximum** | The maximum amount of Coinsurance each Plan Participant is responsible for paying during a Calendar Year before the Coinsurance required by the Plan ceases to apply. When the Out-of-Pocket Maximum is reached, the Plan will pay 100% of any additional Covered Expenses for the remainder of the Calendar Year up to the Plan's limits. The Plan's Deductibles, Copayments, and any expenses for medical services or supplies that are not covered by the Plan, and all charges in excess of the Usual and Customary Charges as determined by the Board of Trustees **do not count** toward the Out-of-Pocket Maximum. |

| | |
|---|---|
| **Participant** | The Employee, Retiree or Dependent who is enrolled for coverage under the Plan. |
| **Participating Local Union Fund** | A Taft-Hartley, GCIU local union health and welfare benefit fund which has been accepted for participation in the Plan and whose board of trustees has agreed in writing to be bound by the terms of the Agreement and Declaration of Trust. A Participating Local Union Fund also can include a GCIU Local Union, a GCIU entity, a joint GCIU-Employer entity or an Employer which has agreed to be bound to the terms of the Agreement and Declaration of Trust with respect to the health and welfare plan established for the benefit of its employees. |
| **Physician** | A person legally licensed as a Medical Doctor (MD), Doctor of Osteopathy (DO), or a doctor of dental surgery, podiatry, or chiropractic services and authorized to practice medicine, to perform surgery, and to administer drugs, under the laws of the State or jurisdiction where the services are rendered who acts within the scope of his or her license. |
| **Plan** | The Graphic Communications National Health and Welfare Plan, as amended from time to time. |
| **Plan Administrator** | The Plan Administrator is the Board of Trustees or its designee who has been given the authority to carry out the administration of the Plan. The Board of Trustees currently engages Central Data Services, Inc., National Prescription Administrators, National Vision Administrators, and Aetna Life and Casualty to administer the payment of claims for certain types of benefits. Any designee may change without notice. |
| **Predecessor Plan** | The former Graphic Communications International Union Health and Welfare Pooling Fund and any other health and welfare fund or plan that agrees to participate in the Plan. |
| **Preferred Provider Organization (PPO)** | A group or network of health care providers under contract with the Fund to provide health care services and supplies at negotiated rates as payment in full, except with respect to a defined Coinsurance, Copayment, and Deductible for which the Participant is responsible. |

| | |
|---|---|
| **Rehabilitation Care** | Cardiac, occupational, physical, pulmonary or speech therapy that is prescribed by a Physician when the bodily function has been restricted or diminished as a result of Illness, Injury or surgery, with the goal of improving or restoring bodily function by a significant and measurable degree to as close as reasonably and medically possible to the condition that existed before the injury, illness or surgery, and that is performed by a licensed therapist acting within the scope of his or her license. |
| **Retiree** | A retired Employee who is receiving monthly pension benefits from a qualified retirement plan established for Employees in the graphic communications industry. |
| **Skilled Nursing Care** | Services performed by a licensed Nurse which are ordered by and provided under the direction of a Physician, intermittent and part-time, generally not exceeding 16 hours a day, and are usually provided on less-than-daily basis, and which are so inherently complex that they can be safely and effectively performed only by or under the supervision of a Nurse. Examples include, but are not limited to, the initiation of intravenous therapy and the initial management of medical gases such as oxygen. |
| **Skilled Nursing Facility** | A licensed public or private facility that primarily provides skilled nursing and related services to people who require medical or nursing care and that rehabilitates injured, disabled or sick people, and that: |

    . is accredited by the Joint Commission on Accreditation of Hospitals and Healthcare Organizations (JCAHHO) as a Skilled Nursing Facility or is recognized by Medicare as a Skilled Nursing Facility; **and**

    . maintains on its premises all facilities necessary for medical care and treatment; **and**

    . provides services under the supervision of Physicians; **and**

    . provides nursing services by or under the supervision of a licensed Registered Nurse, with one licensed Registered Nurse on duty at all times; **and**

    . is not a place for rest, domiciliary care, or care of people who are aged, alcoholic, blind, deaf, drug addicts, mentally deficient, or suffering from tuberculosis; **and**

    . is not a hotel or motel.

10

| | |
|---|---|
| **Specialized Health Care Facilities** | Birthing Centers, Hospices, and Skilled Nursing Facilities, defined above. |
| **Spouse** | The Employee's lawful spouse determined under applicable State law. |
| **Transplant, Transplantation** | The transfer of organs (such as the heart, kidney, liver) or living tissues or cells (such as bone marrow or skin) from a donor to a recipient with the intent to maintain the functional integrity of the transplanted tissue in the recipient. |
| **Usual and Customary Charge** | The prevailing charge most other health care providers in the same or similar geographic area for the same or similar health care service or supply. |
| | Although the actual charges may exceed Usual and Customary charges, in no event will Covered Expenses up to the Usual and Customary level exceed the actual amount charged for a service or supply. |

| **Other Defined Terms** | **Page** |
|---|---|
| Period of Disability | 40 |
| Qualifying Event | 55 |
| Waiting Period | 40 |

11

# ELIGIBILITY

### YOUR ELIGIBILITY
Your eligibility in the Plan is determined by the rules and regulations of your Participating Local Union Fund or Employer in accordance with the applicable collective bargaining or participation agreement. Refer to the supplementary information provided with this booklet to understand the eligibility requirements that apply to you.

### ELIGIBILITY CONTINGENT ON PREMIUM PAYMENTS
All eligibility for coverage for you, your Spouse and/or Dependent Child(ren), is contingent on the Plan's receipt of monthly premium payments from your Participating Local Union Fund or Employer.

No premium payments are required for extension of coverage upon death (see Extension of Coverage upon Death, page 14), other than Continuation Coverage under COBRA. You must make the premium payment for any Continuation Coverage under COBRA as provided on page 59.

### ENROLLMENT
You and/or your Dependents may become covered under this Plan only upon completion of enrollment for coverage. A person who is not duly enrolled is not entitled to any coverage for Plan Benefits or services under this Plan.

Your Participating Local Union Fund or Employer will provide you with the materials necessary for enrollment when you become eligible for coverage. If you want Dependent coverage, you must enroll your Eligible Dependents at the same time.

It is your responsibility to inform the Plan or your Participating Local Union Fund or Employer of any changes in your family status, such as gain or loss of a Dependent.

### COVERAGE
Your coverage begins on the day you are eligible for the Plan, provided you have enrolled by completing the necessary forms. However, if you are confined to a Hospital or you are Disabled on the date you would otherwise be eligible for coverage, your coverage will begin on the first full day you return to full-time Covered Employment. If your Participating Local Union Fund or Employer covered you under another plan during the month before joining the National Health and Welfare Plan, your coverage will begin on the first day of the month for which your Participating Local Union Fund or Employer makes premium payments on your behalf.

Coverage of your enrolled Spouse and/or Dependent Child(ren) begins on the date your coverage begins.

### CHANGES IN COVERAGE

If you **are enrolled for individual coverage** and if you acquire a Spouse by marriage, or if you acquire any Dependent Children by birth, adoption or placement for adoption, you may enroll your newly acquired Spouse and/or Dependent Child(ren) within 60 days after the date of marriage, birth, adoption or placement for adoption.

Coverage for your newly acquired Spouse and/or Dependent Child(ren) will begin as follows:

- Your Spouse's coverage will become effective as of the date of marriage.

- Your Dependent Child's coverage will become effective as of the date of birth, adoption or placement for adoption.

- If you do not enroll your Spouse or Dependent Child(ren) for coverage within 60 days of the date of marriage, birth, adoption or placement for adoption, their coverage will be effective on the first day of the month following enrollment.

If your Dependent Child becomes eligible for coverage as an Employee, your child will cease to be a Dependent Child, and may enroll for coverage as an Employee, in which case coverage as a Dependent Child will terminate as of the date coverage as an Employee begins.

### Qualified Medical Child Support Orders (QMCSOs)
If a court has issued an order with respect to the provision of health care coverage for any of your Dependent Children, the Board of Trustees will determine if the court order meets the requirements of a Qualified Medical Child Support Order (QMCSO) under federal law. The Board of Trustees's determination will be binding on the Employee.

A QMCSO requires the Plan to cover your child as a Dependent Child, even if you do not have custody of the child. If you are not enrolled, you will be required to enroll to cover yourself and your child. If your Employer requires Employee contributions, you must pay any applicable premiums. If you have questions about QMCSOs, or you would like a copy of the Plan's QMCSO procedures free of charge, please contact the Fund Office.

### WHEN COVERAGE ENDS
Refer to the supplementary information provided with this booklet to understand the eligibility requirements that apply to you. In any event, however, your coverage ends on the last day of the month in which you or your Participating Local Union Fund or Employer does not make a premium payment on your behalf to the Fund.

### EXTENSION OF COVERAGE UPON DEATH
If you are an Employee or Retiree at the time of death, your covered Dependents will remain eligible for coverage for the 12-month period beginning after the last month in which you worked or, if you are a Retiree, the 12-month period begins with the first of the month following your date of death. Once your eligible Dependent reaches age 65, or otherwise becomes eligible for Medicare, he or she will be eligible for Medicare supplementary coverage under this extension of coverage provision provided he or she pays 100% of the premium cost.

No new Dependents may be enrolled, other than your newborn or adopted child within 60 days of birth or adoption. Your Dependents' coverage will end on the last day of the month following the date your Spouse remarries, or the last day of the month when your Dependent Child no longer meets the definition of Dependent.

Your Dependents will not be required to make premium payments for the 12-month coverage period provided under this provision.

At the end of the 12-month period, your Dependents will be eligible for 24 months of Continuation Coverage (COBRA) subject to the required premium payments. Upon completion of COBRA Continuation Coverage, your Dependents may elect to continue coverage under this Plan. In order to be eligible for coverage, your Dependents must make this election within 60 days from completion of COBRA Continuation Coverage. Coverage is available provided your Dependent pays 100% of the premium cost. Coverage will end if your Dependent fails to pay for the premiums. No additional coverage under this Plan's COBRA Continuation Coverage provisions is available after termination of coverage under these circumstances.

If you are the Spouse or Dependent child of a deceased active Employee or Retiree and are currently covered under a Predecessor Plan, the rules of the Predecessor Plan will continue to apply to you.

## SPECIAL CIRCUMSTANCES

Special circumstances may entitle you to continue your eligibility for coverage under the Plan when you are on leave from work due to either family and medical leave reasons or due to service in the uniformed services of the United States. To find out more about Family or Medical Leave, contact your Employer.

The general rules are set out below:

### Family and/or Medical Leave

If you have completed 12 months of employment, you are entitled by law to up to 12 weeks each year of unpaid Family or Medical Leave for specified family or medical purposes, such as the birth or adoption of a child, or to provide care of a spouse, child or parent who is seriously ill, or for your own serious illness. While you are officially on such a Family or Medical Leave, you may be able to keep your coverage in effect during that Family or Medical Leave period.

The Fund will maintain the employee's eligibility status until the end of the leave, provided the contributing Employer properly grants the leave under the Family and Medical Leave Act (FMLA) and the contributing Employer makes the required notification *and payment* to the Participating Local Union Fund or the Plan. Call your Employer to determine whether you are eligible for FMLA leave.

14

### Leave for Military Service

If you are on active duty for a period of 31 days or less, you will continue to receive health care coverage for up to 31 days, in accordance with the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA).

If you are on active duty for a period of more than 31 days, USERRA permits you to continue medical and prescription drug coverage for you and your Dependents at your own expense for up to 18 months. This continuation right operates in the same way as COBRA. See the chapter on Continuation of Health Coverage for a full explanation of the COBRA coverage provisions, which will allow you to continue your medical and prescription drug coverage. In addition, your Dependent(s) may be eligible for health care coverage under the Civilian Health & Medical Program of the Uniformed Services (CHAMPUS). This plan will coordinate coverage with CHAMPUS.

Coverage will not be offered for any illness or injury determined by the Secretary of Veterans Affairs to have been incurred in, or aggravated during, performance of service in the uniformed services. The uniformed services and the Department of Veterans Affairs will provide care for service-connected disabilities.

When you are discharged (not less than honorably) from "service in the uniformed services," your full eligibility will be reinstated on the day you return to Covered Employment, provided that you return to employment within:

1.  ninety (90) days from the date of discharge if the period of service was more than one hundred eighty (180) days; or

2.  fourteen (14) days from the date of discharge if the period of service was thirty-one (31) days or more but less than one hundred eighty (180) days; or

3.  at the beginning of the first full regularly scheduled working period on the first calendar day following discharge (plus travel time and an additional eight hours) if the period of service was less than thirty-one (31) days.

If you are hospitalized or convalescing from an injury caused by active duty, these time limits are extended up to two years.

Questions: If you have any questions about taking a leave, please speak directly with your Employer. If you have any questions about how a leave of absence affects your benefits, please contact the Fund Office. Your USERRA rights are subject to change. Coverage will be provided only as required by law. If the law changes, your rights will change accordingly.

### Reinstatement of Coverage

If your coverage ends while you are on an approved leave of absence other than family, medical, or military leave, your coverage will be reinstated on the first day of the month in which your Participating Local Union Fund or Employer makes a premium payment on your behalf.

15

If your coverage ends while you are on an approved leave of absence other than family, medical, or military leave, and is not reinstated within 62 days, the period of leave will be counted as a break in coverage.

Any period of approved leave of absence will **not** be counted as a break in coverage.

Questions regarding your entitlement to such a leave and to the continuation of coverage should be referred to your Participating Local Union Fund or Employer.

16

## *MEDICAL EXPENSES*

---

| **IMPORTANT** |
| --- |
| *You may not be entitled to Medical Benefits under the Plan. Review your Participating Local Union Fund's or Employer's rules and regulations to confirm your eligibility.* |

### COVERED EXPENSES

You are covered for certain expenses you incur for medical services and supplies which are Medically Necessary. Services provided by a Preferred Provider Organization (PPO) health care provider will be covered at the In-Network level shown in the Schedule of Benefits. Services provided by an Out-of-Network provider will be covered at the Out-of-Network level shown in the Schedule of Benefits. If there are fewer than two In-Network providers located within 20 miles of your home, services provided will be covered at the out-of-area level of coverage. Services provided by an Out-of-Network provider who is also out of the PPO region will be covered at 80% of the Usual and Customary charges.

The Plan will not always pay benefits equal to or based on the health care provider's actual charge for health care services or supplies, even after you have paid the applicable Deductible and Coinsurance. This is because the Plan covers only the Usual and Customary charge for Out-of-Network health care services or supplies. Any amount in excess of the Usual and Customary Charge does **not** count toward the Plan's annual Out-of-Pocket Maximums.

The health care providers who are members of the PPO have agreed to accept the designated Copayment or Coinsurance and the amount payable by the Plan as full payment for the medical services or supplies they provide. Deductibles will not apply. As a result, you will not be responsible for any payment in excess of those amounts.

The Plan will not reimburse you for any expenses that are not Covered Expenses. That means you are responsible for paying the full cost of all expenses that are not covered by the Plan.

If you are a Medicare-eligible Retiree or Dependent, Covered Expenses under this Plan only include Medicare-eligible expenses. Expenses for charges which are not eligible for reimbursement under Medicare are not Covered Expenses under this Plan. Your benefit claims must be submitted to Medicare first. This Plan will pay remaining expenses (subject to the applicable deductible and co-insurance amounts) for Medicare-eligible charges up to the amounts allowable under this Plan.

17

## TRANSITION BENEFITS

If you are a member of a new group that has just joined the Fund, you are eligible for transition benefits in the following circumstances:

1. If you or your Dependent(s) are in the course of treatment while under the care of a provider in a network other than the network maintained by the Fund, you can continue your course of treatment for up to thirty days at In-Network Benefit levels provided that the treatment is a Medically Necessary Covered Expense as defined under this Plan. In order to receive In-Network Benefits for the thirty-day grace period, you must continue to see the same provider that you were seeing for your course of treatment on the date upon which you become eligible under this Plan.

2. If you, your Spouse, or your Dependent child are in the course of treatment for a pregnancy, you are eligible for transition benefits provided that you are:

   - beyond the first trimester prior to the effective date of the new group coverage; and
   - under the care of a provider in a network other than the network(s) maintained by the Fund.

   Transition benefits allow you to continue the course of treatment for your pregnancy at In-Network Benefit levels through childbirth and discharge, as long as the same provider previously rendering such services renders all future services.

For purposes of this section, a "course of treatment" is a planned series of procedures or treatments prescribed by a Physician.

## OUT-OF-POCKET EXPENSES

These are the expenses for medical services and supplies that you are responsible for paying yourself. Under the Plan, each year, you will be responsible for paying out of your own pocket:

- Your Individual or Family Deductible
- Any applicable Coinsurance
- Any applicable Copayment
- All expenses for medical services or supplies not covered by the Plan
- All charges in excess of the Usual and Customary Charge
- All charges in excess of the Lifetime Maximum Plan Benefit and/or Annual Maximum Plan Benefits, or any other limitation of the Plan
- Applicable penalties if you fail to comply with the Utilization Management Programs (*see* the Medical Networks and Utilization Management section)

## DEDUCTIBLES

Each year, you are responsible for paying all of your Covered Expenses for services and supplies provided by an Out-of-Network provider until you satisfy the annual Deductible. Then, the Plan begins to pay Benefits. Generally, there are two types of Deductibles: individual and family. The Individual Deductible is the maximum amount one covered person must pay before Plan

Benefits begin. The Family Deductible is the maximum amount that a family of two or more must pay before Plan Benefits begin. See the Schedule of Benefits for Deductible amounts.

## COINSURANCE

If a Deductible applies to your Benefit, you must pay the Deductible before the Plan will pay a Coinsurance. This means that once you have met your annual Deductible, the Plan pays a percentage of the Covered Expenses, and you are responsible for paying the rest. The part you pay is called the Coinsurance. *See* the Schedule of Benefits to determine the percentage paid by the Plan.

Each Calendar Year, after an individual or family incurs a maximum Out-of-Pocket amount of **Coinsurance**, no further Coinsurance will apply to Covered Expenses. As a result, the Plan will pay 100% of all Covered Expenses that are incurred during the remainder of the Calendar Year after the Out-of-Pocket Maximum has been reached.

| IMPORTANT |
| --- |
| If you fail to follow certain of the Plan's Utilization Management Programs, you may be subject to $300 penalty. That means that medical expenses covered by the Plan may be reduced by $300 in addition to any Deductibles or Coinsurance that may apply. These features are described in the Medical Networks and Utilization Management sections of this booklet. |

## COPAYMENT

A Copayment is a set dollar amount you are responsible for paying when you incur a Covered Expense when you go to an In-Network provider. The Plan pays the balance of the charge. When Copayments apply, there are no Deductibles or Coinsurance, unless the Plan specifically provides otherwise.

## MAXIMUM PLAN BENEFITS

The Lifetime Maximum Benefit payable for all medical expenses incurred by any individual covered under this Plan and any Predecessor Plan for you and for each of your covered Dependents is listed on the Schedule of Benefits.

The Lifetime Maximum Benefit payable for medical expenses incurred for any form of Temporomandibular Joint (TMJ) Dysfunction Treatment under this Plan and any Predecessor Plan is $2,500.

The Annual Maximum Plan Benefit payable for medical expenses incurred for any form of Outpatient In Vitro Fertilization, Artificial Insemination or Gamete Intra-Fallopian Transfer (GIFT) under this Plan and any Predecessor Plan is $5,000 per year.

**NEWBORNS' AND MOTHERS' HEALTH PROTECTION ACT**

This Plan complies with federal law that prohibits restricting benefits for any hospital length of stay in connection with childbirth for the mother and newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section, or requiring a health care practitioner to obtain prior authorization from the Plan for prescribing a length of stay not in excess of those periods. However, discharge of the mother and newborn may take place earlier, provided the attending physician has consulted with the mother.

**BREAST RECONSTRUCTIVE SURGERY FOLLOWING MASTECTOMIES BENEFIT**

In accordance with the Women's Health and Cancer Rights Act of 1998, this Plan will provide the following coverage for a participant who is receiving benefits in connection with a mastectomy:

(a) reconstruction of the breast on which the mastectomy has been performed;

(b) surgery and reconstruction of the other breast to produce a symmetrical appearance; and

(c) prosthesis and physical complications for all stages of the mastectomy, including lymphedemas.

## MEDICAL BENEFITS

*(See the EXCLUSIONS and DEFINITIONS sections of this document for important information on exclusions and limitations to these Plan benefits.)*

| Benefit Description | Explanations and Limitations |
|---|---|
| *Hospital Services (Inpatient):*<br>• Room & board in semiprivate room<br>• General nursing services<br>• Specialty care units (e.g., intensive care unit, cardiac care unit)<br>• Lab/x-ray/diagnostic services<br>• Related Medically Necessary ancillary services (e.g., prescriptions, supplies)<br>• Newborn care<br>• Hospitalization for dental services due to injury to sound natural teeth and/or certified by a Physician as necessary to safeguard the health of the patient<br>• Operating, delivery, recovery and treatment room and equipment fees<br>• Services or supplies furnished by a Hospital for treatment in outpatient department, emergency room or ambulatory surgical facility<br>• Anesthesia and its administration<br>• Oxygen and its administration<br>• Blood transfusions and blood products<br>• Inpatient treatment of Mental or Nervous Disorder<br>• Confinement for medical complications of alcoholism or drug abuse (e.g., cirrhosis, delirium tremens, and detoxification) | • Private room is covered only if Medically Necessary.<br>• Hospitalization primarily for diagnostic study directed to a definite Illness or Injury is not covered where treatme by means of physical therapy, hydrotherapy or occupati therapy, unless the services can be provided only on inpatient basis and the patient's physical condition req hospitalization. |
| *Surgical Expenses:*<br>• Medically Necessary surgical procedures<br>• Anesthesia fees for Physicians and Certified Registered Nurse Anesthetists<br>• Assistant surgeon<br>• Dentist or Physician fees for covered dental care required as a result of Injury to sound natural teeth<br>• Surgical sterilization (e.g., vasectomy, tubal ligation) | • Assistant Surgeon fees not to exceed 20% of the expense the covered surgical procedure.<br>• Multiple surgeries from the same incision are covered 100% of Covered Expenses for the major procedure and 50 of Covered Expenses for each additional procedure.<br>• Multiple surgeries from different incisions are covered 100% of Covered Expenses for each procedure. |

| Benefit Description | Explanations and Limitations |
|---|---|
| *Mental or Nervous Disorder Treatment:*<br>• Psychological (Psychiatric) Testing<br><br>*Inpatient:*<br>• Up to 30 days confinement per person per calendar year, subject to Coinsurance<br><br>*Outpatient:*<br>• Up to 50 visits per person per calendar year, subject to Coinsurance | • See the specific exclusions related to Mental and Nervous Disorders, including mental retardation and learning disability, in the Exclusions section.<br>• Benefits are payable only for services of Mental Health Practitioners listed in the Definitions section. |
| *Alcoholism and Substance Abuse Treatment:*<br><br>*Inpatient*<br>• Up to 30 days confinement per person per calendar year, subject to Coinsurance<br><br>*Outpatient*<br>• Up to 50 visits per person per calendar year, subject to Coinsurance | • Benefits are payable only for services of Mental Health Practitioners listed in the Definitions section. |
| *Durable Medical Equipment:*<br>• Coverage is provided for the rental or purchase of Durable Medical Equipment. Purchase is payable only when expected to be less costly than long term rental.<br>• Benefits are payable for Medically Necessary repair and servicing of Durable Medical Equipment. Benefits for replacement of Durable Medical Equipment are payable when replacement is Medically Necessary due to a change in the physical condition of the covered person or if the equipment cannot be satisfactorily repaired. | • See the specific exclusions related to Durable Medical Equipment in the Exclusions section. To help determine what Durable Medical Equipment is covered, see the definition of "Durable Medical Equipment" in the Definitions section.<br>• Durable Medical Equipment is covered only when its use is Medically Necessary and it is ordered by a Physician. |
| *Emergency and Transportation Services:*<br>• Hospital emergency room or free-standing Urgent Care Center for a medical emergency, subject to the copayment shown in the Explanations and Limitations column<br>• Ground transportation (*e.g.,* ambulance) to nearest appropriate facility as Medically Necessary for treatment of medical emergency, acute illness or inter health care facility transfer | • Covered only when services are for a Medical Emergency. See definition of "Medical Emergency" in the Definitions section.<br>• No coverage is provided for non-emergency use of transportation services.<br>• Reduced coverage is provided for non-emergency use of emergency or urgent care facilities. |
| *Family Planning Services:*<br>• In vitro fertilization, artificial insemination or gamete intra-fallopian transfer (GIFT) services provided on an outpatient basis | • Covered Expenses are subject to Coinsurance, and an Annual Maximum Plan Benefit of $5,000 per family.<br>• Not covered when performed on a surrogate parent. |

22

| Benefit Description | Explanations and Limitations |
|---|---|
| *Home Health Services*<br>• Part-time, intermittent Skilled Nursing Care and home health aide services and Medically Necessary supplies to provide Home Health Care–Physical, occupational and speech therapy<br>• Prescription drugs and medicines, including intravenous drugs | • See the specific exclusions related to Home Health Care and custodial care (including personal care and child care) in the Exclusions section of this document.<br>• Home Health Care must start within 7 days after the discharge from a hospital as an inpatient.<br>• Home Health Services may not exceed 40 visits per year.<br>• Each visit by a Nurse or therapist is 1 visit, and each visit up to 4 hours by a home health aide is 1 visit.<br>• Services or supplies which are not part of a home health care plan<br>• Services or supplies provided by a person who usually lives with patient or is a member of the patient's family<br>• Transportation |
| *Maternity Services:*<br>• Hospital and Birthing Center charges and Physician fees for Medically Necessary maternity services<br>• Amniocentesis or chorionic villus sampling (CVS) for pregnant women only if the procedure is Medically Necessary<br>• Termination of pregnancy | • See the specific exclusions related to fertility and reproductive care in the Exclusions section.<br>• Pregnancy-related care is covered if it occurs while the mother is a Participant, Spouse, or Dependent child.<br>• *See* also, the Special Rule for Coverage of Newborn Dependent Children in the Eligibility section. |
| *TMJ Services:*<br>• Temporomandibular joint (TMJ) dysfunction and syndrome, subject to an Annual Maximum Plan Benefit shown in the Explanations and Limitations column | • See the specific exclusions related to Dental Services in the Exclusions section.<br>• Lifetime Maximum Plan Benefit for treatment of TMJ dysfunction, including appliances, is $2,500 per person. |
| *Preadmission Testing:*<br>• Laboratory tests, x-rays and other Medically Necessary tests performed on an out-patient basis prior to a scheduled Hospital admission or out-patient Surgery | • Covered only when ordered by a Physician within seven days of scheduled surgery. |
| *Second (and Third) Surgical Opinion:*<br>• Consultation with a Physician<br>• Laboratory tests | • See the Utilization Management section for details of the Second Surgical Opinion Program.<br>• Additional Medically Necessary tests are covered under other Plan provisions. |
| *Specialized Health Care Facilities:*<br>• *Birthing Center*<br>• *Hospice*<br>• Skilled Nursing Facility (SNF) | • Admission to a Specialized Health Care Facility is subject to precertification. See the section on Utilization Management for details.<br>• Specialized Health Care Facility services must be ordered by a Physician. To determine if a facility is a "Specialized Health Care Facility," see the Definitions section. |

23

| Benefit Description | Explanations and Limitations |
|---|---|
| **Chiropractic Services:**<br><br>Spinal Manipulation, including ancillary and related services (e.g., visit, x-rays, physical therapy) from a Physician or Chiropractor, subject to an Annual Maximum Plan Benefit shown in the Explanations and Limitations column | • Chiropractic Services are limited to 20 visits per calendar year plus 2 additional modalities per day in addition chiropractic manipulation.<br>• Except in the event that it is specifically counter indicated, Chiropractic care shall not include a follow up visit unless a chiropractic manipulation is performed during the visit. |
| **Transplantation (Organ and Tissue):**<br>• Coverage is provided only for eligible services directly related to Transplantation of human organs or tissue. | • **See the specific exclusions related to Transplantation in the Exclusions section.**<br>• Benefits are payable only if services are preauthorized by the UM Company. |
| **Well Child Examinations and Immunizations:**<br><br>• Outpatient newborn and well child visits and routine childhood immunizations (e.g., DTP, polio, MMR, hepatitis). | • This benefit is available **In-Network only.**<br>• **Deductibles and Coinsurance do not apply** to these benefits.<br>• See the **Special Rule for Coverage of Newborn Dependent Children** in the Eligibility section.<br>• Coverage is provided for:<br>  • 5 well child visits from birth to 24 months;<br>  • One visit per year from ages 2 through 12. |
| **Adult Wellness Benefit (Age 13 and up):**<br>• Routine exam<br>• Adult immunizations | • This benefit is available **In-Network only.**<br>• **Deductibles and Coinsurance do not apply** to these benefits.<br>• Coverage is provided for **one exam each year, including testing and immunizations,** to a maximum of $100 per visit. |
| **Well Woman Care:**<br>• Pap test<br>• Screening mammogram (between ages 40 and 75 ) | • Coverage is provided for **one** pap smear lab test per year.<br>• Coverage is provided for one screening mammogram and interpretation of it each year between the ages of 40 and 75, or as recommended by a Physician. |

## MEDICAL NETWORKS

You can obtain health care services from In-Network or Out-of-Network health care providers. See the Quick Reference Chart at the back of this booklet for a list of PPO providers.

### In-Network Services

In-Network health care providers agree with the Plan's Preferred Provider Organization (PPO) to provide health care services and supplies for a favorable negotiated fee applicable only to Participants in this Plan. When you use the services of a PPO health care provider, you are responsible for paying only the applicable Coinsurance or Copayment for any Medically Necessary services or supplies. If you receive Medically Necessary services or supplies from a PPO Provider, you will pay lower Coinsurance and no Deductible will apply.

The In-Network Provider accepts the Plan's payment plus any applicable Coinsurance or Copayment as payment in full.

For every provider you use, you are responsible for contacting the PPO to confirm that provider's participating provider (in-network) status.

### Out-of-Network Services

Out-of-Network health care providers have no agreements with the Plan and are generally free to set their own charges for the services or supplies they provide. The Plan will reimburse you for the Usual and Customary Charge for any Medically Necessary Covered Expenses, subject to the Plan's Deductibles, Coinsurance, Copayments, Limitations and Exclusions. You must submit proof of claim before any reimbursement will be made, and Out-of-Network health care providers may bill you directly for any balance due over the amount payable by the Plan.

## THE UTILIZATION MANAGEMENT PROGRAM

The Utilization Management Program is designed to help control increasing health care costs by avoiding unnecessary services or treatments that are more costly than other available effective treatments.

If you **do** not follow these procedures, you will have to pay **more** out of your own pocket, in addition to any Deductibles or Coinsurance.

The Plan's Utilization Management (UM) Program consists of:

• **Precertification review** of proposed health care services **before** the services are provided.

You must obtain admission precertification from the Utilization Management (UM) Company for:

- all non-Emergency Hospital admissions;

- all non-Emergency admissions to any Specialized Health Care Facility; and

- elective outpatient surgery not performed in your doctor's office.

In the event of an Emergency admission to any type of facility, you must notify the UM Company within 48 hours of the emergency care.

- Some Physicians may obtain precertification for you. However, you are responsible for ensuring that Hospital services have been precertified. Therefore, you should confirm precertification with your Physician prior to Hospital admission.

- **Concurrent (continued stay) review** of health care as it is being provided, especially (but not limited to) inpatient confinement in a Hospital or Specialized Health Care Facility.

- **Second and third opinions** through Physician consultation and/or examination designed to take a second, and, when required, a third look at the need for certain elective health care services.

- **Retrospective review** of health care services **after** they have been provided.

- **Case Management**, whereby the patient, the patient's family, Physician and/or other health care providers work with the UM Company to coordinate a quality, timely and cost-effective treatment plan. Case management services may be particularly helpful for patients who require complex, high-technology medical services. Case management may include prior approval for treatment, discharge planning and psychiatric procedure review, among other things.

The UM Program is administered by an independent UM Company under contract with the Plan. The current UM Company is identified in the Quick Reference Chart at the end of this booklet. The health care professionals in the UM Company focus on:

- necessity and appropriateness of Hospital stays, and

- necessity, appropriateness and cost-effectiveness of proposed medical or surgical services.

26

The UM Company determines whether or not a course of care or treatment is Medically Necessary with respect to the patient's condition and within the terms of this Plan.

**IMPORTANT**

- Your Physician's recommendation for Surgery, Hospitalization, confinement in a Specialized Health Care Facility, or other medical services or supplies does **not** mean that the recommended services or supplies will be considered Medically Necessary for determining coverage for medical Benefits under the Plan.

- The UM Company does not diagnose or treat medical conditions, validate eligibility for coverage, or guarantee payment of Plan Benefits. The UM Company's certification does not guarantee a Benefit payment. Payment of Benefits is subject to the terms and conditions of the Plan as described in the official Plan document. For example, Benefits would not be payable if your eligibility for coverage ended before the services were rendered or if the services were not covered by the Plan either in whole or in part.

All treatment decisions rest with you and your Physician. You should follow whatever course of treatment you and your Physician believe to be the most appropriate, even if the UM Company does not certify the proposed medical treatment, Hospitalization or confinement in a Specialized Health Care Facility as Medically Necessary. The Benefits payable by the Plan may, however, be affected by the determination of the UM Company.

NOTE: The Administrator, the Plan and the UM Company are not engaged in the practice of medicine, and none is responsible for the quality of health care services actually provided, whether or not certified by the UM Company as Medically Necessary.

*What Happens if You Do Not Follow Required Utilization Management Procedures*
If you do not follow the required Utilization Management procedures outlined above, your claim for Benefits will be referred to the UM Company for a retrospective review to determine if the services are Medically Necessary.

- If the UM Company determines that the services are not Medically Necessary, no Plan Benefits will be payable for those services.

- If the UM Company determines that the services are Medically Necessary, Plan Benefits will be payable for those services. However, you will have to pay an additional $300 toward the cost of services, in addition to any Deductible or Coinsurance that may apply. The additional $300 does not count towards your Deductible or Out-of-Pocket Maximum.

27

THIS PAGE INTENTIONALLY BLANK

## GENERAL EXCLUSIONS

Following is a list of some medical services, supplies, and expenses that are **not covered by the Medical Plan.**

- Medical services/supplies, including prescription drugs, considered educational, Experimental or Investigational medical treatment, including any treatment, drug, or supply not recognized as acceptable or legal medical practice in the United States or any items requiring governmental approval not granted at the time service is rendered;
- medical services/supplies available without cost or not legally required to be paid for in absence of the Plan;
- medical services or supplies furnished in or by a Federal, State, or local government, agency, or program or in or by a Hospital or institution owned thereby unless required by law;
- medical services or supplies, including prescription drugs, furnished in or by a nursing home, sanitarium, rest home, convalescent home, extended care facility or similar establishment unless it satisfies the definition of Skilled Nursing Facility;
- private duty nursing care (unless ordered by a Physician and determined to be Medically Necessary) custodial care, or domiciliary care regardless of the facility where provided;
- medical services or supplies furnished by an individual who ordinarily resides in the patient's home or is related to the patient by blood or marriage;
- transsexual surgery;
- services to reverse voluntary, surgically induced infertility;
- therapeutic devices, including, but not limited to, hypodermic needles, syringes, support garments, or other nonmedical substances purchased for self-use, except paraphernalia necessary for the administration of insulin;
- replacement or repair of a prosthetic appliance, unless outgrown;
- orthotics, and orthopedic shoes (except when joined to braces) or supportive devices for the feet, including, but not limited to, arch supports and heel lifts;
- routine care of feet, including callus or corn paring, trimming or excision of toenail, or treatment of chronic conditions of the foot including, but not limited to, weak or fallen arches, flat or pronated foot metatarsalgia, or foot strain;
- radial keratotomy;
- acupuncture;
- organ Transplants, except as approved by the Administrator;
- orthodontic supplies or services;
- therapy for marriage-related problems;
- physical, occupational, myofunctional therapy, or pulmonary rehabilitation, except following Illness or Injury;
- learning disabilities, mental retardation, developmental delay, attention deficit disorder, autistic diseases of childhood, behavioral problems, special education;
- hypnotism, stress management, or goal-oriented behavior modification therapy;
- exogenous obesity;
- cosmetic, plastic, or reconstructive surgery, except to repair or alleviate damage resulting from or caused by Injury, congenital defect, or disfigurement related to a disease;

- construction, services, purchase or rental of supplies, appliances, or equipment for personal hygiene, beautification, comfort or convenience including, but not limited to, cosmetics, air conditioners, dehumidifiers, health club fees, vaporizers, heaters, speech teaching aides, Braille training tests, exercise equipment, whirlpools, tanning beds, water beds, telephones, televisions, or other items not essential for treatment of an Illness or Injury;
- travel or lodging, whether or not recommended by a Physician, except as approved for organ Transplants;
- transportation of a family member or medical personnel, equipment or supplies, except local ambulance service and transportation for organ Transplantation services;
- hearing aids;
- fees for services and supplies in excess of the negotiated fee or the Usual and Customary level;
- expenses that are not Medically Necessary, unless specifically stated herein;
- vision care, except as provided in the Vision Expenses chapter;
- expenses that are not ordered by a Physician;
- services rendered primarily for training or educational purposes;
- services or supplies rendered, to the extent that benefits are available under personal injury protection or compulsory medical payments provisions of any motor vehicle insurance contract required under federal or state no-fault motor vehicle insurance, whether or not the patient properly asserts his rights under such motor vehicle insurance contract;
- charges paid or payable by another plan, including benefits that are not paid by the other health plan due to failure by the Participant to comply with a term or condition of the other health plan.
- Covered Expenses incurred prior to the date of coverage under the Plan;
- an Injury or Illness or services or supplies that arise out of or in the course of employment and that are compensable under workers' compensation, occupational disease, or similar laws, whether or not the right therefor is asserted, except as may be provided as a nonmedical benefit under the Plan;
- an Injury or Illness resulting from past or present military service or caused by or arising from an act of war, whether declared or not, or a conflict involving armed forces;
- third-party liability claims;
- claims not submitted within one year of the time the service was rendered or the event occurred;
- charges for failure to keep a scheduled appointment or for the completion of any form; and
- charges for any health care services and/or supplies received pursuant to a private contract with a Physician or other health care practitioner that has agreed not to submit claims to, or receive payments from Medicare.

## DENTAL EXPENSES

| IMPORTANT |
| --- |
| *You may not be entitled to Dental Benefits under the Plan. Review your Participating Local Union Fund's or Employer's rules and regulations to confirm your eligibility.* |

### COVERED DENTAL EXPENSES

The Plan will reimburse you only for Covered Dental Expenses, subject to the Lifetime and Annual Maximums shown in the chart on the following page and in your Schedule of Benefits. That means you must pay the full cost for all expenses that are not covered by the Plan, as well as any charges for Covered Dental Expenses that exceed the amount covered by the Plan. You must also pay any applicable Deductible and Coinsurance amounts.

### DEDUCTIBLES

Each year, you must pay all your Covered Dental Expenses until you satisfy the annual Deductible. Then, the Plan begins to pay Benefits. There are generally two types of Deductibles: individual and family. The Individual Deductible is the maximum amount one covered person has to pay before the Plan pays any benefits. The Family Deductible is the maximum amount that a family of two or more has to pay before the Plan pays benefits. See your Schedule of Benefits to determine your annual Deductible.

### COINSURANCE

Once you have satisfied your annual Deductible, the Plan pays a percentage of your Covered Dental Expenses, and you pay the rest. The part you pay after the Deductible is called Coinsurance. See your Schedule of Benefits to determine the amount of Coinsurance paid by the Plan.

### ANNUAL MAXIMUM PLAN BENEFITS

The Annual Maximum Plan Benefits payable for dental expenses for any individual under this Plan is provided in your Schedule of Benefits.

### PRETREATMENT ESTIMATES

You may obtain a pretreatment estimate whenever you expect that the cost of a course of dental treatment will exceed $300. Have your Dentist submit a completed dental claim form indicating the type of work to be performed with the estimated cost to the Administrator. The Administrator will send you and your Dentist a statement showing what the Plan will pay. Then you will know your out-of-pocket cost before you begin treatment.

## DENTAL BENEFITS

*(See the DEFINITIONS section of this document for important information on exclusions and limitations to these Plan benefits.)*

| Benefit Description | Explanations and Limitations |
|---|---|
| *Class I Preventive Services:*<br>• Oral examination<br>• Prophylaxis (cleaning of the teeth)<br>• Examination for consultation purposes<br>• Bite-wing x-rays<br>• Full mouth x-rays<br>• Topical application of sodium or stannous fluoride<br>• Space maintainers, for a child after early loss of a first tooth<br>• Topical application of sealants on posterior teeth | • Preventive services are **subject to the Annual and Lifetime Maximum Plan Benefits.**<br>• Oral examination, prophylaxis, scaling, cleaning, polishing, and bite-wing x-rays are limited to twice in a 12 month period with no more than one of each service in a three month period.<br>• Prophylaxis, scaling, cleaning and polishing limited to twice in a 12-month period.<br>• Bite-wing x-rays limited to two charges in a 12-month period.<br>• Full mouth x-rays limited to once in a 36-month period, except to diagnose a specific condition or its treatment.<br>• Fluoride limited to family members under the age of 15 and limited to not more than once in a 12-month period.<br>• Applications of sealants limited to family members under the age of 15 and limited to not more than once in a 36-month period.<br>• Consultations limited to once in a 3-month period. |
| *Class II Restorative Services:*<br>• Prescription drugs, including injection of necessary antibiotic drugs by the attending Dentist<br>• Tooth extractions<br>• Amalgam, silicate, acrylic, plastic and composite filling restoration for decayed or broken teeth<br>• Treatment of periodontal and other diseases of the gums and supporting structures of the mouth (gingiva and/or alveolar bone)<br>• Oral surgery, including extractions and surgical procedures<br>• Administration of local, general anesthesia and/or intravenous sedation in connection with oral surgery and covered dental services<br>• Endodontic treatment, including root canal therapy<br>• Drugs and medicines that are FDA-approved pharmaceuticals requiring a prescription by a Dentist<br>• Prosthodontics - first installation of full and partial removable dentures<br>• Replacement of an existing removable denture or fixed bridgework by a new denture or by adding teeth to a partial removable denture<br>• Repair, re-cementing of crowns, inlays, onlays or dentures | • Basic services are subject to **Annual and Lifetime Maximum Plan Benefits.**<br>• Replacement of bridgework or dentures is covered only if at least 5 years have passed since initial placement, and if existing bridgework or denture cannot be repaired, or the existing fixture is temporary and is replaced within 12 months of initial placement. Replacement is not covered for a lost or stolen prosthetic device.<br>• Replacement of crowns, inlays and prosthetic appliances (unless the appliance replaces a missing tooth) is covered only if at least 3 years have passed since initial placement.<br>• Replacement of a tooth, missing when a person becomes covered, is covered after 24 consecutive months of Plan coverage.<br>• Replacement of prosthetic devices, crowns, or bridges are not covered if performed or ordered prior to Plan coverage or installed more than 30 days after Plan coverage ends. |

| Benefit Description | Explanations and Limitations |
|---|---|
| • Adjusting, relining or re-basing of removable dentures | |
| *Class III Restorative Services:*<br>• Installation of full and partial fixed bridgework, including precision attachments<br>• Inlays and crowns<br>• Replacement of an existing partial or full removable denture or fixed bridgework<br>• Prosthodontics - initial installation of fixed bridgework (including wing attachments, inlays and crowns as abutments) to replace natural teeth that were extracted while the patient was covered by the Plan. Expenses on account of adjustments to fixed bridgework are covered only for the 6-month period following initial installation.<br>• Precision or semi-precision attachments for prosthetic devices<br>• Gold restorations | • Major services are **subject to Annual and Lifetime Maximum Plan Benefits.**<br>• Replacement of bridgework or dentures is covered only if at least 5 years have passed since initial placement, and if existing bridgework or denture cannot be repaired, or the existing fixture is temporary and is replaced within 12 months of initial placement. Replacement is not covered for a lost or stolen prosthetic device.<br>• Replacement of crowns, inlays and prosthetic appliances (unless the appliance replaces a missing tooth) is covered only if at least 3 years have passed since initial placement.<br>• Replacement of a tooth, missing when a person becomes covered, will be covered after 24 consecutive months of Plan coverage.<br>• Services or prosthetic devices, crowns, or bridges are not covered if performed or ordered prior to Plan coverage or installed more than 30 days after Plan coverage ends. |
| *Orthodontia Services:*<br>• Necessary services related to an active course of orthodontia treatment include diagnosis, evaluation and pre-care<br>• The initial installation of orthodontic appliances for an active course of orthodontia treatment<br>• Adjustment of active orthodontia appliances<br>• This orthodontia benefit is for nonsurgical services provided to correct malocclusion (alignment of the teeth and or jaws) that significantly interferes with their function. | • Orthodontia services are **subject to the Lifetime Maximum Plan Benefits.**<br>• Repair or replacement of orthodontia appliances is **not covered.** |

### DENTAL PLAN EXCLUSIONS

Following is a list of some dental services, supplies, and expenses that are not covered by the Dental Plan.

- Expenses for home use supplies, including, but not limited to, toothpaste, toothbrush, water-pick, fluoride, mouthwash, dental floss, etc.;
- expenses for oral hygiene and/or dietary instruction or for a plaque control program (a series of instructions on the care of the teeth);
- expenses for any dental services or appliances including, but not limited to items to increase vertical dimension, restore occlusion, stabilize tooth structure lost by wear or bruxism and harmful habits, except as provided under the Orthodontic Benefit outlined in the list of Dental Benefits;

- expenses for treatment, by any means, of jaw joint problems including Temporomandibular Joint disfunction (TMJ), disturbance, or syndrome;
- Harmful habit appliances;
- Charges for implantology;
- Charges in excess of Usual and Customary charges; and
- Any dental services not included on your Schedule of Benefits.

THIS PAGE INTENTIONALLY BLANK

34

35

## *VISION EXPENSES*

---

**IMPORTANT**

*You may not be entitled to Vision Benefits under the Plan. Review your Participating Local Union Fund's or Employer's rules and regulations to confirm your eligibility.*

---

### COVERED VISION EXPENSES

The Plan will reimburse you only for Vision Expenses covered under the Plan. That means you must pay the full cost for all expenses that are not covered by the Plan, as well as any charges for Vision Expenses that exceed the Benefit limitations and maximums.

### SCHEDULE OF VISION BENEFITS

Covered Vision Expenses include, among other things:

- One eye exam or vision analysis in a 12-month period, performed by a licensed optometrist or ophthalmologist.

- Prescription contact lenses, after cataract surgery, or if necessary to correct visual acuity, or for cosmetic purposes if new lenses are required due to a prescription change.

- One pair of prescription contact lenses or prescription eye glasses to correct visual acuity, including bifocals, trifocals, including oversize lenses and plastic lenses.

See your Schedule of Benefits to determine the amount and frequency covered. Vision benefits are subject to additional terms and conditions as set forth in the contract with the vision care benefit provider.

### VISION PLAN EXCLUSIONS

Following is a list of some vision services, supplies and expenses that are **not covered** by the Vision Plan.

- Expenses incurred for a vision care service or supply which is a covered expense in whole or in part under the medical portion of this Plan will not be covered as a vision care expense;
- expenses for the treatment of a condition covered by workers' compensation or occupational disease law;
- expenses for special procedures which include, but are not limited to, orthoptics or vision training;
- expenses for special supplies which include, but are not limited to, nonprescription sunglasses or subnormal vision aids;
- expenses for anti-reflective coatings;
- expenses for tinted lenses;
- expenses for prescription sunglasses or light sensitive lenses in excess of the amount which would be covered for non-tinted lenses;
- eye examination required as condition of employment (or required by labor agreement or by government law);
- replacement of lost, stolen or broken lenses or frames;
- duplicate or spare eyeglasses, lenses or frames; and
- lenses or frames ordered or furnished due to exam while not covered by the Plan.

## PRESCRIPTION DRUGS EXPENSES

THIS PAGE INTENTIONALLY BLANK

**IMPORTANT**

*You may not be entitled to Prescription Drug Benefits under the Plan. Review your Participating Local Union Fund's or Employer's rules and regulations to confirm your eligibility.*

### COVERED PRESCRIPTION DRUG EXPENSES

The Prescription Drug Plan covers expenses you incur for prescription drugs, including legend drugs, injectable insulin, or other State-controlled drugs which must be prescribed by a Physician and dispensed by a pharmacist. Check your Schedule of Benefits to determine whether you have prescription drug coverage. Prescription Drug Benefits are subject to additional terms and conditions as set forth in the contract with the Prescription Benefit Manager (PBM).

Coverage is provided only for FDA-approved pharmaceuticals requiring a prescription and FDA-approved for the condition, dose, route, duration and frequency, if prescribed by a Physician or other Health Care Practitioner authorized by law to prescribe them.

The Plan has the right to review the facts and circumstances of any prescription drug purchase or refill to ensure appropriate use of Plan Benefits.

### PRESCRIPTION DRUG PLAN EXCLUSIONS

Following is a list of some prescription drug services, supplies and expenses which are **not covered** by the Prescription Drug Plan.

- Pharmaceuticals requiring a prescription which have not been approved by the U.S. Food and Drug Administration (FDA);
- Pharmaceuticals requiring a prescription which are not approved by the FDA for the condition, dose, route and frequency for which they are prescribed;
- Pharmaceuticals requiring a prescription which are Experimental and/or Investigational as defined in the Definitions section of this document; and
- Non-prescription (over-the-counter) drugs and vitamins, minerals, laetrile, enzymes, diet food, or dietary supplements whether prescribed or not.

## WEEKLY DISABILITY BENEFITS

+-----------------------------------------------------------------------+
| **IMPORTANT**                                                         |
|                                                                       |
| *You may not be entitled to Weekly Disability Benefits under the      |
| Plan. Review your Participating Local Union Fund's or Employer's      |
| rules and regulations to confirm your eligibility.*                   |
+-----------------------------------------------------------------------+

### COVERAGE

Weekly Disability Benefits are payable if you are Disabled as a result of a non-occupational Injury or Illness. Payment of Weekly Disability Benefits starts after the applicable Waiting Period has been completed. See your Schedule of Benefits to determine the amount and period of Weekly Disability Benefits payable to you, and any applicable Waiting Period.

For the purposes of the Weekly Disability Benefits, "Disabled" means the inability of a covered Employee to perform his or her duties with the Employer as a result of non-occupational Illness or Injury. A Disabled Employee is not eligible to receive Weekly Disability Benefits from the Plan if he or she performs work for compensation or profit.

"Period of Disability" means any one continuous period of Disability that is due to one or more causes. Successive Periods of Disability will be considered to be one continuous Period of Disability if:

- the Periods of Disability are due to the same cause or a related cause and are not separated by at least 2 weeks of active work at your job; or
- the Periods of Disability are due to different causes.

"Waiting Period" means the period you must wait before Weekly Disability Benefits become payable to you.

### WHEN PAYMENT OF WEEKLY DISABILITY BENEFITS ENDS

Payment of Weekly Disability Benefits ends at the **earlier** of:

- the date on which you are no longer Disabled; or
- after you have received Weekly Disability Benefits for the maximum benefit duration.

If, during a Period of Disability, your employment terminates involuntarily for reasons other than retirement, Weekly Disability Benefits will continue to be paid until the earlier of the dates indicated immediately above. Weekly Disability Benefits are not payable to Retirees.

### EXCLUSIONS

For each Period of Disability, no Weekly Disability Benefits will be paid for:

- the Waiting Period; or
- more than the Maximum Benefit Period.

### PROOF OF DISABILITY

You must submit proof of a claim for Weekly Disability Benefits. See the Claims Information section.

You may be asked to provide the medical records of your Physician(s) and other health care provider(s) who provide medical care and treatment to you during the period for which Weekly Disability Benefits are being requested or paid.

You may be required to submit to periodic physical examinations, at the Plan's expense, by a Physician of its choice as often as may be reasonable during the period for which Weekly Benefits are requested or paid.

Refusal to provide medical records or submit to periodic exams is grounds for withholding Weekly Disability Benefits otherwise payable under the Plan.

## LIFE INSURANCE

THIS PAGE INTENTIONALLY BLANK

---

| IMPORTANT |
| --- |
| *You may not be entitled to Life Insurance Benefits under the Plan. Review your Participating Local Union Fund's or Employer's rules and regulations to confirm your eligibility.* |

### COVERAGE

Life Insurance Benefits are payable to your designated beneficiary upon your death. See your Schedule of Benefits for the amount of Life Insurance Benefits payable on your behalf. Life insurance Benefits are subject to additional terms and conditions as set forth in the contract with the life insurance benefit provider.

### DESIGNATION OF A BENEFICIARY

A person named by you to receive your life insurance proceeds is your designated beneficiary. You must designate your beneficiary on a form provided by your Participating Local Union Fund or Employer. Your life insurance Benefit will be paid based on the most recent form your Participating Local Union Fund or Employer receives prior to payment. You may designate anyone as your beneficiary. You may change your beneficiary at any time by filling out a new form and delivering it to the Plan. Unless your beneficiary designation provides otherwise:

- If more than one beneficiary is designated, they will share equally;
- If one beneficiary dies before you do, any remaining beneficiaries will share equally;
- If you do not name a beneficiary or if the persons named do not survive you, payment will be made to the surviving person(s) in the following order:

    1. your spouse,
    2. your child(ren) in equal shares (if no spouse),
    3. your parents in equal shares (if no spouse or children),
    4. your estate (if no spouse, children, or parents).

### EXCLUSIONS

No life insurance Benefit will be payable unless a certified copy of the death certificate and written request for the life insurance Benefit are provided within one year following your death.

## *ACCIDENTAL DEATH AND DISMEMBERMENT*

| IMPORTANT |
|---|
| *You may not be entitled to Accidental Death and Dismemberment Benefits under the Plan. Review your Participating Local Union Fund's or Employer's rules and regulations to confirm your eligibility.* |

### COVERAGE

The accidental death Benefit is payable to your designated beneficiary in addition to any life insurance Benefit under the Plan. Your designated beneficiary must be named in accordance with the procedures for naming a beneficiary for purposes of a life insurance Benefit. The dismemberment Benefit is payable to you, the Employee, based on the loss suffered.

Accidental death and dismemberment Benefits are subject to additional terms and conditions as set forth in the contract with the accidental death and dismemberment benefit provider.

### EXCLUSIONS

No accidental death and dismemberment Benefit will be payable:

- Unless the death or dismemberment is suffered within 13 weeks of an external, violent and accidental means;
- Unless, for loss of a hand or foot, severance is at or above the wrist or ankle joint;
- Unless, for loss of an eye, sight is lost totally and irrevocably; or
- If the death or dismemberment results directly or indirectly from the following:

  - bodily or mental infirmity;
  - suicide or intentionally self-inflicted Injury;
  - war or any act of war;
  - an Illness, ptomaine, or bacterial infection (except a pyogenic infection that occurs with and through an accidental cut or wound); or
  - medical or surgical treatment (unless required due to Illness occurring while covered under the Plan).

THIS PAGE INTENTIONALLY BLANK

## CLAIMS INFORMATION

### HOW BENEFITS ARE PAID

All Plan Benefits are considered for payment upon the receipt of a written proof of claim. A completed claim form usually contains the necessary proof of claim, but sometimes additional information or records may be required. However, if medical services are provided through the Preferred Provider Organization (PPO), the PPO health care provider may submit proof of claim directly to the Plan or may complete the necessary claim form and return it to you for submission to the Plan. However, you will be responsible for the payment to the PPO health care provider of any applicable Copayment or Coinsurance.

### HOW TO FILE A CLAIM

You can obtain claim forms from your Participating Local Union Fund office or the National Fund Office. Complete the employee part of the claim form in full. Answer every question, even if the answer is "none" or "not applicable (N/A)."

The instructions on the claim form will tell you what documents or medical information are necessary to support the claim. Your Physician or Dentist can complete the health care provider portion of the claim form, or you can attach the bill for professional services if it contains **all** of the following information:

- a description of the services or supplies provided;
- details of the charges for those services or supplies;
- diagnosis;
- date(s) the services or supplies were provided;
- patient's name;
- provider's name, address, phone number, professional degree or license, and
- federal tax identification number.

Review your bills to be sure they are appropriate and correct. **Report any discrepancies in billing to the appropriate contact listed in the Quick Reference Chart on the inside back cover of this booklet.** This simple step can reduce costs to you and the Plan.

Complete a **separate claim form** for each person for whom Plan Benefits are being claimed. Send the completed claim form and any other required information to the appropriate Administrator listed in the Quick Reference Chart.

### TIME LIMIT FOR FILING CLAIMS

**All claims must be submitted to the Plan within one year following the date on which the expenses were incurred.** No Plan Benefits will be paid for any claim not submitted within this period.

### REVIEW PROCEDURE IF YOUR CLAIM IS DENIED

The Administrator will notify you in writing within 90 days of receipt of the claim if payment of your claim is denied in whole or in part. It will explain the reasons why, with reference to the Plan provisions on which the denial was based. If additional information is needed to process your claim, you will be told what additional information is required from you and why it is needed.

You will be told what steps you may take to submit your claim for review and reconsideration.

Your request for review or reconsideration must be made in writing to the Graphic Communications National Health and Welfare Fund at Five Gateway Center, Suite 620, 60 Boulevard of the Allies, Pittsburgh, PA 15222, within 120 days after you receive notice of denial.

The review process works as follows:

- If your claim is denied, or if you disagree with the amount paid on a claim, you may ask for a review.
- You have the right to review documents applicable to the denial and to submit your own comments in writing.
- Your claim will be reviewed by the Board of Trustees. If any additional information is needed to process your request for review, it will be requested promptly.
- The decision on any review of your claim will be given to you in writing. It will explain the reasons for the decision, with reference to the applicable provisions of the Plan.
- Generally, a decision will be reached within 60 days after receipt of your request for review. In special circumstances, up to an additional 60 days may be required to reach a final decision. You will be advised in writing within the 60 days after receipt of your request for review if an additional period of time will be necessary to reach a final decision.

### WHEN YOU MUST REPAY PLAN BENEFITS

If Benefits payable by the Plan are overpaid because:

- some or all of the medical expenses were not paid or payable by you or your covered Dependent; **or**
- you or your covered Dependent received the money to pay some or all of those medical expenses from a source other than the Plan; **or**
- you or your covered Dependent achieve any recovery whatsoever, through a legal action or settlement in connection with any sickness or injury alleged to have been caused by a third party, regardless of whether or not some or all of the amount recovered was specifically for the medical or dental expenses for which Plan Benefits were paid; **or**

- the Plan erroneously paid Benefits to which you were not entitled under the terms and provisions of the Plan, **then**

the Plan is entitled to a refund, from you or your health care provider, in an amount equal to the amount of Benefits actually paid for those expenses less the amount of Benefits which should have been paid by the Plan for those expenses based on the actual facts.

**THIS PAGE INTENTIONALLY BLANK**

48

49

## DUPLICATE COVERAGE

### COORDINATION OF BENEFITS

Many families are covered by more than one medical plan. You must inform the Administrator of all your available coverage when you submit a claim. Failure to provide this information will delay benefit payments.

Coordination of benefits (or COB) operates so that one health plan (called the primary plan) will pay benefits first. The other health plan, (called the secondary plan) then pays benefits. **In no event may the primary and secondary plans combined pay benefits over 100% of the total expenses incurred.** Sometimes, the combined benefits will be less than the total expenses incurred.

If you are eligible to receive benefits from another health plan, Benefits will not be paid for any health care services and/or supplies that are not paid by the other health plan due to your failure to comply with the terms or conditions for receipt of benefits under the other health plan. This includes, but is not limited to, failure to comply with the other health plan's utilization, preauthorization, or case management rules.

### COORDINATION OF BENEFITS RULES

The COB rules determine the order of payment by two or more plans. If the first rule does not establish a sequence or payment of benefits, the next rule is applied, and so on, until the payment order is established. If you are eligible for Medicare, you also should read the Medicare section below. The rules are:

*Rule 1:* A health plan that does not have COB provisions is the primary plan and this Plan will be the secondary plan.

*Rule 2:* The plan that covers a person as an employee, retiree or participant (other than as a dependent) is the primary plan; and the plan that covers the same person as a dependent will be the secondary plan.

*Rule 3:* For a Dependent Child, the plan that covers the parent whose *birthday* falls earlier in the calendar year is the primary plan; and the plan that covers the parent whose birthday falls later in the calendar year will be the secondary plan. The year of birth is ignored in making this determination.

*Rule 4:* For a Dependent Child, if a court order *assigns* responsibility to one parent for the child's health care, the plan of that parent is the primary plan.

*Rule 5:* For a Dependent Child, if the parents **are** unmarried, separated (whether or not they ever were married), or divorced, with no court assignment of responsibility for the child's health care, then:

- The plan of the custodial parent is the primary plan, and
- The plan of the non-custodial parent will be the secondary plan.

*Rule 6:* The plan which **has** provided coverage for the longer period of time is the primary plan; and the plan which has provided coverage for the shorter period of time will be the secondary plan.

### How Much This Plan pays as a Secondary Plan

When this Plan is the secondary plan, it will pay an amount equal to the same Benefits it would have paid as a primary plan (after any Copayment, Deductible or Coinsurance you pay), minus any payment amounts actually made by the primary plan. In no event will this Plan pay more than it would as a primary plan.

### MEDICARE AND OTHER GOVERNMENT PROGRAMS

When you reach age 65, you are eligible for hospital insurance benefits ("Part A") and supplemental medical insurance ("Part B") under Medicare. If you continue to work and remain covered by the Plan, the Plan continues to be your Primary plan (and your Dependents' Primary plan if you have family coverage). Medicare provides secondary coverage. You continue to submit your claims to the Plan and receive the same benefits as other employees. Medicare then considers claims for any remaining expenses.

If you retire, and you are eligible for Medicare Supplement coverage provided under the Plan, the Plan becomes your secondary Plan and Medicare becomes your primary Plan. (Note that not all Participating Local Union Funds or Employers provide Medicare Supplement coverage.) If you are covered by the Medicare Supplement, you submit your claims to Medicare first; remaining expenses then can be submitted to this Plan. Applicable deductibles and co-insurance amounts are set forth in your Schedule of Benefits. Covered Expenses under the Medicare Supplement include only those expenses which are Medicare-eligible.

You are responsible for enrolling in the Medicare program. As a Retiree, this Plan will treat you as though you have enrolled in Medicare. You should call or visit an office of the Social Security Administration during the three-month period prior to your 65th birthday to learn about Medicare.

If you obtain Medicare benefits through Medicare Part C (Medicare+Choice), you must comply with the rules of the Medicare+Choice Plan. Failure to follow the Medicare+Choice Plan's rules, including utilization, preauthorization or case management requirements, will preclude you from receiving Benefits under this Plan.

This Plan will not pay Benefits for any health care services and/or supplies received pursuant to a private contract with certain Physicians or other health care practitioners that agree not to submit claims to, or receive payments, from Medicare.

*Medicaid*

If you are covered by both this Plan and Medicaid, this Plan is the primary plan and Medicaid is the secondary plan.

*CHAMPUS*

If you are covered by both this Plan and CHAMPUS, this Plan is the primary plan and CHAMPUS is the secondary plan.

### MOTOR VEHICLE NO-FAULT COVERAGE REQUIRED BY LAW

If you are covered for medical and/or dental Benefits by both this Plan and any motor vehicle no-fault coverage that is required by law, the motor vehicle no-fault coverage pays first, and this Plan pays second.

In addition, if you are covered for loss of earnings by both this Plan and any motor vehicle no-fault coverage that is required by law, any Weekly Disability Benefits payable by this Plan will be reduced by the benefits available to you for loss of earnings under your no-fault coverage.

### WORKERS' COMPENSATION

This Plan does **not** provide Benefits if the medical expenses are covered by workers' compensation or occupational disease law.

### THIRD-PARTY LIABILITY (SUBROGATION)

"Subrogation" means the right of the Plan to be substituted in your place with respect to any lawful claim, demand, or right of action against a third party who caused your injury or illness resulting in payment of Benefits.

The Plan has the right to be reimbursed for benefits paid or payable for you or your covered Dependent for an injury, illness, expense or loss caused by a third party. When a Plan Participant or Dependent makes a damage claim against a third party or his or her uninsured or underinsured automobile policy, the Plan may assert a lien on the proceeds of that claim in order to reimburse itself to the full amount of benefits it has been called upon to pay. The Plan's lien will apply to any and all recoveries or to any right of recovery (whether by lawsuit, settlement, or otherwise) for such claim. This provision does not allow the Plan's share of the recovery to be reduced because you or your Dependent do not receive the full amount of damages claimed or for your attorney's fees and costs, unless the Board of Trustees agrees, in writing, to the reduction.

Before to the Plan pays any benefits on account of the injury, illness, expense or loss caused by a third party, you or your Dependents may be asked to execute a written assignment to the Plan of all rights, claims, interests, or causes of action which you or your Dependents have to the full extent of such benefits. Further, you or your Dependents may be asked to authorize the Plan, at the Plan's expense, to sue, compromise or settle, in your or your Dependent's name(s) or otherwise, all such rights, claims, interest or causes of action to the full extent of the benefits paid and shall do nothing to prejudice the Plan's rights. In addition, you or your Dependents may be asked to swear that you or your Dependents have not discharged or released any such rights, claims, interests or causes of action. Failure to request or obtain any such document prior to the

Plan paying any benefits on behalf of you or your Dependents for any injury, illness, expense or loss caused by a third party will not in any way diminish the Plan's rights of subrogation and reimbursement.

Pursuant to directions received from the Board of Trustees, or its designee, you or your Dependents shall assist the Plan. Such cooperation shall include, if requested, the institution of legal proceedings against any appropriate persons, firms, corporations, or other entities.

**THIS PAGE INTENTIONALLY BLANK**

## *CONTINUATION COVERAGE*

### CONTINUATION COVERAGE (COBRA)

The Plan does **not** provide Plan Benefits for medical expenses incurred **after** your coverage ends. However, if you or your Dependents are covered under the metical Plan, such coverage can be continued for a limited time period if you lose coverage for a special reason, called a "Qualifying Event."

Continuation Coverage applies only to medical, dental, vision and prescription drug coverage and does **not** apply to life insurance, accidental death and dismemberment, or short term disability.

*Qualifying Event*

To be eligible to elect Continuation Coverage, you or your Dependent must **lose** coverage due to a Qualifying Event. A Qualifying Event is:

- Your termination of employment (but not for gross misconduct) or reduction of working hours;

- Your eligibility for Medicare;

- Your death;

- Your divorce or legal separation; or

- Any event under which a Dependent Child loses Dependent status.

---

**IMPORTANT**

For a Spouse or Dependent Child to be entitled to continue coverage, you or your Dependent must notify the Plan within 60 days after the Qualifying Event occurs. If the Plan does not receive written notice of a Qualifying Event within that 60-day period, the Spouse or Dependent Child will not be eligible for Continuation Coverage.

---

The following table provides the maximum period for which Continuation Coverage is available for each Qualifying Event.

| Qualifying Event | Employee | Spouse | Dependent Child(ren) |
|---|---|---|---|
| Employee terminated (for other than gross misconduct)* | 18 months | 18 months | 18 months |
| Employee reduction in hours worked (making employee ineligible for the same coverage)* | 18 months | 18 months | 18 months |
| Employee dies | N/A | 36 months | 36 months |
| Employee becomes divorced or legally separated | N/A | 36 months | 36 months |
| Employee becomes entitled to Medicare | N/A | 36 months | 36 months |
| Dependent Child ceases to have Dependent status | N/A | N/A | 36 months |

*Coverage for you and any other covered family members may be extended, for up to 11 additional months, if you are determined to be entitled to Social Security disability income benefits within 60 days of the first Qualifying Event.

If you choose Continuation Coverage, the Plan will provide coverage identical to the current coverage for similarly situated employees and family members.

### How to Elect COBRA Continuation Coverage

When your employment terminates or your hours are reduced so that you are no longer entitled to coverage under the Plan, or when the Fund Office is notified on a timely basis that you died, divorced or were legally separated, became entitled to Medicare, or that a Dependent child loses' dependent status, the Fund Office will give you and/or your covered Dependents notice of the date on which your coverage ends and the information and forms they need to elect COBRA Continuation Coverage.

You and/or your covered Dependents will have 60 days from the date the notice is received to apply for COBRA Continuation Coverage.

IF YOU AND/OR ANY OF YOUR COVERED DEPENDENTS DO NOT CHOOSE COBRA CONTINUATION COVERAGE WITHIN 60 DAYS AFTER RECEIVING THAT NOTICE, YOU AND/OR THEY WILL NOT HAVE ANY GROUP HEALTH COVERAGE FROM THIS PLAN AFTER COVERAGE ENDS.

COBRA Continuation Coverage may be elected for some members of the family and not others. In addition, one or more Dependents may elect COBRA even if the Employee does not elect it. However, in order to elect COBRA Continuation Coverage, the members of the family must have been covered by the Plan on the date of the Qualifying Event. A parent may elect or reject COBRA Continuation Coverage on behalf of Dependent children living with him or her.

### Acquiring a New Dependent(s) while Covered by COBRA

If you acquire a new Dependent through marriage, birth, or placement for adoption while you are enrolled in COBRA Continuation Coverage, you may add that Dependent to your coverage for the balance of the COBRA Continuation Coverage period. To enroll your new Dependent for COBRA coverage, you must notify your Participating Local Union Fund or Employer within 31 days of acquiring the new Dependent. There may be a change in your COBRA premium amount to cover the new Dependent.

### Loss of Other Group Health Plan Coverage or Other Health Insurance Coverage

If, while you are enrolled in COBRA Continuation Coverage, your Spouse or Dependent loses coverage under another group health plan, you may enroll the Spouse or Dependent for coverage for the balance of the period of COBRA Continuation Coverage. The spouse or dependent must have been eligible but not enrolled for coverage under the terms of the Plan and, when enrollment was previously offered under the Plan and declined, the Spouse or Dependent must have been covered under another group health plan or had other health insurance coverage.

You must enroll the Spouse or Dependent within 31 days after the termination of the other coverage. Adding a Spouse or Dependent child may cause an increase in the amount you must pay for COBRA Continuation Coverage.

The loss of coverage must be due to exhaustion of COBRA Continuation Coverage under another plan, termination as a result of loss of eligibility for the coverage, or termination as a result of Employer contributions toward the other coverage being terminated. Loss of eligibility does not include a loss due to failure of the individual or participant to pay premiums on a timely basis or termination of coverage for cause.

### Multiple Qualifying Events

If your maximum period of Continuation Coverage is 18 months, and during that period another Qualifying Event occurs, the 18-month period will be extended for another 18 months. The total period of Continuation Coverage may never exceed 36 months from the date of the first Qualifying Event, except in cases where there is a second qualifying event for your Dependents if that event is your eligibility for Medicare. In that case, your Dependents will be entitled to a 36-month period of COBRA Continuation Coverage beginning on the date on which you became entitled to Medicare.

### Entitlement to Social Security Disability Income Benefits

If you are determined to be entitled to Social Security disability income benefits, COBRA Continuation Coverage can be extended for you and your covered Dependents for up to 11 additional months if:

- your Disability occurred before or within the first 60 days of Continuation Coverage;

- you notify the Plan of your Disability determination within the first 18-month period of Continuation Coverage.

This extended period of COBRA coverage will end on the earlier of:

- The last day of the month, 30 days after the Social Security Administration has determined that you and/or your Dependent(s) are no longer Disabled;

- the end of 29 months from the date on which the COBRA qualifying event occurred; or

- the date on which the Disabled individual becomes entitled to Medicare.

### Cost for Continuation Coverage

The cost for Continuation Coverage is 102% of the full cost for coverage under the Plan of a person in the same or similar geographic location. However, if your coverage is extended beyond 18 months due to disability, the cost during the 11-month extension is 150% of the full cost for coverage under the Plan of a person in the same or similar geographic location.

You must pay for your Continuation Coverage at the beginning of each month. There is an initial 45-day grace period to pay the first amounts due starting with the date Continuation Coverage was elected. In addition, there is a 30-day grace period to pay subsequent monthly premiums. If any payment is not received by the end of the applicable grace period, your Continuation Coverage will terminate permanently.

### Confirmation of Coverage to Health Care Providers

Under certain circumstances, federal rules require the Fund to inform your health care providers as to whether you have elected and/or paid for COBRA Continuation Coverage. This rule only applies in situations where the health care provider is requesting confirmation of coverage and you are eligible for, but have not yet elected, COBRA coverage, or you have elected COBRA coverage but have not yet paid for it.

### TERMINATION OF CONTINUATION COVERAGE

Continuation Coverage may be terminated if:

- the group health coverage offered by this Plan terminates;

- you do not pay the applicable premium for your Continuation Coverage on time;

- the covered person is or becomes entitled to Medicare; or

58

- the covered person is or becomes covered under another group health plan that does not contain an applicable pre-existing condition exclusion or limitation.

If any covered person becomes entitled to Medicare, the Continuation Coverage of that person ends, but the Continuation Coverage of any covered Spouse or Dependent Child of that covered person will not be affected.

59

**THIS PAGE INTENTIONALLY BLANK**

## YOUR *ERISA* RIGHTS

As a participant in the Graphic Communications National Health and Welfare Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

- Examine, without charge, at the Fund Office all Plan documents filed with the U.S. Department of Labor, such as the plan document. If you wish to examine any of the Plan documents outside the Fund Office, you must submit a written request to:

    Graphic Communications National Health and Welfare Fund
    1900 L Street, N.W.
    Washington, D.C. 20036

    You will be sent a copy of the Plan documents you request.

- Obtain copies of all Plan documents and other Plan information on written request to the Administrator. The Administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report. The Plan is required by law to furnish each participant with a copy of this summary annual report.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your Employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have your claim reviewed and reconsidered upon request.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the Administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

## OTHER INFORMATION

**NAME OF THE PLAN**
Graphic Communications National Health and Welfare Plan

**NAME AND ADDRESS OF PLAN SPONSOR**
Board of Trustees
Graphic Communications National Health and Welfare Fund
1900 L Street, N.W.
Washington, D.C. 20036

Participants may obtain a complete list of the Employers participating in the Plan upon written request to the Fund Office, where it is also available for examination by Plan Participants.

**PLAN TAX IDENTIFICATION NUMBER**
52-2045099

**PLAN NUMBER**
501

**TYPE OF PLAN**
The Plan is a welfare benefits plan, including:

Medical, Medicare supplemental benefits, dental, vision, prescription drug, life insurance, accidental death and dismemberment, and weekly disability benefits.

**TYPE OF ADMINISTRATION**
The Board of Trustees is comprised of an equal number of Union and Employer representatives. The Board of Trustees has engaged Central Data Services, Inc. to administer the day-to-day operations of the Plan and to pay claims.

National Prescription Administrators administers payment for prescription drug claims. National Vision Administrators administers payment for vision care.

Aetna Life and Casualty insures the life insurance and accidental death and dismemberment benefits provided by the Plan.

The Board of Trustees has negotiated contracts with Private HealthCare Systems and Associates for Health Care as Preferred Provider Organizations.

**AGENT FOR SERVICE OF LEGAL PROCESS**
For disputes arising under the Plan, service of legal process may be made on the Secretary of the Fund.

**PLAN TRUSTEES**

The Trustees of the Plan are:

**TRUSTEES**

**UNION/LABOR**

Mr. Andrew Douglas
GCIU Local #14-M
1310 Sedgley Avenue
Philadelphia, PA 19134

Mr. Joseph Alves
GCIU Local 471-M
403 Nicholson Street
Joliet, IL 60435

Mr. Robert Barber
President
GCIU Local #449-S
2310 Minnesota Avenue, SE
Washington, DC 20020

Mr. Mike Basham
GCIU Local #787-C
P.O. Box 398
Salem IL 62881

Mr. Gordon Beukema
3007 Chapshire SE
Grand Rapids, MI 49546

Ms. Lorraine McClure
GCIU Local #20-B
25600 Woodward Ave.
Suite 100
Royal Oak, MI 48067-0944

Mr. Brad Cagle
GCIU Local #404-M
518 West Duarte Road
Monrovia, CA 91016

Mr. Thomas Englebert
GCIU Local #77-P
1300 American Dr.
Neenah, WI 54956

Mr. Gerald Hartwell
GCIU Local #554-M
#32 Business Center South
P.O. Box 185
Salem, IL 62881

Mr. Dennis Hicks
GCIU Local #39-B
P.O. Box 803
Effingham, IL 62401

Mr. Robert Lacey
GCIU Local #571-M
516 N. Fares Ave.
Suite E
Evansville, IN 47720

Mr. Kaywood Van Note
GCIU Local #303-M
1010 N. Main St.
Speedway, IN 46224

Mr. James Miller
GCIU Local #235-M
10221 E. 40 Highway
Independence, MO 64055

Mr. James Miller
GCIU Local #391-C
P.O. Box 825
Effingham, IL 62401

Mr. Gerald Weikel
GCIU Local #144-B
8957-D Edmonston Road
Greenbelt, MD 20770

**TRUSTEES**

**EMPLOYER/MANAGEMENT**

Mr. Joseph Lackman
Villas at Golf View
1489 Palmer Drive
Springfield, PA 19064

Mr. Steve W. Bearden
Linemark Printing, Inc.
1220 Caraway Court
Suite 1040
Largo, MD 20774

Ms. Judy Clark
Clark Graphics
21914 Schmenan
Warren, MI 48089

Ms. Shari Davidson
Director of Benefits
Quebecor World (USA), Inc.
340 Pemberwick Road
Greenwich, CT 06831

Mr. Daniel G. Daywalt
Group Vice President
Human Resources
Quebecor World (USA), Inc.
One Pierce Place, Suite 800
Itasca, IL 60143

Mr. Chris Feagans
Keller-Crescent Co.
1100 E. Louisiana St.
Evansville, IN 47701

Mr. Michael Frazier
McArdle Printing Co., Inc.
800 Commerce Drive
Upper Marlboro, MD 20774

Mr. John Hilderbrand
Ivy Hill Packing
P.O. Box 3189
Terre Haute, IN 47803

64

65

Mr. Carl Jankowski
937 Westfield Lane
Neenah, WI 54956

Mr. Robert Saxer
Director, Labor Relations
Quebecor World (USA), Inc.
Salem Division
3935 Selmaville Road
P.O. Box 1210
Salem, IL 62881

Mr. Robert Lindgren
P.I.A.
5800 South Eastern Ave.
Los Angeles, CA 90040

Mr. Brian Simcox
9527 Red Cloud Ct.
Leo, IN 46765

Mr. Thomas Pfeiffer
Commercial Litho
1226 Chestnut
Kansas City, MO 64127

Mr. Robert Smith
Colortone Press
1017 Brightseat Road
Landover, MD 20785

Mr. Bruce Rheinecker
Group Controller
Quebecor World (USA), Inc.
Effingham Division
2701 South Banker
P.O. Box 929
Effingham, IL 62401

Mr. Nick Wagner
Printing Industries of MI
23815 Northwestern Highway
Suite 2700
Southfield, MI 48075

### SECRETARY TO FUND

Mr. Lawrence Martinez
GCIU
1900 L Street, NW
Washington, DC 20036-5080

## COLLECTIVE BARGAINING AGREEMENTS

This Plan is maintained under several Collective Bargaining Agreements. Plan Participants may obtain copies of any such Agreements upon written request to your Participating Local Union Fund or Employer, where it also is available for examination by Plan Participants.

## PLAN YEAR

The Plan Year is the 12-month period beginning each October 1 and ending on the following September 30.

66

## PLAN AMENDMENTS OR TERMINATION

The Board of Trustees reserves the right to amend or terminate this Plan, or any part of it, at any time in a manner consistent with the terms set forth in the Plan document.

## DISCRETIONARY AUTHORITY OF THE BOARD OF TRUSTEES AND ITS DESIGNEES

In carrying out their respective responsibilities under the Plan, the Board of Trustees, the Administrator and other individuals with delegated responsibility for the administration of the Plan, will have discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan Benefits in accordance with the terms of the Plan. Any interpretation or determination will be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

## NO LIABILITY FOR PRACTICE OF MEDICINE

The Fund, the Board of Trustees and their designees are **not** engaged in the practice of medicine, and have no control over any diagnosis, treatment, care or lack thereof, or any health care services provided or delivered to you by any health care provider. The Fund, the Board of Trustees and their designees bear no liability for loss or injury caused by any health care provider by reason of negligence, failure to provide care or treatment, or otherwise.

## PRIVACY, CONFIDENTIALITY, RELEASE OF RECORDS OR INFORMATION

Any information collected by the Plan will be treated as confidential information, and will not be disclosed without your written consent, except as required to:

- Administer the Plan or to process claims;
- Coordinate with a plan or insurer that provides duplicate coverage;
- Determine if health care services, supplies or charges are Medically Necessary or Usual and Customary; and
- Comply with law or regulations, or respond to a duly issued subpoena.

## INFORMATION YOU OR YOUR DEPENDENTS MUST FURNISH TO THE PLAN

In addition to information you must furnish in support of any claim for Plan Benefits under this Plan, you or your covered Dependents must furnish, within **60 days** after the event, any information that may affect eligibility for coverage under the Plan. This includes, but is not limited to:

- Change of name;
- Change of address;
- Marriage, divorce, or death;
- Any information regarding the status of a Dependent Child, including, but not limited to:

  - Attaining the Plan's limiting age;
  - School status, if over age 19; and
  - Existence of any physical or mental Handicap.

67

Medicare coverage; and

Coverage under other medical or dental plans.

## CERTIFICATION OF COVERAGE

If you or your Dependents lose coverage under this Plan for any reason, the Health Insurance Portability and Accountability Act of 1996 (HIPAA) requires the Plan to provide you a certificate showing your period of coverage. You may also request a certificate of coverage from the Administrator at any time within the first 24 months after your coverage ends.

You will be required to furnish this certificate if you seek coverage under another group health plan with a preexisting condition limitation. If the new plan imposes a waiting period for a preexisting condition, the waiting period may be reduced by your period of coverage under this Plan if you meet certain other requirements. The new plan will notify you of all the requirements you must meet.

## ASSIGNMENT OF BENEFITS

Benefits under this Plan are not subject to assignment; however, you may direct the Plan to pay medical benefits, otherwise payable to you, directly to the provider. The Plan will not be legally obligated to accept such a direction, and no payment by the Plan pursuant to such a direction shall be considered as a recognition by the Plan of any obligation to pay a provider, except to the extent the Plan actually chooses to do so.

**THIS PAGE INTENTIONALLY BLANK**

68

69

THIS PAGE INTENTIONALLY BLANK

*QUICK REFERENCE CHART*

| For information on: | You should contact: |
| --- | --- |
| Fund administration, claims, eligibility, benefits, Weekly Disability Benefits, Dental | Graphic Communications National Health and Welfare Fund<br>Five Gateway Center, Suite 620<br>60 Boulevard of the Allies<br>Pittsburgh, PA 15222<br>Phone: 800-943-4248(GCIU)<br>Fax: 412-201-2250 |
| PPO providers, precertification and medical review; utilization management | Private HealthCare Systems<br>1100 Winter Street<br>Waltham, MA 02154<br>Phone: 800-226-2153<br>Fax: 781-895-3477<br>www.phcs.com<br><br>Associates for Health Care<br>18650 West Corporate Drive, Suite 310<br>Brookfield, WI 53008<br>Phone: 800-952-8661<br>Fax: 262-879-0876 |
| Vision | National Vision Administrators<br>711 Ridgedale Avenue<br>East Hanover, NJ 07936<br>Phone: 800-672-7723<br>Fax: 973-503-1095 |
| Life Insurance and Accidental Death and Dismemberment | Aetna Life and Casualty<br>151 Farmington Avenue, MB4J<br>Hartford, CT 06156<br>Phone: 860-636-8012<br>Fax: 860-636-0068 |
| Prescription Network | National Prescription Administrators<br>711 Ridgedale Avenue<br>East Hanover, NJ 07936<br>Phone: 800-526-7813<br>Fax: 973-503-1085 |

E-Mail:

Writer's Direct Dial Number:

March 10, 2003

Appeals Committee
Graphic Communications National Health & Welfare Fund
Five Gateway Center, Suite 620
60 Boulevard of the Allies
Pittsburgh, PA 15222-1219

Re:    Insured:
        Patient:

Dear Appeals Committee:

I am appealing the denial of the claims I previously submitted on behalf of my daughter,                , for an emergency room visit in Bloomington, Indiana in December, 2002, and a dental bill in January, 2003.        is 23 years old and is a full-time student at Indiana University School of Law in Bloomington, Indiana. We made an inquiry of the Fund late last year regarding her coverage status. We were specifically told that so long as she remained a full-time student and had not reached the age of 24, she would remain covered. We are now informed that this information is incorrect. These expenses were incurred based upon the assumption that she remained a covered person. Under the circumstances we are requesting that you reconsider your decision to deny these claims.

Very truly yours,

RECEIVED

MAR 1 2 2003

GRAPHIC COMMUNICATIONS
NATIONAL HEALTH & WELFARE FUND

EXHIBIT
3



**GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND**

Five Gateway Center, Suite 620  •  60 Boulevard of the Allies  •  Pittsburgh, PA 15222-1219

(412) 201-2233  •  (800) 943-4248  •  Fax (412) 201-2250

May 8,2003

Claim Appeal GCNHWF003-010

Dear

Your letter of appeal was received March 12,2003 has been reviewed.

We have reviewed your claim for services provided to you under the GCIU National Health and Welfare Plan. Please refer to the Summary Plan Book page 1-11, Definitions, which reads as follows:

**Dependent, Dependent Child(ren)**

An Employee's or Retiree's lawful Spouse and unmarried child, including any stepchild, or a child placed with the Employee or Retiree for adoption or legally adopted by an Employee or Retiree, or any such child for whom the Employee or Retiree are legally obligated to provide support, provided:

- The child has not reached age 19;or
- The child has not reached age 23 and attends an accredited college, university or vocational school on a full time basis and is dependent solely on you for financial support

Coverage of a Dependent Child may continue beyond age 19 (or 23 if a full time student) for any unmarried child who is mentally or physically Disabled and is

- Incapable of self sustaining employment as a result of that Disability; and
- Dependent chiefly on you for support and maintenance.



EXHIBIT

4

The plan may require proof of full time student status, Disability, age and financial support from time to time.

A COBRA letter dated 12/04/01 was sent to                 stating that her coverage with the GCIU National Health and Welfare Fund was terminating as of 06/01/01.

In accordance with the provisions of the Plan as described above, we have determined that an additional allowance is not justified.

Sincerely,

Appeals Committee

Apr-30-03 12:48P GCIU LOCAL 577-M          414 476-2022_____    P.01



## SOUTHERN WISCONSIN LOCAL 577-M
### GRAPHIC COMMUNICATIONS INTERNATIONAL UNION

633 South Hawley Road, Suite 100 • Milwaukee, Wisconsin 53214
Telephone: (414) 476-1577 • Toll Free: 888-477-6331 • FAX: (414) 476-2022
Website: www.gciu577m.org • Email: gciu577m@aol.com

Sent via Fax to: 412-201-2250
and regular mail

April 30, 2003

Graphic Communications
National Health & Welfare Fund
Five Gateway Center, Suite 620
60 Boulevard of the Allies
Pittsburgh, PA 15222-1219

Dear Board of Trustees:

I am writing this letter on behalf of ,          y employee of Arandell Corporation.
.   e has been employed at Arandell Corp. since February 14, 2000 and a participant of
the National Fund since October 2000.    e is a Hispanic male whose second language
is English. In my conversation with him he has demonstrated a very limited vocabulary
and reading comprehension with the English language.

_____   s medical claims for the birth of his daughter    a, December 3, 2002
were denied. Reasons for denial was that he did not provide the required notice within
60 days of the birth as required for eligibility.

s wife was receiving prenatal care for this pregnancy. Pre-authorization for the
birth is generally required which would provide a form of notice to Fund.

's ability to read and understand the summary plan document benefits
booklet due to his language barrier has created this unfortunate situation

y has had a previous birth in his family under this plan (5-1-01)     se states
his previous experience did not require notification for coverage of that birth yet those
claims were paid on his behalf.    e had no knowledge he was not in compliance based
on his past experience.

In light of this information, I am requesting reconsideration of his benefit determination

Thank you for your consideration

Sincerely,



EXHIBIT
5



**GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND**

Five Gateway Center, Suite 620  •  60 Boulevard of the Allies  •  Pittsburgh, PA 15222-1219

(412) 201-2233  •  (800) 943-4248  •  Fax (412) 201-2250

June 6, 2003

Milwa

RE Claim Appeal GCNHWF03-017

Dear

Your letter of appeal dated April 30, 2003 has been received and reviewed.

It has been determined that the expenses associated with your appeal are not covered under the provisions of the GCIU National Health and Welfare Fund.  Please refer to the Plan provisions, on page 13 of the Summary Plan Description Booklet that reads as follows:

Coverage for your newly acquired Spouse and /or Dependent Child(ren) will begin as follows:

- If you do not enroll your Spouse or Dependent Child(ren) for coverage within 60 days of the date of marriage, birth, adoption or placement for adoption, their coverage will be effective on the first day of the month following enrollment.

Regarding the previous birth in the family under this Plan, the National Fund Plan was notified by the employer within the timely guidelines as stated above.

In accordance with the provision of the Plan as described above, we have determined that an additional allowance is not justified.

We regret this determination could not be more favorable.

Sincerely

Appeals Committee

EXHIBIT

6

Blumberg No. 5119

EXHIBIT 7

# Graphic Communications National Health and Welfare Fund

## TERMINATION and CHANGE FORM

4/7/06 - ESI

Five Gateway Center, Suite 620
60 Boulevard of the Allies
Pittsburgh, PA 15222
1-800-943-4248    Fax 412-201-2250

GCIU

| Employee (Last) | (First) | (M.I.) | SSN |
|---|---|---|---|
| Cox | Madeline | | 187 - 42 - 3648 |

Only complete the sections where a change has occurred.

If you have any questions or need additional forms, please call (800) 943-GCIU(4248). After the form has been completed, please submit the Termination and Change Form to the above address or FAX.

**Please check** the changes that you need to make to your member records:

- ☐ Change of Address (Phone)
- ☐ Change Marital Status
- ☐ Change Dependent Status
- ☐ Change of Name
- ☐ Change Agreement Type
- ☐ Add Dependent(s)
- ☐ Add Newborn(s)
- ☐ Delete Dependent(s)
- ☐ Terminate Coverage
- ☐ Other _____
- ☐ Retired _____ Date _____

**If terminating** coverage, please check the reason:       **REQUIRED FIELD**

- ☐ Left Employer   ☐ Medicare eligible
- ☐ Laid Off   ☐ No longer eligible   ☐ Deceased   ☒ Other  RETIRED

Agreement Type after change:
- ☐ Single Contract
- ☐ Husband/Wife Contract
- ☐ Parent/Child Contract
- ☐ Parent/Children Contract
- ☐ Family Contract
- ☐ No Agreement Change

Please give a brief description of the changes to be made.

Send Cobra Letter

## ONLY COMPLETE THE SECTIONS THAT APPLY TO **CHANGES** IN MEMBERSHIP RECORDS.

| Home Address | | City | | State | | Zip Code |
|---|---|---|---|---|---|---|

| Home Phone | | Work Phone | | Effective Date of Coverage Change  4-1-06 | | Marriage Date |
|---|---|---|---|---|---|---|

| | Employee | | | Spouse | | | Dependent | | | Dependent | | | Dependent | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ☐ Add ☐ Drop ☐ Change | | | ☐ Add ☐ Drop ☐ Change | | | ☐ Add ☐ Drop ☐ Change | | | ☐ Add ☐ Drop ☐ Change | | | ☐ Add ☐ Drop ☐ Change | | |
| Soc. Sec. No. | — — | | | — — | | | — — | | | — — | | | — — | | |
| Previous Last Name | | | | | | | | | | | | | | | |
| Current Last Name | Last | | | Last | | | Last | | | Last | | | Last | | |
| First Name Middle Initial | First        M.I. | | | First        M.I. | | | First        M.I. | | | First        M.I. | | | First        M.I. | | |
| Sex | ☐ Male ☐ Female | | | ☐ Male ☐ Female | | | ☐ Male ☐ Female | | | ☐ Male ☐ Female | | | ☐ Male ☐ Female | | |
| Membership Status | Employee  ☐ Single ☐ Married | | | Spouse | | | ☐ Child ☐ Student over 19 ☐ Handicapped | | | ☐ Child ☐ Student over 19 ☐ Handicapped | | | ☐ Child ☐ Student over 19 ☐ Handicapped | | |
| Birthdate | Month  Day  Year | | | Month  Day  Year | | | Month  Day  Year | | | Month  Day  Year | | | Month  Day  Year | | |

Authorizing Local Fund Office's / Employer
Signature and Date _____ 4/4/06 _____ Group Number _____

GCIU 016 1/02        WHITE COPY: CLAIMS OFFICE    CANARY COPY: LOCAL UNION FUND OFFICE / EMPLOYER    PINK COPY: PARTICIPANT

# Graphic Communications
# National Health & Welfare Fund

5 Gateway Center, Suite 620
60 Boulevard of the Allies
Pittsburgh, PA 15222

Toll Free: 1 (800) 943-4248      Fax: (412) 201-2250

04/07/2006

**COBRA CONTINUATION COVERAGE NOTICE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*TERMINATION OF HEALTH INSURANCE COVERAGE*

Madeline Cox, Spouse and Eligible Dependent
2613 Apple Way
Dunkirk, MD 20754

Dear Madeline Cox, Spouse and Eligible Dependent:

This is to advise you that you and your spouse/dependents are no longer eligible to be covered under the Graphic Communications National Health and Welfare Fund as of 04/01/2006, which is the date of your "qualifying event". You have the option to continue your present group health benefits under your Local Union for 18 months beyond this date. This option is called COBRA Continuation Coverage. If you and your family were receiving coverage under your Local Union prior to your qualifying event, as qualified beneficiaries you may elect to continue coverage for you and your family under COBRA, or you, your spouse and/or your dependents may independently elect to be covered under COBRA Continuation Coverage.

COBRA Continuation Coverage is the same health coverage that you (and any covered dependents, if applicable) had previously under your Local Union. *Life insurance and weekly disability benefits are not available under COBRA.* However, if you were receiving Prescription Drug, Dental and/or Vision benefits at the time your coverage ended, you (and any covered dependents) will be allowed to choose continuation of any, or all, of these previous benefits.

Because of the additional coverage offered under the GCC / IBT Staff Plan, you will also have the option to continue your supplemental benefits for Prescription Drug and Vision coverage (in addition to the standard benefits described above). Please refer to the enclosed election sheet for supplemental coverage rates.

EXHIBIT

8

<u>COBRA Continuation Coverage Letter (page 2)</u>

You have sixty (60) days from the date of this notice (06/07/2006) to elect COBRA
Continuation Coverage.  The cost of this coverage is listed on the attached election
form.  Please be aware that this rate is subject to change due to either a change in
benefits provided, or the expiration of the premium rate that is currently in effect. At that
time, you will be notified of any benefit or rate changes, as well as the reason for the
change.

If you choose to elect COBRA Continuation Coverage, and make timely payment of the
necessary premium, COBRA benefits under this Plan will continue until the earliest of
the following dates:

➢ 18 months from the date of your qualifying event; OR 29 months from the date of
   your qualifying event in the event the Social Security Administration determines that
   you or your dependent(s) were disabled as of the date of your qualifying event (or
   within sixty (60) days thereafter).  This extension to 29 months will also be applicable
   to your spouse/dependents if you are determined to be disabled.  **You must contact
   your Local Union Office WITHIN 60 DAYS OF THE DATE OF THE
   DETERMINATION (and within the original 18 month COBRA period) if this
   applies to you:**

➢ The date you become covered under any other group health plan, provided the other
   plan does not contain any exclusion or limitation with respect to the qualified
   beneficiary's pre-existing condition (Contact your Local Union office if this applies to
   you);

➢ The date you become entitled to Medicare benefits;

➢ The date your employer no longer has an obligation to contribute to this Fund;

➢ The date this Plan no longer provides group health coverage; or

➢ The date the monthly premium for this coverage is not paid on time.

If any qualified beneficiaries have COBRA coverage for 18 months (including a qualified
beneficiary born, adopted by, or placed for adoption with you) and a second qualifying
event occurs while they are covered under COBRA, their continuation of coverage can
be extended for up to 36 months from the date of the original qualifying event.  Second
qualifying events include your death; your becoming eligible for Medicare, a divorce or
legal separation, or if your child no longer qualifies as a dependent under your Local
Union eligibility provisions.  *If such an event occurs, the qualified beneficiary should
contact his / her Local Union office.*

## COBRA Continuation Coverage Letter (page 3)

If you choose to continue coverage under COBRA, your first payment will be for the month starting on 04/01/2006. Please include your Social Security Number on your check, and send it to your Local Union office with the enclosed election form. This first payment will be due no later than 45 days after the date you sign the election form and return it to your Local Union Office. Subsequent monthly payments will be due on the first day of the calendar month for which coverage is to be provided, with a grace period of 30 days.

Please keep in mind that **you must make all retroactive payments before your coverage continuation becomes effective. In addition, once your continuation of coverage terminates for non-payment of premium, it cannot be reinstated.**

You should also be aware that any claims received for expenses incurred on or after 04/01/2006 will not be payable by your Local Union unless the applicable self-payments are made on time.

Please complete the enclosed election form and return it to your Local Union office. If you have any questions, you can write or call your Local Union office.

Sincerely,

The Graphic Communications National Health and Welfare Fund
Claims Administration Office

# GRAPHIC COMMUNICATIONS NATIONAL HEALTH & WELFARE FUND

5 Gateway Center, Suite 620
60 Boulevard of the Allies
Pittsburgh PA 15222
Toll Free: 1 (800) 943-4248    Fax: (412) 201-2250

## COBRA CONTINUATION COVERAGE ELECTION FORM

04/07/2006

Print Name:    Madeline Cox, Spouse and Eligible Dependent

Social Security #: 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

Address: 2613 Apple Way, Dunkirk, MD 20754

Effective date of COBRA: 04/01/2006

Please elect coverage as noted below:

| COVERAGE OFFERED: | MONTHLY COST | ELECTION YES  NO |
|---|---|---|
| Medical | $ 1588.59 | |
| Prescription Drug | $ 322.33 | |
| Prescription Drug (supplemental) | $ 6.84 | |
| Dental | $ 103.41 | |
| Vision (supplemental cov'g only) | $ 7.94 | |

Please list all dependents to be covered under COBRA, if applicable.  Please note that only dependents eligible at the qualifying event date (04/01/2006) may continue on COBRA.

| NAME OF DEPENDENT | RELATIONSHIP | SOC SEC # | DATE OF BIRTH |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Signature: _____    Date: _____

## CERTIFICATE OF GROUP HEALTH PLAN COVERAGE

### ***KEEP THIS DOCUMENT FOR YOUR RECORDS***

**\*IMPORTANT- This certificate provides evidence of your prior health coverage. You may need to furnish this certificate if you become eligible under a group health plan that excludes coverage for certain medical conditions that you have before you enroll. This certificate may need to be provided if medical advice, diagnosis, care, or treatment was recommended or received for the condition within the 6-month period prior to your enrollment in the new plan. If you become covered under another group health plan, check with the plan administrator to see if you need to provide this certificate. You may also need this certificate to buy, for yourself or your family, an insurance policy that does not exclude coverage for medical conditions that are present before you enroll.**

1.  Date of this certificate:            04/07/2006

2.  Name of group health plan:     **GRAPHIC COMMUNICATIONS NATIONAL HEALTH AND WELFARE FUND**

3.  Name of participant:               Madeline Cox, Spouse and Eligible Dependent

4.  Identification number of participant:  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

5.  Name of any dependents for whom this certificate applies: William and Natalie Cox

6.  Name, address, and telephone number of plan administrator or issuer responsible for providing this certificate:

    **Graphic Communications National Health & Welfare Fund**
    **5 Gateway Center**
    **Suite 620**
    **60 Boulevard of the Allies**
    **Pittsburgh, PA 15222**

    **1-800-943-4248**

7.  If the individual(s) identified in line 3 and line 5 has at least 18 months of creditable coverage (disregarding periods of coverage before a 63-day break), check here __X__ and skip lines 9 and 10.

8.  Date waiting period of affiliation period (if any) began: _____

9.  Date coverage began: _____

10. Date coverage ended: 03/31/2006
    (or check if coverage is continuing as of the date of this certificate: _____).

**NOTE: Separate certificates will be furnished if information is not identical for the participant and each beneficiary.**

**BOHN & KOURETAS, PLC**
Attorneys & Counselors at Law
2009 N. 14th Street, Suite 400
Mailing Address: P.O. Box 17811
Arlington, Virginia 22216

GEOFFREY M. BOHN, (DC, MD, VA)
DIMITRIS KOURETAS (DC, MD)
ROBERT A. BATTEY (DC, MD)

(703) 842-8089 (Fax)
bohn_kouretas_plc@yahoo.com

VIRGINIA

MARYLAND

WASHINGTON D.C

April 2, 2007

Graphic Communications National Health
and Welfare Fund
Five Gateway Center, Suite 620
Attn: Ms. Kim B.
60 Boulevard of the Allies
Pittsburgh, PA 15222

Re:   **NOTICE OF CLAIM OF PLAN BENEFITS**
Denial of Health and Welfare Benefits
Plan Participant: Madeline Cox, Spouse and Eligible Dependent
Date of Termination of Health Insurance Coverage: 4/7/06
Our File No     155

Dear Graphic Communications National Health and Welfare Fund:

Further to my conversation earlier today with your office, by cover of this correspondence, please be advised that, as counsel for the referenced Plan Participant, a written Notice of Claim of Plan Benefits (Notice) is hereby submitted on behalf of said Plan Participant, Madeline Cox, Spouse and Eligible Dependent  Accordingly, pursuant to the subject Notice, the referenced Plan Participant requests, *inter alia,* that your written April 7, 2006 Termination of Health Insurance Coverage (Termination) issued to the Plan Participant be reconsidered; that health insurance coverage be reinstated to the Plan Participant; and that the Plan Participant receive restitution for any health and welfare premiums and/or costs paid out-of-pocket or otherwise incurred from the date of the April 7, 2006 Termination. Please contact me directly to further resolve this matter.

Your attention to this matter is greatly appreciated. Thank you

Yours very truly,

Geoffrey M. Bohn

cc:   Ms. Madeline Cox
Letter1

| | |
|---|---|
| Geoffrey M Bohn | (703) 599-7076 – Direct dial |
| Dimitris Kouretas | (202) 641-1418 – Direct dial |
| Robert A Battey | (202) 491-4214 – Direct dial |

EXHIBIT
9